## UNITED STATES DISTRICT COURT
### DISTRICT OF MINNESOTA

INSIGNIA SYSTEMS, INC.,                )
                                       )   Case No. 19-cv-1820 (MJD/BRT)
            Plaintiff,                 )
                                       )   **DEFENDANTS' MEMORANDUM**
      v.                               )   **IN SUPPORT OF ITS MOTION FOR**
                                       )   **SUMMARY JUDGMENT ON THE**
NEWS CORPORATION, NEWS AMERICA         )   **COUNTERCLAIM**
MARKETING FSI, L.L.C., and NEWS        )
AMERICA MARKETING IN-STORE             )
SERVICES L.L.C.,                       )
                                       )
            Defendants.                )

## INTRODUCTION

In 2004, Insignia filed an antitrust suit in this Court against Defendant News

America Marketing In-Store Services LLC ["NAM"], Case No. 04-cv-04213, Dkt. 1

("*Insignia I*"). On February 9, 2011, the parties to *Insignia I* entered a Settlement

Agreement to "forever put to rest all disputes and claims" between them. Declaration of

Todd Wind in Support of Motion for Summary Judgment ("Wind"), Ex. 1 (Settlement

Agreement), at 1. For $121 mm, Insignia not only released all claims of any kind that

were made or that could have been made through the date of the Agreement, but also

agreed to a broad covenant prohibiting it from even "attempt[ing] to introduce as

evidence, or otherwise assert" any of the pre-release "facts or conduct" underlying any of

the released matters in "any" future court proceeding. *Id.* ¶ 9.

One year ago, Insignia filed the Complaint not only alleging most of the antitrust

theories pleaded more than a decade ago, but quoting the same testimony that Insignia

had already cited in the course of *Insignia I*. Last January, Insignia conceded that it had

relied on pre-2011 evidence in the Complaint.  In Defendants' Motion for Judgment on the Pleadings, Defendants pointed the Court to *Insignia I* pleadings where Insignia cited the same facts and conduct it relies on in the Complaint.  Wind Ex. 2 (Defendants' Mem. in Support of 12(c) Motion), at 11-15.  Insignia acknowledged the source material for its allegations, but argued that the pre-2011 evidence of the alleged anticompetitive scheme was just too important to leave out; at the motion hearing, Insignia admitted that without the pre-2011 evidence, its "case [is] harder to prove."  Wind Ex. 3 (January 14, 2020 Hearing Tr.), at 73:2-3.

On that point, the parties are in heated agreement: the law is clear that the vertical restraints at the heart of *Insignia I* and this action, such as exclusivity provisions in contracts with retailers, are not *per se* illegal; these provisions promote competition, and they do not support an antitrust case without pleading and proof that they are part of an anticompetitive scheme that creates more consumer harm than benefit.  *See Continental TV, Inc. v. GTE Sylvania, Inc.*, 433 U. S. 36, 57-59 (1977); *Double D Spotting Serv., Inc. v. Supervalu, Inc.*, 136 F.3d 554, 559 (8th Cir. 1998) (vertical restrictions are "governed by" the Rule of Reason, as "they 'promote interbrand competition'") (quoting *GTE*, 443 U.S. at 54); *Lomar Wholesale Grocery, Inc. v. Dieter's Gourmet Foods, Inc.*, 824 F.2d 582, 590 (8th Cir. 1987).  The fact that Insignia may not have another antitrust case to pursue without violating the Settlement Agreement does not justify proceeding any farther; in fact, the opposite is true.  *See Insulate SB, Inc. v. Advanced Finishing Systems, Inc.*, 797 F.3d 538, 543 (8th Cir. 2015) (given burdens imposed by antitrust suits, courts have been "reasonably aggressive in weeding out" meritless cases).

The Court denied Defendants' Motion for Judgment on the Pleadings, finding that the record on the impact of the Settlement Agreement on this litigation was not sufficiently developed to decide the legal issue raised by the Motion, but the Court directed the parties to complete discovery on that issue in expedited fashion, to allow for an early summary judgment motion. Wind Ex. 4 (Report & Recommendation ["R&R"]), at 8-11. Since then, Insignia has done all that it can (and some things it should not have done) to try to prevent Defendants from developing the factual record invited by the Court. That discovery now confirms that Insignia has done exactly what the Settlement Agreement forbids.

The undisputed facts demonstrate that:

- The undated but critical allegations that NAM acknowledged an anticompetitive scheme calculated to injure competition are all based exclusively on pre-2011 facts and conduct underlying released claims;

- The undated allegations of the origins and acquisition of monopoly power are all based on pre-2011 facts and conduct underlying released claims;

- The undated allegations that NAM deployed exclusionary contracting practices are also based at least in substantial part on pre-2011 facts and conduct underlying released claims;

- Even the few dated allegations of NAM interfering with Insignia's opportunities rest, along with the balance of the Complaint, on the allegation that NAM has been implementing the anticompetitive scheme allegedly admitted in pre-2011 testimony.

And, as the record also shows, Insignia's breach was no foot fault – Insignia is attempting to assert facts and conduct barred by the Settlement Agreement because it seeks to taint otherwise lawful business practices. This Court should enforce the Settlement Agreement by granting summary judgment on Defendants' Counterclaim, find that Insignia has asserted in its Complaint facts or conduct underlying the matters released in the Settlement Agreement, and dismiss the Complaint that violated the covenant not to sue, with leave to amend if Insignia believes that it can plead an antitrust case consistent with Rule 11 and without again violating the Settlement Agreement.

## PROCEDURAL HISTORY AND BACKGROUND FACTS

At all relevant times, Insignia and defendant NAM have been competitors in supplying in-store promotions in grocery stores and other retail outlets; the parties pay retailers to secure the right to install these promotions, and then market their services to the consumer packaged goods companies ("CPGs") seeking to promote the sale of their products in retail outlets. Wind Ex. 5 (Complaint), at ¶¶ 1, 14; Ex. 6 (Insignia 30(b)(6) Deposition Tr.), at 175:10-17.

**A.** ***Insignia I:*** On September 23, 2004, Insignia filed a Complaint alleging that NAM had monopolized the market for in-store promotions by acquiring the power to exclude competitors like Insignia through, among other things, (1) entering retailer contracts with broad exclusivity provisions; (2) ensuring that such contracts had long terms; (3) extending the exclusivity with rights of first of refusal; and (4) staggering renewal dates. Wind Ex. 7 (*Insignia I* Amended Complaint), at ¶¶ 2, 13, 20-22, 24-25, 28, 39-40, 49-50.

4

On February 9, 2011, after opening statements at trial, Insignia and NAM entered into a Settlement Agreement to resolve *Insignia I*.  Pursuant to Paragraph 9 of the Agreement, Insignia "promise[d], covenant[ed], and agree[d] not to sue, attempt to introduce as evidence, or otherwise assert any of the Released Matters *and/or the underlying facts or conduct supporting the Released Matters* against the Defendant or the Defendant Released Parties [including Defendants herein] *in any court*, governmental or regulatory body or other proceedings."  Wind Ex. 1, at ¶ 9 (emphasis supplied).

**B.  The "New" Complaint:** In July 2019, Insignia filed a Complaint with allegations strikingly similar to those pleaded and released in *Insignia I*.  Again, Insignia alleged that NAM "acquired and maintained a monopoly in" the market for "in-store promotion products and services . . . sold to consumer-packaged-goods companies."  Wind Ex. 5, at ¶¶ 1-2.  Insignia alleged the same vertical restraints (such as exclusivity) and other contracting practices at the heart of *Insignia I,* charging that (1) NAM's contracts "define exclusivity in . . . overly broad terms," *id.* ¶ 6; (2) are "effectively long-term," *id.* ¶ 40; (3) employ "right[s]-of-first-refusal" provisions, *id*. ¶ 7; and (4) have staggered renewal dates, *id*. ¶¶ 41-44.

Not only did Insignia recycle the legal theories from *Insignia I*, and complain of the same contracting practices, but as the record now makes clear, Insignia relied on the same testimony it had marshaled in the prior case, with one difference: except for a handful of allegations dated 2018-19, the allegations of the Complaint are not dated at all.  But anyone familiar with *Insignia I* and the allegations that Insignia's counsel had advanced in other antitrust litigation against NAM would recognize that the Complaint

was rooted in facts and conduct that predated, and were underlying the claims released in, the February 2011 Settlement Agreement.

In one critical example, Paragraph 3 of the Complaint (Wind Ex. 5) alleges that the unlawful purpose and effect of Defendant NAM's contracting practices were the subject of admissions: "News frankly and repeatedly acknowledged that it has sought to build contractual barriers to make it unlawfully difficult for competitors to compete." Insignia goes on to assert various undated quotes and testimony to demonstrate these "frank" and "repeated acknowledgments."  As the Court will see below, based on the record that has been assembled, not only did Insignia marshal some of the same evidence in *Insignia I*, but Insignia's current lead counsel, who also represented plaintiffs in *Dial Corp. v. News Corp.,* Case No. 1:13-cv-06802 (S.D.N.Y.), quoted the same evidence in the 2014 *Dial* Complaint.  On that occasion, counsel had no reason to delete the dates because the *Dial* plaintiffs were not bound by the 2011 Settlement Agreement.

**C. The Counterclaim and Motion for Judgment on the Pleadings:** In August 2019, Defendants filed a Counterclaim alleging that Insignia's Complaint breached the Settlement Agreement.  Wind Ex. 8, at ¶¶ 1-3, 22.  Defendants pointed to several examples where Insignia had asserted facts and conduct underlying the matters released in *Insignia I* (and identified where Insignia had first cited the same testimony now in the Complaint), in violation of the Settlement Agreement.  *Id.*  ¶¶ 16, 18-19, 21.  Insignia could have simply amended its Complaint, but instead it denied not only that it was in breach but even the fact that it had cited the same testimony in the Complaint that it had

marshaled in its pleadings in *Insignia I*.  Wind Ex. 9 (Insignia's Answer to Defendant's Counterclaim), at ¶¶ 16, 18-19, 21.  That position proved to be untenable.

Defendants moved for judgment on the pleadings under Rule 12(c).  Insignia filed its own cross-motion, arguing that the Settlement Agreement as a matter of law did not bar it from relying again on facts and conduct that underlay claims released in *Insignia I*.  Wind Ex. 10 (Opp. to Defendants' Motion for Judgment on the Pleadings), at 13 (arguing that Settlement Agreement did not bar "what Insignia did here: refer to pre-2011 information as context for its allegations about News's post-2011 illegality").  What Insignia meant by "context" became more clear at the hearing on the Rule 12(c) motion: In the absence of the pre-2011 "information," counsel conceded that Insignia's case would be "harder to prove."  Wind Ex. 3, at 73:2-3.

**D**. **The Court's Rulings:**  Magistrate Judge Thorson denied both parties' motions.  According to Judge Thorson, determining "whether certain facts or conduct included in the new Complaint were 'underlying facts or conduct supporting the Released Matters against the Defendant'" would "take the Court well beyond the confines of the pleadings."  Wind Ex. 4, at 7-8.  Judge Thorson recommended hearing "breach-of-contract issues . . . promptly, with a more developed record."  *Id*. at 10.  To that end, Judge Thorson recommended "a period of expedited discovery on the contract dispute . . . followed by cross-motions for partial summary judgment."  *Id*.  The Court adopted the Report & Recommendation in its entirety.  Wind Ex. 11 (Order of April 6, 2020).

In Defendants' First Set of Requests for Admission, Defendants requested that Insignia admit that critical paragraphs of the Complaint – the "frank acknowledgments"

of an anticompetitive scheme – referred to pre-2011 statements that had been marshaled in pleadings filed by Insignia in the course of *Insignia* I.  Wind Ex. 12 (Plaintiff's Objections and Responses to Requests for Admission). These paragraphs appeared to be ripe for Rule 36 admissions, because it would seem hard to dispute the content of Insignia's prior pleadings.  Insignia served extensive objections to these requests for admission insisting that they were "vague and ambiguous" and sought "information that is not relevant to any claims or defenses in this case, and not proportional to the needs of the case." *Id*.  Insignia proceeded to deny all of the requests for admission, based apparently on sustaining its own objections.  *Id.*

The Magistrate Judge was called upon again, this time to determine the sufficiency of Insignia's objections.  Wind Ex. 13 (Defendants' Motion to Determine the Sufficiency of Plaintiff's Responses and Objections).  The Magistrate Judge overruled critical objections, Insignia was required to serve revised responses, and expedited discovery finally progressed.  Wind Ex. 14 (Order of June 8).

### E.  The Results of the Expedited Discovery

1.  The Critical Allegations of An Anticompetitive Scheme Indisputably Rest on Facts and Conduct Underlying the Released Matters.

The Complaint pleads five "acknowledge[ments]" by executives in support of its claim that NAM's contracting practices were part of an anticompetitive scheme.  Wind Ex. 5, at ¶¶ 3, 31, 35, 42-43.  One would expect Insignia to take the opportunity to name names and provide dates for all of these critical admissions, but that is not what Insignia chose to do.  Now, after discovery, two things are beyond dispute: first, Insignia and its

lawyers knew the names and dates for these alleged critical "acknowledgements"; and second, all of these assertions rely on facts and conduct underlying the claims that were released in the Agreement.

a. In paragraph 3 of the Complaint, Insignia alleges that the unlawful scheme behind the challenged contracting practices is visible in the undated assertion that "a former News America Marketing, Inc. chairman . . . vowed to 'destroy' News's competitors." *Id*. ¶ 3. With its objections overruled, Insignia now admits it relied on that statement in 2009 to support its claims in *Insignia I*. Wind Ex. 15 (Insignia's Amended Responses to Requests for Admission), at 2-3 (conceding that Insignia's 2009 brief opposing summary judgment relied on "destroy" statement).

That is not all. Insignia's current lead counsel firm represented plaintiffs in *Dial*, Wind Ex.16 (Fourth Amended Complaint), and relied on the *Dial* complaint in preparing the "new" Complaint for Insignia. Wind Ex. 15, at 2-4; Wind Ex. 17 (Insignia's Responses to Interrogatories), at 6-7, 12, 17-22, 24, 26-29, 31, 33-34. As Insignia now concedes, in *Dial*, Insignia's lawyers quoted the same alleged statement of anticompetitive purpose asserted in Paragraph 3, and attributed the statement to a trade article published in 2004, which reported that the statement was made in ***1999***. Wind Ex. 6, at 32:6-33:2; Wind Ex. 15, at 2. Thus, the statement was 10 years old when Insignia relied on it the first time, and 15 years old when the *Dial* Complaint cited it, on both occasions acknowledging the source and the date.

b. In Paragraph 31, as evidence for Insignia's claim that NAM developed its "exclusive, national network of retail chains in order to control a large percentage of ISPs

and to forestall competition," Insignia cites a statement by a "former News account manager" that "100 percent of his retail accounts in the southeast United States had exclusivity clauses." Wind Ex. 5, at ¶ 31. Again, the statement is undated and Insignia does not identify the speaker. But Insignia and its counsel knew the name and the date, as the discovery ordered by the Court confirms.

As Insignia now admits, that account manager's testimony was cited on Insignia's trial exhibit list from *Insignia I.* Wind Ex. 15, at 3. Insignia has also admitted that its counsel cited the source and 2009 date of the testimony in the *Dial* Complaint. Wind Ex. 15, at 3; Wind Ex. 16, at ¶ 76. Insignia's corporate designee concedes that Insignia has no source for ¶ 31 other than the testimony from 2009, Wind Ex. 6, at 89:2-90:20, which had been marshaled by Insignia in support of claims released in the Settlement Agreement.

c. Paragraph 35 of the Complaint contains another undated "acknowledgement." To demonstrate that the "broad language" in the exclusivity provisions in NAM's retail contracts is part of an anticompetitive scheme, Insignia attributes another undated statement to a "former News America chief operations officer:" the "aggressive tactic" of broad exclusivity language should be deployed and "if there was any one [on staff] who was a bed wetting liberal [and] concerned about doing the right thing," he should "exit the company." Wind Ex. 5, at ¶ 35. One would think that Insignia would have wanted to lend credence to such an inflammatory allegation with a name and date.

Insignia certainly knew the name of the witness and the date that the cited testimony was given. As Insignia has now admitted, the same testimony was cited by

Insignia in its 2009 brief opposing summary judgment in *Insignia I,* with a name and a date: a former employee named Robert Emmel recounting something he heard in "the spring of **2001**."  Wind Ex. 15, at 4; Wind Ex. 18 (*Insignia I* Memo. In Opp. To Summary Judgment, ECF No. 515), at 33-34.   In *Dial*, Insignia's counsel was also quite specific about the sourcing for this statement.  Wind Ex. 16, at ¶¶ 82-83 (sourcing the statement to testimony from 2009 about something heard on a 2001 conference call).  Insignia's corporate designee testified to no basis for believing that this undated statement in the 2019 Complaint was made other than in 2001.  Wind Ex. 6, at 105:22-106:6.

d-e.  Paragraphs 42 and 43 contain a series of statements attributed to NAM executive Martin Garofalo, allegedly acknowledging the anticompetitive purpose and effect of staggering contract dates.  Wind Ex. 5, at ¶¶ 42-43.  Paragraph 42 asserts that Mr. Garofalo said that NAM "stagger[s] the time of major retail deals to minimize the risk of losing a major number of stores in any one time period," which also ensures that it takes longer for a competitor to acquire a "critical mass" of retail accounts.  Paragraph 43 alleges that Mr. Garofalo added that this allows NAM to focus on key negotiations, and, again, requires competitors to dedicate time to build a retail network.  The lengthy quotes are undated.

Insignia knew the dates.

Insignia has admitted that, in its 2009 brief opposing summary judgment in *Insignia I*, Insignia relied on "a statement by Mr. Garofalo" drawn from **2002** speaking notes to the effect that NAM "intentionally staggers the time of major retail deals to

minimize the risk of losing a major number of stores in any short term time period . . .

[t]his strategy serves as a deterrent to other major companies from joining the In-Store

fray – because they know that it will be a . . . hard fought drawn out process to develop

the critical mass necessary to compete with News America to be successful in this arena."

Wind Ex. 15, at 4-6; Wind Ex. 18, at 12-13 (quoting 2002 Speaking Notes of Martin

Garofalo).  Insignia's corporate designee conceded that Insignia had no source for

Paragraph 42's quote other than the 2002 speaking notes, which had been previously

cited by Insignia in support of the released claims.  Wind Ex. 6, at 125:19-126:6; 131:5-

19; 144:15-20 (Paragraph 43 also sourced in pre-2011 remarks of Mr. Garofalo).

When Insignia's witness was asked why the allegations in the 2019 Complaint

were left undated when Insignia knew the dates, counsel instructed the witness not to

answer on grounds that this was privileged.  Wind Ex. 6, at 131:20 – 133:12.

Paragraphs 3, 31, 35, 42 and 43, the explicit "acknowledgments" of NAM's

anticompetitive scheme, all assert facts and conduct underlying claims released in 2011.

Their impact, however goes far beyond those paragraphs.  Insignia conceded that all of its

allegations in the Complaint, including the few alleging post-2011 conduct, represent the

execution of the anticompetitive scheme pleaded in Paragraph 3 and then further detailed

in Paragraphs 3, 31, 35, 42 and 43.  Wind Ex. 6, at 140:17-141:2 (Q: There "are a number

of allegations about what your counsel has called the game plan or the scheme . . .

[Paragraphs] 3, 35, and 42 and 43. . . . [Is it] your position that – that News America

Marketing has continued to execute on that scheme since 2011.  A:  Absolutely.");  140:2-

141:2; 142:5-143:11 (all the complained of conduct implemented NAM scheme to "hurt

Insignia and hurt competition").  But the only basis that Insignia pleads for claiming that the conduct post-2011 was part of an "anticompetitive scheme" – as opposed to simply lawful marketplace competition – is the pre-2011 "acknowledgments" that are barred by the Settlement Agreement.

As the prior motion practice demonstrated, and as Insignia as much as conceded at argument, the allegations of anticompetitive scheme are vital to its ability to create an antitrust case out of a series of vertical restraints.  That is why Insignia has fought for a year to keep these alleged statements from 1999 and 2001 and 2002 in the Complaint.

> 2.     The Allegations of Market Power and Exclusionary Contracting Practices Indisputably Rest on Pre-2011 Facts and Conduct.

Discovery has also confirmed that, in addition to the critical overarching allegations of an anticompetitive scheme, the Complaint is built on other assertions of pre-2011 facts and conduct underlying the released matters.

> a. Unlawful Acquisition of Market Power: Paragraphs 2, 5, 24-25

Insignia asserts that NAM "acquired and maintained a monopoly" for "over a decade."  Wind Ex. 5, at ¶ 2. The Complaint proceeds to assert facts and conduct underlying the monopolization claims asserted and then released in *Insignia I.*

Paragraph 5 asserts that "exclusionary contracts with retailers and CPGs . . . first created News's unlawful market dominance," an allegation that Insignia made some fifteen years ago.  Wind Ex. 7, at ¶ 2 (NAM "acquired . . . dominance" through "exclusive contracts").  Insignia's corporate designee confirmed that Paragraph 5 of the

Complaint (Wind Ex. 5) asserts conduct that preceded the 2011 Settlement Agreement (and supported the monopolization claims released).  Wind Ex. 6, at 34:4-17; 37:9-38:6.

Paragraphs 24-25 again allege that "News has unlawfully acquired and maintained market power in the relevant market," by virtue of "exclusionary contracts and related anticompetitive conduct."  Insignia claimed in 2005 that NAM had already unlawfully acquired its monopoly position through exclusionary contracts with retailers.  Wind Ex. 7, at ¶¶ 20-22, 56, 116.  Insignia's corporate designee confirmed Insignia's position that NAM unlawfully acquired market power before 2011. Wind Ex. 6, at 64:12-20.

Nothing in the Settlement Agreement prevents Insignia from pleading and proving that NAM unlawfully acquired or that it unlawfully maintained a monopoly after February 2011.  But that is not what Insignia has chosen to do.  The Complaint's allegations regarding how NAM "acquired" market power all arise from facts and conduct released in the Settlement Agreement.

b. Impact on Market Conditions: Paragraphs 9, 27-30

Insignia admits that in-store marketers must "negotiate with retailers" and "pay for the real estate for the ability to offer to provide in-store services" to CPGs, Wind Ex. 6, at 175:10-17, that "any potential competitor must make investments in developing ISP offerings and entering into retail distribution contracts well before it can generate any revenue,"  Wind Ex. 5, at ¶ 29, and that NAM has built the largest retail network, Wind Ex. 5, at ¶¶ 27-28, 55.  There is no suggestion in the Complaint that NAM's payments to build its retail network are illegal.  Nor does Insignia contend that there is anything to complain about if it was outbid.  Wind Ex. 6, at 176:9-12.

14

The Complaint nevertheless alleges that NAM's network of retailers "lock[s] competitors out of a large share of the distribution they need to compete."  Wind Ex. 5, at ¶ 28.

That allegation is not new.  In 2005, Insignia complained that "[p]otential entrants face[d] daunting barriers" because CPGs were "reluctant to contract with in-store advertising and promotion providers unless they can demonstrate they have a network of retailers to place their advertising."  Wind Ex. 7, at ¶ 53.

In Paragraph 30 of the Complaint, Insignia alleges that NAM has a "stranglehold on the retailer distribution network."  Wind Ex. 5, at ¶ 30.  Insignia made that same allegation in 2005, alleging that Defendants had "exclusive contracts with most major retailers."  Wind Ex. 7, at ¶ 20.  As its corporate designee admitted, NAM acquired its "national network" well before 2011.  Wind Ex. 6, at 88:20-89:1.  Nothing in the Settlement Agreement stops Insignia from pleading and proving unlawful acts to acquire or maintain a monopoly based on facts and conduct after February 9, 2011, but again, that is not what Insignia chose to do in the Complaint.

c. Broad Exclusivity Provisions: Paragraphs 6, 33-35

Paragraph 6 alleges that NAM's "exclusionary contracts" contain "a number of anticompetitive provisions."  Insignia does not claim that exclusivity in retail contracts is illegal – for good reason – but Insignia does allege that NAM deployed broadly worded exclusivity clauses to restrict Insignia's ability to introduce services that NAM did not offer.  Wind Ex. 5, at ¶¶ 6, 33-34.

None of this is new either. Insignia alleged in 2005 that NAM used "highly restrictive" contracts that extended to "any new in-store advertising and promotion product[]." Wind Ex. 7, at ¶¶ 20, 39E.

The Complaint makes clear on its face that the allegations in Paragraphs 33-34 about overly broad exclusivity language are based at least in substantial part on pre-2011 facts and conduct. That is because Paragraph 35 provides what it calls an "*explanation*" for "*such overly broad language*." Wind Ex. 5, at ¶ 35 (emphasis supplied). That "explanation" was allegedly given by a former NAM executive, to the effect that if any "bed wetting liberal" was reluctant to deploy this tactic, he should report to HR. *Id.* As Insignia now concedes, that explanation was given in **2001**. Wind Ex. 6, at 99:1-101:2.

Paragraphs 33-34 are clearly based at least in part on facts and conduct underlying claims released in 2011, and of course so is the "explanation" found in ¶ 35.

### d. Staggered Renewal Dates for Retail Contracts: Paragraphs 41-44

In Paragraph 41, the Complaint asserts that NAM deliberately staggered the expiration terms of its retail contracts in order to erect barriers to entry for rivals. Wind Ex. 5, at ¶ 41. This too is an old allegation. Insignia asserted the same facts and conduct in trying to avoid summary judgment in 2009. Wind Ex. 18, at 12-13, 47.

The Complaint on its face alleges that the practice was historic, going on for two full paragraphs (Wind. Ex. 5, at ¶¶ 42-43) to detail Mr. Garofalo's explanation for why NAM staggers its retail contracts ("strategy . . . starts with staggered retail deals"). What the Complaint did not disclose, but Insignia has been forced to admit, is that Mr.

Garofalo's explanation of the strategy was provided in **2002** (with respect to ¶ 42) and otherwise before 2011 (with respect to ¶ 43).

At the recent deposition of Insignia's designee, the witness conceded that the allegations in Paragraph 41 are based at least in part on facts and conduct pre-2011 (and indeed were marshaled by Insignia in 2009 support of its claims released in 2011).  Wind Ex. 6, at 135:7-13.  As for any basis for alleging that ¶ 41 refers to any post-release conduct, the witness offered only that "based on our conversations with retailers, we know when their deals with News America expire, and those are different dates."  *Id*. at 136:2-12.  The witness conceded that Insignia's retail contracts also end on different dates.  *Id.* at 136:14-20.  That, of course, is a far cry from an organized scheme designed and implemented to injure competition itself.

To the extent that ¶¶ 41-44 allege a practice designed to injure competition, they appear to be based entirely on facts and conduct released in the Settlement Agreement.

e. <u>Right of First Refusal Provisions: Paragraphs 7, 36 and 38</u>

In Paragraphs 7, 36 and 38, Insignia alleges that NAM's right-of-first refusal provisions "have effectively afforded [NAM] exclusivity" and eliminated bargaining.  Wind Ex. 5, at ¶¶ 7, 36, 38.  This too appears to be rooted entirely in facts and conduct underlying claims released in 2011.

In 2005, Insignia alleged that NAM insisted "on the contractual right of first refusal" to provide any new in-store promotion.  Wind Ex. 7, at ¶¶ 2, 39E.  The 2011 Settlement Agreement expressly forbade the parties from enforcing rights of first refusal, and provided a remedial scheme in the event of breach.  Wind Ex. 1, at ¶¶ 3, 7.

Insignia's corporate designee conceded that Insignia never availed itself of the right to seek relief for any breach of this commitment in the 8.5 years after the Settlement Agreement was entered.  Wind Ex. 6, at 182:9-21.

When asked for any post-2011 examples of NAM enforcing a right of first refusal, Insignia's corporate designee could cite only what was characterized as something "similar to right of first refusal" involving CVS.  *Id*. at 118:21-120:5.  The witness later explained that CVS told Insignia only that based on its contract with NAM, it could not proceed with Insignia (CVS honored its exclusivity provision), *id*. at 167:17-168:7; the corporate designee has never seen a right of first refusal in one of NAM's contracts and no one at Insignia told her that NAM had enforced a right of first refusal.  *Id*. at 167:12-168:14.  To the extent that Paragraphs 7, 36 and 38 are about anything that can be fairly described as a right of first refusal, they appear to be based entirely on facts and conduct underlying claims released in *Insignia I*.

### f.  Long Term Contracts With Automatic Rollovers (Paragraph 40)

The Complaint charges that NAM "employ[s] automatic rollovers" to make contracts "effectively long-term."  Wind Ex. 5, ¶ 40.  Insignia alleged in 2005 that NAM "entered exclusive long-term contracts with retailers."  Wind Ex. 7, ¶ 26.  It does not appear that any such conduct continued after the Settlement Agreement.

Insignia's corporate designee could identify only one post-2011 event in support of this allegation.  Wind Ex. 6, at 120:6-123:8.  The witness testified that the Kroger contract was extended multiple times over years.  *Id* at 120:6-121:19.  But the witness then conceded that Insignia had no information whether, as alleged in ¶ 40, the contract

was extended through "automatic rollovers," or whether Kroger simply chose to negotiate a series of extensions with a trusted vendor. *Id*. at 122:2-10.

Here, as throughout, Insignia relies on the pre-2011 asserted "acknowledgments" of an anticompetitive scheme to spin lawful business practices into an antitrust suit.

## LEGAL STANDARD

The critical issue on summary judgment "is whether the record evinces a genuine dispute as to any material fact." *In re Wholesale Grocery Products Antitrust Litig.*, 752 F.3d 728, 732-33 (8th Cir. 2014) (internal quotation marks omitted). The Eighth Circuit has not hesitated to affirm grants of summary judgment in complex antitrust cases. *See, e.g., HDC Medical, Inc. v. Minntech Corp.*, 474 F.3d 543, 550 (8th Cir. 2007) (affirming grant of summary judgment to defendant on plaintiff's attempted monopolization claims); *Flegel v. Christian Hosp., Northeast-Northwest*, 4 F.3d 682, 691 (8th Cir. 1993) (affirming grant of summary judgment on plaintiff's Sherman Act Section 1 and 2 claims to defendant).

The Circuit Court has also made clear that given "the unusually high cost of discovery in antitrust cases, the limited success of judicial supervision in checking discovery abuse, and the threat that discovery expense will push cost-conscious defendants to settle even anemic cases, the federal courts have been reasonably aggressive in weeding out meritless antitrust claims at the pleading stage." *Insulate SB,* 797 F.3d at 543 (internal quotation marks and alterations omitted).

In enforcing a settlement agreement, the Court has ample authority to dismiss a complaint. *See Lansing v. Wells Fargo Bank, N.A.*, 2016 WL 3390400 (D. Minn. Apr.

25, 2016); *Lansing v. Wells Fargo Bank, N.A.*, 2016 WL 3406085 (D. Minn. June 17, 2016) (adopting Magistrate Judge's recommendation), *aff'd*, *Lansing v. Wells Fargo Bank, N.A.*, 894 F.3d 967 (8th Cir. 2018); *Laser Aiming Sys. Corp., Inc. v. Bondhus*, 2016 WL 912181, at *6 (D. Minn. Mar. 7, 2016) (dismissing four counterclaims with prejudice on a summary judgment motion because of impact of release ending prior lawsuit).

## ARGUMENT

I.    **The 2011 Settlement Agreement Bars Insignia From Asserting Any Pre-2011 Facts and Conduct Underlying Released Matters in This Court.**

Courts construe contracts like the Settlement Agreement as a matter of law.  When the relevant language "is unambiguous, Minnesota courts give that language its plain and ordinary meaning."  *In re SRC Holding Corp.*, 545 F.3d 661, 666 (8th Cir. 2008); *see also Qwinstar Corp. v. Anthony*, 882 F.3d 748, 754 (8th Cir. 2018) ("Where the parties express their intent in unambiguous words, those words are to be given their plain and ordinary meaning.").  The central issue is "the intent evidenced by the release itself." *Marketing Assistance Plan, Inc. v. Associated Milk Producers, Inc.*, 338 F. Supp. 1019, 1022 (S.D. Tex. 1972).  The court must give effect to the parties' drafting decisions— "freely contracting actors in the marketplace, particularly sophisticated business entities who rely on experts to advise them, are best suited to determine what makes the most economic sense, and the language they have mutually negotiated and agreed to is the best evidence of what those parties intended."  *In re SRC*, 545 F.3d at 668.

Insignia has never argued that the 2011 Settlement Agreement is ambiguous; indeed, Insignia insisted that it should be construed as a matter of law when it cross-moved for judgment on the pleadings.  Wind Ex. 10 at 13-18, 27, 29.

### A. Paragraph 9 Unambiguously Prohibits Any Attempt Even to Assert or Introduce into Evidence Pre-Release Underlying Facts and Conduct.

The discovery taken by Insignia on the origins of Paragraph 9 of the Settlement Agreement confirms what the unambiguous language explicitly says: NAM paid Insignia a large sum of money to ensure that the released parties (all of the Defendants herein) would never have to contend with the facts and conduct underlying every claim that was brought or could have been brought through the date of the release, let alone the *same* facts and conduct that had been marshaled against NAM in *Insignia I*.  Wind Ex. 19 (Testimony of NAM 30(b)(6) designee), at 122:18-123:3; 124:11-21.

The parties began with the broadest possible definition of matters that were being released.  The "Released Matters" include "any and all manner of actions and causes of action, suits, debts, obligations, contracts, torts, covenants, claims," in "law or in equity, known or unknown, of any kind or character, from the beginning of time up to the date of this Agreement."  Wind Ex. 1, ¶ 9.

Paragraph 9 of the Settlement Agreement contains Insignia's covenant not to sue. That provision provides that Insignia:

> promises, covenants and agrees not to sue, *attempt to introduce as evidence, or otherwise assert any of the Released Matters and/or the underlying facts or conduct supporting the Released Matters against* the Defendant [NAM In-Store] or the Defendant Released Parties *in any court*, governmental or regulatory body or other proceedings.

This covenant has two parts.  First, paragraph 9 reaffirms that Insignia cannot "sue" and pursue the *claims* that were the subject of *Insignia I* and other "Released Matters."  The "Released Matters" include all claims of any kind that could have been brought through the date of the Release.  Second, in addition, Paragraph 9 bars Insignia from ever again even "attempt[ing] to introduce into evidence, or otherwise assert[ing] any of the . . . *facts or conduct supporting the Released Matters*."  In other words, pursuant to the Settlement Agreement, Insignia cannot plead (let alone otherwise exploit) in any subsequent proceeding against Defendants any alleged "fact or conduct" that Insignia could have (let alone did) offer in support of the claims released in 2011.

The parties could not have been clearer that they intended to prohibit the reassertion of not just claims, but all of the facts and conduct underlying those claims.

Paragraph 9, by its terms, covers the waterfront of litigation use of "the underlying facts or conduct" in "any" future "court" case – Insignia agreed not to even attempt to introduce as evidence "or otherwise assert" the material underlying the Released Matters. That is everything lawyers do with facts and conduct in litigation:  assert them, and then, if supported with facts, attempt to introduce them into evidence.  Paragraph 9 by its terms stops this process in its tracks.

Finally, Paragraph 9 makes clear that the release applies to *all* subsequent proceedings.  Insignia agreed not to assert any Released Matters or underlying facts or conduct "in any court, governmental or regulatory body or other proceedings."

### B. Paragraph 9 Is Fully Enforceable.

Insignia has suggested that enforcing the contract it entered and for which it was paid $121mm is against public policy, citing cases providing that an agreement that "absolve[s] one party from liability for future violations of the anti-trust statutes" is against public policy. *Fox v. Midwest Theatres v. Means*, 221 F.2d 173, 180 (8th Cir. 1955). This argument ignores the terms of the Settlement Agreement before the Court.

Paragraph 9 does not immunize Defendants for *future* antitrust violations. Instead, the Settlement Agreement prohibits Insignia only from asserting pre-2011 facts or conduct underlying the released claims to support a claim that Defendants committed an antitrust violation after 2011. If Insignia can plead an antitrust case based on post-release facts and conduct, the Settlement Agreement would not limit Defendants' liability.

The fact that even general releases can have an indirect impact on claims that rest on pre and post release conduct does not make them against public policy. Courts "have enforced even general releases to bar antitrust claims predicated on continuing violations of pre-release conduct." *Xerox Corp. v. Media Sciences, Inc.*, 609 F. Supp. 2d 319,326 (S.D.N.Y. 2009) (emphasis omitted).

Here, what is before the Court is not just a general release, but an explicit agreement that Insignia could not in a new case marshal the same facts and conduct that it had already packaged, sold and been paid for. The Settlement Agreement does not stop Insignia from ever bringing another antitrust claim. Instead, the Settlement Agreement bars Insignia from selling the same thing twice.

## II.   Insignia Has Violated the Covenant Not to Sue.

### A. The Complaint Depends On Allegations of an Anticompetitive Scheme That Are Based Entirely On Violations of the Covenant Not To Sue.

The cornerstone of the Complaint is visible in its opening paragraphs:  NAM violated the Sherman Act by monopolizing the in-store promotions market through "pervasive anticompetitive strategies" including "exclusionary agreements with retailers," Wind Ex. 5, at ¶¶ 1-2.  But as Insignia well knows, exclusivity, rights of first refusal and other non-price restraints in agreements between a service provider and a retailer are not prohibited by law.  They are governed by the Rule of Reason.  *See GTE Sylvania, Inc.,* 433 U.S. at 57-59; *Business Electronics Corp. v. Sharp Electronics Corp.*, 485 U.S. 717, 735-36 (1988).

This is certainly true in the Eighth Circuit.  *See Double D Spotting Serv., Inc. v. Supervalu, Inc.*, 136 F.3d at 559 (8th Cir. 1998) (vertical restrictions "not per se violations . . . because they 'promote interbrand competition by allowing the manufacturer to achieve certain efficiencies in the distribution of his products'") (quoting *GTE Sylvania*, 443 U.S. at 54); *Lomar Wholesale Grocery, Inc.,* 824 F.2d at 590. Vertical exclusivity provisions are not barred by law, *U.S. Healthcare, Inc. v. Healthsource, Inc.*, 986 F.2d 589, 594 (1st Cir. 1993), and staggered expiration dates have been found to be pro-competitive.  *See Menasha Corp. v. News America*, 354 F.3d 661, 663 (7th Cir. 2004) ("One might think that staggered expiration dates make entry easier . . . [a rival] can sign up chains as their exclusives expire, without having to enroll

the entire retail industry at one go."); *Fleer Corp.* v. *Topps Chewing Gum, Inc.*, 658 F.2d 139, 149-50 (3d Cir. 1981).

That is why the third paragraph of the Complaint insists that NAM's contracting practices must be viewed as part of an admitted anticompetitive scheme to injure competition itself (not merely an individual competitor). And, Insignia alleges that scheme has already been admitted, as NAM executives have "repeatedly acknowledged" that they have "sought to build contractual barriers to make it unlawfully difficult for competitors to compete." Wind Ex. 5, at¶ 3.

Not surprisingly, in bringing an earlier Sherman Act case complaining of vertical restraints in the relationships between NAM and retailers, Insignia attempted to connect those contracting practices with alleged evidence of an overall anticompetitive scheme. When Insignia decided to return to the well that had delivered a $121mm settlement, it again asserted that the same contracting practices were part of an anticompetitive scheme – but this time, Insignia elected to assert literally the same evidence of that scheme that it marshaled in *Insignia I* and that its lawyers deployed (and dated) in *Dial*.

This time, however, Insignia was faced with the covenant not to even "attempt to introduce into evidence, or otherwise assert the . . . facts or conduct" that underlay the broadly defined released matters in the Settlement Agreement. Insignia attempted to elide the commitments it had made in this Court through a variety of strategies, which began (but by no means ended) with stripping the dates off evidence that it and its lawyers had already dated in earlier filings in this Court and other federal courts. Had Insignia believed that it could rely on this evidence consistent with the Settlement

Agreement, there would have been no reason to strip out the dates. As the record demonstrates, and as Insignia has been forced finally to admit, the "acknowledgements" of an anticompetitive scheme so essential to the Complaint, and found in ¶¶ 3, 31, 35, 42 and 43, all rested exclusively on pre-2011 facts and conduct that underlay the claims released in the Settlement Agreement. *See* pp. 8-13 *supra*. Their inclusion in the Complaint represented a breach of the Settlement Agreement that was pleaded in the Counterclaim and now been proven beyond dispute.

The Court was first told that the various pre-2011 allegations were mere "context," Wind Ex. 10, at 13, a mantra repeated under oath by Insignia's corporate designee, Wind Ex. 6, at 148:16-19.  But that was never true.  Even the careful euphemism of Insignia's counsel confirms the critical role played by the alleged "acknowledgments" of an anticompetitive scheme; without the "pre-2011 information," its "case [would be] harder to prove."  Wind Ex. 3, at 73:2-3.  A case built on vertical restraints in retail contracts leading to lost business by the plaintiff is not going to succeed, not without the critical pleading and proof that these contractual terms have been deployed as part of a scheme to injure competition.  *See Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 338 (1990) ("The antitrust laws were enacted for the protection of *competition*, not *competitors*." (internal quotation marks and citation omitted)); *see also Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2 (1984).  That is why Insignia has fought for a year to keep the pre-2011 facts and conduct in the case.  They are not mere "context;" they serve a critical role in creating the appearance of an antitrust case out of lawful business

practices, relying on facts and conduct that Insignia had agreed not to assert again in any court.

Discovery has now confirmed the central role of these assertions. Insignia's designee confirmed that the alleged anticompetitive "game plan" found in paragraphs 3, 31, 35, 42 and 43, represents the very heart of Insignia's case that NAM has been executing an unlawful scheme since 2011, including in 2018-19. Wind Ex. 6, at 140:17-141:2, 142:5-143:11. All of the claims alleging improper contracting practices are infected by the violations of the covenant not to sue in Paragraphs 3, 31, 35, 42 and 43.

Even the few dated claims alleging improper "interference" with Insignia's business opportunities depend for their viability on the allegations that these are all part of an anticompetitive scheme. Insignia dates a handful of instances where it sought to compete with Defendants, believed they were on the verge of success with some retailer, when Defendants "swooped in" and enforced their contractual exclusivity or other existing rights, or presented the retailer with a better offer. Wind Ex. 5, at ¶¶ 37, 45-47, 50, 57-58. But competitive bidding is "often the very essence of competition." *Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*, 549 U.S. 312, 313 (2007) (internal quotation marks omitted).

Whether Defendants were competing on price or enforcing their exclusivity rights, Insignia's business disappointments do not support an antitrust claim, absent pleading and proof that they were part of an anticompetitive scheme causing injury to competition. *See Double D Spotting Serv., Inc. v. Supervalu, Inc.*, 136 F.3d 554, 561 (8th Cir. 1998); *Amerinet, Inc. v. Xerox Corp.*, 972 F.2d 1483, 1507 (8th Cir. 1992) (Under "competitor's

privilege" doctrine, "competitive conduct which is neither illegal nor independently actionable does not become actionable because it interferes with another's prospective contractual relations.") (internal quotation marks omitted).

The allegations asserting acknowledgments of an anticompetitive scheme are critical to the Complaint and this lawsuit.  The Court should find that Paragraphs 3, 31, 35, 42 and 43 were filed in violation of the Settlement Agreement.

### B.  The Allegations of Market Power and Anticompetitive Practices Also Violate the Covenant Not to Sue.

The record demonstrates that the allegations in Paragraphs 2, 5, 24 and 25 of market power and in Paragraphs 9 and 27-30 of market conditions are all based in least in part on facts and conduct underlying the monopolization claims released in 2011.  *See* pp. 13-15 *supra*.  If NAM acted illegally to acquire, maintain or extend its market position after February 2011, then of course the law would hold it accountable, but that is not what Insignia is seeking to do here.

As Insignia's CEO testified, when she joined Insignia in 2016, she knew that the business depended in part on investing in building an attractive retail network to present to CPGs, and she knew that NAM had "more stores."  Wind Ex. 6, at 74:7-22 (when recruited for CEO job, was not told that NAM had a lock on retail market, only that it had "more stores" in its retail network than Insignia had); 175:10-22 (business depends on paying for access to retailers).  If the size of NAM's retail network made it an attractive business partner to CPGs and an effective competitor after February 2011, that does not create an antitrust claim, and Insignia knows it.  That is why Insignia is attempting to

leverage allegations that NAM *illegally* acquired market power *before* February 2011, rather than attempt to identify illegal conduct by NAM after that date.

The Settlement Agreement bars this.

The record also demonstrates that Insignia is being more than coy when it allows that its allegations of excessively broad exclusivity provisions, or rights of first refusal provisions, or staggered renewal dates, or excessively long contract terms, "might" include pre-2011 facts and conduct.  Wind Ex. 6, at 34:4-17; 38:4-6; 47:16-21; 69:5-6; 88:20-89:1.  In fact, the Complaint makes clear that Paragraphs 33-34 (on excessively broad exclusivity) allege facts and conduct underlying released claims (that is why in Paragraph 35, the 2001 remarks, "explain" the alleged practice); so does all of Paragraph 31 (as it is tied to the 2009 testimony cited at the end); so does Paragraph 41 (on staggered renewal dates), as even Insignia admitted, Wind Ex. 6, at 135:7-13. *See pp.* 15-18 *supra*.  And to the extent that the allegations in Paragraphs 7 and 36-37 are about rights of first refusal, those must be based on pre-2011 facts and conduct (as previously alleged in *Insignia I*), because Insignia apparently has no example of a post-2011 right of first refusal, or of a post-2011 automatic renewal such as alleged in Paragraph 40.  Wind Ex. 6, at 120:6-123:8; 167:12-168:14.

Quite apart from the fact that the critical allegations of an anticompetitive scheme all rest on assertions of evidence that violate the covenant not to sue of Paragraph 9 of the Settlement Agreement, the balance of the Complaint is filled with allegations that clearly rest on facts and conduct underlying the claims released in 2011.

For this second reason, the Court should grant summary judgment on Defendants' counterclaim, and find that Insignia has asserted facts and conduct underlying claims released in the Settlement Agreement.

**III.**     <u>**The Court Should Dismiss the Complaint.**</u>

Intent is not an element of a breach of contract claim, but the undisputed facts before this Court demonstrate that Insignia's breach was not only purposeful – to sustain a case where there was none to plead – but carried out in a manner calculated to add to the burden imposed on the Court and Defendants.

Insignia and its counsel knew the dates of the undated "acknowledgments" of anticompetitive intent – having pleaded the dates in prior pleadings in *Insignia I* and *Dial* (which Insignia relied on in the course of preparing the Complaint here).  Again, had Insignia believed that including this material was consistent with the Settlement Agreement, it would not have gone to the trouble of stripping out the dates.

Any suggestion that the breach was inadvertent was eliminated when Insignia responded to the Counterclaim, which expressly alleged that Insignia had pleaded facts and conduct underlying the claims released in *Insignia I* (even citing the 1999 date of the "destroy" statement in Paragraph 3 and the 2001 date for Paragraph 35).  Wind Ex. 8, at ¶¶ 16, 18-19, 21.  Insignia denied these allegations – not just the legal characterization of the breach, but the facts as well.  Wind Ex. 9, at ¶¶ 16, 18-19, 21.  As Insignia knew then, and the record demonstrates, those denials were simply false.

The Court directed the parties to address the factual issues in expedited discovery. The requests asked Insignia to confirm that the quoted but undated acknowledgements

were from some two decades ago in some cases, and pointed to Insignia's own pleadings that marshaled the same evidence in opposing summary judgment in 2009. Insignia insisted that these questions were "vague and ambiguous," and "disproportionate" to the "needs of the case" (notwithstanding that the Court rejected Insignia's exception to the R&R and endorsed the discovery sought).

The pattern continues. When asked about the date of an undated allegation, Insignia's corporate designee would typically answer that the allegation was in "the Dial *2014* complaint," Ex. 6, at 20:6-13; 32:6-16; 99:4-7 (never failing to mention that post-2011 date), and would admit the pre-2011 source only when confronted with the fact that Insignia's counsel provided the date in *Dial*. And, like clockwork, the corporate designee would routinely qualify an answer with "discovery is ongoing." *Id.* at 22:3-8; 23:13-21; 33:16-22; 169:11-21.

Of course, the issue before the Court is whether Insignia breached the Settlement Agreement *by filing the July 2019 Complaint* asserting facts and conduct underlying claims that had been released in 2011 – "ongoing" discovery should have nothing to do with it. But Insignia's dodge is revealing. Insignia's focus has been about discovery: hiding what its Complaint relies upon for as long as possible, launching "ongoing discovery" to look for some basis to pursue an antitrust suit besides recycled material, and in any case imposing the kinds of discovery costs that the Court of Appeals has recognized often leads to settlements of bogus cases. *Insulate,* 797 F.3d at 543.

Insignia knew better than to plead an antitrust case based on the proposition that NAM (in the words of Insignia's CEO) "has more stores" in its retail network, makes

competitive offers, enters exclusivity agreements with retailers, and enforces its legal rights with third parties.  Instead, Insignia filed a Complaint driven by inflammatory evidence of anticompetitive intent and business practices, hid the dates, and stalled as long as possible before the Settlement Agreement could be enforced.

That time has finally come.

The Court should grant summary judgment on the Counterclaim, as the undisputed facts demonstrate that Insignia has in fact breached Paragraph 9 of the Settlement Agreement.  By Insignia's admission, the critical allegations of anticompetitive scheme in ¶¶ 3, 31, 35, 42 and 43 all rest exclusively on facts and conduct underlying claims released in 2011; the allegations of market power and impacts in ¶¶ 2, 5, 9, 24-25, and 27-30 also depend in substantial part on facts and conduct underlying released claims; the allegations of improper contracting practices, ¶¶ 7-8, 33-36, 38, 40-44, 46; and even the allegations that NAM acted in "bad faith" in enforcing its contractual rights and thereby caused Insignia not to acquire new business, ¶¶ 51-56, all depend on the pre-2011 "acknowledgments" of an anticompetitive scheme.

The proper remedy for a breach of contract that impacts virtually every substantive allegation of a lawsuit is dismissal of the complaint that embodied the breach, without prejudice to Insignia's ability to re-plead consistent with Rule 11.  *See Lansing*, 2016 WL 3390400*; Laser Aiming System Corp.*, 2016 WL 912181; *see also Metro. Sports Facilities Comm'n v. Minnesota Twins P'ship*, 638 N.W.2d 214, 227 (Minn. Ct. App. 2002) (specific performance ordered where contract damages are not "readily

measurable"). Where, as here, the Complaint embodies the breach and its pendency will continue to impose damage, dismissal is the most appropriate remedy.

The Court should also order Insignia to reimburse Defendants for the fees they have already incurred in enforcing Paragraph 9 of the Settlement Agreement. When a plaintiff violates a covenant not to sue, an award of the costs to enforce the covenant is appropriate to offset some of the past damage caused by the breach. *See 3M Innovative Properties Co. v. Barton Nelson, Inc.*, 2004 WL 1278672 (D. Minn. June 6, 2004) (concluding that "American Rule" did not apply because "attorneys' fees and costs were the actual measure of damages"); *3M Innovative Properties, Co. v. Barton Nelson, Inc.*, 2005 WL 679073 (D. Minn. Mar. 22, 2005) (same). Insignia carried out this breach in filing the Complaint, and did everything it could to avoid enforcement of the covenant not to sue for a year. It should now pay the Defendants' costs incurred in enforcing the Settlement Agreement.

## **CONCLUSION**

The Court should grant Defendant's Motion for Summary Judgment on the Counterclaim, and dismiss the Complaint.

Dated: July 10, 2020

s/ Todd Wind
Todd Wind (#0196514)
Nicole M. Moen (#0329435)
Timothy M. O'Shea (#0386437)
Rachel L. Dougherty (#0399947)
**FREDRIKSON & BYRON, P.A.**
200 South Sixth Street, Suite 4000
Minneapolis, MN  55402-1425
Telephone:  612.492.7000
Facsimile:   612.492.7077
twind@fredlaw.com

nmoen@fredlaw.com
toshea@fredlaw.com
rdougherty@fredlaw.com

William B. Michael (admitted *pro hac vice*)
NY Bar No. 4296356
**PAUL WEISS RIFKIND WHARTON &
GARRISON**
1285 Avenue of the Americas
New York, NY 10019-6064
Tel:   212.373.3648
Fax:  212.492.0648
wmichael@paulweiss.com

Kenneth A. Gallo (admitted *pro hac vice*)
NY Bar No. 430369
Jane B. O'Brien (admitted *pro hac vice*)
NY Bar No. 4484457
Jeannie S. Rhee (admitted *pro hac vice*)
District of Columbia Bar No. 464127
**PAUL WEISS RIFKIND WHARTON &
GARRISON**
2001 K Street, NW
Washington, DC 20006-1047
Tel:   202.223.7356
Fax:  202.204.7356
kgallo@paulweiss.com
jobrien@paulweiss.com
jrhee@paulweiss.com

Gerson A. Zweifach (admitted *pro hac vice*)
District of Columbia Bar No. 349266
Kimberly Broecker (pending *pro hac vice*)
MD Bar No. 1712130260
**WILLIAMS & CONNOLLY LLP**
725 Twelfth Street, N.W.
Washington, DC 20005
Tel:   202.434.5000
Fax:  202.434.5029
gzweifach@wc.com
kbroecker@wc.com

***Attorneys for Defendants***