EXHIBIT 1

**Defendants' Employees Deposed in *Valassis***

|   | Name | Relevance |
|---|------|-----------|
| 1 | Augustinos, Rob* | • Custodian in this case. |
| 2 | Aversano, Jesse | • Former EVP, Marketing and Field Operations.<br>• Key player in managing NAM's relationship with Insignia, and subject of previous IDR on disputed custodians.<br>• Custodian in 2014-2016 *Valassis II* documents produced by News. |
| 3 | Bedell, Tina* | • Custodian in this case. |
| 4 | Campanelli, Wayne | • Until October 2016, SVP of Operations & Procurement.<br>• Custodian in 2014-2016 *Valassis II* documents produced by News. |
| 5 | Campbell, June | • VP, Finance in charge of Financial Planning and Analysis (FP&A). News agreed to add Ryan Hoyt, with comparable title (and potentially her successor), as a custodian in this case, which demonstrates Campbell's relevance.<br>• As evident from a redacted snippet of her deposition transcript that is publicly available, she testified that she is "in charge of budgeting, forecasting, month-end actuals, financial analysis, new product profitability analysis" "support[ing] the in-store business for U.S.," Ex. 24, at 11, functions that are all relevant to this case.<br>• Custodian in 2014-2016 *Valassis II* documents produced by News. |
| 6 | Carlucci, Paul | • Chairman and CEO of NAM until approximately June 2014. News agreed to add Marty Garofalo, his successor, as a custodian in this case, which demonstrates Carlucci's relevance.<br>• Custodian in 2014-2016 *Valassis II* documents produced by News. |
| 7 | Dittrich, Tom | • SVP, Merchandising.<br>• A redacted snippet of his deposition reveals that he was the recipient of an email stating that "**Marty [CEO] wants to make sure we acknowledge that we're aware we need to stagger our SUPERVALU independent deals and that we're adjusting the terms accordingly**." Ex. 23, at 68 (emphasis added). |

|   |   |   |
|---|---|---|
|   |   | • He testified that since 2010, his work "entails doing a variety of products and services for both package[d] good companies and retailers," including "instant-redeemable coupons or the coupons that are stickers you put on products, putting up displays, filling displays, putting advertising materials on displays, doing audit work, whether products are in the stores or not. So a variety of things in retail stores," functions relevant to this case. *Id.* at 8-9.<br>• Prior to that role, he was in "shopper marketing," in which he "negotiated the retail deals for a section of the country for News America" and "called on the package[d] good community that marketed to those retailers," also functions relevant to this case. *Id.* at 10. |
| 8 | Garofalo, Marty* | • Custodian in this case. |
| 9 | Hansa, Dominic* | • Custodian in this case. |
| 10 | Kroc, Patrick* | • Custodian in this case. |
| 11 | Leprine, Thomas | • VP, Business Operations.<br>• Custodian in 2014-2016 *Valassis II* documents produced by News. |
| 12 | Mixson, Chris | • Former President of NAM.<br>• As evident from a redacted snippet of his deposition transcript, he testified that "**through [his] time as president, one of NAM's strategy on the in-store side of the business was to enter into long-term exclusive and staggered contracts with retailers**." Ex. 25, at 91-92 (emphasis added).<br>• Left NAM in 2013 but at least as of May 2017, was under the terms of a "consulting agreement" under which NAM paid him approximately $40,000 per month to "represent the company in any legal action that may be taken." *Id.* at 9-11.<br>• Custodian in 2014-2016 *Valassis II* documents produced by News. |
| 13 | Naze, West | • Former EVP, Sales, North America. News agreed to add Robert Augustinos, EVP of Eastern Division Sales, as a custodian in this case, which demonstrates Naze's relevance. |

| | | |
|---|---|---|
| | | • Left NAM in December 2013 but at least through December 2017, was under the terms of a "consultancy agreement" under which NAM paid him $320,000 per year "simply to participate in litigation." Ex. 26, at 6-8.<br>• As executive in charge of sales organization, testified that News's retail network is "better than [its] competitors" because it has "more stores," including the big players like "Safeway, Kroger, Ahold, Albertson's." *Id.* at 99-101.<br>• Custodian in 2014-2016 *Valassis II* documents produced by News. |
| 14 | Nudelman, Jenna | • VP, General Sales Manager, Retail, Southeast Region (January 2019 org chart).<br>• Custodian in 2014-2016 *Valassis II* documents produced by News. |
| 15 | O'Day, Gavin | • VP, Group Sales Manager, Shopper Marketing, Eastern Division Sales (January 2020 org chart).<br>• Insignia previously requested to add him as a custodian, to which News objected. *See* Ex. 29 (G. Park February 28, 2020 email).<br>• Custodian in 2014-2016 *Valassis II* documents produced by News. |
| 16 | Perkins, Nancy* | • Custodian in this case. |
| 17 | Schulman, Mark | • Former VP, Pricing and Contracts, with responsibility to "review pricing for [News's] product lines, work[] with Sales reviewing contracts, and also help[] manage our sales goals process," all functions relevant to this case. Ex. 27, at 7-8.<br>• Custodian in 2014-2016 *Valassis II* documents produced by News. |
| 18 | Spitz, Robert* | • Custodian in this case. |
| 19 | Topham, Lisa | • Director of FP&A, formerly reporting to June Campbell, *see* Ex. 28, at 8, and reporting to Ryan Hoyt in January 2020 org chart.<br>• Involved in preparing proposals to retailers—including the guarantees and signing bonuses that News would pay to retailers to secure contracts—and calculating the profitability margins for News after paying out those guarantees and signing bonuses. *Id.* at 106-108.<br>• Custodian in 2014-2016 *Valassis II* documents produced by News. |

EXHIBIT 2

# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Insignia Systems, Inc.,                          Civ. No. 19-1820 (MJD/BRT)

                    Plaintiff,

v.                                                              **ORDER**

News Corporation, News America
Marketing FSI L.L.C., and News America
Marketing In-Store Services L.L.C.,

                    Defendants.

Alejandra Salinas, Esq., Arun S. Subramanian, Esq., Gloria Park, Esq., Mark Musico, Esq., William Christopher Carmody, Esq., Susman Godfrey LLP; Hunter J. Shkolnik, Esq., Napoli Shkolnik PLLC; Jerry W. Blackwell, Esq., S. Jamal Faleel, Esq., Blackwell Burke PA, counsel for Plaintiff.

Gerson Avery Zweifach, Esq., Williams & Connolly LLP; Jane B. O'Brien, Esq., Jeannie S. Rhee, Esq., Kenneth A. Gallo, Esq., William Michael, Esq., Heather Milligan, Esq., Paul, Weiss, Rifkind, Wharton & Garrison LLP; Nicole M. Moen, Esq., Todd A. Wind, Esq., Fredrikson & Byron, PA, counsel for Defendants.

          This matter is before the Court on Plaintiff's Motion to Compel Production of Documents. (Doc. No. 86, Mot. to Compel.) Defendants oppose Plaintiff's Motion. (*See* Doc. No. 94, Defs.' Resp.) This discovery dispute concerns Defendants' response to a single interrogatory: Insignia's RFP #1: All Documents produced in *Valassis Communications, Inc. v. News Corp., et al.*, Cause No. 17-CV-7378 (PKC ) (S.D.N.Y.). Plaintiff argues that the *Valassis* production is centrally relevant to Plaintiff's claims and defenses because both cases involve alleged monopolization and exclusive dealing and both cases involve the same relevant product market (ISPs) and relevant geographic

market (nationwide). (*See* Doc. No. 87, Pl.'s Mem.) In their opposition papers,

Defendants confirmed that they are producing a subset of the documents sought;

however, Defendants maintain their objections to the production of any pre-2014

documents and third-party documents from the *Valassis* litigation. (*See* Defs.' Resp. 1–

3.) Thus, the remaining discovery dispute in Plaintiff's Motion to Compel is whether

Defendants should be compelled to reproduce pre-2014 documents and all documents

produced by third parties from the *Valassis* case. Defendants object on several grounds.

First, they argue that the pre-2014 documents are not relevant or proportional to this case

pursuant to the Federal Rules of Civil Procedure. (*Id.* at 7–11.) Further, they argue that

the protective order in *Valassis* bars the production, as requested, including the

production of third-party discovery produced pursuant to Rule 45 subpoenas in the

*Valassis* case.[1] (*Id.* at 11–12.)

> Federal Rule of Civil Procedure 26 (b)(1) provides that:
>
> [p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.

Fed. R. Civ. P. 26(b)(1).

> Plaintiff seeks a copy of all documents produced in *Valassis*, arguing the

---

[1] According to Defendants, they created a "work around" in the *Valassis* protective order for the subset production by reprocessing their source documents with new Bates numbers instead of producing clone copies.

production should yield a "treasure trove" of relevant documents." (Pl.'s Mem. 2.)

Defendants argue that the pre-2014 documents have no relevance in light of a 2011

Settlement Agreement[2] and that the burden of producing them is not proportional. (Defs.'

Resp. 1–3.) It is undisputed that the remaining documents produced in *Valassis* exceed 11

million in number, including documents produced by 46 third parties. (*See* Doc. No. 95,

O'Brian Decl. ¶¶ 11, 12.) Importantly, the request at issue seeks "clone" discovery for all

of the documents produced in a different case. As discussed in *Goro v. Flowers Foods,

Inc.*, "[t]here could be a number of reasons why documents appropriately requested and

provided in another case—even if the subject matter of those cases seem to overlap—

would be irrelevant or burdensome to provide in another case. If relevant and

proportional documents exist in the custody or control of the responding party, the

appropriate thing to do is to request those documents." No. 17-cv-02580-JLS-JLB, 2019

WL 6252499, at *18–19 (S.D. Cal. Nov. 22, 2019). This Court agrees that Plaintiff has

not shown that all of the 11 million-plus clone documents are relevant and proportional to

the needs of the case, considering the importance of the issues at stake in the action, the

amount in controversy, the parties' relative access to relevant information, the parties'

resources, the importance of the discovery in resolving the issues, and whether the burden

---

[2]     The February 11, 2011 Settlement Agreement between Insignia Systems, Inc.,
News Corporation, and News America Marketing In-Store, Inc., among others, resolved
an earlier filed case – *Insignia Sys., Inc. v. News Corp., Ltd.*, No. 04-cv-4213 (JRT/AJB).
Defendants claim that the Settlement Agreement should be interpreted to support
dismissal of this case pursuant to Rule 12(c). Defendants also claim that the Settlement
Agreement should be interpreted to limit discovery. The Court, however, has not yet
interpreted the applicable provision of the Settlement Agreement.

or expense of the proposed discovery outweighs its likely benefit.[3] *See* Fed. R. Civ. P. 26(b)(1); *see also Haddley v. Next Chapter Tech., Inc.*, No. 16-cv-1960 (DWF/LIB), 2018 WL 2180253 (D. Minn. Mar. 23, 2018). Accordingly, this Court will not require the wholesale production of the remaining clone discovery from the *Valassis* litigation.[4] To the extent Plaintiff seeks pre-2014 documents or third-party documents, Plaintiff may serve tailored document requests or Rule 45 subpoenas.

      Accordingly, Plaintiff's Motion to Compel (Doc. No. 86) is **DENIED**.

Date: March 24, 2020

                     *s/ Becky R. Thorson*
                     BECKY R. THORSON
                     United States Magistrate Judge

---

[3]    Defendants' burden was sufficiently quantified in the O'Brien Declaration due to the sheer number of documents at issue. *See Vallejo v. Amgen*, 903 F.3d 733 (8th Cir. 2018).

[4]    As this Court noted in footnote 8 of its recent Report and Recommendation, it has not yet taken any position regarding the scope of discovery. This Court's denial of the remaining cloned *Valassis* discovery should not be interpreted to mean that a cut-off date for discovery has been established by this Court. If Plaintiff has reached the limit for the number of document requests permitted pursuant to the Pretrial Scheduling Order, or will exceed those limits, the Court will entertain requests to increase the limits to facilitate this process.

EXHIBIT 3





## News Corp Announces Sale of News America Marketing to Charlesbank Capital Partners

*Cash proceeds of up to approximately $235m, with News Corp option to retain up to 15% interest in NAM; Divestment is part of News Corp's simplification strategy and will increase transparency within the News & Information Services segment, highlighting the value of key assets*

March 31, 2020 09:10 AM Eastern Daylight Time

NEW YORK--(BUSINESS WIRE)--News Corp today announced that it has entered into a definitive agreement to sell its News America Marketing business ("NAM") to Charlesbank Capital Partners, a private equity firm with offices in Boston and New York.

The agreement follows a strategic review of NAM as part of News Corp's ongoing efforts to optimize its portfolio and simplify the structure of the Company.

Under the terms of the agreement, News Corp will receive cash consideration of up to approximately $235 million, comprised of $50 million in cash upon closing of the transaction and additional deferred cash payments in an aggregate amount of between $125 million and approximately $185 million, depending on the timing of such payments. The deferred consideration is payable on or before the five-year anniversary of closing. Additionally, News Corp has the opportunity to benefit from NAM's future success through an option to retain up to 15% equity in the business (5% at closing and 10% five-year warrant). The purchase price is subject to customary working capital and other adjustments. Please see News Corp's Form 8-K to be filed with the Securities and Exchange Commission for more information.

"After evaluating the strategic options, our Board has determined that the sale of NAM to Charlesbank is the best course of action to enhance shareholder value and to simplify the structure of News Corp. We expect that the transaction will enable us to highlight the value of our other properties, including Dow Jones," said Robert Thomson, Chief Executive of News Corp.

"When NAM was established, it was dependent on the distribution of coupons via newspaper inserts, but, in recent years, the in-store and digital segments have expanded substantially. The continued strong performance of supermarkets and consumer goods, both core clients of NAM, suggests that the company will have a successful future under its new ownership," said Mr. Thomson.

"We are excited to be acquiring NAM and look forward to working with the management team, employees and partners to further build this business and significant brand," said Brandon White, Managing Director of Charlesbank. "We are committed to investing the resources required to enhance NAM's growth, including installing Bill Redmond as CEO of NAM

after the transaction closes. Since 1996, Bill has served as CEO and/or Chairman of over twenty companies, public and private, with a record of building substantial shareholder value through a combination of operating efficiency and growth through product, consumer and customer development. From 1981-1996, Bill held every level of sales leadership roles at Procter & Gamble, PepsiCo and Quaker Oats. Bill has also demonstrated successful leadership in take-private transactions and most recently was President & CEO of Innocor, Inc., one of the largest polyurethane foam and foam finished product manufacturers in North America. We feel confident that the company will exceed the expectations of customers, employees and suppliers in the months ahead."

The transaction, which is expected to close in the fourth quarter of fiscal 2020, is subject to regulatory approval and customary closing conditions.

Allen & Company LLC served as financial advisor and Gibson, Dunn & Crutcher LLP served as legal counsel to News Corp in connection with this transaction. RBC Capital Markets served as financial advisor and Goodwin Procter LLP served as legal counsel to Charlesbank in connection with this transaction.

**About News Corp**

News Corp (Nasdaq: NWS, NWSA; ASX: NWS, NWSLV) is a global, diversified media and information services company focused on creating and distributing authoritative and engaging content and other products and services. The company comprises businesses across a range of media, including: news and information services, subscription video services in Australia, book publishing and digital real estate services. Headquartered in New York, News Corp operates primarily in the United States, Australia, and the United Kingdom, and its content and other products and services are distributed and consumed worldwide. More information is available at: http://www.newscorp.com.

**About News America Marketing**

News America Marketing (NAM) is the premier marketing partner of some of the world's most well-known brands, and its broad network of shopper media, incentive platforms and custom merchandising services influences the purchasing decisions of online and offline shoppers across the U.S. and Canada. The business has comprehensive in store marketing media options in over 60,000 stores in the US and Canada, and reaches households across the country with circulation of more than 60 million through nearly 2,000 publications. In addition, the business has a digital media network, powered by first-party shopper data, including programmatic display, email, social and video to help brands and retailers connect with consumers. Headquartered in New York, NAM has a sales force of more than 300 people in 12 offices across the US and Canada. The business can be visited online at www.newsamerica.com.

**About Charlesbank**

Based in Boston and New York, Charlesbank Capital Partners is a middle-market private equity investment firm managing more than $7 billion of capital. Charlesbank focuses on management led buyouts and growth capital financings and also engages in opportunistic credit and technology investments. The firm seeks to partner with strong management teams to build companies with sustainable competitive advantage and excellent prospects for growth. For more information, please visit www.charlesbank.com.

**Forward-Looking Statements**

This release contains forward-looking statements based on current expectations or beliefs, as well as assumptions about future events, and these statements are subject to factors and uncertainties that could cause actual results to differ materially from those described in the forward-looking statements. The words "expect", "estimate", "anticipate", "predict", "believe," "potential" and similar expressions and variations thereof are intended to identify forward-looking statements. These statements appear in a number of places in this release and include statements with respect to, among other things, the expected timing for the completion of, and the potential benefits from, the sale of the Company's News America Marketing business. Readers are cautioned that any forward-looking statements are not guarantees of future performance and involve risks and uncertainties. Many factors, such as the risks and uncertainties related to the parties' efforts to comply with and satisfy applicable regulatory approvals and closing conditions relating to the sale, as well as continued uncertainty caused by the new coronavirus pandemic, could cause actual results to differ materially from those described

in these forward-looking statements. The forward-looking statements in this release speak only as of this date and the parties undertake no obligation (and expressly disclaim any obligation) to publicly update or revise any forward-looking statements, whether as a result of new information, future events or otherwise, except as required by law.

## Contacts

News Corp Investor Relations

Michael Florin

212-416-3363

mflorin@newscorp.com

News Corp Corporate Communications

Jim Kennedy

212-416-4064

jkennedy@newscorp.com

EXHIBIT 4

| From: | Gloria Park |
|---|---|
| To: | Moen, Nicole; Wind, Todd; Michael, William; Gallo, Kenneth A; O"Brien, Jane B; Dagnew, Lina; Milligan, Heather C; Tannenbaum, Brette; Zweifach, Gerson; Broecker, Kimberly; O"Shea, Timothy; Dougherty, Rachel |
| Cc: | Alejandra Salinas; Bill Carmody; Arun Subramanian; Mark Musico; S. Jamal Faleel; Jerry Blackwell; Rachel Black; Ryan Caughey; Rodney Polanco; Caroline DaCosta |
| Subject: | Insignia/News - Second and Third Sets of RFPs |
| Date: | Wednesday, July 1, 2020 5:10:00 PM |

Counsel,

We are writing to confirm whether News's June 8, 2020 production, consisting of certain retailer contracts with a start date of February 9, 2011 through December 31, 2013, is the only set of documents that News is going to produce in response to Insignia's Second and Third Set of RFPs.

Insignia's Second Set of RFPs consisted of one document request for "all documents and communications regarding Insignia, including but not limited to Insignia's existing and/or potential business relationship with CPGs and/or Retailers." This request did not contain a time period limitation. Insignia's Third Set of RFPs included a comprehensive set of document requests, including requests similar to those contained in Insignia's First Set of RFPs but without the 2014-2019 time limitation, new requests regarding the recent sale of NAM to Charlesbank, as well as tailored requests for documents produced in *Valassis*. These requests were consistent with the Court's March 24, 2020 ruling that Insignia may seek "pre-2014 documents" through "tailored document requests." Dkt. 113, at 4.

On April 16, 2020, Todd noted that Defendants "are prepared to agree to produce the following: (i) Feb. 2011-13 documents previously produced by NAM in Valassis II that hit on the recently agreed-upon search terms, and (ii) transcripts of depositions taken in Valassis II of agreed-upon NAM custodians in this case (subject to redactions of non-ISP-related testimony). In addition, we are assessing the cost and burden associated with identifying and producing the Feb. 2011-13 ISP-related contracts that were previously produced to Valassis in Valassis II and will let you know our position on that as soon as practicable."

On a May 5, 2020 meet and confer, Defendants backtracked on the above position communicated by Todd and were unprepared or unwilling to discuss the set of documents that Defendants will actually produce—even though Defendants should have been prepared to provide this information by May 4, when Defendants' responses and objections to the Third Set of RFPs were due. Likewise, notwithstanding Defendants' statement on May 4 that they are "looking into [] and will follow up" on the hit counts for documents responsive to Requests 1-6 of the Third Set of RFPs, Defendants never actually followed up with this information.

On May 7, 14, and 18, Insignia repeatedly emailed Defendants and asked them to provide the search terms and custodians that were used for Defendants' production in *Valassis*, identify the documents that Defendants will agree to produce in response to Requests 1-6 of the Third Set of RFPs, and provide the approximate volume of documents at issue in response to these RFPs. In these emails, Insignia reminded Defendants about the meet and confer deadlines set forth in the amended scheduling order and explained how having the requested information would facilitate the process of negotiating ESI parameters for Insignia's Second and Third Set of RFPs. Defendants never

responded.

On a May 22 call regarding expedited discovery, Insignia asked Defendants to respond to Insignia's May 7, 14, and 18 emails and to resume conferring with Insignia to negotiate ESI parameters for the Second and Third Sets of RFPs. One week later, on May 29, Defendants finally responded with a one-sentence email regarding Request No. 6 of the Third Set of RFPs but without any information on the rest of Insignia's document requests.

For the first time in the parties' June 5 joint letter to the Court, Insignia found out that Defendants refuse to meet and confer with regard to any of the remaining document requests contained in the Second and Third Set of RFPs or to produce documents beyond the retailer agreements produced on June 8. Defendants' statement that it "met-and-conferred with Insignia regarding Defendants' objections [to the Third Set of RFPs] in an attempt to narrow the areas of dispute" is inaccurate, as Defendants were unprepared or unwilling to discuss the documents that they will and will not produce on May 5, the only meet-and-confer discussion on the Second and Third Set of RFPs that the parties have had to date. Similarly, while Defendants represented to the Court that they "undertook efforts to determine the burden associated with producing additional categories of documents," they never shared the results of those efforts with Insignia. Defendants have also never explained why they reneged on their initial April 16 agreement. Nor have they ever provided the information requested in Insignia's May 7, 14, and 18 emails. Given Defendants' refusal to even meet and confer with Insignia in good faith about the RFPs, let alone producing documents responsive to those requests, Insignia strongly disagrees with Defendants' conclusion that their "position [on Insignia's outstanding RFPs] is clear and is more than reasonable under the circumstances."

We will raise Defendants' refusal to produce anything in response to our RFPs (other than RFP No. 6), or even meet and confer with us about those RFPs, with the Court.

Best,
Gloria

**Gloria Park | Susman Godfrey**
o. 212.729.2029 | c. 917.340.3695
1301 Avenue of the Americas, 32nd Fl. | New York, NY 10019
gpark@susmangodfrey.com

This e-mail may contain privileged and confidential information. If you received this message in error, please notify the sender and delete it immediately.

EXHIBIT 5

SUSMAN GODFREY L.L.P.

A REGISTERED LIMITED LIABILITY PARTNERSHIP
32ND FLOOR
1301 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10019-6023
(212) 336-8330
FAX (212) 336-8340
WWW.SUSMANGODFREY.COM

| SUITE 5100 | SUITE 1400 | SUITE 3800 |
| 1000 LOUISIANA STREET | 1900 AVENUE OF THE STARS | 1201 THIRD AVENUE |
| HOUSTON, TEXAS 77002-5096 | LOS ANGELES, CALIFORNIA 90067-6029 | SEATTLE, WASHINGTON 98101-3000 |
| (713) 651-9366 | (310) 789-3100 | (206) 516-3880 |

GLORIA PARK
DIRECT DIAL (212) 729-2029

E-MAIL GPARK@SUSMANGODFREY.COM

June 5, 2020

**VIA ECF**

The Honorable Becky R. Thorson
United States Magistrate Judge
United States District Court
Warren E. Burger Federal Building
316 North Robert Street
St. Paul, MN 55101

Re:     *Insignia Systems, Inc. v. News Corp., et al.*, No. 19-cv-01820 (MJD/BRT)

Dear Magistrate Judge Thorson:

Pursuant to the Amended Scheduling Order (Dkt. 122), the parties jointly provide an update on the status of discovery and set the following agenda for the June 10 status conference.

**<u>Joint Update on Status of Discovery</u>**

The parties have fully briefed their disputes on expedited discovery issues. *See* Dkts. 155-184.

*Plaintiff's Position*: To date, Insignia has produced nearly 600,000 documents and over 2.4 million pages. Insignia has also served privilege logs associated with the production of those documents. Insignia has further responded in good faith to Defendants' expedited breach-of-contract discovery requests, including responding to interrogatories with detailed answers guiding News to over 300 documents relevant to its inquiries, and agreeing to produce a Rule 30(b)(6) witness prepared to testify on all but the most facially unreasonable topics in Defendants' 30(b)(6) notice. Insignia is completing review of a small remaining volume of documents that hit on its privilege screen and will produce any nonprivileged documents from that review by June 22, the first of four rolling deadlines that the Court set for the production of Defendants' nonprivileged documents resulting from privilege review. *See* Dkt. 149, at 3.

*Defendants' Position*: Defendants have conducted a reasonable search for ESI and have produced a substantial number of documents in response to Insignia's discovery requests. Specifically, Defendants have produced about 7.9 million pages, which includes over 3 million

June 5, 2020
Page 2

pages from the post-2014 *Valassis II* production, about 4.8 million pages from the sixteen agreed-upon custodians that hit on 114 search terms, and over 35,000 pages of agreements. Defendants' productions include documents collected from NAM's legacy Exchange email archive, custodians' legacy personal network folders, custodians' laptop and PC hard drives, legacy network share folders, Org Charts, Retailer and CPG Agreements for In-Store Promotions, Gmail, and documents maintained in custodians' Google Drive folders. Defendants have also collected additional documents based on the May 18, 2020 IDR Order, to add Henri Lellouche as a custodian, ("attribut* w/5 test") as a search term across all custodians, and will be producing those non-privileged responsive documents in accordance with the Court's Second Order Amending First Amended Pretrial Scheduling Order. (Dkt. No. 149.) In addition, and in response to Insignia's Third Set of RFPs, Request No. 6, Defendants agreed to conduct a reasonable search for and produce retailer contracts produced in *Valassis II* entered into from February 10, 2011 through 2013.

Defendants dispute that Insignia has responded appropriately or in good faith regarding Defendants' expedited discovery requests. Defendants' position is set forth in its Motion To Determine The Sufficiency Of Plaintiff's Responses And Objections To Defendants' Requests For Admission And Rule 30(B)(6) Topics (Dkt. 161.)

**Insignia's Request Regarding Insignia's Third Set of RFPs Seeking Pre-2014 Documents**

*Plaintiff's Position*: Defendants violated the May 18, 2020 deadline set by the Amended Scheduling Order for the parties to meet and confer regarding ESI protocol for documents responsive to Insignia's RFPs for pre-2014 documents relevant to this case. Insignia's RFPs seeking such materials were served on April 3; Defendants' responses and objections were due on May 4; and the scheduling order required the parties to meet and confer within 14 days thereafter, which was May 18. *See* Dkt. 122, at 4.

Defendants ignored repeated requests from Insignia to meet and confer on the timeframe set by the Court. On a May 5 call (the *only* meet and confer call the parties have had about these RFPs), Defendants indicated that they were not prepared to discuss what documents they would or would not produce in response to Insignia's RFPs (specifically, RFPs 1 through 6, seeking a tailored set of materials from *Valassis*), even though their deadline to respond to those RFPs had already passed. Insignia also asked Defendants to provide the search terms and custodians that were used in *Valassis*, as that information would facilitate the negotiation of the ESI parameters for Insignia's RFPs seeking pre-2014 material.

On May 5, 7, 14, 18, and 22, Insignia asked Defendants again and again to respond. Insignia noted that Defendants were in violation of not only FRCP 34 but also the Court's scheduling order. Defendants did not respond. On May 29, Insignia at last received a one-sentence email regarding a single RFP (RFP No. 6), which was itself deficient, and in any event did not cure Defendants' continued refusal to meet and confer concerning search protocols for the rest of Insignia's RFPs. If Defendants are categorically refusing to produce documents from before

June 5, 2020
Page 3

2014 other than the limited subset of contracts they recently agreed to produce in response to Insignia's RFP No. 6, Defendants' blurb below marks the first time they have said as much. To the extent Defendants are merely refusing to engage *for now* because the RFPs at issue are "separate from Insignia's expedited discovery requests," Defendants' position remains inconsistent with the Amended Scheduling Order and the Court's Order concerning expedited discovery. *See* Dkt. 110, at 10 n.9 ("[t]he Pretrial Scheduling Order in place has set deadlines that are not stayed").

Respectfully, Insignia requests that the Court require Defendants to promptly meet and confer with Insignia (this time, actually prepared to discuss what Defendants will and will not produce in response to each RFP), and to meet and confer with Insignia regarding search protocols for its RFPs (including by answering Insignia's questions meant to facilitate that process)—all of which the Amended Scheduling Order and the Federal Rules already required Defendants to do weeks ago.

*Defendants' Position*: Defendants did not violate the Scheduling Order; Defendants complied with their obligations under the Scheduling Order and the Rules. Insignia requested additional pre-2014 documents in its Third Set of RFPs (separate from Insignia's expedited discovery requests). Insignia served the Third Set of RFPs after the Court issued the order denying Insignia's motion to compel and directing Insignia to serve "tailored" discovery requests. Insignia's Third Set of RFPs were not tailored; instead, Insignia split its previous broad one request into multiple requests. Insignia's Third Set of RFPs continue to encompass a substantial volume of documents that are not relevant or proportional to the case. Defendants timely served their responses and objections to Insignia's Third Set of RFPs. Defendants also met-and-conferred with Insignia regarding Defendants' objections in an attempt to narrow the areas of dispute. Defendants undertook efforts to determine the burden associated with producing additional categories of documents (even though they dispute that any additional documents would be relevant). As a result of those efforts, Defendants have agreed to produce additional retailer agreements from an earlier timeframe in response to RFP. No. 6 (*see* Defendants' position above). Defendants' position is clear and is more than reasonable under the circumstances. Insignia's position is unreasonable under the circumstances. Defendants should not be required to meet-and-confer ad nauseum with Insignia or produce documents beyond those Defendants have already agreed to produce.

Sincerely,

*s/ Gloria Park*
Gloria Park

EXHIBIT 6

SUSMAN GODFREY L.L.P.

A REGISTERED LIMITED LIABILITY PARTNERSHIP
32ND FLOOR
1301 AVENUE OF THE AMERICAS
NEW YORK, NEW YORK 10019-6023
(212) 336-8330
FAX (212) 336-8340
WWW.SUSMANGODFREY.COM

_____

| SUITE 5100 | SUITE 1400 | SUITE 3800 |
| 1000 LOUISIANA STREET | 1900 AVENUE OF THE STARS | 1201 THIRD AVENUE |
| HOUSTON, TEXAS 77002-5096 | LOS ANGELES, CALIFORNIA 90067-6029 | SEATTLE, WASHINGTON 98101-3000 |
| (713) 651-9366 | (310) 789-3100 | (206) 516-3880 |

GLORIA PARK
DIRECT DIAL (212) 729-2029

E-MAIL GPARK@SUSMANGODFREY.COM

August 5, 2020

**VIA ECF**

The Honorable Becky R. Thorson
United States Magistrate Judge
United States District Court
Warren E. Burger Federal Building
316 North Robert Street
St. Paul, MN 55101

Re:     *Insignia Systems, Inc. v. News Corp., et al.*, No. 19-cv-01820 (MJD/BRT)

Dear Magistrate Judge Thorson:

Pursuant to the Amended Scheduling Order (Dkt. 122), the parties jointly provide an update on the status of discovery and set the following agenda for the August 10 status conference.

The parties recognize that the Court planned to discuss anticipated experts and the upcoming settlement conference during the August status conference. *See* Dkt. 122, at 7, 13. The parties are ready to discuss these issues with the Court.

## Joint Update on Status of Discovery

*Plaintiff's Position*: As Insignia last updated the Court on July 13, Insignia has satisfied all of Defendants' discovery requests to Insignia.  In total, Insignia—as the plaintiff and as the party not accused of any antitrust violations—has produced 608,318 documents totaling 2,457,512 pages.

The parties are continuing their meet and confer on documents Defendants will produce in response to Insignia's Second and Third Set of RFPs. On Thursday, July 30, Defendants provided certain basic information that Insignia had been requesting since at least May to be able to evaluate Defendants' objections to Insignia's requests. In particular, Defendants provided the names of News witnesses that were deposed in *Valassis II*, and the total number of expert reports served in that case. Defendants continue to refuse to provide the names of other News witnesses whose depositions were reproduced in *Valassis II*. Defendants are also still evaluating what

August 5, 2020
Page 2

documents they will produce regarding the recent sale of News America Marketing ("NAM") to a private equity firm after Insignia explained in writing on July 22 why those documents are relevant.

Insignia disagrees with Defendants' characterization of outstanding documents to be produced—which include transcripts of depositions taken in 2017, and NAM's sale earlier *this year*—as "old and irrelevant." Insignia is currently evaluating the (limited) information Defendants have provided, will respond to their most recent email this week, and will wrap up the meet-and-confer process and tee up any discovery disputes (if any) in an expeditious manner as directed by the Court during the last status conference.

*Defendants' Position*: Defendants do not agree with Plaintiff's characterization of the parties' negotiations. However, Defendants agree that they are (limited) waiting for Plaintiff's response to Defendants' proposal regarding the Second and Third Sets of RFPs, outlined below. With respect to Plaintiff's three overly broad requests for virtually all documents relating to the sale of NAM to a private equity firm (to which Defendants timely objected), Plaintiff has only recently identified certain categories of documents relating to the transaction of purported relevance to this action, which Defendants are now considering.

To date, Defendants have produced **2,860,801 documents** totaling **10,201,927 pages**. Defendants are working diligently to complete production in accordance with the Court's Order. Defendants have produced or are in the process of producing the following categories of documents:

1. Custodial documents that were previously produced in Valassis II dated January 1, 2014 and beyond;
2. All agreements with retailers and CPGs since January 2014;
3. Custodial documents from 17 custodians that hit on 115 search terms;
4. Retailer contracts produced in Valassis II with a start date of February 9, 2011 through December 31, 2013; and
5. Documents produced in response to expedited discovery requests.

Given the magnitude of Defendants' document production, Defendants should not be required to produce any additional documents, especially since the additional documents that Insignia seeks are old and/or irrelevant. Nevertheless, Defendants have proposed to produce the following categories of documents, in full satisfaction of Defendants' responses to Insignia's RFPs Sets II and III:

1. The February 2011–2013 custodial documents previously produced by NAM in *Valassis II* that hit on the search terms agreed upon in this matter; and

August 5, 2020
Page 3


2. The transcripts of depositions taken in *Valassis II* of the NAM custodians agreed-to in this case, subject to redactions of non-ISP and pre-2011-related testimony.  There are potentially seven depositions that fall into this category:  Garofalo, Augustinos, Spitz, Hansa, Perkins, Kroc, and Bedell.

With respect to the proposed February 2011–2013 custodial documents previously produced by NAM in *Valassis II* that hit on the search terms in this case, Defendants have further agreed not to exclude documents originally produced in the *Dial* litigation that were re-produced in *Valassis II*, but only as part of a global resolution of the parties' disputes regarding Insignia's RFPs Sets II and III. Defendants estimate that this category would result in the production of **over 1.4 million additional documents**.

Separately, Defendants do not agree that Plaintiff has satisfied all of its discovery obligations, as Defendants are still reviewing Plaintiff's productions and the parties have not yet exchanged transactional or other data.


Sincerely,

*s/ Gloria Park*
Gloria Park

EXHIBIT 7

| | |
|---|---|
| **From:** | Gloria Park |
| **To:** | Moen, Nicole; Alejandra Salinas; Arun Subramanian; Bill Carmody; Caroline DaCosta; Jerry Blackwell; Mark Musico; Rachel Black; Rodney Polanco; Ryan Caughey; S. Jamal Faleel |
| **Cc:** | Gerson A. Zweifach; Heather Milligan; Jeannie S. Rhee; jobrien@paulweiss.com; kgallo@paulweiss.com; Kimberly Broecker; Dougherty, Rachel; O"Shea, Timothy; Wind, Todd; wmichael@paulweiss.com |
| **Subject:** | RE: Insignia/News - Meet and Confer on Insignia"s Second and Third Sets of RFPs |
| **Date:** | Thursday, August 6, 2020 10:37:00 AM |

Nicole,

We respond to Defendants' July 7 proposal and July 30 follow-up communication.

Insignia disagrees with Defendants' stated objections on relevance and burden grounds. In particular, we disagree with Defendants' position that they won't even provide the names of deposed News witnesses whose deposition material was reproduced in *Valassis II* because "[n]one of those transcripts are relevant at all." For example, we understand that most if not all of those depositions include testimony concerning Defendants' conduct in the third-party ISP market, in which case they are plainly relevant. As for the time period, while Insignia maintains that pre-2011 facts and events are relevant and discoverable, even setting that dispute aside, at least depositions from the *Dial* case will include the sworn testimony of News executives from after 2011 on matters relevant to this case.

In an effort to move discovery forward, and to accommodate Defendants' often-repeated concerns about burden, Insignia proposes the following.  Rather than producing all documents from *Valassis II* and *Dial* that hit on the search terms negotiated for this case, which Defendants have represented includes over 1.4 million documents in the 2011-2013 time period, Insignia proposes that Defendants produce:

1. The deposition transcripts of the 19 News witnesses that were deposed in *Valassis II*. The deposition transcripts are plainly relevant, and their production poses no burden to Defendants.  The deposition transcripts should not be redacted; as News is no doubt aware, such redactions are highly disfavored and routinely rejected. While Insignia maintains that the exhibits to those depositions also should be produced, Insignia would accept just the transcripts in the first instance, pending Insignia's review of the transcripts for relevant exhibits.

2. A list of depositions of News witnesses that were reproduced in *Valassis II*, including indication of the prior litigation in which the deposition was taken.  Insignia cannot reasonably evaluate News's position that those depositions are irrelevant or burdensome to produce without even knowing how many depositions are at issue, who was deposed, and in what context.

3. The trial exhibits and exhibits to summary judgment briefing from *Valassis II*.  If Defendants object to producing that limited set of documents, which Insignia understands to include a few thousand documents at most, Insignia alternatively proposes that Defendants produce the documents in these categories that hit on the search terms negotiated for this case.

Insignia will accept Defendants' production of this limited set of documents and information to avoid a dispute at this time, without waiver of any rights to seek additional relevant documents in the future.

Finally, Insignia expects that the parties will continue to meet and confer concerning the following categories of documents not addressed by the above proposal:
- Financial and market data to be exchanged, including underlying data and analysis from *Valassis II* expert reports
- Documents related to the sale of NAM to Charlesbank

Insignia reserves all rights.

Best,
Gloria

**Gloria Park | Susman Godfrey**
o. 212.729.2029 | c. 917.340.3695
1301 Avenue of the Americas, 32nd Fl. | New York, NY 10019
gpark@susmangodfrey.com

This e-mail may contain privileged and confidential information. If you received this message in error, please notify the sender and delete it immediately.

---

**From:** Moen, Nicole <NMoen@fredlaw.com>
**Sent:** Thursday, July 30, 2020 9:12 AM
**To:** Gloria Park <GPark@susmangodfrey.com>; Alejandra Salinas <ASalinas@susmangodfrey.com>; Arun Subramanian <asubramanian@SusmanGodfrey.com>; Bill Carmody <bcarmody@SusmanGodfrey.com>; Caroline DaCosta <CDaCosta@susmangodfrey.com>; Jerry Blackwell <blackwell@blackwellburke.com>; Mark Musico <MMusico@susmangodfrey.com>; Rachel Black <rblack@SusmanGodfrey.com>; Rodney Polanco <RPolanco@susmangodfrey.com>; Ryan Caughey <rcaughey@susmangodfrey.com>; S. Jamal Faleel <jfaleel@blackwellburke.com>
**Cc:** Gerson A. Zweifach <gzweifach@wc.com>; Heather Milligan <hmilligan@paulweiss.com>; Jeannie S. Rhee <jrhee@paulweiss.com>; jobrien@paulweiss.com; kgallo@paulweiss.com; Kimberly Broecker <kbroecker@wc.com>; Dougherty, Rachel <RDougherty@fredlaw.com>; O'Shea, Timothy <toshea@fredlaw.com>; Wind, Todd <twind@fredlaw.com>; wmichael@paulweiss.com
**Subject:** RE: Insignia/News - Meet and Confer on Insignia's Second and Third Sets of RFPs

Counsel,
We write in response to Gloria's 7/22 email.

### I.    Cloned Discovery: *Valassis II* Depositions

In order to resolve the parties' dispute, defendants have offered to produce deposition transcripts of any of the agreed upon *Insignia II* custodians and associated exhibits, subject to redactions or exclusions of testimony and documents pertaining to NAM's non-ISP business matters or solely pre-2011 facts and events. By offering to produce certain depo transcripts, NAM does not concede that

the testimony contained therein meets any standards for admissibility in this action under the Federal Rules of Civil Procedure or the Rules of Evidence.

During the meet and confer, you asked us to provide the names of the NAM witnesses that were deposed in *Valassis II*.  That information is provided below (*Insignia II* custodians are denoted with an *):

> Augustinos, Rob*
>
> Aversano, Jesse
>
> Bedell, Tina*
>
> Campanelli, Wayne
>
> Campbell, June
>
> Carlucci, Paul
>
> Dittrich, Tom
>
> Garofalo, Marty*
>
> Hansa, Dominic*
>
> Kroc, Patrick*
>
> Leprine, Thomas
>
> Mixson, Chris
>
> Naze, West
>
> Nudelman, Jenna
>
> O'Day, Gavin
>
> Perkins, Nancy*
>
> Schulman, Mark
>
> Spitz, Robert*
>
> Topham, Lisa

The provision of this information is not a concession that any of these deposition transcripts are relevant or discoverable in this matter.  Furthermore, we do not agree to provide the names of NAM witnesses deposed in other matters that may have been reproduced in *Valassis II*.  None of those transcripts are relevant and all of those transcripts are likely to include testimony regarding primarily (if not exclusively) pre-2011 facts and events.  At this point, we have agreed to provide voluminous quantities of documents and testimony previously produced in *Valassis II*.  In addition, we have spent excessive amounts of time devoted to discussions regarding the record in *Valassis II* and collecting information to provide in response to your many requests seeking cloned discovery.  This has unduly diverted our attention from litigating *this* case.  We will not provide further information regarding long-since concluded litigations such as *Dial*, *Valassis I*, *Insignia I*, or *Floorgraphics*, unless ordered to do so by the Court.

## II.      Cloned Discovery:  Expert Reports from *Valassis II*

To date, the parties in *Valassis II* have served thirteen expert reports in connection with that matter. Insignia is not entitled to these reports in the form of cloned discovery in this case.  As an initial matter, the expert reports from *Valassis II* are not relevant to Insignia's claims in this litigation. Indeed, the alleged damages period in this case *does not even begin* until July 2015, well after Valassis exited the in-store business.  Insignia's request for the *Valassis II* reports is yet another example of its overreaching by seeking cloned discovery.  It is worth noting, in this regard, that in *Insignia I*, Insignia similarly sought cloned expert reports from NAM's prior litigation with Valassis, which was correctly denied by Magistrate Judge Boylan.

In any event, the thirteen reports are subject to the Paragraph I.B. of the *Valassis II* protective order, which requires that "[a]ll discovery subject to this Order shall be used solely and exclusively for purposes of this action in accordance with the provisions of this Order. No discovery shall be used in or for other cases, proceedings, or disputes or for any commercial, business, competitive, or other purpose whatsoever, without further order of the Court or Panel."

### III.      Cloned Discovery:  Reproduction of 2/2011-12/2013 documents previously produced in *Valassis II* that hit on search terms agreed upon in this matter

We have confirmed that there were post-2/9/2011 documents originally produced in *Dial* that were reproduced in *Valassis II*.  Defendants are willing to include those documents in our offer, but only as part of a global resolution of the parties disputes regarding Insignia's Second and Third RFPs.

### IV.      Request for documents related to the Charlesbank transaction

We are conferring with our client regarding this request and will follow up with you as soon as practicable.

Defendants reserve all rights.

Sincerely,

Nicole

Nicole M. Moen
Fredri*k*son & Byron, P.A.
200 South Sixth Street, Suite 4000, Minneapolis, MN 55402-1425
Direct: 612.492.7320
Cell: 612.600.0707
Fax: 612.492.7077
Email: nmoen@fredlaw.com
Assistant: Cindy Thomas, 612.492.7562, cthomas@fredlaw.com

---

**From:** Gloria Park <GPark@susmangodfrey.com>
**Sent:** Wednesday, July 22, 2020 5:36 PM
**To:** Gerson A. Zweifach <gzweifach@wc.com>; Heather Milligan <hmilligan@paulweiss.com>; Jeannie S. Rhee <jrhee@paulweiss.com>; jobrien@paulweiss.com; kgallo@paulweiss.com; Kimberly Broecker <kbroecker@wc.com>; Moen, Nicole <NMoen@fredlaw.com>; Dougherty, Rachel <RDougherty@fredlaw.com>; O'Shea, Timothy <toshea@fredlaw.com>; Wind, Todd <twind@fredlaw.com>; wmichael@paulweiss.com
**Cc:** Alejandra Salinas <ASalinas@susmangodfrey.com>; Arun Subramanian <asubramanian@SusmanGodfrey.com>; Bill Carmody <bcarmody@SusmanGodfrey.com>; Caroline DaCosta <CDaCosta@susmangodfrey.com>; Gloria Park <GPark@susmangodfrey.com>; Jerry Blackwell <blackwell@blackwellburke.com>; Mark Musico <MMusico@susmangodfrey.com>; Rachel Black <rblack@SusmanGodfrey.com>; Rodney Polanco <RPolanco@susmangodfrey.com>; Ryan Caughey <rcaughey@susmangodfrey.com>; S. Jamal Faleel <jfaleel@blackwellburke.com>
**Subject:** Insignia/News - Meet and Confer on Insignia's Second and Third Sets of RFPs

[EXTERNAL E-MAIL]

Counsel,

We write to follow up on the parties' meet and confer earlier today.

**Depositions taken and produced in *Valassis II***: Defendants proposed producing documents for the depositions taken in *Valassis II* of the NAM custodians in this case. Beyond those seven depositions, Defendants noted that producing additional depositions would not be proportional to the needs of this case. So that Insignia can assess Defendants' objection, Defendants agreed to provide a list of deponents in *Valassis II*. Please do so by this Friday, July 24.

Defendants' counsel also stated that they will confer with their client on whether they will provide a list of witnesses who were deposed in prior litigations (e.g., *Dial, Insignia I, Valassis I, Floorgraphics*) whose deposition materials were produced in *Valassis II*. If you are willing to provide this information, please do so by this Friday, July 24. If you are not willing to provide this information, please let us know that position by this Friday and please let us know why you are unwilling to provide the information.

**Expert reports in *Valassis II***: Defendants objected to producing expert reports in *Valassis II* on relevance and burden grounds. Defendants stated those reports may contain information that Defendants believe is not relevant to this case, such as pre-2011 information. Defendants stated that producing expert reports may also raise confidentiality issues. So that Insignia can assess Defendants' objection, Defendants agreed to provide the total number of expert reports in *Valassis II*. Please do so by this Friday, July 24.

**Documents designated trial exhibits in *Valassis II***: Defendants noted that Insignia should already have post-2014 trial exhibits from *Valassis II* from Defendants' productions to date, and that Defendants' offer to run search terms through their 2011-2013 *Valassis II* production should encompass post-2011 trial exhibits. Plaintiff will take this representation under advisement.

**Documents related to the sale of NAM to Charlesbank**: Defendants stated their willingness to discuss producing documents on the sale of NAM to Charlesbank provided that Plaintiff provides additional information on why such documents are relevant. As noted on the call, Plaintiff believes that the Charlesbank documents are relevant for at least the following nonexhaustive list of reasons:
1. Any valuation of NAM that was conducted in advance of or as part of the transaction is relevant to this case.
2. Any market and competitive analysis that was conducted in advance of or as part of the transaction is relevant to this case.
3. Any research or survey on market conditions that was conducted in advance of or as part of the transaction is relevant to this case.
4. Charlesbank owns Vestcom, a player in the third-party ISP market. Documents and communications regarding Vestcom, potential synergies and cooperation between NAM and Vestcom, and any consideration (regulatory, market, business strategy, or otherwise) on one entity owning both Vestcom and NAM are relevant to this case.

Please confirm whether documents exist on the above-referenced relevant topics and whether Defendants will produce those documents.

**Defendants' proposal to run negotiated search terms through Defendants' *Valassis II* production**: Defendants clarified that they did not undertake a responsiveness review in *Valassis II*. Defendants further clarified that they are proposing to run search terms through only documents newly produced in *Valassis II*, not documents produced by Defendants in prior litigations like *Dial* that have been re-produced in *Valassis II*. Defendants' counsel stated that they will confirm whether there were post-2/9/2011 documents produced in *Dial* and, if so, articulate the basis of Defendant's position for not running search terms through that set of documents. Please do so by this Friday, July 24.

**Retailer and CPG contracts**: Defendants stated that they have completed their production of 2014-2019 CPG and retailer contracts and 2011-2013 retailer contracts. Defendants stated that they will not produce 2011-2013 CPG contracts on burden grounds. Defendants stated their willingness to discuss producing existing data that aggregates the information reflected in the individual CPG contracts.

**Exchange of financial and market data**: The parties agreed to mutually identify categories of financial and market data that the parties will produce.

Best,
Gloria

**Gloria Park | Susman Godfrey**
o. 212.729.2029 | c. 917.340.3695
1301 Avenue of the Americas, 32nd Fl. | New York, NY 10019
gpark@susmangodfrey.com

This e-mail may contain privileged and confidential information. If you received this message in error, please notify the sender and delete it immediately.

EXHIBIT 8

| From: | Moen, Nicole |
|---|---|
| To: | Gloria Park; Alejandra Salinas; Arun Subramanian; Bill Carmody; Caroline DaCosta; Jerry Blackwell; Mark Musico; Rachel Black; Rodney Polanco; Ryan Caughey; S. Jamal Faleel |
| Cc: | Gerson A. Zweifach; Heather Milligan; Jeannie S. Rhee; jobrien@paulweiss.com; kgallo@paulweiss.com; Kimberly Broecker; Dougherty, Rachel; O"Shea, Timothy; Wind, Todd; wmichael@paulweiss.com |
| Subject: | RE: Insignia/News - Meet and Confer on Insignia"s Second and Third Sets of RFPs |
| Date: | Thursday, August 20, 2020 5:40:29 PM |

Gloria,

We are writing in response to your proposal regarding Insignia's Second and Third RFPs (described in your August 6 email) and request for documents regarding the sale of NAM to Charlesbank (addressed in your July 22 email).

With respect to your August 6th proposal:

- For the reasons described in Part I of my July 30 email, we do not agree to your proposals numbered 1) and 2) in your email.
- As for your proposal that Defendants produce Valassis trial and summary judgment exhibits that hit on the search terms negotiated for this case, we understand that you would not agree that such a production would resolve your request for pre-2013 documents previously produced in Valassis, but rather you would be reserving your right to pursue further discovery in response to those requests.  That is not resolving a dispute, it's postponing one.  We therefore cannot agree. If you have a proposal that would actually resolve the dispute, please let us know, and we'll consider that proposal.

With respect to your Charlesbank request:

1. **"Valuation of NAM"** – We disagree that NAM's valuation, whether analyzed in connection with the transaction or otherwise, is relevant to this case.  In any event, we note that we have agreed to produce extensive financial data that should more than suffice to address the issues you have raised.  We do not agree to conduct additional or incremental searches beyond what is already being produced.

2. **"Any market and competitive analysis"** – We do not agree to conduct an additional search for documents responsive to this request.  We note that, to the extent they exist, such analyses would have been captured by the search protocol already agreed to by the parties and have been or will be produced.  We see no reason to go outside the agreed-upon search protocol to collect additional documents of this sort (even assuming they exist).

3. **"Any research or survey on market conditions"** – We do not understand the distinction, if any, between this category of documents and the prior category, but in all events, our response is the same.

4. **"Documents and communications regarding Vestcom, potential synergies and cooperation, and any consideration on one entity owning both Vestcom and NAM"** – To the extent that you are seeking legal/regulatory analyses with this request, any such documents that may exist would be privileged and not subject to discovery.  We therefore do not agree to expend resources searching for and collecting them.  We also do not agree to search for and collect "synergies" documents, and you have not explained how such documents would be relevant to this case.  Finally, we note that while you now concede that Vestcom is a competitor in

what you call the "third-party ISP market," you did not previously request that NAM search for *any* documents regarding Vestcom.  We do not see why NAM should be put to the burden of now searching for the documents you describe here.

Sincerely,
Nicole

Nicole M. Moen
Fredrikson & Byron, P.A.
200 South Sixth Street, Suite 4000, Minneapolis, MN 55402-1425
Direct: 612.492.7320
Cell: 612.600.0707
Fax: 612.492.7077
Email: nmoen@fredlaw.com
Assistant: Cindy Thomas, 612.492.7562, cthomas@fredlaw.com

---

**From:** Gloria Park <GPark@susmangodfrey.com>
**Sent:** Thursday, August 20, 2020 7:03 AM
**To:** Moen, Nicole <NMoen@fredlaw.com>; Alejandra Salinas <ASalinas@susmangodfrey.com>; Arun Subramanian <asubramanian@SusmanGodfrey.com>; Bill Carmody <bcarmody@SusmanGodfrey.com>; Caroline DaCosta <CDaCosta@susmangodfrey.com>; Jerry Blackwell <blackwell@blackwellburke.com>; Mark Musico <MMusico@susmangodfrey.com>; Rachel Black <rblack@SusmanGodfrey.com>; Rodney Polanco <RPolanco@susmangodfrey.com>; Ryan Caughey <rcaughey@susmangodfrey.com>; S. Jamal Faleel <jfaleel@blackwellburke.com>
**Cc:** Gerson A. Zweifach <gzweifach@wc.com>; Heather Milligan <hmilligan@paulweiss.com>; Jeannie S. Rhee <jrhee@paulweiss.com>; jobrien@paulweiss.com; kgallo@paulweiss.com; Kimberly Broecker <kbroecker@wc.com>; Dougherty, Rachel <RDougherty@fredlaw.com>; O'Shea, Timothy <toshea@fredlaw.com>; Wind, Todd <twind@fredlaw.com>; wmichael@paulweiss.com
**Subject:** RE: Insignia/News - Meet and Confer on Insignia's Second and Third Sets of RFPs

[EXTERNAL E-MAIL]

Nicole,

Defendants represented to the Court during the August status conference last week that they would respond to Insignia's proposal by this week. Please let us know no later than tomorrow whether Defendants agree to Insignia's proposal made on August 6 and what documents Defendants will produce related to the sale of NAM to Charlesbank. As you know, we provided in writing the relevance of those Charlesbank documents almost a month ago, in our July 22 email.

Best,
Gloria

---

**From:** Gloria Park

**Sent:** Thursday, August 6, 2020 10:38 AM
**To:** Moen, Nicole <NMoen@fredlaw.com>; Alejandra Salinas <ASalinas@susmangodfrey.com>; Arun Subramanian <asubramanian@SusmanGodfrey.com>; Bill Carmody <bcarmody@SusmanGodfrey.com>; Caroline DaCosta <CDaCosta@susmangodfrey.com>; Jerry Blackwell <blackwell@blackwellburke.com>; Mark Musico <MMusico@susmangodfrey.com>; Rachel Black <rblack@SusmanGodfrey.com>; Rodney Polanco <RPolanco@susmangodfrey.com>; Ryan Caughey <rcaughey@susmangodfrey.com>; S. Jamal Faleel <jfaleel@blackwellburke.com>
**Cc:** Gerson A. Zweifach <gzweifach@wc.com>; Heather Milligan <hmilligan@paulweiss.com>; Jeannie S. Rhee <jrhee@paulweiss.com>; jobrien@paulweiss.com; kgallo@paulweiss.com; Kimberly Broecker <kbroecker@wc.com>; Dougherty, Rachel <RDougherty@fredlaw.com>; O'Shea, Timothy <toshea@fredlaw.com>; Wind, Todd <twind@fredlaw.com>; wmichael@paulweiss.com
**Subject:** RE: Insignia/News - Meet and Confer on Insignia's Second and Third Sets of RFPs

Nicole,

We respond to Defendants' July 7 proposal and July 30 follow-up communication.

Insignia disagrees with Defendants' stated objections on relevance and burden grounds. In particular, we disagree with Defendants' position that they won't even provide the names of deposed News witnesses whose deposition material was reproduced in *Valassis II* because "[n]one of those transcripts are relevant at all." For example, we understand that most if not all of those depositions include testimony concerning Defendants' conduct in the third-party ISP market, in which case they are plainly relevant. As for the time period, while Insignia maintains that pre-2011 facts and events are relevant and discoverable, even setting that dispute aside, at least depositions from the *Dial* case will include the sworn testimony of News executives from after 2011 on matters relevant to this case.

In an effort to move discovery forward, and to accommodate Defendants' often-repeated concerns about burden, Insignia proposes the following.  Rather than producing all documents from *Valassis II* and *Dial* that hit on the search terms negotiated for this case, which Defendants have represented includes over 1.4 million documents in the 2011-2013 time period, Insignia proposes that Defendants produce:

1. The deposition transcripts of the 19 News witnesses that were deposed in *Valassis II*. The deposition transcripts are plainly relevant, and their production poses no burden to Defendants.  The deposition transcripts should not be redacted; as News is no doubt aware, such redactions are highly disfavored and routinely rejected. While Insignia maintains that the exhibits to those depositions also should be produced, Insignia would accept just the transcripts in the first instance, pending Insignia's review of the transcripts for relevant exhibits.

2. A list of depositions of News witnesses that were reproduced in *Valassis II*, including indication of the prior litigation in which the deposition was taken.  Insignia cannot reasonably evaluate News's position that those depositions are irrelevant or burdensome to produce without even knowing how many depositions are at issue, who was deposed, and in what

context.

3. The trial exhibits and exhibits to summary judgment briefing from *Valassis II.*  If Defendants object to producing that limited set of documents, which Insignia understands to include a few thousand documents at most, Insignia alternatively proposes that Defendants produce the documents in these categories that hit on the search terms negotiated for this case.

Insignia will accept Defendants' production of this limited set of documents and information to avoid a dispute at this time, without waiver of any rights to seek additional relevant documents in the future.

Finally, Insignia expects that the parties will continue to meet and confer concerning the following categories of documents not addressed by the above proposal:
- Financial and market data to be exchanged, including underlying data and analysis from *Valassis II* expert reports
- Documents related to the sale of NAM to Charlesbank

Insignia reserves all rights.


Best,
Gloria


**Gloria Park | Susman Godfrey**
o. 212.729.2029 | c. 917.340.3695
1301 Avenue of the Americas, 32nd Fl. | New York, NY 10019
gpark@susmangodfrey.com

This e-mail may contain privileged and confidential information.  If you received this message in error, please notify the sender and delete it immediately.

---

**From:** Moen, Nicole <NMoen@fredlaw.com>
**Sent:** Thursday, July 30, 2020 9:12 AM
**To:** Gloria Park <GPark@susmangodfrey.com>; Alejandra Salinas <ASalinas@susmangodfrey.com>; Arun Subramanian <asubramanian@SusmanGodfrey.com>; Bill Carmody <bcarmody@SusmanGodfrey.com>; Caroline DaCosta <CDaCosta@susmangodfrey.com>; Jerry Blackwell <blackwell@blackwellburke.com>; Mark Musico <MMusico@susmangodfrey.com>; Rachel Black <rblack@SusmanGodfrey.com>; Rodney Polanco <RPolanco@susmangodfrey.com>; Ryan Caughey <rcaughey@susmangodfrey.com>; S. Jamal Faleel <jfaleel@blackwellburke.com>
**Cc:** Gerson A. Zweifach <gzweifach@wc.com>; Heather Milligan <hmilligan@paulweiss.com>; Jeannie S. Rhee <jrhee@paulweiss.com>; jobrien@paulweiss.com; kgallo@paulweiss.com; Kimberly Broecker <kbroecker@wc.com>; Dougherty, Rachel <RDougherty@fredlaw.com>; O'Shea, Timothy <toshea@fredlaw.com>; Wind, Todd <twind@fredlaw.com>; wmichael@paulweiss.com
**Subject:** RE: Insignia/News - Meet and Confer on Insignia's Second and Third Sets of RFPs

Counsel,
We write in response to Gloria's 7/22 email.

## I.      Cloned Discovery: *Valassis II* Depositions

In order to resolve the parties' dispute, defendants have offered to produce deposition transcripts of any of the agreed upon *Insignia II* custodians and associated exhibits, subject to redactions or exclusions of testimony and documents pertaining to NAM's non-ISP business matters or solely pre-2011 facts and events.  By offering to produce certain depo transcripts, NAM does not concede that the testimony contained therein meets any standards for admissibility in this action under the Federal Rules of Civil Procedure or the Rules of Evidence.

During the meet and confer, you asked us to provide the names of the NAM witnesses that were deposed in *Valassis II*.  That information is provided below (*Insignia II* custodians are denoted with an *):

> Augustinos, Rob*
>
> Aversano, Jesse
>
> Bedell, Tina*
>
> Campanelli, Wayne
>
> Campbell, June
>
> Carlucci, Paul
>
> Dittrich, Tom
>
> Garofalo, Marty*
>
> Hansa, Dominic*
>
> Kroc, Patrick*
>
> Leprine, Thomas
>
> Mixson, Chris
>
> Naze, West
>
> Nudelman, Jenna
>
> O'Day, Gavin
>
> Perkins, Nancy*
>
> Schulman, Mark
>
> Spitz, Robert*
>
> Topham, Lisa

The provision of this information is not a concession that any of these deposition transcripts are relevant or discoverable in this matter.  Furthermore, we do not agree to provide the names of NAM witnesses deposed in other matters that may have been reproduced in *Valassis II*.  None of those transcripts are relevant and all of those transcripts are likely to include testimony regarding primarily (if not exclusively) pre-2011 facts and events.  At this point, we have agreed to provide voluminous quantities of documents and testimony previously produced in *Valassis II*.  In addition, we have spent excessive amounts of time devoted to discussions regarding the record in *Valassis II* and collecting information to provide in response to your many requests seeking cloned discovery.  This has unduly diverted our attention from litigating *this* case.  We will not provide further information regarding long-since concluded litigations such as *Dial*, *Valassis I*, *Insignia I*, or *Floorgraphics*, unless ordered to do so by the Court.

## II.      Cloned Discovery:  Expert Reports from *Valassis II*

To date, the parties in *Valassis II* have served thirteen expert reports in connection with that matter.

Insignia is not entitled to these reports in the form of cloned discovery in this case.  As an initial matter, the expert reports from *Valassis II* are not relevant to Insignia's claims in this litigation. Indeed, the alleged damages period in this case *does not even begin* until July 2015, well after Valassis exited the in-store business.  Insignia's request for the *Valassis II* reports is yet another example of its overreaching by seeking cloned discovery.  It is worth noting, in this regard, that in *Insignia I*, Insignia similarly sought cloned expert reports from NAM's prior litigation with Valassis, which was correctly denied by Magistrate Judge Boylan.

In any event, the thirteen reports are subject to the Paragraph I.B. of the *Valassis II* protective order, which requires that "[a]ll discovery subject to this Order shall be used solely and exclusively for purposes of this action in accordance with the provisions of this Order. No discovery shall be used in or for other cases, proceedings, or disputes or for any commercial, business, competitive, or other purpose whatsoever, without further order of the Court or Panel."

### III.    Cloned Discovery:  Reproduction of 2/2011-12/2013 documents previously produced in *Valassis II* that hit on search terms agreed upon in this matter

We have confirmed that there were post-2/9/2011 documents originally produced in *Dial* that were reproduced in *Valassis II*.  Defendants are willing to include those documents in our offer, but only as part of a global resolution of the parties disputes regarding Insignia's Second and Third RFPs.

### IV.    Request for documents related to the Charlesbank transaction

We are conferring with our client regarding this request and will follow up with you as soon as practicable.

Defendants reserve all rights.

Sincerely,

Nicole

Nicole M. Moen
Fredrikson & Byron, P.A.
200 South Sixth Street, Suite 4000, Minneapolis, MN 55402-1425
Direct: 612.492.7320
Cell: 612.600.0707
Fax: 612.492.7077
Email: nmoen@fredlaw.com
Assistant: Cindy Thomas, 612.492.7562, cthomas@fredlaw.com

---

**From:** Gloria Park <GPark@susmangodfrey.com>
**Sent:** Wednesday, July 22, 2020 5:36 PM
**To:** Gerson A. Zweifach <gzweifach@wc.com>; Heather Milligan <hmilligan@paulweiss.com>; Jeannie S. Rhee <jrhee@paulweiss.com>; jobrien@paulweiss.com; kgallo@paulweiss.com; Kimberly Broecker <kbroecker@wc.com>; Moen, Nicole <NMoen@fredlaw.com>; Dougherty, Rachel <RDougherty@fredlaw.com>; O'Shea, Timothy <toshea@fredlaw.com>; Wind, Todd <twind@fredlaw.com>; wmichael@paulweiss.com
**Cc:** Alejandra Salinas <ASalinas@susmangodfrey.com>; Arun Subramanian

<asubramanian@SusmanGodfrey.com>; Bill Carmody <bcarmody@SusmanGodfrey.com>; Caroline DaCosta <CDaCosta@susmangodfrey.com>; Gloria Park <GPark@susmangodfrey.com>; Jerry Blackwell <blackwell@blackwellburke.com>; Mark Musico <MMusico@susmangodfrey.com>; Rachel Black <rblack@SusmanGodfrey.com>; Rodney Polanco <RPolanco@susmangodfrey.com>; Ryan Caughey <rcaughey@susmangodfrey.com>; S. Jamal Faleel <jfaleel@blackwellburke.com>
**Subject:** Insignia/News - Meet and Confer on Insignia's Second and Third Sets of RFPs

[EXTERNAL E-MAIL]

Counsel,

We write to follow up on the parties' meet and confer earlier today.

**Depositions taken and produced in *Valassis II***: Defendants proposed producing documents for the depositions taken in *Valassis II* of the NAM custodians in this case. Beyond those seven depositions, Defendants noted that producing additional depositions would not be proportional to the needs of this case. So that Insignia can assess Defendants' objection, Defendants agreed to provide a list of deponents in *Valassis II*. Please do so by this Friday, July 24.

Defendants' counsel also stated that they will confer with their client on whether they will provide a list of witnesses who were deposed in prior litigations (e.g., *Dial, Insignia I, Valassis I, Floorgraphics*) whose deposition materials were produced in *Valassis II*. If you are willing to provide this information, please do so by this Friday, July 24. If you are not willing to provide this information, please let us know that position by this Friday and please let us know why you are unwilling to provide the information.

**Expert reports in *Valassis II***: Defendants objected to producing expert reports in *Valassis II* on relevance and burden grounds. Defendants stated those reports may contain information that Defendants believe is not relevant to this case, such as pre-2011 information. Defendants stated that producing expert reports may also raise confidentiality issues. So that Insignia can assess Defendants' objection, Defendants agreed to provide the total number of expert reports in *Valassis II*. Please do so by this Friday, July 24.

**Documents designated trial exhibits in *Valassis II***: Defendants noted that Insignia should already have post-2014 trial exhibits from *Valassis II* from Defendants' productions to date, and that Defendants' offer to run search terms through their 2011-2013 *Valassis II* production should encompass post-2011 trial exhibits. Plaintiff will take this representation under advisement.

**Documents related to the sale of NAM to Charlesbank**: Defendants stated their willingness to discuss producing documents on the sale of NAM to Charlesbank provided that Plaintiff provides additional information on why such documents are relevant. As noted on the call, Plaintiff believes that the Charlesbank documents are relevant for at least the following nonexhaustive list of reasons:
1. Any valuation of NAM that was conducted in advance of or as part of the transaction is relevant to this case.
2. Any market and competitive analysis that was conducted in advance of or as part of the transaction is relevant to this case.

3. Any research or survey on market conditions that was conducted in advance of or as part of the transaction is relevant to this case.
4. Charlesbank owns Vestcom, a player in the third-party ISP market. Documents and communications regarding Vestcom, potential synergies and cooperation between NAM and Vestcom, and any consideration (regulatory, market, business strategy, or otherwise) on one entity owning both Vestcom and NAM are relevant to this case.

Please confirm whether documents exist on the above-referenced relevant topics and whether Defendants will produce those documents.

**Defendants' proposal to run negotiated search terms through Defendants' *Valassis II* production**: Defendants clarified that they did not undertake a responsiveness review in *Valassis II*. Defendants further clarified that they are proposing to run search terms through only documents newly produced in *Valassis II*, not documents produced by Defendants in prior litigations like *Dial* that have been re-produced in *Valassis II*. Defendants' counsel stated that they will confirm whether there were post-2/9/2011 documents produced in *Dial* and, if so, articulate the basis of Defendant's position for not running search terms through that set of documents. Please do so by this Friday, July 24.

**Retailer and CPG contracts**: Defendants stated that they have completed their production of 2014-2019 CPG and retailer contracts and 2011-2013 retailer contracts. Defendants stated that they will not produce 2011-2013 CPG contracts on burden grounds. Defendants stated their willingness to discuss producing existing data that aggregates the information reflected in the individual CPG contracts.

**Exchange of financial and market data**: The parties agreed to mutually identify categories of financial and market data that the parties will produce.

Best,
Gloria

**Gloria Park | Susman Godfrey**
o. 212.729.2029 | c. 917.340.3695
1301 Avenue of the Americas, 32nd Fl. | New York, NY 10019
gpark@susmangodfrey.com

This e-mail may contain privileged and confidential information.  If you received this message in error, please notify the sender and delete it immediately.

EXHIBIT 9

| From: | Gloria Park |
|---|---|
| To: | "Moen, Nicole"; Alejandra Salinas; Arun Subramanian; Bill Carmody; Caroline DaCosta; Jerry Blackwell; Mark Musico; Rachel Black; Rodney Polanco; Ryan Caughey; S. Jamal Faleel |
| Cc: | Gerson A. Zweifach; Heather Milligan; Jeannie S. Rhee; jobrien@paulweiss.com; kgallo@paulweiss.com; Kimberly Broecker; Dougherty, Rachel; O'Shea, Timothy; Wind, Todd; wmichael@paulweiss.com |
| Subject: | RE: Insignia/News - Meet and Confer on Insignia"s Second and Third Sets of RFPs |
| Date: | Tuesday, September 1, 2020 4:02:00 PM |

Nicole,

With regard to our August 6 proposal, as we have stated previously with regard to Defendants' continued all-or-nothing discovery positions, it is unreasonable to refuse to produce any documents unless Insignia agrees to waive its right to seek any follow-up discovery. We did not say that we are necessarily going to seek more documents later. Rather, we asked for a narrow set of documents (*Valassis* deposition transcripts and trial and summary judgment exhibits), so that we can evaluate whether we need more and what. All Defendants are doing is delaying our assessment of a reasonable set of documents until after a motion to compel.

As for documents related to the Charlesbank transaction, we understand that Defendants will not produce any documents related to the sale of NAM. The fact that we did not propose Vestcom as a search term back in February—before the sale of NAM to Charlesbank was announced—hardly diminishes the relevance of documents regarding "Vestcom, potential synergies and cooperation between NAM and Vestcom, and any consideration (regulatory, market, business strategy, or otherwise) on one entity owning both Vestcom and NAM." Of course, Defendants conceded the relevance of Vestcom when they asked Insignia to run "Vestcom*" and "vest com" as search terms.

Best,
Gloria

---

**From:** Moen, Nicole <NMoen@fredlaw.com>
**Sent:** Thursday, August 20, 2020 5:40 PM
**To:** Gloria Park <GPark@susmangodfrey.com>; Alejandra Salinas <ASalinas@susmangodfrey.com>; Arun Subramanian <asubramanian@SusmanGodfrey.com>; Bill Carmody <bcarmody@SusmanGodfrey.com>; Caroline DaCosta <CDaCosta@susmangodfrey.com>; Jerry Blackwell <blackwell@blackwellburke.com>; Mark Musico <MMusico@susmangodfrey.com>; Rachel Black <rblack@SusmanGodfrey.com>; Rodney Polanco <RPolanco@susmangodfrey.com>; Ryan Caughey <rcaughey@susmangodfrey.com>; S. Jamal Faleel <jfaleel@blackwellburke.com>
**Cc:** Gerson A. Zweifach <gzweifach@wc.com>; Heather Milligan <hmilligan@paulweiss.com>; Jeannie S. Rhee <jrhee@paulweiss.com>; jobrien@paulweiss.com; kgallo@paulweiss.com; Kimberly Broecker <kbroecker@wc.com>; Dougherty, Rachel <RDougherty@fredlaw.com>; O'Shea, Timothy <toshea@fredlaw.com>; Wind, Todd <twind@fredlaw.com>; wmichael@paulweiss.com
**Subject:** RE: Insignia/News - Meet and Confer on Insignia's Second and Third Sets of RFPs

Gloria,

We are writing in response to your proposal regarding Insignia's Second and Third RFPs (described in your August 6 email) and request for documents regarding the sale of NAM to Charlesbank

(addressed in your July 22 email).

With respect to your August 6th proposal:
- For the reasons described in Part I of my July 30 email, we do not agree to your proposals numbered 1) and 2) in your email.
- As for your proposal that Defendants produce Valassis trial and summary judgment exhibits that hit on the search terms negotiated for this case, we understand that you would not agree that such a production would resolve your request for pre-2013 documents previously produced in Valassis, but rather you would be reserving your right to pursue further discovery in response to those requests.  That is not resolving a dispute, it's postponing one.  We therefore cannot agree.  If you have a proposal that would actually resolve the dispute, please let us know, and we'll consider that proposal.

With respect to your Charlesbank request:

1. **"Valuation of NAM"** – We disagree that NAM's valuation, whether analyzed in connection with the transaction or otherwise, is relevant to this case.  In any event, we note that we have agreed to produce extensive financial data that should more than suffice to address the issues you have raised.  We do not agree to conduct additional or incremental searches beyond what is already being produced.
2. **"Any market and competitive analysis"** – We do not agree to conduct an additional search for documents responsive to this request.  We note that, to the extent they exist, such analyses would have been captured by the search protocol already agreed to by the parties and have been or will be produced.  We see no reason to go outside the agreed-upon search protocol to collect additional documents of this sort (even assuming they exist).
3. **"Any research or survey on market conditions"** – We do not understand the distinction, if any, between this category of documents and the prior category, but in all events, our response is the same.
4. **"Documents and communications regarding Vestcom, potential synergies and cooperation, and any consideration on one entity owning both Vestcom and NAM"** – To the extent that you are seeking legal/regulatory analyses with this request, any such documents that may exist would be privileged and not subject to discovery.  We therefore do not agree to expend resources searching for and collecting them.  We also do not agree to search for and collect "synergies" documents, and you have not explained how such documents would be relevant to this case.  Finally, we note that while you now concede that Vestcom is a competitor in what you call the "third-party ISP market," you did not previously request that NAM search for *any* documents regarding Vestcom.  We do not see why NAM should be put to the burden of now searching for the documents you describe here.

Sincerely,
Nicole

Nicole M. Moen
Fredrikson & Byron, P.A.
200 South Sixth Street, Suite 4000, Minneapolis, MN 55402-1425

Direct: 612.492.7320
Cell: 612.600.0707
Fax: 612.492.7077
Email: nmoen@fredlaw.com
Assistant: Cindy Thomas, 612.492.7562, cthomas@fredlaw.com

---

**From:** Gloria Park <GPark@susmangodfrey.com>
**Sent:** Thursday, August 20, 2020 7:03 AM
**To:** Moen, Nicole <NMoen@fredlaw.com>; Alejandra Salinas <ASalinas@susmangodfrey.com>; Arun Subramanian <asubramanian@SusmanGodfrey.com>; Bill Carmody <bcarmody@SusmanGodfrey.com>; Caroline DaCosta <CDaCosta@susmangodfrey.com>; Jerry Blackwell <blackwell@blackwellburke.com>; Mark Musico <MMusico@susmangodfrey.com>; Rachel Black <rblack@SusmanGodfrey.com>; Rodney Polanco <RPolanco@susmangodfrey.com>; Ryan Caughey <rcaughey@susmangodfrey.com>; S. Jamal Faleel <jfaleel@blackwellburke.com>
**Cc:** Gerson A. Zweifach <gzweifach@wc.com>; Heather Milligan <hmilligan@paulweiss.com>; Jeannie S. Rhee <jrhee@paulweiss.com>; jobrien@paulweiss.com; kgallo@paulweiss.com; Kimberly Broecker <kbroecker@wc.com>; Dougherty, Rachel <RDougherty@fredlaw.com>; O'Shea, Timothy <toshea@fredlaw.com>; Wind, Todd <twind@fredlaw.com>; wmichael@paulweiss.com
**Subject:** RE: Insignia/News - Meet and Confer on Insignia's Second and Third Sets of RFPs

---

[EXTERNAL E-MAIL]

---

Nicole,

Defendants represented to the Court during the August status conference last week that they would respond to Insignia's proposal by this week. Please let us know no later than tomorrow whether Defendants agree to Insignia's proposal made on August 6 and what documents Defendants will produce related to the sale of NAM to Charlesbank. As you know, we provided in writing the relevance of those Charlesbank documents almost a month ago, in our July 22 email.

Best,
Gloria

---

**From:** Gloria Park
**Sent:** Thursday, August 6, 2020 10:38 AM
**To:** Moen, Nicole <NMoen@fredlaw.com>; Alejandra Salinas <ASalinas@susmangodfrey.com>; Arun Subramanian <asubramanian@SusmanGodfrey.com>; Bill Carmody <bcarmody@SusmanGodfrey.com>; Caroline DaCosta <CDaCosta@susmangodfrey.com>; Jerry Blackwell <blackwell@blackwellburke.com>; Mark Musico <MMusico@susmangodfrey.com>; Rachel Black <rblack@SusmanGodfrey.com>; Rodney Polanco <RPolanco@susmangodfrey.com>; Ryan Caughey <rcaughey@susmangodfrey.com>; S. Jamal Faleel <jfaleel@blackwellburke.com>
**Cc:** Gerson A. Zweifach <gzweifach@wc.com>; Heather Milligan <hmilligan@paulweiss.com>; Jeannie S. Rhee <jrhee@paulweiss.com>; jobrien@paulweiss.com; kgallo@paulweiss.com; Kimberly Broecker <kbroecker@wc.com>; Dougherty, Rachel <RDougherty@fredlaw.com>; O'Shea, Timothy

<toshea@fredlaw.com>; Wind, Todd <twind@fredlaw.com>; wmichael@paulweiss.com
**Subject:** RE: Insignia/News - Meet and Confer on Insignia's Second and Third Sets of RFPs

Nicole,

We respond to Defendants' July 7 proposal and July 30 follow-up communication.

Insignia disagrees with Defendants' stated objections on relevance and burden grounds. In particular, we disagree with Defendants' position that they won't even provide the names of deposed News witnesses whose deposition material was reproduced in *Valassis II* because "[n]one of those transcripts are relevant at all." For example, we understand that most if not all of those depositions include testimony concerning Defendants' conduct in the third-party ISP market, in which case they are plainly relevant. As for the time period, while Insignia maintains that pre-2011 facts and events are relevant and discoverable, even setting that dispute aside, at least depositions from the *Dial* case will include the sworn testimony of News executives from after 2011 on matters relevant to this case.

In an effort to move discovery forward, and to accommodate Defendants' often-repeated concerns about burden, Insignia proposes the following.  Rather than producing all documents from *Valassis II* and *Dial* that hit on the search terms negotiated for this case, which Defendants have represented includes over 1.4 million documents in the 2011-2013 time period, Insignia proposes that Defendants produce:

1. The deposition transcripts of the 19 News witnesses that were deposed in *Valassis II*. The deposition transcripts are plainly relevant, and their production poses no burden to Defendants.  The deposition transcripts should not be redacted; as News is no doubt aware, such redactions are highly disfavored and routinely rejected. While Insignia maintains that the exhibits to those depositions also should be produced, Insignia would accept just the transcripts in the first instance, pending Insignia's review of the transcripts for relevant exhibits.

2. A list of depositions of News witnesses that were reproduced in *Valassis II*, including indication of the prior litigation in which the deposition was taken.  Insignia cannot reasonably evaluate News's position that those depositions are irrelevant or burdensome to produce without even knowing how many depositions are at issue, who was deposed, and in what context.

3. The trial exhibits and exhibits to summary judgment briefing from *Valassis II*.  If Defendants object to producing that limited set of documents, which Insignia understands to include a few thousand documents at most, Insignia alternatively proposes that Defendants produce the documents in these categories that hit on the search terms negotiated for this case.

Insignia will accept Defendants' production of this limited set of documents and information to avoid a dispute at this time, without waiver of any rights to seek additional relevant documents in the future.

Finally, Insignia expects that the parties will continue to meet and confer concerning the following categories of documents not addressed by the above proposal:
- Financial and market data to be exchanged, including underlying data and analysis from *Valassis II* expert reports
- Documents related to the sale of NAM to Charlesbank

Insignia reserves all rights.

Best,
Gloria

**Gloria Park | Susman Godfrey**
o. 212.729.2029 | c. 917.340.3695
1301 Avenue of the Americas, 32nd Fl. | New York, NY 10019
gpark@susmangodfrey.com

This e-mail may contain privileged and confidential information.  If you received this message in error, please notify the sender and delete it immediately.

---

**From:** Moen, Nicole <NMoen@fredlaw.com>
**Sent:** Thursday, July 30, 2020 9:12 AM
**To:** Gloria Park <GPark@susmangodfrey.com>; Alejandra Salinas <ASalinas@susmangodfrey.com>; Arun Subramanian <asubramanian@SusmanGodfrey.com>; Bill Carmody <bcarmody@SusmanGodfrey.com>; Caroline DaCosta <CDaCosta@susmangodfrey.com>; Jerry Blackwell <blackwell@blackwellburke.com>; Mark Musico <MMusico@susmangodfrey.com>; Rachel Black <rblack@SusmanGodfrey.com>; Rodney Polanco <RPolanco@susmangodfrey.com>; Ryan Caughey <rcaughey@susmangodfrey.com>; S. Jamal Faleel <jfaleel@blackwellburke.com>
**Cc:** Gerson A. Zweifach <gzweifach@wc.com>; Heather Milligan <hmilligan@paulweiss.com>; Jeannie S. Rhee <jrhee@paulweiss.com>; jobrien@paulweiss.com; kgallo@paulweiss.com; Kimberly Broecker <kbroecker@wc.com>; Dougherty, Rachel <RDougherty@fredlaw.com>; O'Shea, Timothy <toshea@fredlaw.com>; Wind, Todd <twind@fredlaw.com>; wmichael@paulweiss.com
**Subject:** RE: Insignia/News - Meet and Confer on Insignia's Second and Third Sets of RFPs

Counsel,
We write in response to Gloria's 7/22 email.

I.     **Cloned Discovery: *Valassis II* Depositions**

In order to resolve the parties' dispute, defendants have offered to produce deposition transcripts of any of the agreed upon *Insignia II* custodians and associated exhibits, subject to redactions or exclusions of testimony and documents pertaining to NAM's non-ISP business matters or solely pre-2011 facts and events.  By offering to produce certain depo transcripts, NAM does not concede that the testimony contained therein meets any standards for admissibility in this action under the Federal Rules of Civil Procedure or the Rules of Evidence.
During the meet and confer, you asked us to provide the names of the NAM witnesses that were

deposed in *Valassis II*.  That information is provided below (*Insignia II* custodians are denoted with an *):

      Augustinos, Rob*

      Aversano, Jesse

      Bedell, Tina*

      Campanelli, Wayne

      Campbell, June

      Carlucci, Paul

      Dittrich, Tom

      Garofalo, Marty*

      Hansa, Dominic*

      Kroc, Patrick*

      Leprine, Thomas

      Mixson, Chris

      Naze, West

      Nudelman, Jenna

      O'Day, Gavin

      Perkins, Nancy*

      Schulman, Mark

      Spitz, Robert*

      Topham, Lisa

The provision of this information is not a concession that any of these deposition transcripts are relevant or discoverable in this matter.  Furthermore, we do not agree to provide the names of NAM witnesses deposed in other matters that may have been reproduced in *Valassis II*.  None of those transcripts are relevant and all of those transcripts are likely to include testimony regarding primarily (if not exclusively) pre-2011 facts and events.  At this point, we have agreed to provide voluminous quantities of documents and testimony previously produced in *Valassis II*.  In addition, we have spent excessive amounts of time devoted to discussions regarding the record in *Valassis II* and collecting information to provide in response to your many requests seeking cloned discovery.  This has unduly diverted our attention from litigating *this* case.  We will not provide further information regarding long-since concluded litigations such as *Dial*, *Valassis I*, *Insignia I*, or *Floorgraphics*, unless ordered to do so by the Court.

      **II.**      **Cloned Discovery:  Expert Reports from *Valassis II***

To date, the parties in *Valassis II* have served thirteen expert reports in connection with that matter.  Insignia is not entitled to these reports in the form of cloned discovery in this case.  As an initial matter, the expert reports from *Valassis II* are not relevant to Insignia's claims in this litigation.  Indeed, the alleged damages period in this case *does not even begin* until July 2015, well after Valassis exited the in-store business.  Insignia's request for the *Valassis II* reports is yet another example of its overreaching by seeking cloned discovery.  It is worth noting, in this regard, that in *Insignia I*, Insignia similarly sought cloned expert reports from NAM's prior litigation with Valassis, which was correctly denied by Magistrate Judge Boylan.

In any event, the thirteen reports are subject to the Paragraph I.B. of the *Valassis II* protective order, which requires that "[a]ll discovery subject to this Order shall be used solely and exclusively for purposes of this action in accordance with the provisions of this Order. No discovery shall be used in

or for other cases, proceedings, or disputes or for any commercial, business, competitive, or other purpose whatsoever, without further order of the Court or Panel."

###   III.   Cloned Discovery:  Reproduction of 2/2011-12/2013 documents previously produced in *Valassis II* that hit on search terms agreed upon in this matter

We have confirmed that there were post-2/9/2011 documents originally produced in *Dial* that were reproduced in *Valassis II*.  Defendants are willing to include those documents in our offer, but only as part of a global resolution of the parties disputes regarding Insignia's Second and Third RFPs.

###   IV.   Request for documents related to the Charlesbank transaction

We are conferring with our client regarding this request and will follow up with you as soon as practicable.
Defendants reserve all rights.
Sincerely,
Nicole

Nicole M. Moen
Fredrikson & Byron, P.A.
200 South Sixth Street, Suite 4000, Minneapolis, MN 55402-1425
Direct: 612.492.7320
Cell: 612.600.0707
Fax: 612.492.7077
Email: nmoen@fredlaw.com
Assistant: Cindy Thomas, 612.492.7562, cthomas@fredlaw.com

---

**From:** Gloria Park <GPark@susmangodfrey.com>
**Sent:** Wednesday, July 22, 2020 5:36 PM
**To:** Gerson A. Zweifach <gzweifach@wc.com>; Heather Milligan <hmilligan@paulweiss.com>; Jeannie S. Rhee <jrhee@paulweiss.com>; jobrien@paulweiss.com; kgallo@paulweiss.com; Kimberly Broecker <kbroecker@wc.com>; Moen, Nicole <NMoen@fredlaw.com>; Dougherty, Rachel <RDougherty@fredlaw.com>; O'Shea, Timothy <toshea@fredlaw.com>; Wind, Todd <twind@fredlaw.com>; wmichael@paulweiss.com
**Cc:** Alejandra Salinas <ASalinas@susmangodfrey.com>; Arun Subramanian <asubramanian@SusmanGodfrey.com>; Bill Carmody <bcarmody@susmangodfrey.com>; Caroline DaCosta <CDaCosta@susmangodfrey.com>; Gloria Park <GPark@susmangodfrey.com>; Jerry Blackwell <blackwell@blackwellburke.com>; Mark Musico <MMusico@susmangodfrey.com>; Rachel Black <rblack@SusmanGodfrey.com>; Rodney Polanco <RPolanco@susmangodfrey.com>; Ryan Caughey <rcaughey@susmangodfrey.com>; S. Jamal Faleel <jfaleel@blackwellburke.com>
**Subject:** Insignia/News - Meet and Confer on Insignia's Second and Third Sets of RFPs

[EXTERNAL E-MAIL]

---

Counsel,

We write to follow up on the parties' meet and confer earlier today.

**Depositions taken and produced in *Valassis II***: Defendants proposed producing documents for the depositions taken in *Valassis II* of the NAM custodians in this case. Beyond those seven depositions, Defendants noted that producing additional depositions would not be proportional to the needs of this case. So that Insignia can assess Defendants' objection, Defendants agreed to provide a list of deponents in *Valassis II*. Please do so by this Friday, July 24.

Defendants' counsel also stated that they will confer with their client on whether they will provide a list of witnesses who were deposed in prior litigations (e.g., *Dial, Insignia I, Valassis I, Floorgraphics*) whose deposition materials were produced in *Valassis II*. If you are willing to provide this information, please do so by this Friday, July 24. If you are not willing to provide this information, please let us know that position by this Friday and please let us know why you are unwilling to provide the information.

**Expert reports in *Valassis II***: Defendants objected to producing expert reports in *Valassis II* on relevance and burden grounds. Defendants stated those reports may contain information that Defendants believe is not relevant to this case, such as pre-2011 information. Defendants stated that producing expert reports may also raise confidentiality issues. So that Insignia can assess Defendants' objection, Defendants agreed to provide the total number of expert reports in *Valassis II*. Please do so by this Friday, July 24.

**Documents designated trial exhibits in *Valassis II***: Defendants noted that Insignia should already have post-2014 trial exhibits from *Valassis II* from Defendants' productions to date, and that Defendants' offer to run search terms through their 2011-2013 *Valassis II* production should encompass post-2011 trial exhibits. Plaintiff will take this representation under advisement.

**Documents related to the sale of NAM to Charlesbank**: Defendants stated their willingness to discuss producing documents on the sale of NAM to Charlesbank provided that Plaintiff provides additional information on why such documents are relevant. As noted on the call, Plaintiff believes that the Charlesbank documents are relevant for at least the following nonexhaustive list of reasons:
   1. Any valuation of NAM that was conducted in advance of or as part of the transaction is relevant to this case.
   2. Any market and competitive analysis that was conducted in advance of or as part of the transaction is relevant to this case.
   3. Any research or survey on market conditions that was conducted in advance of or as part of the transaction is relevant to this case.
   4. Charlesbank owns Vestcom, a player in the third-party ISP market. Documents and communications regarding Vestcom, potential synergies and cooperation between NAM and Vestcom, and any consideration (regulatory, market, business strategy, or otherwise) on one entity owning both Vestcom and NAM are relevant to this case.

Please confirm whether documents exist on the above-referenced relevant topics and whether Defendants will produce those documents.

**Defendants' proposal to run negotiated search terms through Defendants' *Valassis II* production**: Defendants clarified that they did not undertake a responsiveness review in *Valassis II*. Defendants

further clarified that they are proposing to run search terms through only documents newly produced in *Valassis II*, not documents produced by Defendants in prior litigations like *Dial* that have been re-produced in *Valassis II*. Defendants' counsel stated that they will confirm whether there were post-2/9/2011 documents produced in *Dial* and, if so, articulate the basis of Defendant's position for not running search terms through that set of documents. Please do so by this Friday, July 24.

**Retailer and CPG contracts**: Defendants stated that they have completed their production of 2014-2019 CPG and retailer contracts and 2011-2013 retailer contracts. Defendants stated that they will not produce 2011-2013 CPG contracts on burden grounds. Defendants stated their willingness to discuss producing existing data that aggregates the information reflected in the individual CPG contracts.

**Exchange of financial and market data**: The parties agreed to mutually identify categories of financial and market data that the parties will produce.

Best,
Gloria

**Gloria Park | Susman Godfrey**
o. 212.729.2029 | c. 917.340.3695
1301 Avenue of the Americas, 32nd Fl. | New York, NY 10019
gpark@susmangodfrey.com

This e-mail may contain privileged and confidential information.  If you received this message in error, please notify the sender and delete it immediately.

EXHIBIT 10

| | |
|---|---|
| **From:** | Moen, Nicole |
| **To:** | Gloria Park; Alejandra Salinas; Arun Subramanian; Bill Carmody; Caroline DaCosta; Jerry Blackwell; Mark Musico; Rachel Black; Rodney Polanco; Ryan Caughey; S. Jamal Faleel |
| **Cc:** | Gerson A. Zweifach; Heather Milligan; Jeannie S. Rhee; jobrien@paulweiss.com; kgallo@paulweiss.com; Kimberly Broecker; Dougherty, Rachel; O'Shea, Timothy; Wind, Todd; wmichael@paulweiss.com |
| **Subject:** | RE: Insignia/News - Meet and Confer on Insignia''s Second and Third Sets of RFPs |
| **Date:** | Thursday, September 3, 2020 11:41:36 AM |

Gloria,

==Defendants disagree with how your email characterizes the dispute and the parties' negotiations, and we disagree that our position is unreasonable.== To the contrary, Defendants have made a reasonable and good faith proposal to resolve the dispute—and we believe our proposal far exceeds our discovery obligations.  Nevertheless, in an attempt to avoid motion practice, and as a further show of good faith, we're willing to keep our last proposal open, in case Insignia wishes to reconsider.  Also, and as noted in my August 20th email below, if you have a proposal that would actually resolve the dispute, please let us know, and we'll consider that proposal.

Defendants reserve all rights.

Nicole

Nicole M. Moen
Fredrikson & Byron, P.A.
200 South Sixth Street, Suite 4000, Minneapolis, MN 55402-1425
Direct: 612.492.7320
Cell: 612.600.0707
Fax: 612.492.7077
Email: nmoen@fredlaw.com
Assistant: Cindy Thomas, 612.492.7562, cthomas@fredlaw.com

---

**From:** Gloria Park <GPark@susmangodfrey.com>
**Sent:** Tuesday, September 1, 2020 3:02 PM
**To:** Moen, Nicole <NMoen@fredlaw.com>; Alejandra Salinas <ASalinas@susmangodfrey.com>; Arun Subramanian <asubramanian@SusmanGodfrey.com>; Bill Carmody <bcarmody@SusmanGodfrey.com>; Caroline DaCosta <CDaCosta@susmangodfrey.com>; Jerry Blackwell <blackwell@blackwellburke.com>; Mark Musico <MMusico@susmangodfrey.com>; Rachel Black <rblack@SusmanGodfrey.com>; Rodney Polanco <RPolanco@susmangodfrey.com>; Ryan Caughey <rcaughey@susmangodfrey.com>; S. Jamal Faleel <jfaleel@blackwellburke.com>
**Cc:** Gerson A. Zweifach <gzweifach@wc.com>; Heather Milligan <hmilligan@paulweiss.com>; Jeannie S. Rhee <jrhee@paulweiss.com>; jobrien@paulweiss.com; kgallo@paulweiss.com; Kimberly Broecker <kbroecker@wc.com>; Dougherty, Rachel <RDougherty@fredlaw.com>; O'Shea, Timothy <toshea@fredlaw.com>; Wind, Todd <twind@fredlaw.com>; wmichael@paulweiss.com
**Subject:** RE: Insignia/News - Meet and Confer on Insignia's Second and Third Sets of RFPs

**[EXTERNAL E-MAIL]**

Nicole,

With regard to our August 6 proposal, as we have stated previously with regard to Defendants' continued all-or-nothing discovery positions, it is unreasonable to refuse to produce any documents unless Insignia agrees to waive its right to seek any follow-up discovery. We did not say that we are necessarily going to seek more documents later. Rather, we asked for a narrow set of documents (*Valassis* deposition transcripts and trial and summary judgment exhibits), so that we can evaluate whether we need more and what. All Defendants are doing is delaying our assessment of a reasonable set of documents until after a motion to compel.

As for documents related to the Charlesbank transaction, we understand that Defendants will not produce any documents related to the sale of NAM. The fact that we did not propose Vestcom as a search term back in February—before the sale of NAM to Charlesbank was announced—hardly diminishes the relevance of documents regarding "Vestcom, potential synergies and cooperation between NAM and Vestcom, and any consideration (regulatory, market, business strategy, or otherwise) on one entity owning both Vestcom and NAM." Of course, Defendants conceded the relevance of Vestcom when they asked Insignia to run "Vestcom*" and "vest com" as search terms.

Best,
Gloria

---

**From:** Moen, Nicole <NMoen@fredlaw.com>
**Sent:** Thursday, August 20, 2020 5:40 PM
**To:** Gloria Park <GPark@susmangodfrey.com>; Alejandra Salinas <ASalinas@susmangodfrey.com>; Arun Subramanian <asubramanian@SusmanGodfrey.com>; Bill Carmody <bcarmody@SusmanGodfrey.com>; Caroline DaCosta <CDaCosta@susmangodfrey.com>; Jerry Blackwell <blackwell@blackwellburke.com>; Mark Musico <MMusico@susmangodfrey.com>; Rachel Black <rblack@SusmanGodfrey.com>; Rodney Polanco <RPolanco@susmangodfrey.com>; Ryan Caughey <rcaughey@susmangodfrey.com>; S. Jamal Faleel <jfaleel@blackwellburke.com>
**Cc:** Gerson A. Zweifach <gzweifach@wc.com>; Heather Milligan <hmilligan@paulweiss.com>; Jeannie S. Rhee <jrhee@paulweiss.com>; jobrien@paulweiss.com; kgallo@paulweiss.com; Kimberly Broecker <kbroecker@wc.com>; Dougherty, Rachel <RDougherty@fredlaw.com>; O'Shea, Timothy <toshea@fredlaw.com>; Wind, Todd <twind@fredlaw.com>; wmichael@paulweiss.com
**Subject:** RE: Insignia/News - Meet and Confer on Insignia's Second and Third Sets of RFPs

Gloria,

We are writing in response to your proposal regarding Insignia's Second and Third RFPs (described in your August 6 email) and request for documents regarding the sale of NAM to Charlesbank (addressed in your July 22 email).

With respect to your August 6th proposal:

- For the reasons described in Part I of my July 30 email, we do not agree to your proposals numbered 1) and 2) in your email.

As for your proposal that Defendants produce Valassis trial and summary judgment exhibits that hit on the search terms negotiated for this case, we understand that you would not agree that such a production would resolve your request for pre-2013 documents previously produced in Valassis, but rather you would be reserving your right to pursue further discovery in response to those requests.  That is not resolving a dispute, it's postponing one.  We therefore cannot agree.  If you have a proposal that would actually resolve the dispute, please let us know, and we'll consider that proposal.

With respect to your Charlesbank request:

1. **"Valuation of NAM"** – We disagree that NAM's valuation, whether analyzed in connection with the transaction or otherwise, is relevant to this case.  In any event, we note that we have agreed to produce extensive financial data that should more than suffice to address the issues you have raised.  We do not agree to conduct additional or incremental searches beyond what is already being produced.

2. **"Any market and competitive analysis"** – We do not agree to conduct an additional search for documents responsive to this request.  We note that, to the extent they exist, such analyses would have been captured by the search protocol already agreed to by the parties and have been or will be produced.  We see no reason to go outside the agreed-upon search protocol to collect additional documents of this sort (even assuming they exist).

3. **"Any research or survey on market conditions"** – We do not understand the distinction, if any, between this category of documents and the prior category, but in all events, our response is the same.

4. **"Documents and communications regarding Vestcom, potential synergies and cooperation, and any consideration on one entity owning both Vestcom and NAM"** – To the extent that you are seeking legal/regulatory analyses with this request, any such documents that may exist would be privileged and not subject to discovery.  We therefore do not agree to expend resources searching for and collecting them.  We also do not agree to search for and collect "synergies" documents, and you have not explained how such documents would be relevant to this case.  Finally, we note that while you now concede that Vestcom is a competitor in what you call the "third-party ISP market," you did not previously request that NAM search for *any* documents regarding Vestcom.  We do not see why NAM should be put to the burden of now searching for the documents you describe here.

Sincerely,
Nicole

Nicole M. Moen
Fredrikson & Byron, P.A.
200 South Sixth Street, Suite 4000, Minneapolis, MN 55402-1425
Direct: 612.492.7320
Cell: 612.600.0707
Fax: 612.492.7077
Email: nmoen@fredlaw.com
Assistant: Cindy Thomas, 612.492.7562, cthomas@fredlaw.com

**From:** Gloria Park <GPark@susmangodfrey.com>
**Sent:** Thursday, August 20, 2020 7:03 AM
**To:** Moen, Nicole <NMoen@fredlaw.com>; Alejandra Salinas <ASalinas@susmangodfrey.com>; Arun Subramanian <asubramanian@SusmanGodfrey.com>; Bill Carmody <bcarmody@SusmanGodfrey.com>; Caroline DaCosta <CDaCosta@susmangodfrey.com>; Jerry Blackwell <blackwell@blackwellburke.com>; Mark Musico <MMusico@susmangodfrey.com>; Rachel Black <rblack@SusmanGodfrey.com>; Rodney Polanco <RPolanco@susmangodfrey.com>; Ryan Caughey <rcaughey@susmangodfrey.com>; S. Jamal Faleel <jfaleel@blackwellburke.com>
**Cc:** Gerson A. Zweifach <gzweifach@wc.com>; Heather Milligan <hmilligan@paulweiss.com>; Jeannie S. Rhee <jrhee@paulweiss.com>; jobrien@paulweiss.com; kgallo@paulweiss.com; Kimberly Broecker <kbroecker@wc.com>; Dougherty, Rachel <RDougherty@fredlaw.com>; O'Shea, Timothy <toshea@fredlaw.com>; Wind, Todd <twind@fredlaw.com>; wmichael@paulweiss.com
**Subject:** RE: Insignia/News - Meet and Confer on Insignia's Second and Third Sets of RFPs

**[EXTERNAL E-MAIL]**

Nicole,

Defendants represented to the Court during the August status conference last week that they would respond to Insignia's proposal by this week. Please let us know no later than tomorrow whether Defendants agree to Insignia's proposal made on August 6 and what documents Defendants will produce related to the sale of NAM to Charlesbank. As you know, we provided in writing the relevance of those Charlesbank documents almost a month ago, in our July 22 email.

Best,
Gloria

**From:** Gloria Park
**Sent:** Thursday, August 6, 2020 10:38 AM
**To:** Moen, Nicole <NMoen@fredlaw.com>; Alejandra Salinas <ASalinas@susmangodfrey.com>; Arun Subramanian <asubramanian@SusmanGodfrey.com>; Bill Carmody <bcarmody@SusmanGodfrey.com>; Caroline DaCosta <CDaCosta@susmangodfrey.com>; Jerry Blackwell <blackwell@blackwellburke.com>; Mark Musico <MMusico@susmangodfrey.com>; Rachel Black <rblack@SusmanGodfrey.com>; Rodney Polanco <RPolanco@susmangodfrey.com>; Ryan Caughey <rcaughey@susmangodfrey.com>; S. Jamal Faleel <jfaleel@blackwellburke.com>
**Cc:** Gerson A. Zweifach <gzweifach@wc.com>; Heather Milligan <hmilligan@paulweiss.com>; Jeannie S. Rhee <jrhee@paulweiss.com>; jobrien@paulweiss.com; kgallo@paulweiss.com; Kimberly Broecker <kbroecker@wc.com>; Dougherty, Rachel <RDougherty@fredlaw.com>; O'Shea, Timothy <toshea@fredlaw.com>; Wind, Todd <twind@fredlaw.com>; wmichael@paulweiss.com
**Subject:** RE: Insignia/News - Meet and Confer on Insignia's Second and Third Sets of RFPs

Nicole,

We respond to Defendants' July 7 proposal and July 30 follow-up communication.

Insignia disagrees with Defendants' stated objections on relevance and burden grounds. In particular, we disagree with Defendants' position that they won't even provide the names of deposed News witnesses whose deposition material was reproduced in *Valassis II* because "[n]one of those transcripts are relevant at all." For example, we understand that most if not all of those depositions include testimony concerning Defendants' conduct in the third-party ISP market, in which case they are plainly relevant. As for the time period, while Insignia maintains that pre-2011 facts and events are relevant and discoverable, even setting that dispute aside, at least depositions from the *Dial* case will include the sworn testimony of News executives from after 2011 on matters relevant to this case.

In an effort to move discovery forward, and to accommodate Defendants' often-repeated concerns about burden, Insignia proposes the following.  Rather than producing all documents from *Valassis II* and *Dial* that hit on the search terms negotiated for this case, which Defendants have represented includes over 1.4 million documents in the 2011-2013 time period, Insignia proposes that Defendants produce:

1.  The deposition transcripts of the 19 News witnesses that were deposed in *Valassis II*. The deposition transcripts are plainly relevant, and their production poses no burden to Defendants.  The deposition transcripts should not be redacted; as News is no doubt aware, such redactions are highly disfavored and routinely rejected. While Insignia maintains that the exhibits to those depositions also should be produced, Insignia would accept just the transcripts in the first instance, pending Insignia's review of the transcripts for relevant exhibits.

2.  A list of depositions of News witnesses that were reproduced in *Valassis II*, including indication of the prior litigation in which the deposition was taken.  Insignia cannot reasonably evaluate News's position that those depositions are irrelevant or burdensome to produce without even knowing how many depositions are at issue, who was deposed, and in what context.

3.  The trial exhibits and exhibits to summary judgment briefing from *Valassis II.*  If Defendants object to producing that limited set of documents, which Insignia understands to include a few thousand documents at most, Insignia alternatively proposes that Defendants produce the documents in these categories that hit on the search terms negotiated for this case.

Insignia will accept Defendants' production of this limited set of documents and information to avoid a dispute at this time, without waiver of any rights to seek additional relevant documents in the future.

Finally, Insignia expects that the parties will continue to meet and confer concerning the following categories of documents not addressed by the above proposal:
-   Financial and market data to be exchanged, including underlying data and analysis from *Valassis II* expert reports

Documents related to the sale of NAM to Charlesbank

Insignia reserves all rights.

Best,
Gloria

**Gloria Park | Susman Godfrey**
o. 212.729.2029 | c. 917.340.3695
1301 Avenue of the Americas, 32nd Fl. | New York, NY 10019
gpark@susmangodfrey.com

This e-mail may contain privileged and confidential information.  If you received this message in error, please notify the sender and delete it immediately.

---

**From:** Moen, Nicole <NMoen@fredlaw.com>
**Sent:** Thursday, July 30, 2020 9:12 AM
**To:** Gloria Park <GPark@susmangodfrey.com>; Alejandra Salinas <ASalinas@susmangodfrey.com>; Arun Subramanian <asubramanian@SusmanGodfrey.com>; Bill Carmody <bcarmody@SusmanGodfrey.com>; Caroline DaCosta <CDaCosta@susmangodfrey.com>; Jerry Blackwell <blackwell@blackwellburke.com>; Mark Musico <MMusico@susmangodfrey.com>; Rachel Black <rblack@SusmanGodfrey.com>; Rodney Polanco <RPolanco@susmangodfrey.com>; Ryan Caughey <rcaughey@susmangodfrey.com>; S. Jamal Faleel <jfaleel@blackwellburke.com>
**Cc:** Gerson A. Zweifach <gzweifach@wc.com>; Heather Milligan <hmilligan@paulweiss.com>; Jeannie S. Rhee <jrhee@paulweiss.com>; jobrien@paulweiss.com; kgallo@paulweiss.com; Kimberly Broecker <kbroecker@wc.com>; Dougherty, Rachel <RDougherty@fredlaw.com>; O'Shea, Timothy <toshea@fredlaw.com>; Wind, Todd <twind@fredlaw.com>; wmichael@paulweiss.com
**Subject:** RE: Insignia/News - Meet and Confer on Insignia's Second and Third Sets of RFPs

Counsel,
We write in response to Gloria's 7/22 email.

## I.     Cloned Discovery: *Valassis II* Depositions

In order to resolve the parties' dispute, defendants have offered to produce deposition transcripts of any of the agreed upon *Insignia II* custodians and associated exhibits, subject to redactions or exclusions of testimony and documents pertaining to NAM's non-ISP business matters or solely pre-2011 facts and events.  By offering to produce certain depo transcripts, NAM does not concede that the testimony contained therein meets any standards for admissibility in this action under the Federal Rules of Civil Procedure or the Rules of Evidence.
During the meet and confer, you asked us to provide the names of the NAM witnesses that were deposed in *Valassis II*.  That information is provided below (*Insignia II* custodians are denoted with an *):

       Augustinos, Rob*
       Aversano, Jesse
       Bedell, Tina*

Campanelli, Wayne

Campbell, June

Carlucci, Paul

Dittrich, Tom

Garofalo, Marty*

Hansa, Dominic*

Kroc, Patrick*

Leprine, Thomas

Mixson, Chris

Naze, West

Nudelman, Jenna

O'Day, Gavin

Perkins, Nancy*

Schulman, Mark

Spitz, Robert*

Topham, Lisa

The provision of this information is not a concession that any of these deposition transcripts are relevant or discoverable in this matter.  Furthermore, we do not agree to provide the names of NAM witnesses deposed in other matters that may have been reproduced in *Valassis II*.  None of those transcripts are relevant and all of those transcripts are likely to include testimony regarding primarily (if not exclusively) pre-2011 facts and events.  At this point, we have agreed to provide voluminous quantities of documents and testimony previously produced in *Valassis II*.  In addition, we have spent excessive amounts of time devoted to discussions regarding the record in *Valassis II* and collecting information to provide in response to your many requests seeking cloned discovery.  This has unduly diverted our attention from litigating *this* case.  We will not provide further information regarding long-since concluded litigations such as *Dial*, *Valassis I*, *Insignia I*, or *Floorgraphics*, unless ordered to do so by the Court.

## II.       Cloned Discovery:  Expert Reports from *Valassis II*

To date, the parties in *Valassis II* have served thirteen expert reports in connection with that matter.  Insignia is not entitled to these reports in the form of cloned discovery in this case.  As an initial matter, the expert reports from *Valassis II* are not relevant to Insignia's claims in this litigation.  Indeed, the alleged damages period in this case *does not even begin* until July 2015, well after Valassis exited the in-store business.  Insignia's request for the *Valassis II* reports is yet another example of its overreaching by seeking cloned discovery.  It is worth noting, in this regard, that in *Insignia I*, Insignia similarly sought cloned expert reports from NAM's prior litigation with Valassis, which was correctly denied by Magistrate Judge Boylan.

In any event, the thirteen reports are subject to the Paragraph I.B. of the *Valassis II* protective order, which requires that "[a]ll discovery subject to this Order shall be used solely and exclusively for purposes of this action in accordance with the provisions of this Order. No discovery shall be used in or for other cases, proceedings, or disputes or for any commercial, business, competitive, or other purpose whatsoever, without further order of the Court or Panel."

## III.      Cloned Discovery:  Reproduction of 2/2011-12/2013 documents previously produced in *Valassis II* that hit on search terms agreed upon in this matter

We have confirmed that there were post-2/9/2011 documents originally produced in *Dial* that were reproduced in *Valassis II*.  Defendants are willing to include those documents in our offer, but only as part of a global resolution of the parties disputes regarding Insignia's Second and Third RFPs.

## IV.        Request for documents related to the Charlesbank transaction

We are conferring with our client regarding this request and will follow up with you as soon as practicable.

Defendants reserve all rights.

Sincerely,

Nicole

Nicole M. Moen

Fredr*ik*son & Byron, P.A.

200 South Sixth Street, Suite 4000, Minneapolis, MN 55402-1425

Direct: 612.492.7320

Cell: 612.600.0707

Fax: 612.492.7077

Email: nmoen@fredlaw.com

Assistant: Cindy Thomas, 612.492.7562, cthomas@fredlaw.com

---

**From:** Gloria Park <GPark@susmangodfrey.com>
**Sent:** Wednesday, July 22, 2020 5:36 PM
**To:** Gerson A. Zweifach <gzweifach@wc.com>; Heather Milligan <hmilligan@paulweiss.com>; Jeannie S. Rhee <jrhee@paulweiss.com>; jobrien@paulweiss.com; kgallo@paulweiss.com; Kimberly Broecker <kbroecker@wc.com>; Moen, Nicole <NMoen@fredlaw.com>; Dougherty, Rachel <RDougherty@fredlaw.com>; O'Shea, Timothy <toshea@fredlaw.com>; Wind, Todd <twind@fredlaw.com>; wmichael@paulweiss.com
**Cc:** Alejandra Salinas <ASalinas@susmangodfrey.com>; Arun Subramanian <asubramanian@SusmanGodfrey.com>; Bill Carmody <bcarmody@SusmanGodfrey.com>; Caroline DaCosta <CDaCosta@susmangodfrey.com>; Gloria Park <GPark@susmangodfrey.com>; Jerry Blackwell <blackwell@blackwellburke.com>; Mark Musico <MMusico@susmangodfrey.com>; Rachel Black <rblack@SusmanGodfrey.com>; Rodney Polanco <RPolanco@susmangodfrey.com>; Ryan Caughey <rcaughey@susmangodfrey.com>; S. Jamal Faleel <jfaleel@blackwellburke.com>
**Subject:** Insignia/News - Meet and Confer on Insignia's Second and Third Sets of RFPs

---

[EXTERNAL E-MAIL]

---

Counsel,

We write to follow up on the parties' meet and confer earlier today.

**Depositions taken and produced in *Valassis II*:** Defendants proposed producing documents for the depositions taken in *Valassis II* of the NAM custodians in this case. Beyond those seven depositions, Defendants noted that producing additional depositions would not be proportional to the needs of

this case. So that Insignia can assess Defendants' objection, Defendants agreed to provide a list of deponents in *Valassis II*. Please do so by this Friday, July 24.

Defendants' counsel also stated that they will confer with their client on whether they will provide a list of witnesses who were deposed in prior litigations (e.g., *Dial, Insignia I, Valassis I, Floorgraphics*) whose deposition materials were produced in *Valassis II*. If you are willing to provide this information, please do so by this Friday, July 24. If you are not willing to provide this information, please let us know that position by this Friday and please let us know why you are unwilling to provide the information.

**Expert reports in *Valassis II***: Defendants objected to producing expert reports in *Valassis II* on relevance and burden grounds. Defendants stated those reports may contain information that Defendants believe is not relevant to this case, such as pre-2011 information. Defendants stated that producing expert reports may also raise confidentiality issues. So that Insignia can assess Defendants' objection, Defendants agreed to provide the total number of expert reports in *Valassis II*. Please do so by this Friday, July 24.

**Documents designated trial exhibits in *Valassis II***: Defendants noted that Insignia should already have post-2014 trial exhibits from *Valassis II* from Defendants' productions to date, and that Defendants' offer to run search terms through their 2011-2013 *Valassis II* production should encompass post-2011 trial exhibits. Plaintiff will take this representation under advisement.

**Documents related to the sale of NAM to Charlesbank**: Defendants stated their willingness to discuss producing documents on the sale of NAM to Charlesbank provided that Plaintiff provides additional information on why such documents are relevant. As noted on the call, Plaintiff believes that the Charlesbank documents are relevant for at least the following nonexhaustive list of reasons:

1. Any valuation of NAM that was conducted in advance of or as part of the transaction is relevant to this case.
2. Any market and competitive analysis that was conducted in advance of or as part of the transaction is relevant to this case.
3. Any research or survey on market conditions that was conducted in advance of or as part of the transaction is relevant to this case.
4. Charlesbank owns Vestcom, a player in the third-party ISP market. Documents and communications regarding Vestcom, potential synergies and cooperation between NAM and Vestcom, and any consideration (regulatory, market, business strategy, or otherwise) on one entity owning both Vestcom and NAM are relevant to this case.

Please confirm whether documents exist on the above-referenced relevant topics and whether Defendants will produce those documents.

**Defendants' proposal to run negotiated search terms through Defendants' *Valassis II* production**: Defendants clarified that they did not undertake a responsiveness review in *Valassis II*. Defendants further clarified that they are proposing to run search terms through only documents newly produced in *Valassis II*, not documents produced by Defendants in prior litigations like *Dial* that have been re-produced in *Valassis II*. Defendants' counsel stated that they will confirm whether there were post-2/9/2011 documents produced in *Dial* and, if so, articulate the basis of Defendant's position for not running search terms through that set of documents. Please do so by this Friday, July

24.

**Retailer and CPG contracts**: Defendants stated that they have completed their production of 2014-2019 CPG and retailer contracts and 2011-2013 retailer contracts. Defendants stated that they will not produce 2011-2013 CPG contracts on burden grounds. Defendants stated their willingness to discuss producing existing data that aggregates the information reflected in the individual CPG contracts.

**Exchange of financial and market data**: The parties agreed to mutually identify categories of financial and market data that the parties will produce.

Best,
Gloria

**Gloria Park | Susman Godfrey**
o. 212.729.2029 | c. 917.340.3695
1301 Avenue of the Americas, 32nd Fl. | New York, NY 10019
gpark@susmangodfrey.com

This e-mail may contain privileged and confidential information.  If you received this message in error, please notify the sender and delete it immediately.

EXHIBIT 11

| From: | Moen, Nicole |
|---|---|
| To: | Gloria Park; Alejandra Salinas; Arun Subramanian; Bill Carmody; Caroline DaCosta; Jerry Blackwell; Mark Musico; Rachel Black; Rodney Polanco; Ryan Caughey; S. Jamal Faleel |
| Cc: | Gerson A. Zweifach; Heather Milligan; Jeannie S. Rhee; jobrien@paulweiss.com; kgallo@paulweiss.com; Kimberly Broecker; Dougherty, Rachel; O"Shea, Timothy; Wind, Todd; wmichael@paulweiss.com |
| Subject: | RE: Insignia/News - Meet and Confer on Insignia"s Second and Third Sets of RFPs |
| Date: | Thursday, July 30, 2020 9:12:43 AM |

Counsel,

We write in response to Gloria's 7/22 email.

### I.    Cloned Discovery: *Valassis II* Depositions

In order to resolve the parties' dispute, defendants have offered to produce deposition transcripts of any of the agreed upon *Insignia II* custodians and associated exhibits, subject to redactions or exclusions of testimony and documents pertaining to NAM's non-ISP business matters or solely pre-2011 facts and events. By offering to produce certain depo transcripts, NAM does not concede that the testimony contained therein meets any standards for admissibility in this action under the Federal Rules of Civil Procedure or the Rules of Evidence.

During the meet and confer, you asked us to provide the names of the NAM witnesses that were deposed in *Valassis II*.  That information is provided below (*Insignia II* custodians are denoted with an *):

Augustinos, Rob*

Aversano, Jesse

Bedell, Tina*

Campanelli, Wayne

Campbell, June

Carlucci, Paul

Dittrich, Tom

Garofalo, Marty*

Hansa, Dominic*

Kroc, Patrick*

Leprine, Thomas

Mixson, Chris

Naze, West

Nudelman, Jenna

O'Day, Gavin

Perkins, Nancy*

Schulman, Mark

Spitz, Robert*

Topham, Lisa

The provision of this information is not a concession that any of these deposition transcripts are relevant or discoverable in this matter. Furthermore, we do not agree to provide the names of NAM witnesses deposed in other matters that may have been reproduced in *Valassis II*.  None of those transcripts are relevant and all of those transcripts are likely to include testimony regarding primarily (if not exclusively) pre-2011 facts and events.  At this point, we have agreed to provide voluminous quantities of documents and testimony previously produced in *Valassis II*.  In addition, we have spent excessive amounts of time devoted to discussions regarding the record in *Valassis II* and

collecting information to provide in response to your many requests seeking cloned discovery.  This has unduly diverted our attention from litigating *this* case.  We will not provide further information regarding long-since concluded litigations such as *Dial*, *Valassis I*, *Insignia I*, or *Floorgraphics*, unless ordered to do so by the Court.

### II.        Cloned Discovery:  Expert Reports from *Valassis II*

To date, the parties in *Valassis II* have served thirteen expert reports in connection with that matter. Insignia is not entitled to these reports in the form of cloned discovery in this case.  As an initial matter, the expert reports from *Valassis II* are not relevant to Insignia's claims in this litigation. Indeed, the alleged damages period in this case *does not even begin* until July 2015, well after Valassis exited the in-store business.  Insignia's request for the *Valassis II* reports is yet another example of its overreaching by seeking cloned discovery.  It is worth noting, in this regard, that in *Insignia I*, Insignia similarly sought cloned expert reports from NAM's prior litigation with Valassis, which was correctly denied by Magistrate Judge Boylan.

In any event, the thirteen reports are subject to the Paragraph I.B. of the *Valassis II* protective order, which requires that "[a]ll discovery subject to this Order shall be used solely and exclusively for purposes of this action in accordance with the provisions of this Order. No discovery shall be used in or for other cases, proceedings, or disputes or for any commercial, business, competitive, or other purpose whatsoever, without further order of the Court or Panel."

### III.       Cloned Discovery:  Reproduction of 2/2011-12/2013 documents previously produced in *Valassis II* that hit on search terms agreed upon in this matter

We have confirmed that there were post-2/9/2011 documents originally produced in *Dial* that were reproduced in *Valassis II*.  Defendants are willing to include those documents in our offer, but only as part of a global resolution of the parties disputes regarding Insignia's Second and Third RFPs.

### IV.       Request for documents related to the Charlesbank transaction

We are conferring with our client regarding this request and will follow up with you as soon as practicable.

Defendants reserve all rights.

Sincerely,

Nicole

Nicole M. Moen
Fredrikson & Byron, P.A.
200 South Sixth Street, Suite 4000, Minneapolis, MN 55402-1425
Direct: 612.492.7320
Cell: 612.600.0707
Fax: 612.492.7077
Email: nmoen@fredlaw.com
Assistant: Cindy Thomas, 612.492.7562, cthomas@fredlaw.com

**From:** Gloria Park <GPark@susmangodfrey.com>

**Sent:** Wednesday, July 22, 2020 5:36 PM
**To:** Gerson A. Zweifach <gzweifach@wc.com>; Heather Milligan <hmilligan@paulweiss.com>; Jeannie S. Rhee <jrhee@paulweiss.com>; jobrien@paulweiss.com; kgallo@paulweiss.com; Kimberly Broecker <kbroecker@wc.com>; Moen, Nicole <NMoen@fredlaw.com>; Dougherty, Rachel <RDougherty@fredlaw.com>; O'Shea, Timothy <toshea@fredlaw.com>; Wind, Todd <twind@fredlaw.com>; wmichael@paulweiss.com
**Cc:** Alejandra Salinas <ASalinas@susmangodfrey.com>; Arun Subramanian <asubramanian@SusmanGodfrey.com>; Bill Carmody <bcarmody@SusmanGodfrey.com>; Caroline DaCosta <CDaCosta@susmangodfrey.com>; Gloria Park <GPark@susmangodfrey.com>; Jerry Blackwell <blackwell@blackwellburke.com>; Mark Musico <MMusico@susmangodfrey.com>; Rachel Black <rblack@SusmanGodfrey.com>; Rodney Polanco <RPolanco@susmangodfrey.com>; Ryan Caughey <rcaughey@susmangodfrey.com>; S. Jamal Faleel <jfaleel@blackwellburke.com>
**Subject:** Insignia/News - Meet and Confer on Insignia's Second and Third Sets of RFPs

[EXTERNAL E-MAIL]

Counsel,

We write to follow up on the parties' meet and confer earlier today.

**Depositions taken and produced in *Valassis II***: Defendants proposed producing documents for the depositions taken in *Valassis II* of the NAM custodians in this case. Beyond those seven depositions, Defendants noted that producing additional depositions would not be proportional to the needs of this case. So that Insignia can assess Defendants' objection, Defendants agreed to provide a list of deponents in *Valassis II*. Please do so by this Friday, July 24.

Defendants' counsel also stated that they will confer with their client on whether they will provide a list of witnesses who were deposed in prior litigations (e.g., *Dial, Insignia I, Valassis I, Floorgraphics*) whose deposition materials were produced in *Valassis II*. If you are willing to provide this information, please do so by this Friday, July 24. If you are not willing to provide this information, please let us know that position by this Friday and please let us know why you are unwilling to provide the information.

**Expert reports in *Valassis II***: Defendants objected to producing expert reports in *Valassis II* on relevance and burden grounds. Defendants stated those reports may contain information that Defendants believe is not relevant to this case, such as pre-2011 information. Defendants stated that producing expert reports may also raise confidentiality issues. So that Insignia can assess Defendants' objection, Defendants agreed to provide the total number of expert reports in *Valassis II*. Please do so by this Friday, July 24.

**Documents designated trial exhibits in *Valassis II***: Defendants noted that Insignia should already have post-2014 trial exhibits from *Valassis II* from Defendants' productions to date, and that Defendants' offer to run search terms through their 2011-2013 *Valassis II* production should encompass post-2011 trial exhibits. Plaintiff will take this representation under advisement.

**Documents related to the sale of NAM to Charlesbank**: Defendants stated their willingness to

discuss producing documents on the sale of NAM to Charlesbank provided that Plaintiff provides additional information on why such documents are relevant. As noted on the call, Plaintiff believes that the Charlesbank documents are relevant for at least the following nonexhaustive list of reasons:

1. Any valuation of NAM that was conducted in advance of or as part of the transaction is relevant to this case.
2. Any market and competitive analysis that was conducted in advance of or as part of the transaction is relevant to this case.
3. Any research or survey on market conditions that was conducted in advance of or as part of the transaction is relevant to this case.
4. Charlesbank owns Vestcom, a player in the third-party ISP market. Documents and communications regarding Vestcom, potential synergies and cooperation between NAM and Vestcom, and any consideration (regulatory, market, business strategy, or otherwise) on one entity owning both Vestcom and NAM are relevant to this case.

Please confirm whether documents exist on the above-referenced relevant topics and whether Defendants will produce those documents.

**Defendants' proposal to run negotiated search terms through Defendants' *Valassis II* production**: Defendants clarified that they did not undertake a responsiveness review in *Valassis II*. Defendants further clarified that they are proposing to run search terms through only documents newly produced in *Valassis II*, not documents produced by Defendants in prior litigations like *Dial* that have been re-produced in *Valassis II*. Defendants' counsel stated that they will confirm whether there were post-2/9/2011 documents produced in *Dial* and, if so, articulate the basis of Defendant's position for not running search terms through that set of documents. Please do so by this Friday, July 24.

**Retailer and CPG contracts**: Defendants stated that they have completed their production of 2014-2019 CPG and retailer contracts and 2011-2013 retailer contracts. Defendants stated that they will not produce 2011-2013 CPG contracts on burden grounds. Defendants stated their willingness to discuss producing existing data that aggregates the information reflected in the individual CPG contracts.

**Exchange of financial and market data**: The parties agreed to mutually identify categories of financial and market data that the parties will produce.

Best,
Gloria

**Gloria Park | Susman Godfrey**
o. 212.729.2029 | c. 917.340.3695
1301 Avenue of the Americas, 32nd Fl. | New York, NY 10019
gpark@susmangodfrey.com

This e-mail may contain privileged and confidential information.  If you received this message in error, please notify the sender and delete it immediately.

EXHIBIT 12

# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Insignia Systems, Inc.,                          Civ. No. 19-1820 (MJD/BRT)

        Plaintiff,

v.

News Corporation, News America          **ORDER**
Marketing FSI L.L.C., and News America
Marketing In-Store Services L.L.C.,

        Defendants.

Alejandra Salinas, Esq., Arun S. Subramanian, Esq., Gloria Park, Esq., Mark Musico, Esq., and William Christopher Carmody, Esq., Susman Godfrey LLP; Hunter J. Shkolnik, Esq., Napoli Shkolnik PLLC; Jerry W. Blackwell, Esq., and S. Jamal Faleel, Esq., Blackwell Burke PA, counsel for Plaintiff.

Gerson Avery Zweifach, Esq., Williams & Connolly LLP; Jane B. O'Brien, Esq., Jeannie S. Rhee, Esq., Kenneth A. Gallo, Esq., William Michael, Esq., and Heather Milligan, Esq., Paul, Weiss, Rifkind, Wharton & Garrison LLP; Nicole M. Moen, Esq., Rachel Dougherty, Esq., Timothy M. O'Shea, Esq., and Todd A. Wind, Esq., Fredrikson & Byron, PA, counsel for Defendants.

        This matter is before the Court on Defendants' Motion for a Protective Order Regarding Plaintiff's Subpoenas. (Doc. No. 128, Mot. to Compel.) Plaintiff opposes Defendants' Motion. (*See* Doc. No. 136, Pl.'s Mem. of Law in Opp'n ("Pl.'s Opp'n").) This dispute concerns Rule 45 subpoenas served on four third parties: Plaintiff's Subpoena for Production to CVS Health Corporation ("CVS") dated February 26, 2020; Plaintiff's Subpoena for Production to Albertsons Companies, Inc. dated February 26, 2020; Plaintiff's Subpoena for Production to Albertsons Companies, Inc., Idaho dated

February 26, 2020; and Plaintiff's Subpoena for Production to The Kroger Co. dated March 2, 2020. (*See* Doc. No. 131, Decl. of Todd Wind in Supp. of Mot. ("Wind Decl."), Exs. 1–4.) The third parties have not objected to the subpoenas; however, on April 17, 2020, the Defendant parties filed this Motion for a Protective Order to limit discovery pursuant to Rule 26(c). (Doc. No. 128, Mot. to Compel.) As already noted, Plaintiff opposes the motion. (Doc. No. 136, Pl.'s Mem. of Law in Opp'n ("Pl.'s Opp'n").)

## THIS COURT'S MARCH 24, 2020 ORDER

In bringing their Motion for a Protective Order, Defendants rely on this Court's Order denying Plaintiff's Motion to Compel Defendants to produce "All Documents produced in *Valassis Communications, Inc. v. News Corp., et al*., Cause No. 17-CV-7378 (PKC ) (S.D.N.Y.)." (Doc. No. 113, 3/24/20 Order.) Defendants argue that this Court's March 24, 2020 Order should be interpreted to preclude Plaintiff from seeking clone discovery from the third parties. Plaintiff, too, relies on this Court's March 24, 2020 Order, taking the position that the Court invited Plaintiff to turn to the third parties to obtain the documents sought when denying Plaintiff's motion to compel. While the Court is not critical of counsel's zealous advocacy, both sides overreach the meaning and scope of the Court's March 24, 2020 Order.

The March 24, 2020 Order addressed Plaintiff's motion to compel the production of more than 11 million documents sought by Plaintiff from the Defendants via a single

document request for clone discovery in *Valassis II*,[1] including documents produced by forty-six third parties. (*See* 3/24/20 Order at 3.) In opposing Plaintiff's motion to compel, Defendants asserted lack of relevance and an undue burden in producing the clone documents. (*See generally* Doc. No. 94, Defs.' Mem. of Law in Opp'n to Pl.'s Mot. to Compel; *see also* Doc. No. 95, Decl. of Jane B. O'Brien ¶¶ 11, 12.) Indeed, Defendants argued that the production would require Defendants to track down no fewer than forty-six parties to obtain their consent to produce their documents. (Doc. No. 94 at 16.) In addition, at the hearing, Defendants argued that the burden associated with exponentially expanding the scope of the record to add more than 11 million documents would have a "ripple effect" that would be costly. (Doc. No. 100, 3/9/20 Hrg. Tr. at 23.) In denying Plaintiff's motion to compel these 11 million documents, the Court found that "Plaintiff has not shown that all of the 11 million-plus clone documents are relevant and <u>proportional to the needs of the case</u>, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and <u>whether the burden or expense of the proposed discovery outweighs its likely benefit.</u> (3/24/20 Order at 3–4) (emphasis added). The Court also noted that Defendants' burden was sufficiently quantified in the O'Brien Declaration due to the sheer number of documents at issue pursuant to *Vallejo v. Amgen*, 903 F.3d 733 (8th Cir. 2018). (*Id.* at 4,

---

[1]     *Valassis II* is the matter currently being litigated in the Southern District of New York. (Doc. No. 100, 3/9/20 Hrg. Tr. at 29.)

n. 3.) "Accordingly, this Court [did] not require the wholesale production of the
remaining clone discovery from the *Valassis* litigation." (*Id.* at 4.) The Court ended its
Order by stating, "To the extent Plaintiff seeks pre-2014 documents or third-party
documents, Plaintiff may serve tailored document requests or Rule 45 subpoenas." (*Id.*)

## THE FOUR SUBPOENAS AT ISSUE

In February and early March 2020, Plaintiff served third-party subpoenas on CVS,
Albertsons Companies, Inc., Albertsons Companies, Inc., Idaho, and The Kroger Co. –
well before this Court's March 24, 2020 Order.[2] The responding third parties have not
objected to the subpoenas or any of the document requests. These four subpoenas at issue
include a common request for clone discovery that each third party produced in six past
litigations. (*See* Doc. No. 131, Wind Decl., Exs. 1–4, Exhibit A to the Subpoenas.) In
addition, each Exhibit A included requests for non-clone documents. For
example, the requests to CVS, Albertsons Companies, Inc., and Albertsons Companies,
Inc., Idaho, are listed below:

    1.    All Documents and Communications[3] concerning Your
        evaluation of the ISP work done by Defendants in Your stores.

---

[2]    The Court's March 24, 2020 Order should not be construed as a per se bar to clone
discovery, especially if such discovery is shown to be relevant and proportional. Here the
subpoenas and Exhibit A to the four subpoenas were not before the Court when it
considered Plaintiff's motion to compel the *Valassis II* documents, and this Court's
mention of the availability of additional document requests or third-party subpoenas as a
discovery tool in the March 24, 2020 Order was not pre-approval of any subpoena.

[3]    The terms "Documents" and "Communication" are defined very broadly in
Exhibit A to the Subpoenas.

2.      All Documents and Communications concerning any Agreement between You and Defendants that was in effect during the time period of September 1, 2017 to the present.

3.      All Documents and Communications concerning Your decision to announce the Shelf Edge Monetization RFP.

4.      All Documents and Communications concerning Your criteria for selecting ISP vendors from which to solicit proposals in response to the Shelf Edge Monetization RFP.

5.      All Documents and Communications concerning Your criteria for selecting among proposals received in response to the Shelf Edge Monetization RFP.

6.      All Documents and Communications concerning Your evaluation of Insignia's proposal submitted in response to the Shelf Edge Monetization RFP.

7.      All Documents and Communications concerning Your ultimate rejection of Insignia's proposal submitted in response to the Shelf Edge Monetization RFP.

8.      All Documents and Communications concerning Your evaluation of Defendants' proposal submitted in response to the Shelf Edge Monetization RFP.

9.      All Documents and Communications concerning any relationship between Your Agreement with Defendants and Your evaluation of proposals submitted in response to the Shelf Edge Monetization RFP.

10.     All Documents and Communications produced by You in any of the following lawsuits:

    a.      Floorgraphics,Inc. v. News America Marketing In-Store Services, Inc., et al., No. 3:04-cv-03500 (D.N.J.);

    b.      The Dial Corporation, et al. v. News Corp., et al., No. l: 13-cv-06802 (S.D.N.Y.);

    c.      Theme Promotions, Inc. v. News America Marketing FSI, No. CV-97- 04617 (N.D. Cal.);

      d.     *Insignia Systems, Inc. v. News Corp., et al.*, No. 04-cv-04213-JRT-AJB (D. Minn.);

      e.     *Valassis Communications, Inc. v. News America Inc.*, No. 2:06-cv-10240 (E.D. Mich.); and

      f.     *Valassis Communications, Inc. v. News Corp. et al.*, No. l:17-cv-07378- PKC (S.D.N.Y.).

11.     All Documents regarding ISPs.

12.     All Communications with Defendants regarding ISPs.

(Doc. 131-1, Exhibit A at 5–11 ("CVS"); *id*. at 15–20 ("Albertsons"); *id*. at 25–30 ("Albertsons Idaho") (the disputed request regarding clone discovery is request 10 and its subparts).) The Kroger Co. subpoena listed seven non-clone discovery requests for documents and the same clone discovery request with the same six subparts as the other subpoenas. (Doc. 131-1, Exhibit A at 35–40 ("Kroger") (the disputed request regarding clone discovery is request 6 and its subparts). Defendants seek a protective order regarding Document Request 10 and subparts (a)-(f) sought in the CVS, Albertsons, and Albertsons Idaho subpoenas, and Document Request 6 and subparts (a)-(f) sought in the Kroger subpoena. Defendants do not object to any of the other document requests in the subpoenas.

## DISCUSSION

The outcome of the present motion relating to the four third-party subpoenas is not foreordained by the March 24, 2020 Order. The March 24, 2020 Order addressed Plaintiff's motion to compel discovery of more than 11 million documents from the *Valassis II* litigation, including documents produced by Defendants and, at least, forty-nine third parties. The Court found that Plaintiff had not established that the 11 million-

plus clone documents were relevant and <u>proportional to the needs of the case</u>, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and <u>whether the burden or expense of the proposed discovery outweighs its likely benefit.</u> Defendants' burden was addressed at the hearing and evidence of their burden was noted in the Court's March 24, 2020 Order. (3/24/20 Order at 4, n.3.)[4]

Although this Court lacks jurisdiction to quash the subpoenas, it has the power to enter a protective order under Federal Rule of Civil Procedure 26(c) and to otherwise limit discovery under Rule 26(b)(2)(C). Rule 26(c) provides:

> The court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including one or more of the following:
>
> (A) forbidding the disclosure or discovery;
>
> ....
>
> (C) prescribing a discovery method other than the one selected by the party seeking discovery;
>
> (D) forbidding inquiry into certain matters, or limiting the scope of disclosure or discovery to certain matters; . . .

Fed. R. Civ. P. 26(c)(1). Rule 26 provides that a court must limit—on motion or on its

---

[4]     To the Court's knowledge, the third parties have not objected to the subpoenas or any of the requests. Defendants concede that they do not have standing to argue the third parties' burden when seeking the requested protective order from this Court, but instead argue lack of relevance and raise their own burden that would result from the third parties responding to the clone discovery requests.

own—the frequency or extent of discovery otherwise allowed by the rules if it determines

that:

> (i) the discovery sought is <u>unreasonably cumulative or duplicative</u>, or can
> be obtained from some other source that is more convenient, less
> burdensome, or less expensive;
>
> (ii) the party seeking discovery has had ample opportunity to obtain the
> information by discovery in the action; or
>
> (iii) the proposed discovery is outside the scope permitted by Rule 26(b)(1).

Fed. R. Civ. P. 26(b)(2)(C) (emphasis added).

The Court concludes that Defendants have shown good cause to strike the single

request (including subparts) for the clone-discovery documents from the four third-party

subpoenas.[5] First, Plaintiff concedes that the clone discovery seeks duplicative discovery

from the third parties in two ways. Plaintiff concedes, for example, that documents from

at least one of the past litigations was produced in the *Valassis* litigation. And, at the

hearing on Plaintiff's motion to compel, Plaintiff explained that the *Valassis I* documents

may be included in the *Valassis II* record.  (Doc. No. 100, 3/9/20 Hrg. Tr. at 38.) In other

words, the production would generate duplicate documents across the past litigations.

Complicating things more, the requests for <u>un-cloned</u> discovery overlap the clone

discovery. *See Goro v. Flowers Foods*, No. 17-cv-02580-JLS-JLB, 2019 WL 6252499, at

---

[5]     This Court agrees with Plaintiff that *Abhe v. Hedley*, No. 15-1952 (WMW/BRT),
2016 WL 11509914, at *4 (D. Minn. Mar. 15, 2016), does not support Defendants'
motion. In *Abhe*, the Court found that the clone discovery sought via third-party
subpoena was cumulative of discovery that <u>was ordered produced by one of the parties</u>.
Here, Defendants refused to produce any third-party documents or its own pre-2014
documents from past litigations.

*18–19 (S.D. Cal. Nov. 22, 2019) (denying motion to compel clone discovery, stating the requesting party had "already propounded discovery requests that capture the documents they seek through [the clone discovery request]"). For example, Plaintiff acknowledges that the requests for "All Documents regarding ISPs" to the third parties capture documents sought through the clone discovery. The Court appreciates Plaintiff's representation that its counsel would work with the third parties to only require the production of non-duplicative and non-cumulative documents and that Plaintiff might be satisfied by a third party's production of their *Valassis* documents. The Court, however, must review the requests as written in the subpoenas and accompanying exhibits.[6] On their face, the subpoenas seek duplicative documents across the various litigations delineated in the clone discovery requests' subparts.

Defendants appear to admit that some documents produced by third parties from other litigations might be relevant; however, Defendants argue that Plaintiff has not established the relevance of "all documents" sought in the clone discovery requests.[7] In

---

[6]     This Order does not preclude the third parties from meeting and conferring with Plaintiff's counsel on the remaining requests. In fact, Defendants agree that this Court cannot preclude the third parties from voluntarily producing their documents from the past productions listed to satisfy the subpoena requests. *See Axcan Scandipharm Inc. v. Ethex Corp.*, No. 07-2556 (RHK/JSM), 2008 WL 11349882, at *5 (D. Minn. Dec. 31, 2008) (noting that the responding party was free to choose to produce the production in its entirety).

[7]     The Court does not rule today that a party must <u>always</u> establish that "all" documents are relevant in order to justify clone discovery from another litigation in every situation. But here, Plaintiff thus far has not provided the Court with a sufficient explanation of what kind of documents are likely to be found in the clone discovery, how they are relevant and proportional to the case.

making this argument, Defendants rely heavily on *Axcan Scandipharm Inc. v. Ethex Corp.*, No. 07-2556 (RHK/JSM), 2008 WL 11349882 (D. Minn. Dec. 31, 2008). In *Axcan*, the court denied a motion to compel the production of clone documents produced by the parties in a different case. *Id*. at *5. Although the dispute over clone discovery in *Axcan* was between parties—and not third parties—the court's concerns about the clone discovery in *Axcan* apply here. In *Axcan*, the court –

> had no doubt that within the [documents produced in the past litigation] there are documents (and perhaps many documents) which are relevant to and should be produced in the [current] litigation. At the same time, however, the Court [did] not assume, nor [had] [the party] established, that all documents produced by these defendants in the [past] litigation are relevant to the instant litigation.

*Id*. After making this observation, the court concluded that the past productions –

> should be treated the same as all other documents in their possession and should be reviewed to determine if they contain relevant documents responsive to [the party's] other document requests, and if they do, the documents should either be produced or identified on a privilege log, if withheld based on privilege or any other basis.

*Id*. The court in *Axcan* found no basis for relieving the responding party's duty to search for documents responsive to the other requests.[8] *Id*.

---

[8]    In its March 24, 2020 Order, the Court in this case noted that it had not yet taken any position regarding the scope of discovery, stating:

> As this Court noted in footnote 8 of its Recent Report and Recommendation, it has not yet taken any position regarding the scope of discovery. This Court's denial of the remaining cloned *Valassis* discovery should not be interpreted to mean that a cut-off date for discovery has been established by this Court. If Plaintiff has reached the limit for the number of document requests permitted pursuant to the Pretrial Scheduling Order, or

(Footnote continued on next page)

The Court grants Defendants' Motion for a Protective Order as to the single clone discovery request and subparts in each of the four subpoenas. This Order, however, does not bar Plaintiff from seeking documents responsive to the other document requests in the third party's possession and control. Nor does it bar the responding third parties from working with Plaintiff to identify responsive documents—including documents produced in past litigations—that would satisfy Plaintiff's remaining requests.

## ORDER

Based on the file, record, submissions, and arguments of counsel, **IT IS HEREBY ORDERED** that:

1.     Defendants' Motion for a Protective Order Regarding Plaintiff's Subpoenas (Doc. No. 128) is **GRANTED**. Request No. 10 as set forth in Exhibit A to the CVS, Albertsons, and Albertsons Idaho subpoenas, and Request No. 6 as set forth in Exhibit A to the Kroger Co. subpoena are stricken pursuant to Federal Rule Civil Procedure 26(c).

2.     Plaintiff must provide a copy of this Order to the above third parties.


Date: May 21, 2020                          *s/ Becky R. Thorson*_____
                                            BECKY R. THORSON
                                            United States Magistrate Judge

---

(Footnote continued from previous page)
        will exceed those limits, the Court will entertain requests to increase the
        limits to facilitate this process.

(3/24/20 Order at 4, n.4.)

EXHIBIT 14

## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

INSIGNIA SYSTEMS, INC.,

        Plaintiff,

        v.

NEWS CORPORATION, NEWS
AMERICA MARKETING FSI L.L.C.,
AND NEWS AMERICA MARKETING IN-
STORE SERVICES L.L.C.,

        Defendants.

Case No. 19-cv-1820 (MJD/BRT)

## MEMORANDUM IN SUPPORT OF
## <u>DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS</u>

Defendants News Corporation, News America Marketing FSI L.L.C., and News

America Marketing In-Store Services L.L.C. ("NAM In-Store") (collectively,

"Defendants") respectfully move the Court pursuant to Federal Rule of Civil Procedure

12(c) to grant judgment on the pleadings against Plaintiff Insignia Systems, Inc.

("Insignia"), and to dismiss the Complaint.

## <u>INTRODUCTION</u>

On February 9, 2011, after seven years of litigation, the empanelment of a jury,

and the delivery of opening statements, these parties availed themselves of the services of

the then-chief Magistrate Judge of this Court, who guided the parties to achieving a

comprehensive settlement agreement that not only ended a complex antitrust case,

*Insignia Sys., Inc. v. News Corp., Ltd.*, No. 04-cv-4213 ("*Insignia I*"), but embodied a

commitment to make a fresh start. As the Court will see, in exchange for substantial

1

consideration, Insignia committed not only to release all claims of any kind through the date of the 2011 release, but not to "attempt to introduce as evidence" or "otherwise assert" any of the "facts" or "conduct" that had formed the basis of the released claims.

The Complaint filed by Insignia this July is striking both for what is present and for what is absent. Notwithstanding Insignia's commitment to the contrary, paragraph after paragraph of the Complaint "asserts" facts that had been alleged in the 2004-11 litigation and explicitly released. No mention whatsoever is made of the February 9, 2011 Settlement Agreement. And, the allegations of recent vintage are thin gruel. Whether Insignia ignored the 2011 Settlement Agreement because it recognized that it needed something more than the post-2011 conduct to sustain a lawsuit, or simply because Insignia chose not to abide by its commitments, the Complaint does not permit the Defendants or the Court to fairly address whether the post-2011 allegations – the unreleased conduct – state an antitrust claim. Nor does the Complaint set out the metes and bounds of the "new" case so as to allow the Court to sensibly manage discovery.

Rule 12(c) has been recognized in this District and Circuit as an appropriate vehicle for the Court to enforce a prior settlement agreement. The Defendants will invite the Court's attention to pleadings in this case – the Complaint, Defendants' Answer, Defendants' Counterclaim (to enforce the 2011 Agreement), and Insignia's Answer – as well as the pleadings in *Insignia I*. Those pleadings, and the Settlement Agreement referenced in Defendants' Answer and Counterclaim, support judgment for the Defendants, with a direction to Insignia that any amended complaint must take into account the commitments it made 8 years ago in this Court.

## BACKGROUND PLEADINGS

This Motion rests on the Complaint, Defendants' Answer and Counterclaim, and Insignia's Answer to the Counterclaim filed herein; the Amended Complaint and other pleadings filed by Insignia in this Court during the course of *Insignia I*; and the Settlement Agreement & Release of February 9, 2011, described in the Defendants' Counterclaim at paragraphs 10-13, acknowledged by Insignia in its Answer at paragraphs 10-12, and filed under seal with this Motion (Exhibit A to Declaration of Todd Wind).

As these pleadings reflect, in 2004 Insignia filed suit against some of the Defendants alleging that they had violated federal and Minnesota laws prohibiting anticompetitive market practices in the alleged in-store advertising and promotional products market. *See Insignia I*, ECF Nos. 1 (Complaint), 54 (Fourth Amended Complaint). In February 2011, the parties entered a comprehensive Settlement Agreement intended to "forever put to rest all disputes and claims" arising from pre-release conduct, with Insignia explicitly promising not to assert or seek to make any use of any of the pre-release "underlying facts or conduct" in any future court proceeding. Settlement Agreement ¶¶ 2, 9. This past July, Insignia's Complaint charged – again – that the Defendants had monopolized the same markets, asserting (without citation to) some of the same evidence and testimony relied upon in the pleadings of *Insignia I*; in August, the Defendants filed an Answer and Counterclaim that invoked the 2011 Settlement Agreement and alleged that Insignia was in breach; and in September, Insignia answered, acknowledging the 2011 Settlement Agreement, but suggesting that its enforcement now was somehow against "public policy." Pl.'s Ans. 5, ¶ 2.

3

## ARGUMENT

### I.    RULE 12(c) IS AN APPROPRIATE VEHICLE FOR ENFORCING PRIOR SETTLEMENT AGREEMENTS.

Federal Rule of Civil Procedure 12(c) authorizes a motion for judgment on the pleadings after the pleadings are closed, but early enough not to delay trial. Judgment pursuant to Rule 12(c) is "particularly appropriate" where, as here, the central dispute turns on a party's duties under the correct interpretation of a contract. *VoiceAge Corp. v. RealNetworks, Inc.*, 926 F. Supp. 2d 524, 529 (S.D.N.Y. 2013); *see, e.g.*, *Restaurant Recycling, LLC v. Employer Mutual Casualty Co.*, 922 F.3d 414, 417 (8th Cir. 2019); *Buddy Bean Lumber Co. v. Axis Surplus Ins. Co.*, 715 F.3d 695, 697-98 (8th Cir. 2013). In this case, that contract is the 2011 Settlement Agreement.

Courts evaluate Rule 12(c) motions under the same standards governing motions to dismiss under Rule 12(b)(6). As such, courts adjudicating a Rule 12(c) motion may consider all documents "necessarily embraced" by the pleadings. *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999). Courts may also look to other judicially noticeable facts and "public record[s]," such as documents or filings from "earlier underlying . . . court proceedings." *Hatch v. TIG Ins. Co.*, 301 F.3d 915, 916 n.2 (8th Cir. 2002); *see Porous Media Corp.*, 186 F.3d at 1079 (citing 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure: Civil 2d* § 1357, at 299 (1990)); *see also Rollins v. City of Albert Lea*, 79 F. Supp. 3d 946, 953 (D. Minn. 2014).

This Court has granted judgment on the pleadings to prevent would-be plaintiffs from pursuing actions in violation of prior settlement agreements. In *Lansing v. Wells*

*Fargo Bank, N.A.*, 2016 WL 3406085 (D. Minn. June 17, 2016), for example, the district court granted judgment on the pleadings to Wells Fargo and dismissed the entirety of plaintiff's complaint, *id.* at \*1, on the basis that the plaintiff's claims "concern[ed] the same set of factual consequences" and the same "foreclosure proceeding" that were subject to an earlier settlement agreement between the parties, *Lansing v. Wells Fargo Bank, N.A.*, 2016 WL 3390400, at \*6, \*14-16 (D. Minn. Apr. 25, 2016), *adopted by* 2016 WL 3406085. The Eighth Circuit affirmed the dismissal of plaintiff's complaint under Rule 12(c), reasoning that the "plain language of the settlement agreement show[ed] that the parties intended [plaintiff's] waiver" of claims to preclude him from pressing the claims contained in his new complaint. *Lansing v. Wells Fargo Bank, N.A.*, 894 F.3d 967, 973 (8th Cir. 2018). Similarly, in *John v. MainGate, Inc.*, 2013 WL 6119072 (D. Minn. Nov. 21, 2013), the court granted the defendant's motion for judgment on the pleadings and dismissed the whole of plaintiff's complaint on the basis that the "express[]" terms of a settlement agreement between the parties demonstrated that plaintiff's claim had been "previously settled and released," *id.*, at \*3; *John v. MainGate, Inc.*, 2014 WL 3805662, \*2 (D. Minn. Aug. 1, 2014).

Those cases are instructive here, where the only question concerns the application of the Settlement Agreement to the allegations and factual material referenced in Insignia's Complaint, as well as other pleadings in this Court.

## II.  THE 2011 SETTLEMENT AGREEMENT AND COVENANT NOT TO SUE EXPLICITLY AND UNAMBIGUOUSLY BARS INSIGNIA FROM "ASSERTING"  OR MAKING ANY OTHER USE OF PRE-2011 FACTS IN THIS OR ANY COURT PROCEEDING.

Insignia does not dispute the existence, authenticity, or contents of the February 2011 Settlement Agreement.[1]  *See* Pl.'s Ans. ¶¶ 10-12.  As that agreement is referenced by the parties' pleadings and central to the present dispute, it is properly considered by the Court.  *See Porous Media Corp.*, 186 F.3d at 1079.

Of particular relevance is paragraph 9 of the Settlement Agreement, which contains Insignia's general release of claims and covenant not to sue.  As set forth in Defendants' pleadings, paragraph nine provides that Insignia

> hereby releases, releases, remises, acquits, and forever discharges Defendant [NAM In-Store and its related entities] from any and all manner of actions and causes of actions . . . known or unknown, of any kind or character, from the beginning of time up to the date of this Agreement (collectively, the "Released Matters").

Settlement Agreement ¶ 9.  Paragraph 9 does not stop at specifying a general release of *claims*.  Not only is Insignia barred from recovery on any claims it could have asserted, it

---

[1] In addition to the proposition that enforcing settlement agreements is against "public policy," Insignia suggests in its Answer that the Defendants have not complied with the Settlement Agreement.  In that Agreement, Insignia agreed to present any claims of noncompliance to Magistrate Judge Boylan.  Settlement Agreement ¶ 7.  Insignia never questioned the Defendants' compliance before filing its Answer to Defendants' Counterclaim.  Nor has it pressed a claim for breach in this Court.  Insignia's as-yet unidentified quarrel over compliance presents no basis to vitiate the Release and Covenant Not to Sue and no bar to entry of judgment for Defendants on the Complaint.  *See MainGate, Inc.*, 2013 WL 6119072, at *3 (declining to consider plaintiff's breach defense to a settlement agreement because plaintiff's complaint "d[id] not assert a breach of contract claim," and thus issue was "not properly before the Court").

is barred even from asserting or making any other use of any of the pre-release facts

underlying the released claims. The Agreement provides that Insignia

> promises, covenants and agrees not to sue, attempt to introduce as evidence, or
> otherwise *assert any of the Released Matters and/or the underlying facts or
> conduct supporting the Released Matters against* Defendant [NAM In-Store] or
> the Defendant Released Parties *in any court*, governmental or regulatory body or
> other proceeding.

*Id.* (emphasis added).[2]

Paragraph 9 thus made clear that what was released extended past the causes of

action at issue in 2011 – a dismissal with prejudice would have sufficed for that purpose.

Insignia covenanted not to make any effort to replead or repackage or "otherwise *assert*"

any of the "facts or conduct" underling the released claims.  And, that commitment not

even to "assert" any of those facts or conduct extended to any proceeding in any court.

The covenant in the Settlement Agreement barred Insignia from pleading (let alone

otherwise exploiting) in any subsequent proceeding against Defendants any alleged "fact

or conduct" that Insignia had ever alluded to or offered in support of the claims released

in 2011.

---

[2] Although Defendant NAM In-Store was the only current defendant named in the
operative *Insignia I* Complaint, *see* Fourth Am. Compl., ECF No. 54, the Settlement
Agreement broadly applies to all "Defendant Released Parties," defined as any of NAM
In-Store's "past or present members, related or affiliated companies and any or all of its
respective officers, directors, shareholders, partners, servants, employees, members,
attorneys, accountants, agents representatives, affiliates, subsidiaries, parents, successors
and assigns, whether in their individual capacity or as principal or agent." Settlement
Agreement ¶ 9.  Insignia's Complaint pleads that all the Defendants in this action are
affiliated entities, and thus all qualify as Defendant Released Parties.

In exchange for broadly waiving its rights to assert all pre-Settlement Agreement allegations, facts, and conduct in future litigation, Insignia was paid substantial consideration by Defendant NAM In-Store. *See id.* ¶ 1; Pl.'s Ans. ¶ 12. It is difficult to understand how Insignia managed to forget the elaborate commitments it made in consideration for receiving a nine-figure settlement.

## III. INSIGNIA'S COMPLAINT RELIES SUBSTANTIALLY ON PRE-2011 ALLEGED FACTS AND CONDUCT THAT THE SETTLEMENT AGREEMENT BARS FROM ANY USE IN ANY COURT PROCEEDING.

Notwithstanding the unambiguous prohibition against "assert[ing]" any pre-2011 facts or conduct in any future court proceeding, the Complaint filed in July is filled with such allegations. Some of these are quite explicit. Others are undated, but familiar to anyone who was a party to the 7-year litigation history of *Insignia I*. All of these allegations play a material role in the July 2019 Complaint.

For example:

1. Insignia relies on released material from the very start. Paragraph two of the Complaint asserts that "*[f]or over a decade*, News has acquired and maintained a monopoly." Compl. ¶ 2 (emphasis added). That reference by its terms would reach back to the establishment of an alleged monopoly in 2009 – two years before Insignia entered into the Settlement Agreement. From the very start of the Complaint, Insignia appears unable or at least unwilling to rest its allegations of the acquisition and maintenance of a monopoly on conduct that began after the date of the Settlement Agreement.

2. The trend continues in paragraphs 5 and 26, in which Insignia makes assertions about Defendants' market-share growth "*[i]n the intervening decade* since the antitrust

litigation began." *Id.* ¶ 5 (emphasis added).  This is no accident.  Insignia's decision to rest on pre-2011 facts was intended to allow it to begin with Defendants' "2009… annual revenues in the United States" and revenue growth from 2009 through the execution of the Settlement Agreement.  *Id.* ¶ 26.  Again, Insignia was not content to rest its market-share measurement (and its allegations about how that market share was acquired and maintained) on events post-2011, but of course that is exactly what it covenanted to do in the Settlement Agreement.

3.  So too with paragraphs 40 and 52 of the Complaint, which refer to "effectively long-term" contracts, including one extending for "10 years" – a period reaching back prior to 2011.  *Id.* ¶¶ 40, 52.  Insignia's July 2019 Complaint alleges that the Defendants wrongfully entered into long-term agreements with retailers designed to make it more difficult for competitors to assemble a retail network to then market to consumer goods manufacturers who might hire Insignia for in-store advertising services.  Whether it is somehow anticompetitive to enter contracts with sophisticated retailers who can choose to renew them or not is a subject that the parties can debate before the Court.  But if Insignia wishes to make that case, it ought to be called upon first to properly plead it.  Here, the crown jewel of Insignia's "long-term" retail contract allegation – perhaps the only example – is a contract covered by the general release and covenant not to sue executed by the Parties in February 2011.

The more insidious violations of the Settlement Agreement are not in the dated allegations but in the ones where Insignia chose not to assign a date.  But in prior pleadings in *Insignia I*, when it was seeking to extract a large settlement, Insignia made

9

clear that it knew the dates of the alleged conduct. And a comparison of those pleadings with the July Complaint makes clear that Insignia has, in multiple material instances, sought to leverage alleged facts that it previously covenanted it would not "assert" or otherwise use again in any court, let alone the same court where it made those promises.

For ease of reference, the below charts set out a series of comparisons of select portions of Insignia's present Complaint with pre-Settlement Agreement documents, pleadings, and other judicially noticeable materials from the *Insignia I* litigation.

| Insignia's Present Complaint | Pre-Settlement Agreement Source(s) |
|---|---|
| <u>Paragraph 3:</u> "News frankly and repeatedly acknowledged that it has sought to build contractual barriers to make it unlawfully difficult for competitors to compete. *As a former News America Marketing, Inc. chairman put it, he has vowed to 'destroy' News's competitors*." | • "Mr. Carlucci warned FGI's executives… 'We will destroy you….'" Insignia's Mem. in Opp'n to NAM In-Store's Mot. S.J. 33, *Insignia I*, ECF No. 515 (filed under seal Feb. 27, 2009) (quoting G. Rebh Tr., *Sept. 27, 2006*, Ex. 27 at 281:19-284:19).<br><br>• "This and other examples of exclusionary conduct are in keeping with *statements made by News' Chairman and CEO Paul Carlucci to the founders of FGI at a **2002** meeting* in New York – that if FGI dared to compete with News in its core products, News would destroy them." Insignia's Case Statement 10, *Insignia I*, ECF No. 739 (filed under seal Nov. 29, 2010) (emphasis added).<br><br>*See* Defs.' Ans. ¶ 3; Defs.' Countercl. ¶ 16. |

Insignia's July 2019 reference to a "former News America Marketing, Inc. chairman" is in fact an allegation about what Mr. Carlucci said in 2002. This critical allegation in paragraph 3 of the Complaint is calculated to support a claim that all of the contracting practices alleged throughout the Complaint were driven by anti-competitive animus directed at Insignia. And so, the relatively few instances of post-release conduct cited by Insignia – i.e., the making of competitive bids, or the request that retailers honor their exclusivity agreements – are all shaded as instances of "bad faith" or anticompetitive behavior because they are alleged to be part and parcel of a scheme to "destroy" – a scheme sourced in an alleged statement 17 years ago that was the subject of a release.

| Insignia's Present Complaint | Pre-Settlement Agreement Source(s) |
|---|---|
| Paragraph 31: "Internally, News has frankly acknowledged that it has sought to build contractual barriers to make it difficult for competitors to compete. News developed this exclusive, national network of retail chains in order to control a large percentage of ISPs and to forestall competition. *A former News account manager has testified that 100 percent of his retail accounts in the southeast United States had exclusivity clauses.*" | • "Question: Can you estimate for me what percentage of the contracts you handled with retailers had exclusivity clauses? Answer: Yes. I believe in my particular case it would have been 100 percent." Tr. of R. Emmel Testimony, *June 17, 2009*, at 174:8-12, *Valassis Commcns., Inc. v. News Am. Inc.* (No. 7-706645) (included on Insignia's trial exhibit list in *Insignia I*, ECF No. 745, PX 2962 (filed Nov. 29, 2010)).<br><br>*See* Defs.' Ans. ¶ 31; Defs.' Countercl. ¶ 21. |

This "frank[] acknowledge[ment]," as Insignia knows, is June 2009 testimony from an employee who departed in 2006, in which the employee is purporting to describe his pre-termination relationships with retailers. Again, if there are barriers to entry that were put in place by post-release conduct, then Insignia should plead them and prove them. If Insignia has a good-faith basis to allege that Defendants' contracts with retailers post-2011 all contain exclusivity provisions that unlawfully exclude Insignia, then Insignia should so plead. (Insignia knows better.) This allegation about conditions no more recent than 13 years ago represents an assertion and effort to make use of "evidence" that is itself based upon released acts and conduct, which is barred by the Settlement Agreement of 2011. In support of the proposition that Insignia is locked out of the retail marketplace by the Defendants' contracting practices, it "asserts" alleged "facts" and evidence that have no place in this proceeding, as a matter of law.

| Insignia's Present Complaint | Pre-Settlement Agreement Source(s) |
|---|---|
| Paragraph 35: "A former News America Marketing chief operations officer has explained that News has used such overly broad language to introduce signage that was not considered by the retailer at the time the contract was entered into. The officer went on to conclude his explanation of this aggressive tactic by stating: '[I]f there was any one [on staff] who was a bed wetting liberal [and] concerned about doing the right thing, they should speak up at that point, and he would arrange for human resources to work with that person and they would exit the company.'" | • "*In the Spring of 2001*, Mr. Carlucci told the entire sales staff that starting with the new fiscal year, to expect 'aggressive tactics' against its competitors. He then warned everyone on the phone that: '*If there was anyone who was a bed-wetting liberal that was concerned about doing the right thing*, they should speak up at that point and he would arrange for human resources to work with that person and they would exit the company.'" Insignia's Mem. in Opp'n to NAM In-Store's Mot. S.J. 33-34, *Insignia I*, ECF No. 515 (filed under seal Feb. 27, 2009) (quoting Emmel Tr., *Jan. 15, 2008*, Ex. 13 at 20:17-22:3 (emphasis added)).<br><br>*See* Defs.' Ans. ¶ 35; Defs.' Countercl. ¶ 18. |

Insignia is apparently unable or unwilling to attack the Defendants' contracting practices post-2011 on their competitive merits, and so, here it attacks signage practices that it claims were motivated and shaped by a "former News America Marketing chief operations officer." Of course, as Insignia previously stated, the alleged admission it asserts here is based on a telephone call that allegedly took place 18 years ago, according to an 11 year old deposition transcript. If Insignia thinks it can demonstrate that post-2011 business practices were anticompetitive in design and effect, then it should plead and prove them. But here, it is simply asserting words and conduct that it covenanted never to use in this Court.

| Insignia's Present Complaint | Pre-Settlement Agreement Source(s) |
|---|---|
| Paragraphs 41-43:  "Fourth, News has intentionally staggered the expiration dates of its retailer contracts so that, in any given year, opportunities for competitors to expand and underbid News's monopoly distribution are limited.  As Marty Garofalo, News America Marketing's former Executive Vice President of Trade explained, this practice was designed to unlawfully increase the barrier to competition:<br><br>'[…] News America, *we intentionally stagger the time of major retail deals to minimize the risk of losing a major number of stores in any one time period . . . .* [T]his strategy serves to deter a major competitor from joining the in-store fray *because they know it will take a long time and it would be a very hard fought drawn out process to develop the critical mass* necessary to be successful in this arena.'<br><br>Garofalo has further stated:<br><br>'We also stagger the deals to prevent a large percentage of the network from being vulnerable at any specific point in time. . . . This method allows us to concentrate on our key negotiations.  It also means that any competitor who wants to develop critical mass for their network would have to dedicate a lot of money over a considerable amount of time in order to break into the in-store game in any significant way.'" | • "NAM staggers the expiration dates of its contracts, to make it difficult for competitors to make inroads in NAM's exclusive retailer network.  As NAM's Martin Garafalo explained to NAM employees:<br><br>*News America Marketing intentionally staggers the time of major retail deals to minimize the risk of losing a major number of stores in any short term time period . . . .* A big part of being successful with our package good clients is having the critical mass to deliver promotions that move volume. By staggering the deals we can concentrate on key negotiations.  But perhaps more importantly this strategy serves as a deterrent to other major companies from joining the In-Store fray – *because they know that it will be a long – hard fought drawn out process to develop the critical mass* necessary to compete with News America to be successful in this arena."<br><br>Insignia's Mem. in Opp'n to NAM In-Store's Mot. S.J. 12-13, *Insignia I*, ECF No. 515 (filed under seal Feb. 27, 2009) (quoting *2002 Speaking Notes of Martin Garofalo*, Ex. 18; *2006 Presentation Script Attributed to Martin Garofalo*, included on Insignia's trial exhibit list in *Insignia I*, ECF No. 745, PX 1572 (filed Nov. 29, 2010)).<br><br>*See* Defs.' Ans. ¶¶ 41-43; Defs.' Countercl. ¶ 19. |

Insignia here admits it is purporting to quote Mr. Garafalo, but omits that—as Insignia well knows—these are remarks he allegedly made in 2002, 9 years before the Settlement Agreement released any claim that would rely on these remarks.  Once again, the quoted statement is critical to what passes for Insignia's "new case."

Insignia broadly attacks the purpose and intent behind exclusivity with retail networks (citing 17-year-old remarks), the length of those contracts (citing a 2009 agreement), and here the inter-relationship between the various retail contracts and the intentions behind Defendants' practices.  These attacks are central to the entire premise of the "new" lawsuit, and yet, the purported basis for the allegations here again are remarks allegedly made in 2002.  The parties must be put in a position where they can engage with each other and the Court on whether post-2011 marketing practices have the purpose and effect of reducing competition.  But these allegations do nothing but obscure whether in fact Insignia can state a claim based on events post-2011.  And, of course, unless and until the legitimate boundaries of this lawsuit are defined, discovery practice will simply recycle wide-ranging disputes on what is a matter of law.

## IV.   IN LIGHT OF THE COMPLAINT'S EXTENSIVE AND IMPROPER RELIANCE UPON PRECLUDED FACTS AND CONDUCT, DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS SHOULD BE GRANTED AND INSIGNIA REQUIRED TO REPLEAD.

These examples of explicit and undisclosed instances of Insignia ignoring its obligations under the 2011 Settlement Agreement are by no means exclusive.  Based on what is visible, there is every reason to believe that any or all of the undated allegations in the "new" Complaint may be drawn from released conduct.  Defendants have been

limited to instances where particular allegations were obviously sourced in prior
pleadings. Presumably Insignia knows the source of its undated allegations. It should be
called upon to disclose the dates, not only to fully enforce the Settlement Agreement, but
to allow the Court to assess what exactly is left of this case once Insignia complies.

It is striking just how thin are the dated post-2011 allegations of misconduct. The
allegations, such as they are, certainly confirm Insignia's distaste for the challenges of
competition. Insignia charges that, just as it was about to secure one promising retailer,
the Defendants "swooped in" and "torpedoed" the deal, Compl. ¶¶ 7, 37, somehow
securing the business even though Defendants "did not have products and processes
comparable" to what Insignia was offering. *Id.* Insignia complains that it was expecting
new business with a grocer when, inexplicably, the Defendants "tortiously" secured the
business even though, again, Insignia's "products and processes" were superior. *Id.* ¶ 50.

Insignia's "commercial disappointment at losing" business to competitors does not
support an inference that Defendants have engaged in unlawful, anticompetitive conduct.
*Double D Spotting Serv., Inc. v. Supervalu, Inc.*, 136 F.3d 554, 561 (8th Cir. 1998)
(internal quotation marks omitted); *see Stamatakis Indus., Inc. v. King*, 965 F.2d 469, 471
(7th Cir. 1992) ("a producer's loss is of no concern to the antitrust laws, which protect
consumers from suppliers rather than suppliers from each other"). Nor is there anything
"tortious" about outbidding a competitor. *See Amerinet, Inc. v. Xerox Corp.*, 972 F.2d
1483, 1507 (8th Cir. 1992) (under "competitor's privilege" doctrine, "competitive
conduct which is neither illegal nor independently actionable does not become actionable
because it interferes with another's prospective contractual relations" (internal quotation

16

marks and alteration omitted)). Insignia's chagrin that a potential competitor to

Defendants "must make investments" before it can generate revenue, Compl. ¶ 29,

reflects the realities of competition in any number of markets.

What is most striking, however, is not simply the nature of Insignia's post-2011

allegations but their number. At least based on the allegations that bear an actual date, it

appears that Insignia is taking issue with Defendants' conduct with respect to three

retailers and (perhaps) one consumer products good manufacturer. This in an alleged

market that according to Insignia itself consists of at least *55,000* retail outlets, from

grocery to drug stores to convenience stores, and hundreds of consumer goods

manufacturers who look for in-store services in those retail outlets to "put their

promotions in front of millions of consumers nationwide." Compl. ¶ 27; *see* Report of

Dr. Thomas R. Overstreet, Jr., Sept. 29, 2008, Ex. 3 to Insignia's Mem. in Opp'n to NAM

In-Store's Mot. S.J., at 21, 24-25, *Insignia I*, ECF No. 516 (filed under seal Feb. 27,

2009) (asserting that in 2006 NAM sold in-store promotions to 269 CPGs and had

contracts with 130 different retailers, while Insignia sold its in-store promotions to 57

CPGs and had contracts with 76 different retailers). Whatever the merit of Insignia's

allegations about Defendants' practices in these three or four instances, it is clear that a

handful of anecdotes such as these cannot possibly support a plausible allegation of

market foreclosure. *See Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 45

(1984) (O'Connor, J., concurring) ("Exclusive dealing is an unreasonable restraint on

trade only when a significant fraction of buyers or sellers are frozen out of a market by

the exclusive deal."); *Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*,

17

373 F.3d 57, 68 (1st Cir. 2004) ("For exclusive dealing, foreclosure levels are unlikely to be of concern where they are less than 30 or 40 percent."); *see also Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1059 (8th Cir. 2000) (identifying "the extent to which competition has been foreclosed in a substantial share of the relevant market" as important element for evaluating reasonableness of a contractual restraint).

 The Court need not decide today whether Insignia's post-2011 allegations, such as they are, would suffice to state a claim. What is clear is that the heart of the July 2019 Complaint – the engine of all the allegations of anticompetitive animus, the source of all the allegations of how and when the market was monopolized, and the heart of the allegations of exclusionary practices – all rests on released conduct. And that is just based on the undated material that is clearly sourced in previous pleadings in *Insignia I*. Neither the Defendants nor the Court have any way of knowing how many other undated allegations are in fact rooted in released conduct. When the pre-2011 alleged conduct is removed, what is left are a series of complaints about Insignia's disappointment at being exposed to a competitive process, and not enough of those to possibly support a claim of market foreclosure. This is why the Court should put a stop to Insignia's effort to leverage allegations and testimony about events from 2002 and 2006; not only to enforce a 2011 agreement entered by these parties with the assistance of the Court, but to allow the Court to assess whether the allegations not barred by the Settlement Agreement suffice to state a claim under federal law.

 Before the parties and the Court venture down the path of trying to assess whether these allegations support an antitrust suit, let alone attempt to navigate their way through

the complexities of antitrust discovery and accompanying motion practice, Rule 12(c)

provides a vehicle for the Court to compel Insignia to do what it covenanted to do in this

Court 8 years ago. *See Lansing*, 894 F.3d at 973; *MainGate, Inc.*, 2013 WL 6119072, at

*3. The Complaint should be dismissed because it clearly includes all manner of material

allegations that have been made in violation of express commitments not to make any use

of pre-2011 events and conduct in any court, let alone this one.[3] Insignia should be

directed to comply with its obligations under the 2011 Settlement Agreement in any

amended complaint, and to date its allegations to ensure that it does not again proceed in

violation of its obligations.

　　　Both the United States Supreme Court and this Circuit have urged district courts to

be "reasonably aggressive in weeding out meritless antitrust claims at the pleading stage"

in light of the "unusually high cost of discovery in antitrust cases . . . ." *Insulate SB, Inc.*

*v. Advanced Finishing Sys., Inc.*, 797 F.3d 538, 543 (8th Cir. 2015) (internal quotation

marks, citations, and alterations omitted) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S.

544, 558-59 (2007)). *Twombly* itself arose in the context of an antitrust case, where the

Supreme Court recognized that the burdens of these cases call upon the trial courts to

scrutinize the legal basis for proceeding at the earliest opportunity.

---

[3] A far less suitable alternative would be for the Court to enforce the Settlement
Agreement by striking the improper assertion of released acts and conduct under Rule
12(f). *See Lunsford v. United States*, 570 F.2d 221, 227 & n.11 (8th Cir. 1977) (court
may entertain a motion to strike notwithstanding that Answer had been filed). But this
approach creates its own uncertainties, because Insignia's decision not to date most of its
allegations makes it impossible at this stage for the Court to identify all of the allegations
drawn from released conduct. An amended pleading would put that burden on Insignia,
where it belongs, and then give the Court a fair opportunity to assess whether what
remains amounts to a case under the Sherman Act.

In this case, Insignia's suggestion that the Court not answer the fundamental

question of what is part of this case and what was released as a matter of law will burden

the Court and the parties, and slow the progress of the case, if there is indeed a case here.

At minimum, it will add dramatically to the expense and the length of the litigation.

Surely it is not too much to ask Insignia, which presumably knows where its allegations

came from and should be familiar with the 2011 Settlement Agreement, to file a new

pleading that honors the commitments it made in this Court.

## **CONCLUSION**

For the above reasons, Defendants respectfully request the Court to grant their

motion for judgment on the pleadings and dismiss Insignia's Complaint.

Dated: October 21, 2019

s/ Todd Wind
Todd Wind (#0196514)
Nicole M. Moen (#0329435)
**FREDRIKSON & BYRON, P.A.**
200 South Sixth Street, Suite 4000
Minneapolis, MN 55402-1425
Tel: 612.492.7000
Fax: 612.492.7077
twind@fredlaw.com
nmoen@fredlaw.com

William B. Michael (admitted *pro hac vice*)
NY Bar No. 4296356
**PAUL WEISS RIFKIND WHARTON &
GARRISON**
1285 Avenue of the Americas
New York, NY 10019-6064
Tel: 212.373.3648
Fax: 212.492.0648
wmichael@paulweiss.com

Kenneth A. Gallo (admitted *pro hac vice*)
NY Bar No. 430369
Jane B. O'Brien (admitted *pro hac vice*)
NY Bar No. 4484457
Jeannie S. Rhee (admitted *pro hac vice*)
District of Columbia Bar No. 464127
**PAUL WEISS RIFKIND WHARTON & GARRISON**
2001 K Street, NW
Washington, DC 20006-1047
Tel:   202.223.7356
Fax:   202.204.7356
kgallo@paulweiss.com
jobrien@paulweiss.com
jrhee@paulweiss.com

Gerson A. Zweifach (admitted *pro hac vice*)
District of Columbia Bar No. 349266
**WILLIAMS & CONNOLLY LLP**
725 Twelfth Street, N.W.
Washington, DC 20005
Tel:   202.434.5000
Fax:   202.434.5029
gzweifach@wc.com

***Attorneys for Defendants***

68348226

EXHIBIT 15

# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| INSIGNIA SYSTEMS, INC., | |
| Plaintiff, | |
| v. | Case No. 19-cv-1820 MJD/BRT |
| NEWS CORPORATION, NEWS AMERICA MARKETING FSI L.L.C., AND NEWS AMERICA MARKETING IN-STORE SERVICES L.L.C., | |
| Defendants. | |

# DEFENDANTS' MEMORANDUM OF LAW IN
# OPPOSITION TO PLAINTIFF'S MOTION TO COMPEL

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................... 1

APPLICABLE LEGAL STANDARD ................................................................... 3

ARGUMENT ....................................................................................................... 5

I.      Defendants Are Producing a Huge Quantity of
        Documents Responsive to Insignia's Requests. ....................................... 5

II.     The Pre-2014 *Valassis II* Documents Are Outside the
        Scope of Permissible Discovery Under Rule 26(b). ................................. 7

        A.      Insignia Cannot Show that the Discovery Sought Is
                Either Relevant or Proportional to the Needs of This Case. ......... 7

        B.      The Discovery Sought Would Impose
                an Undue Burden on Defendants. ............................................... 11

        C.      The Discovery Sought Is Duplicative and Cumulative
                of What Defendants Have Already Agreed to Provide. .............. 14

III.    Insignia's Unreasonable Negotiating Positions and Refusal to
        Commence Staged Discovery Have Caused Unnecessary Delay. .......... 15

CONCLUSION ................................................................................................. 19

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Alaska Elec. Pension Fund* v. *Bank of Am. Corp.*,
  2016 WL 6779901 (S.D.N.Y. Nov. 16, 2016) ............................................................. 6

*Axcan Scandipharm Inc.* v. *Ethex Corp.*,
  2008 WL 11349882 (D. Minn. Dec. 31, 2008) ................................................... 7, 9, 13

*In re Cathode Ray Tube (CRT) Antitrust Litig.*,
  2015 WL 13655394 (N.D. Cal. July 9, 2015) ............................................................. 6

*Chen* v. *Ampco Sys. Parking*,
  2009 WL 2496729 (S.D. Cal. Aug. 14, 2009) ............................................................. 9

*Diaz-Lebel* v. *TD Bank USA, N.A.*,
  2018 WL 4145912 (D. Minn. Aug. 30, 2018) (Thorson, J.) ....................................... 17

*United States ex rel. Dicken* v. *Nw. Eye Clinic, P.A.*,
  2018 WL 2980394 (D. Minn. June 14, 2018) (Menendez, J.) .................................... 10

*E-Contact Techs., LLC* v. *Apple, Inc.*,
  2013 WL 12143967 (E.D. Tex. Feb. 6, 2013) ........................................................... 12

*In re eBay Seller Antitrust Litig.*,
  2010 WL 2836815 (N.D. Cal. July 19, 2010) ............................................................ 13

*Oklahoma ex rel. Edmondson* v. *Tyson Foods, Inc.*,
  2006 WL 2862216 (N.D. Okla. Oct. 4, 2006) ............................................................. 9

*Eisai Inc.* v. *Sanofi-Aventis U.S., LLC*,
  2011 WL 5416334 (D.N.J. Nov. 7, 2011) ................................................................... 9

*Floorgraphics, Inc.* v. *News Am. Mktg. In-Store Servs., Inc.*,
  2007 WL 1544572 (D. Minn. May 23, 2007) ............................................................ 15

*Goro* v. *Flowers Foods, Inc.*,
  2019 WL 6252499 (S.D. Cal. Nov. 22, 2019) ............................................................. 8

*Haddley* v. *Next Chapter Tech., Inc.*,
  2018 WL 2180253 (D. Minn. Mar. 23, 2018) ............................................................. 4

*Hofer* v. *Mack Trucks, Inc.*,
  981 F.2d 377 (8th Cir. 1992) .................................................................................... 4

*Inline Packaging, LLC* v. *Graphic Packaging Int'l, Inc.*,
 2016 WL 7042117 (D. Minn. July 25, 2016) (Brisbois, J.).........................10

*Insignia Sys. Inc.* v. *News Am. Mktg. In-Store, Inc.*,
 2008 WL 11349955 (D. Minn. Mar. 26, 2008) ........................................7, 12

*Insulate SB, Inc.* v. *Advanced Finishing Sys., Inc.*,
 797 F.3d 538 (8th Cir. 2015) .........................................................................4

*Invacare Corp.* v. *Respironics, Inc.*,
 2006 WL 2038647 (N.D. Ohio Feb. 28, 2006).......................................8, 14

*King Cty.* v. *Merrill Lynch & Co.*,
 2011 WL 3438491 (W.D. Wash. Aug. 5, 2011) .............................................8

*Maxon Hyundai Mazda* v. *Carfax, Inc.*,
 2015 WL 4510416 (S.D.N.Y. July 24, 2015) ..............................................14

*In re Plastics Additives Antitrust Litig.*,
 2004 WL 2743591 (E.D. Pa. Nov. 29, 2004) ...............................................12

*ResCap Liquidating Trust* v. *U.S. Bank N.A.*,
 2018 WL 4259873 (D. Minn. Feb. 14, 2018) ...............................................12

*TravelPass Grp., LLC* v. *Caesars Entm't Corp.*,
 2020 WL 698538 (E.D. Tex. Jan. 16, 2020)...................................................8

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*,
 2017 WL 4680242 (N.D. Cal. Oct. 18, 2017)..........................................7, 13

*Walker* v. *Pioneer Prod. Servs. Inc.*,
 2016 WL 1244510 (E.D. La. Mar. 30, 2016) ...............................................11

*Wilk* v. *Am. Med. Ass'n*,
 635 F.2d 1295 (7th Cir. 1980) .....................................................................12

## OTHER AUTHORITIES

Fed. R. Civ. P. 26(b)......................................................................passim

Defendants News Corporation, News America Marketing FSI L.L.C. ("NAM FSI"), and News America Marketing In-Store Services L.L.C. ("NAM In-Store") (collectively, "Defendants") respectfully submit this memorandum of law in opposition to Insignia's motion to compel all documents produced in *Valassis Communications, Inc.* v. *News Corporation, et al.*, No. 17-cv-7378 (S.D.N.Y.) ("*Valassis II*").[1]

## PRELIMINARY STATEMENT

Since discovery began, Defendants have been willing to produce a huge quantity of documents and endeavored to negotiate with Insignia in good faith, confident that the contemporaneous record would bear out that the contracting practices Insignia complains about are entirely lawful. In apparent recognition of how baseless its allegations really are, Insignia has consistently taken an unreasonable, all-or-nothing approach to discovery, in a calculated bid to make this case about decades-old, largely settled and released allegations and to impose the maximum possible burden on Defendants so as to increase the settlement value of this spurious lawsuit. Insignia's refusal to compromise has resulted in months of needlessly tortured negotiations and unwarranted delay. As matters currently stand, notwithstanding that Insignia has pleaded only a handful of allegedly unlawful acts from 2018 and 2019 in its Complaint, and pleaded nothing about events between 2011 and 2018, Defendants have agreed to, among other things, (i) collect and review an estimated 1.3 million documents from at least 15 custodians for the time period January 1, 2014 through July 11, 2019 **and** (ii) produce

---

[1]     All exhibits referenced herein are exhibits to the Declaration of Jane B. O'Brien.

well over one million additional documents that Defendants previously produced in

*Valassis II* post-dating January 1, 2014. (O'Brien Decl. ¶¶ 7, 9.) In addition, Defendants

offered this voluminous discovery without prejudice to Insignia reserving its rights to

seek further discovery if, after reviewing these millions of documents, it can identify

some good-faith basis for doing so. Insignia will therefore receive *more* than ample

discovery to test the meager allegations in its Complaint. Nevertheless, Insignia now

asks the Court to order the production of the remaining 11.7 million documents produced

by any party (including 46 third parties) in *Valassis II*. (*Id.* ¶¶ 11, 12.)

But Insignia has made no showing that these documents are relevant or

remotely proportional to the needs of this case, as required by Federal Rule of Civil

Procedure 26(b)(1). Indeed, Insignia's stated entitlement to this discovery is untethered

to any actionable allegation in the Complaint, which is devoid of a single instance of

allegedly wrongful conduct during the period between 2010–2018. And contrary to

Insignia's blithe assertion that the pre-2014 portions of the *Valassis II* productions

"should be a treasure trove of key documents relevant to this lawsuit" (Pl.'s Br. 2), the

two matters are starkly different in several key respects. Most significantly, Valassis had

largely exited the alleged relevant product market for in-store promotions ("ISP") before

any arguable damages period in this case had even begun. (*See* O'Brien Decl. ¶ 5.)

Furthermore, discovery in *Valassis II* broadly encompassed matters with no relevance to

this case (i.e., the free-standing insert ("FSI") coupon business in which Insignia has no

involvement) and claims not asserted here (i.e., claims of unlawful bundling or tying in

the alleged FSI market and Michigan state law claims for tortious interference with

2

Valassis's business expectancies), the lion's share of which were eventually dismissed. (*Id.* ¶ 4.)

In any event, Insignia is *not* automatically entitled to the remaining 11.7 million documents produced by Defendants and various other parties in *Valassis II* merely because this case allegedly raises *some* similar issues. Courts routinely reject requests for "cloned discovery" as improper attempts to circumvent the ordinary constraints of discovery and the limitations imposed by the Federal Rules. The same outcome is warranted here.

Setting aside the clear overbreadth of Insignia's request, Insignia's motion should also be denied because, contrary to Insignia's repeated assertion that its request imposes zero burden, Defendants are not at liberty to simply reproduce documents that they or any other party produced in *Valassis II*. Rather, the protective order in *Valassis II* requires Defendants to make a motion to modify the protective order *and* seek leave from Valassis and 46 third parties prior to doing so. As discussed further below, it is well established that such requirements can impose an undue burden.

Finally, Insignia's motion should also be denied on the ground that it seeks cumulative and duplicative discovery.

## APPLICABLE LEGAL STANDARD

Federal Rule of Civil Procedure 26(b)(1) limits the scope of permissible discovery to information "regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties'

relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1). While the standard for relevance is broader during discovery than it is at trial, "this often intoned legal tenet should not be misapplied so as to allow fishing expeditions in discovery." *Hofer* v. *Mack Trucks, Inc.*, 981 F.2d 377, 380 (8th Cir. 1992). Instead, courts should "aggressive[ly]" manage discovery to ensure it remains relevant and proportional to the actual claims or defenses at issue in the litigation. Fed. R. Civ. P. 26(b)(1) advisory committee's note to 2015 amendments. The Court's role in setting appropriate guard rails on discovery is particularly important in antitrust cases in light of the "unusually high cost of discovery" in such matters. *See Insulate SB, Inc.* v. *Advanced Finishing Sys., Inc.*, 797 F.3d 538, 543 (8th Cir. 2015) (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 558 (2007)). Thus, if a party seeking to compel discovery fails to show that the information sought is relevant to the actual claims or defenses at issue in the litigation, the motion to compel should be denied. *Haddley* v. *Next Chapter Tech., Inc.*, 2018 WL 2180253, at *3 (D. Minn. Mar. 23, 2018). A motion to compel should also be denied if the party opposing the discovery shows that the discovery request is overbroad, imposes an undue burden, or is unreasonably cumulative or duplicative. Fed. R. Civ. P. 26(b)(1), (b)(2)(C)(i); *Haddley*, 2018 WL 2180253, at *3.

4

**ARGUMENT**

I.   **DEFENDANTS ARE PRODUCING A HUGE QUANTITY OF DOCUMENTS RESPONSIVE TO INSIGNIA'S REQUESTS.**

Insignia's motion is wholly unnecessary and baseless.  Insignia already stands to receive *millions* of documents from Defendants, dating from the time period 2014 through 2019.

*First*, Defendants have already begun producing NAM In-Store's agreements with retailers and consumer-packaged-goods companies ("CPGs") concerning ISP from January 1, 2014 through July 11, 2019.  Defendants have already produced 375 agreements, and are in the process of supplementing that production with additional agreements.  (O'Brien Decl. ¶ 6.)

*Second*, Defendants are preparing to produce approximately 1.1 million post-2014 documents that Defendants previously produced in *Valassis II*.  (*Id.* ¶ 7.) Contrary to Insignia's repeated suggestion that doing so imposes no burden on Defendants (Pl.'s Br. 1, 15), these documents are the subject of a protective order in the *Valassis II* litigation, which, like the protective order in this litigation, expressly provides that "[n]o discovery shall be used in or for other cases, proceedings, or disputes or for any commercial, business, competitive, or other purpose whatsoever, without further order of the Court . . . ." (Ex. 3 ¶ I.B.; *see also infra* Section II.B.)[2]  Accordingly, to comply with the protective order, Defendants have had to re-process the underlying documents as a

---

[2]   As discussed *infra* Section II.B, in order to reproduce documents produced by Valassis or third parties, Defendants would need to take the additional step of obtaining their consent.

new production in this matter. Nevertheless, Defendants agreed to undertake this

burdensome step to avoid burdening the *Valassis II* court with a motion to modify the

protective order and in an effort to work in good faith with Insignia.

> **Third**, Defendants have already agreed to collect documents from at least

ten to fifteen custodians—including custodians in sales, marketing, and finance-related

roles, ranging in seniority from day-to-day CPG and retailer-facing managers to senior

vice presidents and C-suite executives—and agreed to apply a broad set of search terms.

(O'Brien Decl. ¶¶ 8, 9; Ex. 2.) Despite the fact that Insignia has asserted no specific

allegations of actionable conduct between 2010–2018, Defendants have agreed not to

limit responsiveness to matters pertaining to the 2018 and 2019 allegations. (Ex. 4.)

Accordingly, based on what has been collected to date, Defendants estimate that between

1.3 and 1.4 million documents will be reviewed for privilege and responsiveness.

(O'Brien Decl. ¶ 9.)

> This wide-ranging, expansive discovery is more than proportional to the

needs of this case and should fully satisfy Defendants' discovery obligations. Fed. R.

Civ. P. 26(b)(1); *see also, e.g.*, *Alaska Elec. Pension Fund* v. *Bank of Am. Corp.*, 2016

WL 6779901, at *2–4 (S.D.N.Y. Nov. 16, 2016) (denying motion to compel production

of additional documents related to various regulatory investigations on relevance,

proportionality, and overbreadth grounds where the antitrust defendants had already

produced millions of pages of documents from those investigations); *In re Cathode Ray*

*Tube (CRT) Antitrust Litig.*, 2015 WL 13655394, at *6, *7 (N.D. Cal. July 9, 2015)

(denying motion to compel additional document productions in light of the "extensive"

discovery already produced). Nonetheless, Defendants have made clear, for over three

months, that they will entertain further discussions regarding the scope of discovery once

Insignia has had the opportunity to review the production. As such, Insignia has no

legitimate basis to suggest that it should be entitled to more discovery now.

## II.  THE PRE-2014 *VALASSIS II* DOCUMENTS ARE OUTSIDE THE SCOPE OF PERMISSIBLE DISCOVERY UNDER RULE 26(b).

### A.  Insignia Cannot Show that the Discovery Sought Is Either Relevant or Proportional to the Needs of This Case.

Defendants have appropriately resisted discovery of the pre-2014 *Valassis*

*II* documents because they are neither relevant nor proportional to the needs of this case.

***First***, the fact that documents have already been assembled and produced in

one case does not answer the question of whether those documents should be produced in

another. *See, e.g.*, *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods.*

*Liab. Litig.*, 2017 WL 4680242, at *1–2 (N.D. Cal. Oct. 18, 2017) (holding that the

plaintiffs were "not entitled to complete access to the MDL Production simply because

there may be an overlap between their claims and those in the consolidated consumer

class action"); *Axcan Scandipharm Inc.* v. *Ethex Corp.*, 2008 WL 11349882, at *5

(D. Minn. Dec. 31, 2008) (holding that the plaintiff was not entitled to documents

produced in a prior litigation beyond those relevant to the present case and responsive to

other discovery requests); *Insignia Sys. Inc.* v. *News Am. Mktg. In-Store, Inc.*, 2008 WL

11349955, at *1 (D. Minn. Mar. 26, 2008) (holding that Insignia was only entitled to a

limited subset of documents produced in other cases). Indeed, courts routinely deny

requests for "cloned discovery" because the proper avenue for obtaining documents is

7

through direct, specific requests for the sought information, which enables the parties and the court to ensure that the requested documents are both relevant and proportional to the parties' claims and defenses as required by Rule 26(b)(1). *E.g.*, *TravelPass Grp., LLC* v. *Caesars Entm't Corp.*, 2020 WL 698538, at *6 (E.D. Tex. Jan. 16, 2020) (holding that plaintiffs' request for cloned discovery was "improper as failing to make the requisite showing of relevance"); *Goro* v. *Flowers Foods, Inc.*, 2019 WL 6252499, at *18–19 (S.D. Cal. Nov. 22, 2019) (holding same and that compelling the cloned discovery would be "definitionally unduly burdensome"); *King Cty.* v. *Merrill Lynch & Co.*, 2011 WL 3438491, at *3 (W.D. Wash. Aug. 5, 2011) (holding that "[s]ince Plaintiff does not contend that the *fact* that Defendants produced documents to investigating government bodies is relevant to their claim, the [cloned] discovery requests here at issue are not relevant").

Here, the differences between this case and Valassis's make clear that any relevance of the pre-2014 *Valassis II* documents is attenuated at best. Valassis began selling ISP in 2010 and exited the ISP business, for the most part, by 2014. (O'Brien Decl. ¶ 5.) The alleged damages period in this case does not even begin until July 2015—well after Valassis exited.[3] (*Id.*) Beyond that, the *Valassis II* complaint included

---

[3] While it is true that discovery in antitrust cases is often not limited to the damages period, the applicable time period for discovery must nevertheless meet the requirements of Rule 26(b). *See, e.g., Invacare Corp.* v. *Respironics, Inc.*, 2006 WL 2038647, at *5 (N.D. Ohio Feb. 28, 2006) (explaining that "[a]ntitrust cases, while subject to an expansive interpretation as to the relevant time period for discovery, also do not constitute a wholly separate category of actions where discovery antedating the applicable statute of limitations can be granted without a showing of relevancy"). And, as discussed, Defendants have agreed to produce a huge volume of material pre-dating the alleged damages period in this case.

allegations that Defendants were competing unfairly for FSI. (*Id.* ¶ 4.) Valassis also asserted a claim for tortious interference arising out of a 2011 retail agreement. (*Id.*) Valassis's claims about FSI were eventually dismissed due to "a complete failure of proof" (Exs. 5, 6), but only after a huge amount of discovery had already been produced. Finally, not one of the eight CPGs referenced in the *Valassis II* complaint overlaps with the unnamed CPGs referenced in Insignia's Complaint, and only one of the sixteen retailers referenced in Valassis's complaint is also referenced in Insignia's Complaint.[4] (*See* Ex. 1.) As a result, a significant percentage of what was produced in *Valassis II* relates to business dealings that have absolutely nothing to do with Insignia's claims and is therefore not discoverable. *See, e.g.*, *Axcan Scandipharm*, 2008 WL 11349882, at *5 (permitting cloned discovery only of the previously produced documents relevant to the issues before the court); *cf. Chen* v. *Ampco Sys. Parking*, 2009 WL 2496729, at *2 (S.D. Cal. Aug. 14, 2009) (holding that the similarities between cases were "not enough to require a *carte blanche* production of all documents" from the other cases where the other cases involved different time periods, different and broader claims, different laws, and were in a much more advanced phase of discovery); *Eisai Inc.* v. *Sanofi-Aventis U.S., LLC*, 2011 WL 5416334, at *8 (D.N.J. Nov. 7, 2011) (rejecting request for cloned discovery in an antitrust case on relevance and undue burden grounds where there were "significant differences" between the two cases); *Oklahoma ex rel. Edmondson* v. *Tyson*

---

[4]     Insignia's Complaint does not identify *any* CPGs or retailers by name. However, after protracted meet and confers during which Defendants repeatedly requested this information, Insignia finally disclosed the CPGs and retailers referenced in paragraphs 7, 37, 39, 45–50, and 57–58 of its Complaint on January 31, 2020. (Ex. 7.)

*Foods, Inc.*, 2006 WL 2862216, at *1–3 (N.D. Okla. Oct. 4, 2006) (rejecting request for cloned discovery on relevance and undue burden grounds despite "some surface similarities" between the two cases).

     **Second**, Insignia's claimed entitlement to these documents lacks any legitimate foundation in the pleadings. As this Court has observed, for discovery to be proper, it must "hew closely to matters specifically described in the complaint." *United States ex rel. Dicken* v. *Nw. Eye Clinic, P.A.*, 2018 WL 2980394, at *3 (D. Minn. June 14, 2018) (Menendez, J.) (quoting *United States ex rel. McCartor* v. *Rolls-Royce Corp.*, 2013 WL 5348536, at *7 (S.D. Ind. Sept. 24, 2013)); *see also Inline Packaging, LLC* v. *Graphic Packaging Int'l, Inc.*, 2016 WL 7042117, at *6 (D. Minn. July 25, 2016) (Brisbois, J.) (limiting the scope of antitrust discovery to "the patents, products, entities, and instances of anti-competitive conduct specific[ally] alleged in support of the claims or defenses identified in the pleadings"). But, as noted above and discussed in Defendants' Rule 12(c) motion, Insignia's only actionable allegations are limited to a handful of examples of entirely lawful contractual provisions and conduct. (*See* Ex. 8, Dkt. 48 at 18.) All the other allegations rely on "facts" and "conduct" that Insignia expressly covenanted never to "attempt to introduce as evidence" or "otherwise assert" in any future proceeding.[5] (Ex. 9, Dkt. 19 at ¶¶ 10–21; *see also* Ex. 8, Dkt. 48 at 8–15

---

[5]    As the Court is aware from prior proceedings in this matter, Insignia made these commitments in connection with the settlement of *Insignia Systems, Inc.* v. *News Corporation, et al.*, No. 04-cv-4213 (D. Minn.). The particulars of the Settlement Agreement and its implications as it relates to this matter are detailed in Defendants' Answer to Plaintiff's Complaint with Counterclaims, Memorandum of Law in Support of Defendants' Motion for Judgment on the Pleadings, and Reply Memorandum in Support of Defendants' Motion for Judgment on the Pleadings and in Opposition to Plaintiff's

(identifying pre-settlement allegations).)  While Insignia appears to concede that any pre-settlement evidence is inadmissible, it nonetheless insists that it is *de facto* discoverable. (*See* Pl.'s Br. 14.)  But while admissibility is not a pre-requisite to discoverability under Rule 26(b)(1) (indeed, some non-trivial portion of the millions of documents Defendants will produce is likely to be inadmissible), this is the unusual case in which the Plaintiff has released all antitrust claims arising prior to 2011 *and* covenanted not to ever re-assert any of the facts underlying those released claims.  As such, Insignia cannot possibly establish that such material is relevant or proportional.  *See Walker* v. *Pioneer Prod. Servs. Inc.*, 2016 WL 1244510, at *5 (E.D. La. Mar. 30, 2016) (holding that the information sought by the plaintiff was not discoverable because there was "no scenario conceivable" under which the evidence the plaintiff sought "could ever be presented to the finder of fact").[6]  Even worse, by insisting on pre-release discovery, Insignia is rendering the peace Defendants bought—to the tune of $121 million—meaningless. (Ex. 9, Dkt. 19 at 33.)

**B.     The Discovery Sought Would Impose an Undue Burden on Defendants.**

It is demonstrably untrue that reproducing "all documents that have been produced to date in *Valassis* [*II*]" imposes no burden on Defendants.  (Pl.'s Br. 1, 3, 15.) To the contrary, in order to make such a production, Defendants would need to undertake

---

Cross-Motion for Judgment on the Pleadings.  (Ex. 9, Dkt. 19; Ex. 8, Dkt. 48; Ex. 10, Dkt. 70.)

[6]     At most, Insignia professes a desire to compare Defendants' pre-settlement contractual provisions to Defendants' post-settlement contractual provisions.  (Pl.'s Br. 13–14.)  But such a comparison, in addition to being of limited relevance, does not justify the broad pre-settlement discovery that Insignia is seeking.

the significant burden of obtaining consent from all parties who produced documents in

*Valassis II*.[7]   This would mean requiring Defendants to track down no fewer than *forty-six* separate third parties.  (O'Brien Decl. ¶ 10.)  Assuming that any of those entities

agreed to the reproduction of their confidential information in an unknown litigation,

Defendants would then have to engage in motions practice to modify the *Valassis II*

protective order.[8]   This is just the sort of undue burden that courts have recognized in

denying motions to compel cloned discovery.  *See ResCap Liquidating Trust* v. *U.S.*

*Bank N.A.*, 2018 WL 4259873, at *5–6 (D. Minn. Feb. 14, 2018) (noting these burdens in

denying a motion to compel discovery from other cases); *E-Contact Techs., LLC* v.

*Apple, Inc.*, 2013 WL 12143967, at *3–4 (E.D. Tex. Feb. 6, 2013) (denying motion to

compel cloned discovery on these grounds); *Insignia*, 2008 WL 11349955, at *1 (denying

motion to compel documents produced by third parties in other cases that may be subject

to protective orders).[9]

---

[7]     Pursuant to paragraph III.M of the *Valassis II* protective order, a party must obtain "prior written consent of the party that produced" designated information before producing any such information in response to "a request for production of documents in connection with litigation."  (Ex. 3 ¶ III.M.)

[8]     Paragraph I.B. of the *Valassis II* protective order requires that "[a]ll discovery subject to this Order shall be used solely and exclusively for purposes of this action in accordance with the provisions of this Order.  No discovery shall be used in or for other cases, proceedings, or disputes or for any commercial, business, competitive, or other purpose whatsoever, without further order of the Court or Panel."  (Ex. 3 ¶ I.B.)

[9]     Neither of the cases cited by Insignia are to the contrary.  (*See* Pl.'s Br. 15–16.) The prior productions at issue in *In re Plastics Additives Antitrust Litigation*, 2004 WL 2743591, at *12–13 (E.D. Pa. Nov. 29, 2004), were made to regulatory authorities in connection with an investigation of the same industry and the same time period at issue in the civil litigation.  In *Wilk* v. *Am. Med. Ass'n*, 635 F.2d 1295 (7th Cir. 1980)—decided thirty-five years before the current Federal Rule of Civil Procedure 26(b)(1) went into effect—the Seventh Circuit reversed the denial of an intervenor's motion to modify the *Wilk* protective order to allow the intervenor to use the *Wilk* discovery in a similar litigation in another district where, among other things, the "operative charges of wrongdoing in the two complaints are almost word for word the same."  *Id.* at 1296.

Furthermore, there can be no dispute that the only portions of the *Valassis II* productions to which Insignia could even arguably be entitled are those documents that are otherwise responsive to appropriately tailored requests. (*See supra* Section II.A.) Identifying those documents would necessitate an extraordinarily burdensome and uncalled-for review of millions of documents. *Axcan Scandipharm*, 2008 WL 11349882, at *5 ("[T]he defendants' respective *Solvay* productions should be treated the same as all other documents in their possession—these productions should be reviewed to determine if they contain relevant documents responsive to [the plaintiff's] other document requests . . . ."); (O'Brien Decl. ¶ 11). Insignia proclaims that Defendants are free to avoid this burden by simply forking everything over without further review (Pl.'s Br. 16), but that is not a reasonable alternative. Defendants should not be faced with the dilemma of re-reviewing a huge number of documents (most of which will never be admissible in light of the parties' Settlement Agreement) or simply turning over millions of documents to a direct competitor that have nothing to do with any aspect of this case. While "it would almost always be more efficient for [defendants] to 'open up [their] document repositories for the opposing side to rifle through,' . . . such a practice would expand the scope of discovery beyond that allowed by the Federal Rules." *In re Volkswagen*, 2017 WL 4680242, at *1; *see also In re eBay Seller Antitrust Litig.*, 2010 WL 2836815, at *3 (N.D. Cal. July 19, 2010) (noting that the producing party has the right to review documents for responsiveness; "[t]he opposing lawyer does not get that luxury").[10]

---

[10] By the same token, all of the third parties who provided discovery in *Valassis II* would have the right to review their *Valassis II* productions for responsiveness to Insignia's other requests for production.

## C. The Discovery Sought Is Duplicative and Cumulative of What Defendants Have Already Agreed to Provide.

Insignia's motion should be denied for the additional reason that the pre-2014 *Valassis II* material is entirely duplicative and cumulative of the expansive discovery Defendants are already undertaking to provide. *See* Fed. R. Civ. P. 26(b)(2)(C)(i). Where, as here, a party fails to show that discovery from an earlier time period will be anything other than cumulative of discovery from a more recent time period, courts will deny the party's motion to compel. *See Maxon Hyundai Mazda* v. *Carfax, Inc.*, 2015 WL 4510416, at *3 (S.D.N.Y. July 24, 2015) (limiting the temporal scope of discovery to two years prior to the liability period where the plaintiffs had not shown that documents relating to the defendant's alleged anticompetitive conduct or course of dealing during the pre-liability period "would be any more probative than documents" relating to such alleged conduct during the liability period); *Invacare*, 2006 WL 2038647, at *6 (denying motion to compel discovery where the plaintiff did not show that discovery concerning the defendant's dealings in the two-year period prior to the liability period was "likely [to] be other than cumulative of the evidence of its dealings" from the liability period forward). Insignia has made zero showing that evidence of Defendants' contracting practices from 2011–2013 is likely to be anything other than cumulative of the evidence of its dealing from 2014 forward. Insignia should review the voluminous production that Defendants are in the process of making. At that point, if it can articulate a good-faith basis for seeking further discovery from the pre-2014 period, Defendants remain willing to revisit the scope of discovery.

14

## III. INSIGNIA'S UNREASONABLE NEGOTIATING POSITIONS AND REFUSAL TO COMMENCE STAGED DISCOVERY HAVE CAUSED UNNECESSARY DELAY.

In light of the broad scope of discovery that Defendants have agreed (and already begun) to produce, Insignia's complaints regarding Defendants' conduct in the parties' discovery negotiations ring hollow. In reality, Insignia's accusation of Defendants' stonewalling could not be further from the truth, as the parties' discovery correspondence amply demonstrates. (*See* Exs. 11–12, 14–28.) Defendants have been willing to commence increasingly broad, staged discovery, without prejudice to either party revisiting the scope of discovery as the case progresses, since the parties' very first meet and confer. (*Id.*) As reflected in the below timeline, Defendants have offered good-faith solutions and compromises with a view to proceeding with discovery, only to have those offers rejected or ignored by Insignia. Furthermore, Insignia unreasonably refused for months to identify the unnamed retailers and CPGs referenced in the handful of post-settlement allegations in the Complaint, resulting in further unnecessary delay, has been derelict in meeting its own discovery obligations, and improperly attempted to use third-party discovery to obtain Defendants' pre-2014 documents and other irrelevant material.[11]

---

[11] Insignia has attempted to take the oversight of the scope of discovery out of this Court's hands by issuing a third-party subpoena to Valassis for the entire *Valassis II* record, including all of the material that is sought in this motion. (Ex. 13.) Of course, this Court is in the best position to determine the scope of discovery, especially of Defendants' own documents. *See Floorgraphics, Inc.* v. *News Am. Mktg. In-Store Servs., Inc.*, 2007 WL 1544572, at *2 (D. Minn. May 23, 2007) (granting a stay on the enforcement of a subpoena *duces tecum* to third-party Insignia pending resolution of closely related issues in the underlying litigation in the District of New Jersey). Insignia has also served extraordinarily broad third-party subpoenas to Albertsons, CVS, and

15

### Timeline of the Parties' Relevant Meet-and-Confer Negotiations

| | |
|---|---|
| **11/14/2019** | In light of the pending Rule 12(c) motion, Defendants offered to immediately commence discovery focused, in the first instance, on Insignia's allegations of purported anticompetitive conduct that occurred in 2018 and 2019. To that end, Defendants asked Insignia to identify the unnamed retailers and CPGs referred to in paragraphs 7, 37, 39, 45–50, and 57–58 of the Complaint. (*See* Ex. 12.) |
| **11/25/2019** | Insignia refused to identify the unnamed retailers and CPGs or to negotiate any discovery short of "broad discovery into News's relationships, contracts, and communications with CPGs and retailers market-wide." (Ex. 11.) |
| **12/2/2019** | Defendants offered again to immediately begin staged discovery, without prejudice to either party revisiting the scope of discovery following a ruling on the pending Rule 12(c) motion. (Ex. 12.) |
| **12/6/2019** | Insignia refused Defendants' offer. To further delay matters, Insignia again refused to identify the unnamed retailers and CPGs unless Defendants served an interrogatory, notwithstanding the fact that Defendants' first set of Requests for Production ("RFPs") seek all documents pertaining to Insignia's 2018–2019 allegations. (*See* Ex. 14.) |
| **12/12/2019** | Defendants reiterated their willingness to negotiate a proportionate search protocol relating to Insignia's post-2014 allegations, without prejudice to further discovery as the case progressed. (Ex. 14.) |
| **1/15/2020** | After nearly a month of radio silence, and only after the Court's admonitions regarding the schedule during the January 14, 2020 status conference, Insignia advised Defendants that unless they agreed to Insignia's RFPs, virtually in their entirety, it would file a motion to compel. (Ex. 15.) |
| **1/16/2020** | Defendants promptly responded with a compromise proposal, proposing that the parties produce certain categories of documents (including, on Defendants' part, the post-2014 documents they produced in *Valassis II*) and negotiate reasonably tailored, proportionate custodian and search-term protocols to identify responsive documents. (Ex. 16.) |
| **1/17/2020** | The parties held a meet and confer, during which Insignia asked whether Defendants would also agree to extend the relevant time frame to February 2011 for (i) the *Valassis II* production, (ii) Defendants' response to Insignia's request for "all Documents and Communications relating to Insignia . . . ", and (iii) retailer and CPG agreements. (*See* Ex. 17.) |

---

Kroger, seeking, among other things, documents produced in prior, entirely unrelated litigations filed as long ago as 1997. (Ex. 13.)

| 1/22/2020 | In response, and for the express purpose of avoiding the expense and distraction of motion practice, Defendants offered to review the 2011–2014 documents it previously produced in *Valassis II* containing Insignia-related search terms, in addition to what Defendants had previously offered. (Ex. 17.) |
|---|---|
| 1/23/2020 | Insignia purported to accept Defendants' compromise position, but nevertheless stated its intention to file a motion to compel everything else that Insignia requested.  (Ex. 18.) |
| 1/24/2020 | In light of Insignia's stated intention to make a motion, which defeated the purpose and terms of Defendants' compromise offer, Defendants withdrew the offer to provide the additional documents offered on January 22.[12]  (*See* Ex. 19.) |
| 1/27/2020 | Nonetheless, Defendants agreed to move forward with discovery in the meantime, including its prior agreement to produce all post-2014 *Valassis II* documents[13] and to exchange with Insignia post-2014 retailer and CPG agreements.  (Ex. 4.) |

Over the last month, the parties have been exchanging proposals regarding document custodians and search-term parameters, thus far with limited success.  As with all the parties' prior negotiations, Insignia has made unreasonable, disproportionate demands on Defendants, while failing to meet its own discovery obligations in good faith.

---

[12]     Insignia criticizes Defendants for doing so, but as Your Honor has recognized in similar circumstances, Insignia's position "was no compromise."  *Diaz-Lebel* v. *TD Bank USA, N.A.*, 2018 WL 4145912, at *3 (D. Minn. Aug. 30, 2018) (Thorson, J.) (explaining that a plaintiff has failed to compromise where it proposes that a defendant "collect and process a significant number of documents now, reserving the right to demand all of the documents later").  What Insignia has done here is even worse.  Insignia wants Defendants to collect and produce everything they offered to produce to resolve the parties' dispute, and has still moved to compel the remainder.  In all events, Defendants withdrew only the additional *Valassis II* documents from 2011–2014 that they had offered to review for responsiveness.  (Ex. 4.)

[13]     It is not true, as Insignia asserts, that Defendants "reneged and refused to produce any" documents from *Valassis II*.  (Pl.'s Br. 7.)  In correspondence dated January 27, 2020, after Insignia had made clear it intended to file the instant motion, Defendants memorialized the categories of documents the parties were nevertheless agreeing to produce, including the post-2014 *Valassis II* documents.  (Ex. 4.)  Defendants expect the *Valassis II* documents will be re-stamped and processed for production in this litigation by March 13.  (O'Brien Decl. ¶ 7.)

17

For example, Insignia failed to produce a single document identified in its initial disclosures by the Court-ordered deadline of December 9, 2019.  (*See* Ex. 20.) When Defendants raised with Insignia its production deficiencies, Insignia represented that it was construing the parties' ongoing meet and confer process "to extend[] to the categories of documents identified in Insignia's initial disclosures," and that "[a]ll of the categories" in its initial disclosures "consist of discovery that should be produced pursuant to the ordinary process of negotiating custodians and search terms."  (Ex. 21.) Taking Insignia at its word, while reserving all rights, Defendants agreed that if Insignia was representing that it intended "to produce a complete set of the documents described" in the relevant categories of its disclosures "pursuant to the negotiated ESI protocol," Defendants would not move to compel.  (Ex. 22.)  Insignia replied:  "We are in agreement and look forward to exchanging custodians and search terms . . . ."  (Ex. 23.)

As agreed, the parties exchanged search terms and 10–15 proposed custodians on February 7.  Each party identified 10 custodians.  Defendants proposed 84 terms, Insignia 267.  (Exs. 24, 25.)  The parties agreed to exchange counterproposals on February 12.  Defendants received Insignia's responses, only to find that Insignia challenged 54 of Defendants' 84 terms on the basis that the terms did not relate to a specific RFP.  (Ex. 26.)  Insignia described as "a nonstarter" Defendants' suggestion that many of the terms were designed to identify the documents described in Insignia's initial disclosures.  (Ex. 27.)  Insignia claimed it was "unreasonable" of Defendants to think Insignia would produce the categories of documents identified in its initial disclosures pursuant to the negotiated ESI process, and insisted that it would not consider the 54

18

terms absent "properly served discovery requests." (*Id.*) Baffled by the bait-and-switch,

Defendants nevertheless acceded to Insignia's demands and served a second set of

requests for production. (Ex. 28.) In the same vein, after agreeing that the parties would

identify for each other 10–15 proposed custodians, Insignia countered by identifying **39**

"supplemental" custodians from whom it expected Defendants to collect documents.

(Ex. 27.) As of the time of this filing, Defendants are continuing to meet and confer with

Insignia in good-faith but will promptly bring any unresolved disputes to the Court's

attention. (O'Brien Decl. ¶ 13.)

## **CONCLUSION**

Defendants respectfully submit that Insignia's Motion to Compel should be

denied.


Dated: March 2, 2020                Respectfully submitted,

                                    s/ Jane B. O'Brien
                                    Kenneth A. Gallo (admitted *pro hac vice*)
                                    NY Bar No. 430369
                                    Jane B. O'Brien (admitted *pro hac vice*)
                                    NY Bar No. 4484457
                                    Jeannie S. Rhee (admitted *pro hac vice*)
                                    District of Columbia Bar No. 464127
                                    **PAUL WEISS RIFKIND WHARTON & GARRISON**
                                    2001 K Street, NW
                                    Washington, DC 20006-1047
                                    Tel:   202.223.7356
                                    Fax:  202.204.7356
                                    kgallo@paulweiss.com
                                    jobrien@paulweiss.com
                                    jrhee@paulweiss.com

William B. Michael (admitted *pro hac vice*)
NY Bar No. 4296356
**PAUL WEISS RIFKIND WHARTON & GARRISON**
1285 Avenue of the Americas
New York, NY 10019-6064
Tel: 212.373.3648
Fax: 212.492.0648
wmichael@paulweiss.com

Gerson A. Zweifach (admitted *pro hac vice*)
District of Columbia Bar No. 349266
**WILLIAMS & CONNOLLY LLP**
725 Twelfth Street, N.W.
Washington, DC 20005
Tel: 202.434.5000
Fax: 202.434.5029
gzweifach@wc.com

Todd Wind (#0196514)
Nicole M. Moen (#0329435)
**FREDRIKSON & BYRON, P.A.**
200 South Sixth Street, Suite 4000
Minneapolis, MN 55402-1425
Tel: 612.492.7000
Fax: 612.492.7077
twind@fred.law
nmoen@fredlaw.com

***Attorneys for Defendants***

EXHIBIT 16

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

---

# FORM 8-K

---

### CURRENT REPORT
**Pursuant to Section 13 or 15(d)**
**of The Securities Exchange Act of 1934**

**Date of Report (Date of earliest event reported): May 5, 2020**

---



# NEWS CORPORATION
**(Exact name of registrant as specified in its charter)**

---

| Delaware | 001-35769 | 46-2950970 |
|---|---|---|
| **(State or other jurisdiction of incorporation)** | **(Commission File Number)** | **(IRS Employer Identification No.)** |

**1211 Avenue of the Americas, New York, New York 10036**
**(Address of principal executive offices, including zip code)**

**(212) 416-3400**
**(Registrant's telephone number, including area code)**

---

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐   Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐   Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐   Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐   Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| **Class A Common Stock, par value $0.01 per share** | **NWSA** | **The Nasdaq Global Select Market** |
| **Class B Common Stock, par value $0.01 per share** | **NWS** | **The Nasdaq Global Select Market** |
| **Class A Preferred Stock Purchase Rights** | **N/A** | **The Nasdaq Global Select Market** |
| **Class B Preferred Stock Purchase Rights** | **N/A** | **The Nasdaq Global Select Market** |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Item 2.01 Completion of Acquisition or Disposition of Assets.

On May 5, 2020, News Corporation (the "Company") completed the previously announced sale of its News America Marketing business ("NAM") to CB Neptune Holdings, LLC and CB Neptune Canada Sub Inc., affiliates of Charlesbank Capital Partners (the "Transaction"). The aggregate purchase price for the Transaction consists of (a) up to approximately \$235 million, comprised of (i) \$50 million in cash at closing, subject to working capital and other adjustments, less cash reinvested to acquire a 5% equity interest in the business at closing, and (ii) additional deferred cash payments payable on or before the fifth anniversary of closing in an aggregate amount of between \$125 million and approximately \$185 million, depending on the timing of such payments, and (b) a warrant to purchase up to an additional 10% equity interest in the business, which is exercisable on or prior to the seventh anniversary of closing. In the Transaction, the Company retained certain liabilities relating to NAM, including those arising from its ongoing legal proceedings with Valassis Communications, Inc. and Insignia Systems, Inc.

**Item 9.01      Financial Statements and Exhibits.**

**(b) Pro Forma Financial Information.**

The unaudited pro forma consolidated financial information of the Company giving effect to the Transaction is filed as Exhibit 99.1 to this Current Report on Form 8-K and incorporated herein by reference.

**(d) Exhibits.**

| Exhibit No. | Description |
|---|---|
| 99.1 | Unaudited pro forma consolidated financial information of the Company. |
| 104 | Cover Page Interactive Data File (embedded within the Inline XBRL document). |

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

NEWS CORPORATION
(REGISTRANT)

By:   /s/ Michael L. Bunder
　　　Michael L. Bunder
　　　Senior Vice President, Deputy General
　　　Counsel and Corporate Secretary

Dated: May 7, 2020

Exhibit 99.1

**UNAUDITED PRO FORMA CONSOLIDATED FINANCIAL INFORMATION**

**Overview**

On May 5, 2020, News Corporation (the "Company") completed the previously announced sale of its News America Marketing business ("NAM" or the "Business") to CB Neptune Holdings, LLC and CB Neptune Canada Sub Inc., affiliates of Charlesbank Capital Partners (collectively, "Charlesbank"), pursuant to the Share and Asset Purchase Agreement (the "Agreement") dated March 31, 2020. The sale of the Business (the "Transaction") follows a strategic review of NAM as part of the Company's ongoing efforts to optimize its portfolio and simplify the structure of the Company. The aggregate purchase price for the Transaction consists of (a) up to approximately $235 million, comprised of (i) $50 million in cash at closing, subject to working capital and other adjustments, less cash reinvested to acquire a 5% equity interest in the Business at closing and (ii) additional deferred cash payments payable on or before the fifth anniversary of closing in an aggregate amount of between $125 million and approximately $185 million, depending on the timing of such payments, and (b) a warrant to purchase up to an additional 10% equity interest in the Business, which is exercisable on or prior to the seventh anniversary of closing. In the Transaction, the Company retained certain liabilities relating to NAM, including those arising from its ongoing legal proceedings with Valassis Communications, Inc. and Insignia Systems, Inc.

**Basis of Presentation**

On May 5, 2020, the Company completed the disposition of the Business. The Transaction constituted a disposition of a significant amount of assets for purposes of Item 2.01 of the U.S. Securities and Exchange Commission's (the "SEC") Current Report on Form 8-K even though the Company determined that the Business did not meet the criteria to qualify for presentation as a discontinued operation pursuant to ASC 205. As a result, the accompanying unaudited pro forma consolidated financial information (the "Pro Forma Financial Information") has been presented to illustrate the estimated effects of the Transaction in accordance with Article 11 of SEC Regulation S-X, and is not intended to be a complete presentation of the Company's financial position or results of operations had the Transaction occurred as of and for the periods indicated. In addition, the Pro Forma Financial Information is provided for illustrative and informational purposes only and is not necessarily indicative of the Company's future results of operations or financial condition had the Transaction been completed on the date(s) assumed. The Company has entered into a Transition Services Agreement with Charlesbank pursuant to which the Company will provide certain specified services on a temporary basis. These transition services are not expected to have a material impact on the Company and are not recurring in nature and as such, have not been included in the Transaction adjustments.

The Pro Forma Financial Information is derived by applying pro forma adjustments for the impacts of the Transaction to the historical consolidated financial statements of the Company.

The unaudited pro forma Consolidated Statements of Operations for the six months ended December 31, 2019 and for the fiscal year ended June 30, 2019 reflect the Company's results as if the Transaction had occurred on July 1, 2018. The unaudited pro forma Consolidated Balance Sheet as of December 31, 2019 gives effect to the Transaction as if it had occurred on December 31, 2019.

Pro forma adjustments included in the Pro Forma Financial Information are limited to those that are (i) directly attributable to the Transaction, (ii) factually supportable, and (iii) with respect to the Statements of Operations, expected to have a continuing impact on the Company's results.

The Pro Forma Financial Information is subject to the assumptions and adjustments described in the accompanying notes, which should be read together with the Pro Forma Financial Information. Management believes that these assumptions and adjustments, based upon the information available at this time, are reasonable under the circumstances.

The unaudited pro forma Consolidated Statements of Operations do not reflect future events that may occur after the closing of the Transaction, including, but not limited to, material non-recurring charges that may be incurred subsequent to the closing.

The Pro Forma Financial Information should be read in conjunction with the (i) historical financial statements of the Company and the related notes and "Management's Discussion and Analysis of Financial Condition and Results of Operations" included in the Company's Annual Report on Form 10-K for the fiscal year

ended June 30, 2019 under the caption "Summary of 2019 Financial Results." The unaudited financial information and "Management's Discussion and Analysis of Financial Condition and Results of Operations" included in the Company's Quarterly Report on Form 10-Q for the six months ended December 31, 2019 as filed with the SEC on February 7, 2020 ("Form 10-Q").

**UNAUDITED PRO FORMA CONSOLIDATED STATEMENT OF OPERATIONS**
**FOR THE SIX MONTHS ENDED DECEMBER 31, 2019**
**(in millions, except per share data)**

| | Historical News Corporation | Pro Forma Adjustments NAM Disposition (a) | Pro Forma Adjustments Other Adjustments | Notes | Pro Forma News Corporation |
|---|---|---|---|---|---|
| | | (Unaudited) | | | |
| **Revenues:** | | | | | |
| Circulation & Subscription | $ 1,985 | $ — | $ — | | $ 1,985 |
| Advertising | 1,285 | (391) | — | | 894 |
| Consumer | 808 | — | — | | 808 |
| Real Estate | 460 | — | — | | 460 |
| Other | 281 | — | — | | 281 |
| Total revenues | 4,819 | (391) | — | | 4,428 |
| Operating expenses | (2,687) | 298 | — | | (2,389) |
| Selling, general and administrative | (1,556) | 74 | (10) | (b), (c) | (1,492) |
| Depreciation and amortization | (324) | 7 | — | | (317) |
| Impairment and restructuring charges | (326) | 245 | — | | (81) |
| Equity losses of affiliates | (5) | — | — | | (5) |
| Interest (expense) income, net | (4) | 2 | (2) | (d) | (4) |
| Other, net | 6 | (19) | 19 | (d) | 6 |
| **(Loss) income before income taxes** | (77) | 216 | 7 | | 146 |
| Income tax expense | (31) | (38) | (2) | (e) | (71) |
| **Net (loss) income** | (108) | 178 | 5 | | 75 |
| Less: Net income attributable to noncontrolling interests | (34) | — | — | | (34) |
| Net (loss) income attributable to News Corporation stockholders | $ (142) | $ 178 | $ 5 | | $ 41 |
| **Net (loss) income available to News Corporation stockholders per share:** | | | | | |
| Basic | $ (0.24) | | | | $ 0.07 |
| Diluted | $ (0.24) | | | | $ 0.07 |
| **Weighted average shares** | | | | | |
| Basic | 587.4 | | | | 587.4 |
| Diluted | 587.4 | | | | 587.4 |

See accompanying Notes to the Unaudited Pro Forma Consolidated Financial Information.

**UNAUDITED PRO FORMA CONSOLIDATED STATEMENT OF OPERATIONS**
**FOR THE FISCAL YEAR ENDED JUNE 30, 2019**
**(in millions, except per share data)**

| | Historical News Corporation | Pro Forma Adjustments NAM Disposition (a) | Other Adjustments (Unaudited) | Notes | Pro Forma News Corporation |
|---|---|---|---|---|---|
| **Revenues:** | | | | | |
| Circulation & Subscription | $ 4,104 | $ — | $ — | | $ 4,104 |
| Advertising | 2,738 | (895) | — | | 1,843 |
| Consumer | 1,679 | — | — | | 1,679 |
| Real Estate | 908 | — | — | | 908 |
| Other | 645 | — | — | | 645 |
| Total revenues | 10,074 | (895) | — | | 9,179 |
| Operating expenses | (5,622) | 625 | — | | (4,997) |
| Selling, general and administrative | (3,208) | 144 | (5) | (b), (c) | (3,069) |
| Depreciation and amortization | (659) | 13 | — | | (646) |
| Impairment and restructuring charges | (188) | 54 | — | | (134) |
| Equity losses of affiliates | (17) | — | — | | (17) |
| Interest (expense) income, net | (59) | 6 | (6) | (d) | (59) |
| Other, net | 33 | (46) | 46 | (d) | 33 |
| **Income (loss) before income taxes** | 354 | (99) | 35 | | 290 |
| Income tax (expense) benefit | (126) | 16 | (9) | (e) | (119) |
| **Net income (loss)** | 228 | (83) | 26 | | 171 |
| Less: Net income attributable to noncontrolling interests | (73) | — | — | | (73) |
| Net income (loss) attributable to News Corporation stockholders | $ 155 | $ (83) | $ 26 | | $ 98 |
| **Net income (loss) available to News Corporation stockholders per share:** | | | | | |
| Basic | $ 0.27 | | | | $ 0.17 |
| Diluted | $ 0.26 | | | | $ 0.17 |
| **Weighted average shares** | | | | | |
| Basic | 584.7 | | | | 584.7 |
| Diluted | 587.9 | | | | 587.9 |

See accompanying Notes to the Unaudited Pro Forma Consolidated Financial Information.

**UNAUDITED PRO FORMA CONSOLIDATED BALANCE SHEET**
**AS OF DECEMBER 31, 2019**
**(in millions, except per share data)**

| | Historical News Corporation | Pro Forma Adjustments NAM Disposition (a) | Pro Forma Adjustments Other Adjustments | Notes | Pro Forma News Corporation |
|---|---|---|---|---|---|
| | | (Unaudited) | | | |
| **Assets:** | | | | | |
| Current assets: | | | | | |
| Cash and cash equivalents | $ 1,272 | $ (13) | $ 7 | (f) | $ 1,266 |
| Receivables, net | 1,570 | (188) | — | (g) | 1,382 |
| Inventory, net | 358 | (15) | — | | 343 |
| Other current assets | 518 | (16) | 1 | (g) | 503 |
| Total current assets | 3,718 | (232) | 8 | | 3,494 |
| Non-current assets: | | | | | |
| Investments | 325 | — | 1 | (h) | 326 |
| Property, plant, and equipment, net | 2,476 | (20) | — | | 2,456 |
| Operating lease right-of-use assets | 1,299 | (10) | — | | 1,289 |
| Intangible assets, net | 2,257 | (226) | — | | 2,031 |
| Goodwill | 4,976 | — | — | | 4,976 |
| Deferred income tax assets | 283 | — | — | | 283 |
| Other non-current assets | 948 | — | 114 | (h) | 1,062 |
| Total assets | $ 16,282 | $ (488) | $ 123 | | $ 15,917 |
| **Liabilities and Equity:** | | | | | |
| Current liabilities: | | | | | |
| Accounts payable | $ 375 | $ (22) | $ — | (g) | $ 353 |
| Accrued expenses | 1,072 | (80) | 10 | (g) | 1,002 |
| Deferred revenue | 411 | (22) | — | | 389 |
| Current borrowings | — | — | — | | — |
| Other current liabilities | 869 | (57) | 4 | (g) | 816 |
| Total current liabilities | 2,727 | (181) | 14 | | 2,560 |
| Non-current liabilities: | | | | | |
| Borrowings | 1,201 | — | — | | 1,201 |
| Retirement benefit obligations | 258 | — | — | | 258 |
| Deferred income tax liabilities | 268 | — | — | | 268 |
| Operating lease liabilities | 1,343 | (8) | — | | 1,335 |
| Other non-current liabilities | 358 | 213 | (213) | (i) | 358 |
| Commitments and contingencies | | | | | |
| Class A common stock | 4 | — | — | | 4 |
| Class B common stock | 2 | — | — | | 2 |
| Additional paid-in capital | 12,183 | (683) | 683 | (i) | 12,183 |
| Accumulated deficit | (2,114) | 177 | (361) | | (2,298) |
| Accumulated other comprehensive loss | (1,117) | (6) | — | | (1,123) |
| Total News Corporation stockholders' equity | 8,958 | (512) | 322 | | 8,768 |
| Noncontrolling interests | 1,169 | — | — | | 1,169 |
| Total equity | 10,127 | (512) | 322 | | 9,937 |
| Total liabilities and equity | $ 16,282 | $ (488) | $ 123 | | $ 15,917 |

See accompanying Notes to the Unaudited Pro Forma Consolidated Financial Information.

**Pro Forma Adjustments**

The unaudited pro forma Consolidated Statements of Operations for the six months ended December 31, 2019 and for the fiscal year ended June 30, 2019 and the unaudited pro forma Consolidated Balance Sheet as of December 31, 2019 include the following pro forma adjustments:

(a)    Reflects the operations, assets, liabilities and equity of News America Marketing, formerly the in-store marketing products and services, home-delivered shopper media and digital marketing solutions business reported as part of the News & Information Services segment of the Company, which was derived from the historical consolidated financial statements of the Company.

*Unaudited Pro Forma Consolidated Statements of Operations*

(b)    Reflects the removal of $1 million and $1 million of nonrecurring transaction costs which were incurred and are included in the Company's historical results of operations for the six months ended December 31, 2019 and the fiscal year ended June 30, 2019, respectively. These costs were primarily related to third-party consulting and accounting fees and other incremental costs directly related to Transaction-related activities that are not expected to have a continuing impact on the Company's results of operations following the completion of the Transaction.

(c)    Represents $9 million and $4 million of certain legal costs related to the Valassis and Insignia litigations which were incurred and are included in the Company's historical results of operations for the six months ended December 31, 2019 and the fiscal year ended June 30, 2019, respectively. The Company agreed to retain certain liabilities arising from ongoing legal proceedings with Valassis Communications, Inc. and Insignia Systems, Inc. pursuant to the various agreements entered into as part of the Transaction.

(d)    Represents the removal of $17 million and $40 million, net, of historical ongoing intercompany transactions which were historically eliminated in consolidation and are included in the Company's historical results of operations for the six months ended December 31, 2019 and the fiscal year ended June 30, 2019, respectively, as a result of their non-transfer between the Company and NAM as part of the Transaction.

(e)    Represents the tax impact of the Transaction adjustments as well as the adjustments needed to reflect pro forma News Corporation net income. In determining the tax rate to apply to the Transaction adjustments, the Company used the applicable statutory rate based on the jurisdiction to which the adjustment relates, adjusted to reflect income taxes on Transaction activity.

*Unaudited Pro Forma Consolidated Balance Sheet*

(f)    Represents estimated upfront net cash proceeds from the disposition of the Business of $50 million less $31 million, primarily related to net working capital adjustments, as provided for in the Agreement. Additionally, represents a reduction of cash on the unaudited pro forma consolidated balance sheet for payment of an estimated $11 million of transaction costs payable upon closing of the Transaction and $1 million in cash paid to acquire a 5% post-transaction equity interest in NAM. The cash proceeds reflected in the December 31, 2019 unaudited pro forma Consolidated Balance Sheet will likely be different from the actual cash proceeds received from the Transaction due to differences in the adjustment for net working capital and other items which will be finalized after the closing of the Transaction.

(g)    Represents the adjustment of certain assets, including print volume rebate receivables, with an estimated value of $1 million, and certain liabilities with an estimated value of $14 million, including those arising from the ongoing legal proceedings with Valassis Communications, Inc. and Insignia Systems, Inc. These liabilities are being retained by the Company and were not transferred between the Company and NAM pursuant to the Agreement.

(h)    Represents the total revenue receivable by the Company as of the close of the Transaction in exchange for NAM being utilized. The Company also exercised its option to acquire a 5% post-transaction interest in NAM for $1 million and received a warrant that allows for the purchase of up to an additional 10% post-transaction interest in NAM at a future date with a fair value of $3 million.

(i)    Represents the removal of $470 million of historical intercompany transactions with the Company which were historically eliminated in consolidation, and which will cease as part of the Transaction.

EXHIBIT 17

## Contact

www.linkedin.com/in/marty-garofalo-bb5b38 (LinkedIn)

## Top Skills

Integrated Marketing
Digital Marketing
Shopper Marketing

# Marty Garofalo

CEO at News America Marketing

New York City Metropolitan Area

## Summary

Experienced Chief Executive Officer with a demonstrated history of working in both traditional and the online media industry. Skilled in Customer Insight, Integrated Marketing, Strategic Partnerships, Digital Marketing, and Shopper Marketing. Strong business development professional graduated from Georgetown University.

————

## Experience

**News America Marketing**
19 years

CEO
July 2014 - Present (6 years 3 months)
New York, New York

EVP
2001 - Present (19 years)

**News Corp.**
President
March 2014 - Present (6 years 7 months)

**National Football League Properties**
Marketing Manager
1986 - 1988 (2 years)

**Nestle Foods Company**
Maketing Manager
1983 - 1986 (3 years)

**Procter & Gamble**
Brand Management
July 1980 - July 1983 (3 years 1 month)

————

## Education

Georgetown University

Double Major- Marketing and Finance  · (1976 - 1980)

EXHIBIT 18

## Contact

www.linkedin.com/in/traceykoller
(LinkedIn)

## Top Skills

Healthcare
Cross-functional Team Leadership
Assortment

## Languages

English

## Honors-Awards

Leading and Coaching Leadership
Award
Trend Merchant of the Year
Top Talent Development Program

# Tracey Koller

Retail/Digital/Marketing/Transformation Sr. Executive Also Seeking
Board and Advisory Opportunities
Greater Minneapolis-St. Paul Area

## Summary

Highly collaborative, results-driven, Senior Retail Executive, with 25+
years of Core Merchandising, Retail Ops, Expense Optimization,
PMO, Transformation, Digital and Marketing leadership experience.
Successful track record of bringing new consumer products and
solutions to life, driving brand development, leading transformational
efforts, delivering operational excellence, reducing costs and building
high-performing teams while consistently exceeding goals.
Specialize in new business development, digital integration,
operational overhauls and leading enterprise-wide, strategic
initiatives. Passionate about  delivering exceptional consumer
products and experiences, building unique business strategies,
creating growth platforms and driving operational efficiencies across
enterprise functions.

Leadership Strengths:
- Thrives within transformation, white space and ambiguity
- Leads cross-functionally, manages senior level governance, and
brings business silos together
- Drives growth, profit improvement and streamlined expense
management
- Delivers 'Operational Excellence' through strategic execution and
comprehensive risk management
- Leads digital channel, supply chain, operating model, process and
technology integration
- Develops talent and builds high-performing teams
- Ensures strong organizational change and communications
strategies
-  Leadership across CPG, Grocery, Toys, Entertainment, Apparel,
Accessories and Shoes
- Healthcare leadership in Rx, OTC, Managed Care/Payer, Franchise
launch, and Operations
-  Recent leadership across Shopper marketing, Digital marketing,
Merchandising services, Retailer and relationships.

- Manages large P&L's ranging from $500M to $4B

Professional Purpose:
To help retail-focused companies transform their business into the digital age with a focus on growth strategies, new product solutions, operational efficiencies, and business transformation while enabling greater organizational performance.

If you're looking for a change agent that will push your organization beyond its comfort zone, please reach out to me at:
takoller@comcast.net

———

## Experience

Party City
Retail Tranformation Sr. Executive
June 2020 - Present (4 months)

News Corp
EVP/Chief Retail & Merchandising Officer-News America Marketing Div. of News Corp
December 2017 - May 2020 (2 years 6 months)
Greater New York City Area/Minneapolis

News America Marketing, a Division of News Corp where I had oversight for 100+ retail relationships and the retail development teams across North America. Also had oversight for merchandising service division, in store products and experience team, digital marketing and the digital instore growth strategy along with the oversight for a high performing field organization of 4,000+ talented, in-store, retail experts. Drove the growth strategy for the retail digital media shopper experience and the instore digital media platform of tools, solutions, measurement and overall experience. Part of team that led a PE acquisition strategy, operational streamlining and the recent sale of company.

Whole Foods Market
Retail Strategy, Transformation, Operations Executive Consultant
September 2015 - December 2017 (2 years 4 months)
Greater Minneapolis-St. Paul Area/Austin, TX

A full-time consultant with Whole Foods Market. Transformational advisor to leadership team reaching across all regions/enterprise wide. Helped stand up new initiatives that impacted people, process, strategy and technology.

## Target
5 years 9 months

### Merchandising Operations/Transformation Office/Expense Optimization Leader
January 2013 - September 2015 (2 years 9 months)
Greater Minneapolis-St. Paul Area

Responsible for leading a Portfolio Management team across all of Merchandising and Operations through organizational transformation and omnichannel efforts, to include coordination of, merchandising operating model, systems, technology, process and supply chain. Also responsible for the creation and coordination of merchandising enterprise organizational change and communication strategy. Previous experience in enterprise expense efforts, category role prioritization, core purchasing and leadership functions in Apparel, Shoes, Accessories, Toys, Entertainment and Healthcare with start-up, mass and off-price retail leaders. Executive level experience in team leadership, P&L management, operations and international expansion.

### VP/DMM, Merchandising/Healthcare Executive
February 2011 - January 2013 (2 years)
Greater Minneapolis-St. Paul Area

Responsibility for developing strategic direction and providing oversight of the international expansion strategy for Healthcare operations. Led large cross-functional team to create entry strategy, business model, and the development of a franchise for pharmacy. Full P&L responsibility.

### Sr. Director, Target Healthcare Operations
January 2010 - March 2011 (1 year 3 months)

Responsible for the oversight of Managed Care, New Business Development, Administration and Finance teams for a Pharmacy. Led the introduction of B2B and direct to consumer business strategies. Also developed and led several strategic payer and health plan relationships. 3 years experience in Washington D.C. lobbying for retail healthcare and pharmacy issues with NCPDP Organization.

## Target
11 years

### Sr. GM, Health and Beauty Division

2007 - 2009 (2 years)

New Business Development, Strategic Partnerships, Financial Management

(Sr.) Buyer, Apparel, Accessories, Shoes, Toys, Entertainment and Healthcare Industries
1998 - 2007 (9 years)

Areas of Merchandising Experience:

- Apparel, Accessories and Shoes

- Toys and Entertainment

- Pharmacy and Healthcare

## Retail Apparel Group
Assistant, Associate and Buyer- Offprice Apparel Retailer
1989 - 1998 (9 years)
Solon, Ohio

Privately held start-up retailer delivering best in class off-price, branded ladies apparel, accessories, shoes, giftware and cosmetics. Part of the new launch team that built the chain from zero to over 240+ stores during tenure. Specialized in growth strategies and new business launches. Deep experience in Merchandising, Purchasing, Product Development, Marketing and Team leadership.

———

# Education

## Kent State University
Bachelor of Applied Science (B.A.Sc.), Retail Merchandising and Business Management

EXHIBIT 19

## Contact

peter_moustakerski@yahoo.com

www.linkedin.com/in/peter-moustakerski (LinkedIn)
www.newsamerica.com (Company)
www.voila-chocolat.com (Company)

## Top Skills

Strategy
Corporate Development
Thought Leadership

## Languages

Bulgarian (Native or Bilingual)
Chinese (Full Professional)
Russian (Limited Working)

## Honors-Awards

Beta Gamma Sigma
Reporting Excellence Award
Involvement & Impact Award

## Publications

China food retail, part 1: Navigating the complex ecosystem that is China's grocery market

Examining China's Potential

The open corporation: How the app culture is changing how companies do business

China food retail, part 2: Transformational trends in China's grocery market

Cloud complexity: The need for resilience

# Peter Moustakerski

C-Level Executive, Innovation & Growth Strategist, Visionary Thought Leader, Hands-On Operator, 2x Entrepreneur
New York

## Summary

Peter Moustakerski is a seasoned C-level executive, innovation- & growth-focused strategist, former financial services professional and management consultant. He is a widely published visionary thought leader, and a serial entrepreneur with extensive experience as hands-on operator and P&L owner.

Most recently, Peter was Chief Strategy Officer at News America Marketing, a subsidiary of News Corp., where led all corporate strategy planning and execution, mergers and acquisitions, strategic alliances and new business development, partnership-based innovation and new products, market research and client insights.

Prior to that, Peter spent 25 years in the field of strategy management consulting at Booz Allen Hamilton and financial services at UBS and Bridgewater, as well as launching two startups, one in China and one in New York City. At Booz Allen, he managed many data-heavy, cross-functional strategy and implementation programs for Fortune 500 clients. At UBS, he led a Strategic Initiatives group reporting directly to the CEO that designed and oversaw all major C-level projects, including territorial and organizational restructuring, compensation and pricing redesign. At Bridgewater, he worked with the founder to envision, build and run his family office. In the late 1990's, Peter built and ran a food manufacturing company and a premium consumer brand in China, and in 2012, he founded an innovative experiential 'make your own chocolate' retail, manufacturing and specialty catering business in New York City.

In addition, for more than 20 years, Peter has been a contributing writer and researcher with The Economist Intelligence Unit (EIU), and has conducted many qualitative and quantitative research projects, and written a number of influential white papers for the EIU,

NBER and other research institutions. He is also the Treasurer of the 125-year-old University Glee Club of New York City.

Peter holds an MBA degree from Columbia Business School and a Bachelor of Science in Computer Science from Zhejiang University in China. He lives in New York City with his wife and two children.

––––––

## Experience

University Glee Club of New York City
Treasurer, Board Member
July 2019 - Present (1 year 3 months)
New York City Metropolitan Area

Manage the Club's finances, including all payments, funds collections, budgeting, reporting, audit, and the investment administration of the Club's endowment. Chair of the Board's Finance Committee, member of the Endowment Committee. Lead the Board's 2020 Strategic Planning task force.

News America Marketing
2 years 9 months

Chief Strategy Officer
July 2019 - May 2020 (11 months)
Greater New York City Area

Senior Vice President, Corporate Strategy and Development
September 2017 - June 2019 (1 year 10 months)
Greater New York City Area

Voilà Chocolat
Founder & Chief Cacao Nut
May 2012 - April 2019 (7 years)
New York City

Bridgewater Associates
Senior Manager
June 2010 - March 2012 (1 year 10 months)
Westport, CT

UBS Wealth Management

Executive Director, Head of Strategic Initiatives
November 2007 - June 2010 (2 years 8 months)

Booz & Company
Senior Associate
May 2003 - November 2007 (4 years 7 months)

USDA
Consumer Food Marketing Specialist
September 1998 - June 2001 (2 years 10 months)
Shanghai, China

Cowboy Candy Company
Co-Founding Director & CFO
September 1995 - September 1998 (3 years 1 month)
Shenyang, China

――――

## Education

Columbia Business School
MBA, Finance and Economics · (2002 - 2004)

French Culinary Institute
Chocolate Candy & Confections · (2012 - 2012)

Ecole Chocolat
Chocolate Making, Professional Chocolatiering · (2011 - 2012)

Princeton University
Economics and Political Science · (2001 - 2002)

Zhejiang University
B.Sc., Computer Science · (1989 - 1993)

EXHIBIT 21

# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

INSIGNIA SYSTEMS, INC.,

          Plaintiff,

          v.

NEWS CORPORATION, NEWS AMERICA
MARKETING FSI, L.L.C., and NEWS
AMERICA MARKETING IN-STORE
SERVICES L.L.C.,

          Defendants.

Case No. 19-cv-1820 (MJD/BRT)

**DEFENDANTS' MEMORANDUM
IN SUPPORT OF ITS MOTION FOR
SUMMARY JUDGMENT ON THE
COUNTERCLAIM**

## INTRODUCTION

In 2004, Insignia filed an antitrust suit in this Court against Defendant News America Marketing In-Store Services LLC ["NAM"], Case No. 04-cv-04213, Dkt. 1 ("*Insignia I*"). On February 9, 2011, the parties to *Insignia I* entered a Settlement Agreement to "forever put to rest all disputes and claims" between them. Declaration of Todd Wind in Support of Motion for Summary Judgment ("Wind"), Ex. 1 (Settlement Agreement), at 1. For $121 mm, Insignia not only released all claims of any kind that were made or that could have been made through the date of the Agreement, but also agreed to a broad covenant prohibiting it from even "attempt[ing] to introduce as evidence, or otherwise assert" any of the pre-release "facts or conduct" underlying any of the released matters in "any" future court proceeding. *Id.* ¶ 9.

One year ago, Insignia filed the Complaint not only alleging most of the antitrust theories pleaded more than a decade ago, but quoting the same testimony that Insignia had already cited in the course of *Insignia I*. Last January, Insignia conceded that it had

relied on pre-2011 evidence in the Complaint. In Defendants' Motion for Judgment on the Pleadings, Defendants pointed the Court to *Insignia I* pleadings where Insignia cited the same facts and conduct it relies on in the Complaint. Wind Ex. 2 (Defendants' Mem. in Support of 12(c) Motion), at 11-15. Insignia acknowledged the source material for its allegations, but argued that the pre-2011 evidence of the alleged anticompetitive scheme was just too important to leave out; at the motion hearing, Insignia admitted that without the pre-2011 evidence, its "case [is] harder to prove." Wind Ex. 3 (January 14, 2020 Hearing Tr.), at 73:2-3.

On that point, the parties are in heated agreement: the law is clear that the vertical restraints at the heart of *Insignia I* and this action, such as exclusivity provisions in contracts with retailers, are not *per se* illegal; these provisions promote competition, and they do not support an antitrust case without pleading and proof that they are part of an anticompetitive scheme that creates more consumer harm than benefit. *See Continental TV, Inc. v. GTE Sylvania, Inc.*, 433 U. S. 36, 57-59 (1977); *Double D Spotting Serv., Inc. v. Supervalu, Inc.*, 136 F.3d 554, 559 (8th Cir. 1998) (vertical restrictions are "governed by" the Rule of Reason, as "they 'promote interbrand competition'") (quoting *GTE*, 443 U.S. at 54); *Lomar Wholesale Grocery, Inc. v. Dieter's Gourmet Foods, Inc.*, 824 F.2d 582, 590 (8th Cir. 1987). The fact that Insignia may not have another antitrust case to pursue without violating the Settlement Agreement does not justify proceeding any farther; in fact, the opposite is true. *See Insulate SB, Inc. v. Advanced Finishing Systems, Inc.*, 797 F.3d 538, 543 (8th Cir. 2015) (given burdens imposed by antitrust suits, courts have been "reasonably aggressive in weeding out" meritless cases).

The Court denied Defendants' Motion for Judgment on the Pleadings, finding that the record on the impact of the Settlement Agreement on this litigation was not sufficiently developed to decide the legal issue raised by the Motion, but the Court directed the parties to complete discovery on that issue in expedited fashion, to allow for an early summary judgment motion. Wind Ex. 4 (Report & Recommendation ["R&R"]), at 8-11. Since then, Insignia has done all that it can (and some things it should not have done) to try to prevent Defendants from developing the factual record invited by the Court. That discovery now confirms that Insignia has done exactly what the Settlement Agreement forbids.

The undisputed facts demonstrate that:

- The undated but critical allegations that NAM acknowledged an anticompetitive scheme calculated to injure competition are all based exclusively on pre-2011 facts and conduct underlying released claims;

- The undated allegations of the origins and acquisition of monopoly power are all based on pre-2011 facts and conduct underlying released claims;

- The undated allegations that NAM deployed exclusionary contracting practices are also based at least in substantial part on pre-2011 facts and conduct underlying released claims;

- Even the few dated allegations of NAM interfering with Insignia's opportunities rest, along with the balance of the Complaint, on the allegation that NAM has been implementing the anticompetitive scheme allegedly admitted in pre-2011 testimony.

And, as the record also shows, Insignia's breach was no foot fault – Insignia is attempting to assert facts and conduct barred by the Settlement Agreement because it seeks to taint otherwise lawful business practices. This Court should enforce the Settlement Agreement by granting summary judgment on Defendants' Counterclaim, find that Insignia has asserted in its Complaint facts or conduct underlying the matters released in the Settlement Agreement, and dismiss the Complaint that violated the covenant not to sue, with leave to amend if Insignia believes that it can plead an antitrust case consistent with Rule 11 and without again violating the Settlement Agreement.

## PROCEDURAL HISTORY AND BACKGROUND FACTS

At all relevant times, Insignia and defendant NAM have been competitors in supplying in-store promotions in grocery stores and other retail outlets; the parties pay retailers to secure the right to install these promotions, and then market their services to the consumer packaged goods companies ("CPGs") seeking to promote the sale of their products in retail outlets. Wind Ex. 5 (Complaint), at ¶¶ 1, 14; Ex. 6 (Insignia 30(b)(6) Deposition Tr.), at 175:10-17.

**A. _Insignia I_:** On September 23, 2004, Insignia filed a Complaint alleging that NAM had monopolized the market for in-store promotions by acquiring the power to exclude competitors like Insignia through, among other things, (1) entering retailer contracts with broad exclusivity provisions; (2) ensuring that such contracts had long terms; (3) extending the exclusivity with rights of first of refusal; and (4) staggering renewal dates. Wind Ex. 7 (_Insignia I_ Amended Complaint), at ¶¶ 2, 13, 20-22, 24-25, 28, 39-40, 49-50.

4

On February 9, 2011, after opening statements at trial, Insignia and NAM entered into a Settlement Agreement to resolve *Insignia I*.  Pursuant to Paragraph 9 of the Agreement, Insignia "promise[d], covenant[ed], and agree[d] not to sue, attempt to introduce as evidence, or otherwise assert any of the Released Matters *and/or the underlying facts or conduct supporting the Released Matters* against the Defendant or the Defendant Released Parties [including Defendants herein] *in any court*, governmental or regulatory body or other proceedings."  Wind Ex. 1, at ¶ 9 (emphasis supplied).

**B.  The "New" Complaint:**  In July 2019, Insignia filed a Complaint with allegations strikingly similar to those pleaded and released in *Insignia I*.  Again, Insignia alleged that NAM "acquired and maintained a monopoly in" the market for "in-store promotion products and services . . . sold to consumer-packaged-goods companies."  Wind Ex. 5, at ¶¶ 1-2.  Insignia alleged the same vertical restraints (such as exclusivity) and other contracting practices at the heart of *Insignia I,* charging that (1) NAM's contracts "define exclusivity in . . . overly broad terms," *id.* ¶ 6; (2) are "effectively long-term," *id.* ¶ 40; (3) employ "right[s]-of-first-refusal" provisions, *id.* ¶ 7; and (4) have staggered renewal dates, *id.* ¶¶ 41-44.

Not only did Insignia recycle the legal theories from *Insignia I*, and complain of the same contracting practices, but as the record now makes clear, Insignia relied on the same testimony it had marshaled in the prior case, with one difference: except for a handful of allegations dated 2018-19, the allegations of the Complaint are not dated at all.  But anyone familiar with *Insignia I* and the allegations that Insignia's counsel had advanced in other antitrust litigation against NAM would recognize that the Complaint

was rooted in facts and conduct that predated, and were underlying the claims released in, the February 2011 Settlement Agreement.

In one critical example, Paragraph 3 of the Complaint (Wind Ex. 5) alleges that the unlawful purpose and effect of Defendant NAM's contracting practices were the subject of admissions: "News frankly and repeatedly acknowledged that it has sought to build contractual barriers to make it unlawfully difficult for competitors to compete." Insignia goes on to assert various undated quotes and testimony to demonstrate these "frank" and "repeated acknowledgments."  As the Court will see below, based on the record that has been assembled, not only did Insignia marshal some of the same evidence in *Insignia I*, but Insignia's current lead counsel, who also represented plaintiffs in *Dial Corp. v. News Corp.,* Case No. 1:13-cv-06802 (S.D.N.Y.), quoted the same evidence in the 2014 *Dial* Complaint.  On that occasion, counsel had no reason to delete the dates because the *Dial* plaintiffs were not bound by the 2011 Settlement Agreement.

**C. The Counterclaim and Motion for Judgment on the Pleadings:** In August 2019, Defendants filed a Counterclaim alleging that Insignia's Complaint breached the Settlement Agreement.  Wind Ex. 8, at ¶¶ 1-3, 22.  Defendants pointed to several examples where Insignia had asserted facts and conduct underlying the matters released in *Insignia I* (and identified where Insignia had first cited the same testimony now in the Complaint), in violation of the Settlement Agreement.  *Id.*  ¶¶ 16, 18-19, 21.  Insignia could have simply amended its Complaint, but instead it denied not only that it was in breach but even the fact that it had cited the same testimony in the Complaint that it had

marshaled in its pleadings in *Insignia I*. Wind Ex. 9 (Insignia's Answer to Defendant's Counterclaim), at ¶¶ 16, 18-19, 21. That position proved to be untenable.

Defendants moved for judgment on the pleadings under Rule 12(c). Insignia filed its own cross-motion, arguing that the Settlement Agreement as a matter of law did not bar it from relying again on facts and conduct that underlay claims released in *Insignia I*. Wind Ex. 10 (Opp. to Defendants' Motion for Judgment on the Pleadings), at 13 (arguing that Settlement Agreement did not bar "what Insignia did here: refer to pre-2011 information as context for its allegations about News's post-2011 illegality"). What Insignia meant by "context" became more clear at the hearing on the Rule 12(c) motion: In the absence of the pre-2011 "information," counsel conceded that Insignia's case would be "harder to prove." Wind Ex. 3, at 73:2-3.

**D**. **The Court's Rulings:** Magistrate Judge Thorson denied both parties' motions. According to Judge Thorson, determining "whether certain facts or conduct included in the new Complaint were 'underlying facts or conduct supporting the Released Matters against the Defendant'" would "take the Court well beyond the confines of the pleadings." Wind Ex. 4, at 7-8. Judge Thorson recommended hearing "breach-of-contract issues . . . promptly, with a more developed record." *Id*. at 10. To that end, Judge Thorson recommended "a period of expedited discovery on the contract dispute . . . followed by cross-motions for partial summary judgment." *Id*. The Court adopted the Report & Recommendation in its entirety. Wind Ex. 11 (Order of April 6, 2020).

In Defendants' First Set of Requests for Admission, Defendants requested that Insignia admit that critical paragraphs of the Complaint – the "frank acknowledgments"

of an anticompetitive scheme – referred to pre-2011 statements that had been marshaled in pleadings filed by Insignia in the course of *Insignia* I.  Wind Ex. 12 (Plaintiff's Objections and Responses to Requests for Admission). These paragraphs appeared to be ripe for Rule 36 admissions, because it would seem hard to dispute the content of Insignia's prior pleadings.  Insignia served extensive objections to these requests for admission insisting that they were "vague and ambiguous" and sought "information that is not relevant to any claims or defenses in this case, and not proportional to the needs of the case." *Id*.  Insignia proceeded to deny all of the requests for admission, based apparently on sustaining its own objections.  *Id.*

The Magistrate Judge was called upon again, this time to determine the sufficiency of Insignia's objections.  Wind Ex. 13 (Defendants' Motion to Determine the Sufficiency of Plaintiff's Responses and Objections).  The Magistrate Judge overruled critical objections, Insignia was required to serve revised responses, and expedited discovery finally progressed.  Wind Ex. 14 (Order of June 8).

### E.  The Results of the Expedited Discovery

1. The Critical Allegations of An Anticompetitive Scheme Indisputably Rest on Facts and Conduct Underlying the Released Matters.

 The Complaint pleads five "acknowledge[ments]" by executives in support of its claim that NAM's contracting practices were part of an anticompetitive scheme.  Wind Ex. 5, at ¶¶ 3, 31, 35, 42-43.  One would expect Insignia to take the opportunity to name names and provide dates for all of these critical admissions, but that is not what Insignia chose to do.  Now, after discovery, two things are beyond dispute: first, Insignia and its

lawyers knew the names and dates for these alleged critical "acknowledgements"; and second, all of these assertions rely on facts and conduct underlying the claims that were released in the Agreement.

a. In paragraph 3 of the Complaint, Insignia alleges that the unlawful scheme behind the challenged contracting practices is visible in the undated assertion that "a former News America Marketing, Inc. chairman . . . vowed to 'destroy' News's competitors." *Id*. ¶ 3. With its objections overruled, Insignia now admits it relied on that statement in 2009 to support its claims in *Insignia I*. Wind Ex. 15 (Insignia's Amended Responses to Requests for Admission), at 2-3 (conceding that Insignia's 2009 brief opposing summary judgment relied on "destroy" statement).

That is not all. Insignia's current lead counsel firm represented plaintiffs in *Dial,* Wind Ex.16 (Fourth Amended Complaint), and relied on the *Dial* complaint in preparing the "new" Complaint for Insignia. Wind Ex. 15, at 2-4; Wind Ex. 17 (Insignia's Responses to Interrogatories), at 6-7, 12, 17-22, 24, 26-29, 31, 33-34. As Insignia now concedes, in *Dial,* Insignia's lawyers quoted the same alleged statement of anticompetitive purpose asserted in Paragraph 3, and attributed the statement to a trade article published in 2004, which reported that the statement was made in *1999*. Wind Ex. 6, at 32:6-33:2; Wind Ex. 15, at 2. Thus, the statement was 10 years old when Insignia relied on it the first time, and 15 years old when the *Dial* Complaint cited it, on both occasions acknowledging the source and the date.

b. In Paragraph 31, as evidence for Insignia's claim that NAM developed its "exclusive, national network of retail chains in order to control a large percentage of ISPs

and to forestall competition," Insignia cites a statement by a "former News account manager" that "100 percent of his retail accounts in the southeast United States had exclusivity clauses." Wind Ex. 5, at ¶ 31. Again, the statement is undated and Insignia does not identify the speaker. But Insignia and its counsel knew the name and the date, as the discovery ordered by the Court confirms.

As Insignia now admits, that account manager's testimony was cited on Insignia's trial exhibit list from *Insignia I*. Wind Ex. 15, at 3. Insignia has also admitted that its counsel cited the source and 2009 date of the testimony in the *Dial* Complaint. Wind Ex. 15, at 3; Wind Ex. 16, at ¶ 76. Insignia's corporate designee concedes that Insignia has no source for ¶ 31 other than the testimony from 2009, Wind Ex. 6, at 89:2-90:20, which had been marshaled by Insignia in support of claims released in the Settlement Agreement.

c. Paragraph 35 of the Complaint contains another undated "acknowledgement." To demonstrate that the "broad language" in the exclusivity provisions in NAM's retail contracts is part of an anticompetitive scheme, Insignia attributes another undated statement to a "former News America chief operations officer:" the "aggressive tactic" of broad exclusivity language should be deployed and "if there was any one [on staff] who was a bed wetting liberal [and] concerned about doing the right thing," he should "exit the company." Wind Ex. 5, at ¶ 35. One would think that Insignia would have wanted to lend credence to such an inflammatory allegation with a name and date.

Insignia certainly knew the name of the witness and the date that the cited testimony was given. As Insignia has now admitted, the same testimony was cited by

Insignia in its 2009 brief opposing summary judgment in *Insignia I,* with a name and a date: a former employee named Robert Emmel recounting something he heard in "the spring of **2001**." Wind Ex. 15, at 4; Wind Ex. 18 (*Insignia I* Memo. In Opp. To Summary Judgment, ECF No. 515), at 33-34. In *Dial*, Insignia's counsel was also quite specific about the sourcing for this statement. Wind Ex. 16, at ¶¶ 82-83 (sourcing the statement to testimony from 2009 about something heard on a 2001 conference call). Insignia's corporate designee testified to no basis for believing that this undated statement in the 2019 Complaint was made other than in 2001. Wind Ex. 6, at 105:22-106:6.

d-e. Paragraphs 42 and 43 contain a series of statements attributed to NAM executive Martin Garofalo, allegedly acknowledging the anticompetitive purpose and effect of staggering contract dates. Wind Ex. 5, at ¶¶ 42-43. Paragraph 42 asserts that Mr. Garofalo said that NAM "stagger[s] the time of major retail deals to minimize the risk of losing a major number of stores in any one time period," which also ensures that it takes longer for a competitor to acquire a "critical mass" of retail accounts. Paragraph 43 alleges that Mr. Garofalo added that this allows NAM to focus on key negotiations, and, again, requires competitors to dedicate time to build a retail network. The lengthy quotes are undated.

Insignia knew the dates.

Insignia has admitted that, in its 2009 brief opposing summary judgment in *Insignia I*, Insignia relied on "a statement by Mr. Garofalo" drawn from **2002** speaking notes to the effect that NAM "intentionally staggers the time of major retail deals to

11

minimize the risk of losing a major number of stores in any short term time period . . .
[t]his strategy serves as a deterrent to other major companies from joining the In-Store
fray – because they know that it will be a . . . hard fought drawn out process to develop
the critical mass necessary to compete with News America to be successful in this arena."
Wind Ex. 15, at 4-6; Wind Ex. 18, at 12-13 (quoting 2002 Speaking Notes of Martin
Garofalo).  Insignia's corporate designee conceded that Insignia had no source for
Paragraph 42's quote other than the 2002 speaking notes, which had been previously
cited by Insignia in support of the released claims.  Wind Ex. 6, at 125:19-126:6; 131:5-
19; 144:15-20 (Paragraph 43 also sourced in pre-2011 remarks of Mr. Garofalo).

     When Insignia's witness was asked why the allegations in the 2019 Complaint
were left undated when Insignia knew the dates, counsel instructed the witness not to
answer on grounds that this was privileged.  Wind Ex. 6, at 131:20 – 133:12.

     Paragraphs 3, 31, 35, 42 and 43, the explicit "acknowledgments" of NAM's
anticompetitive scheme, all assert facts and conduct underlying claims released in 2011.
Their impact, however goes far beyond those paragraphs.  Insignia conceded that all of its
allegations in the Complaint, including the few alleging post-2011 conduct, represent the
execution of the anticompetitive scheme pleaded in Paragraph 3 and then further detailed
in Paragraphs 3, 31, 35, 42 and 43.  Wind Ex. 6, at 140:17-141:2 (Q: There "are a number
of allegations about what your counsel has called the game plan or the scheme . . .
[Paragraphs] 3, 35, and 42 and 43. . . . [Is it] your position that – that News America
Marketing has continued to execute on that scheme since 2011.  A:  Absolutely.");  140:2-
141:2; 142:5-143:11 (all the complained of conduct implemented NAM scheme to "hurt

Insignia and hurt competition"). But the only basis that Insignia pleads for claiming that the conduct post-2011 was part of an "anticompetitive scheme" – as opposed to simply lawful marketplace competition – is the pre-2011 "acknowledgments" that are barred by the Settlement Agreement.

As the prior motion practice demonstrated, and as Insignia as much as conceded at argument, the allegations of anticompetitive scheme are vital to its ability to create an antitrust case out of a series of vertical restraints. That is why Insignia has fought for a year to keep these alleged statements from 1999 and 2001 and 2002 in the Complaint.

    2.    The Allegations of Market Power and Exclusionary Contracting Practices Indisputably Rest on Pre-2011 Facts and Conduct.

Discovery has also confirmed that, in addition to the critical overarching allegations of an anticompetitive scheme, the Complaint is built on other assertions of pre-2011 facts and conduct underlying the released matters.

    a.  Unlawful Acquisition of Market Power: Paragraphs 2, 5, 24-25

Insignia asserts that NAM "acquired and maintained a monopoly" for "over a decade." Wind Ex. 5, at ¶ 2. The Complaint proceeds to assert facts and conduct underlying the monopolization claims asserted and then released in *Insignia I*.

Paragraph 5 asserts that "exclusionary contracts with retailers and CPGs . . . first created News's unlawful market dominance," an allegation that Insignia made some fifteen years ago. Wind Ex. 7, at ¶ 2 (NAM "acquired . . . dominance" through "exclusive contracts"). Insignia's corporate designee confirmed that Paragraph 5 of the

Complaint (Wind Ex. 5) asserts conduct that preceded the 2011 Settlement Agreement (and supported the monopolization claims released).  Wind Ex. 6, at 34:4-17; 37:9-38:6.

Paragraphs 24-25 again allege that "News has unlawfully acquired and maintained market power in the relevant market," by virtue of "exclusionary contracts and related anticompetitive conduct."  Insignia claimed in 2005 that NAM had already unlawfully acquired its monopoly position through exclusionary contracts with retailers.  Wind Ex. 7, at ¶¶ 20-22, 56, 116.  Insignia's corporate designee confirmed Insignia's position that NAM unlawfully acquired market power before 2011. Wind Ex. 6, at 64:12-20.

Nothing in the Settlement Agreement prevents Insignia from pleading and proving that NAM unlawfully acquired or that it unlawfully maintained a monopoly after February 2011.  But that is not what Insignia has chosen to do.  The Complaint's allegations regarding how NAM "acquired" market power all arise from facts and conduct released in the Settlement Agreement.

### b. Impact on Market Conditions: Paragraphs 9, 27-30

Insignia admits that in-store marketers must "negotiate with retailers" and "pay for the real estate for the ability to offer to provide in-store services" to CPGs, Wind Ex. 6, at 175:10-17, that "any potential competitor must make investments in developing ISP offerings and entering into retail distribution contracts well before it can generate any revenue,"  Wind Ex. 5, at ¶ 29, and that NAM has built the largest retail network, Wind Ex. 5, at ¶¶ 27-28, 55.  There is no suggestion in the Complaint that NAM's payments to build its retail network are illegal.  Nor does Insignia contend that there is anything to complain about if it was outbid.  Wind Ex. 6, at 176:9-12.

The Complaint nevertheless alleges that NAM's network of retailers "lock[s] competitors out of a large share of the distribution they need to compete." Wind Ex. 5, at ¶ 28.

That allegation is not new. In 2005, Insignia complained that "[p]otential entrants face[d] daunting barriers" because CPGs were "reluctant to contract with in-store advertising and promotion providers unless they can demonstrate they have a network of retailers to place their advertising." Wind Ex. 7, at ¶ 53.

In Paragraph 30 of the Complaint, Insignia alleges that NAM has a "stranglehold on the retailer distribution network." Wind Ex. 5, at ¶ 30. Insignia made that same allegation in 2005, alleging that Defendants had "exclusive contracts with most major retailers." Wind Ex. 7, at ¶ 20. As its corporate designee admitted, NAM acquired its "national network" well before 2011. Wind Ex. 6, at 88:20-89:1. Nothing in the Settlement Agreement stops Insignia from pleading and proving unlawful acts to acquire or maintain a monopoly based on facts and conduct after February 9, 2011, but again, that is not what Insignia chose to do in the Complaint.

### c. Broad Exclusivity Provisions: Paragraphs 6, 33-35

Paragraph 6 alleges that NAM's "exclusionary contracts" contain "a number of anticompetitive provisions." Insignia does not claim that exclusivity in retail contracts is illegal – for good reason – but Insignia does allege that NAM deployed broadly worded exclusivity clauses to restrict Insignia's ability to introduce services that NAM did not offer. Wind Ex. 5, at ¶¶ 6, 33-34.

15

None of this is new either.  Insignia alleged in 2005 that NAM used "highly restrictive" contracts that extended to "any new in-store advertising and promotion product[]."  Wind Ex. 7, at ¶¶ 20, 39E.

The Complaint makes clear on its face that the allegations in Paragraphs 33-34 about overly broad exclusivity language are based at least in substantial part on pre-2011 facts and conduct.  That is because Paragraph 35 provides what it calls an "*explanation*" for "*such overly broad language*."  Wind Ex. 5, at ¶ 35 (emphasis supplied).  That "explanation" was allegedly given by a former NAM executive, to the effect that if any "bed wetting liberal" was reluctant to deploy this tactic, he should report to HR.  *Id.*  As Insignia now concedes, that explanation was given in **2001**.  Wind Ex. 6, at 99:1-101:2.

Paragraphs 33-34 are clearly based at least in part on facts and conduct underlying claims released in 2011, and of course so is the "explanation" found in ¶ 35.

d. Staggered Renewal Dates for Retail Contracts: Paragraphs 41-44

In Paragraph 41, the Complaint asserts that NAM deliberately staggered the expiration terms of its retail contracts in order to erect barriers to entry for rivals.  Wind Ex. 5, at ¶ 41.  This too is an old allegation.  Insignia asserted the same facts and conduct in trying to avoid summary judgment in 2009.  Wind Ex. 18, at 12-13, 47.

The Complaint on its face alleges that the practice was historic, going on for two full paragraphs (Wind. Ex. 5, at ¶¶ 42-43) to detail Mr. Garofalo's explanation for why NAM staggers its retail contracts ("strategy . . . starts with staggered retail deals").  What the Complaint did not disclose, but Insignia has been forced to admit, is that Mr.

Garofalo's explanation of the strategy was provided in **2002** (with respect to ¶ 42) and otherwise before 2011 (with respect to ¶ 43).

At the recent deposition of Insignia's designee, the witness conceded that the allegations in Paragraph 41 are based at least in part on facts and conduct pre-2011 (and indeed were marshaled by Insignia in 2009 support of its claims released in 2011). Wind Ex. 6, at 135:7-13. As for any basis for alleging that ¶ 41 refers to any post-release conduct, the witness offered only that "based on our conversations with retailers, we know when their deals with News America expire, and those are different dates." *Id*. at 136:2-12. The witness conceded that Insignia's retail contracts also end on different dates. *Id.* at 136:14-20. That, of course, is a far cry from an organized scheme designed and implemented to injure competition itself.

To the extent that ¶¶ 41-44 allege a practice designed to injure competition, they appear to be based entirely on facts and conduct released in the Settlement Agreement.

e. <u>Right of First Refusal Provisions: Paragraphs 7, 36 and 38</u>

In Paragraphs 7, 36 and 38, Insignia alleges that NAM's right-of-first refusal provisions "have effectively afforded [NAM] exclusivity" and eliminated bargaining. Wind Ex. 5, at ¶¶ 7, 36, 38. This too appears to be rooted entirely in facts and conduct underlying claims released in 2011.

In 2005, Insignia alleged that NAM insisted "on the contractual right of first refusal" to provide any new in-store promotion. Wind Ex. 7, at ¶¶ 2, 39E. The 2011 Settlement Agreement expressly forbade the parties from enforcing rights of first refusal, and provided a remedial scheme in the event of breach. Wind Ex. 1, at ¶¶ 3, 7.

17

Insignia's corporate designee conceded that Insignia never availed itself of the right to seek relief for any breach of this commitment in the 8.5 years after the Settlement Agreement was entered. Wind Ex. 6, at 182:9-21.

When asked for any post-2011 examples of NAM enforcing a right of first refusal, Insignia's corporate designee could cite only what was characterized as something "similar to right of first refusal" involving CVS. *Id*. at 118:21-120:5. The witness later explained that CVS told Insignia only that based on its contract with NAM, it could not proceed with Insignia (CVS honored its exclusivity provision), *id*. at 167:17-168:7; the corporate designee has never seen a right of first refusal in one of NAM's contracts and no one at Insignia told her that NAM had enforced a right of first refusal. *Id*. at 167:12-168:14. To the extent that Paragraphs 7, 36 and 38 are about anything that can be fairly described as a right of first refusal, they appear to be based entirely on facts and conduct underlying claims released in *Insignia I*.

### f. Long Term Contracts With Automatic Rollovers (Paragraph 40)

The Complaint charges that NAM "employ[s] automatic rollovers" to make contracts "effectively long-term." Wind Ex. 5, ¶ 40. Insignia alleged in 2005 that NAM "entered exclusive long-term contracts with retailers." Wind Ex. 7, ¶ 26. It does not appear that any such conduct continued after the Settlement Agreement.

Insignia's corporate designee could identify only one post-2011 event in support of this allegation. Wind Ex. 6, at 120:6-123:8. The witness testified that the Kroger contract was extended multiple times over years. *Id* at 120:6-121:19. But the witness then conceded that Insignia had no information whether, as alleged in ¶ 40, the contract

was extended through "automatic rollovers," or whether Kroger simply chose to
negotiate a series of extensions with a trusted vendor. *Id*. at 122:2-10.

Here, as throughout, Insignia relies on the pre-2011 asserted "acknowledgments"
of an anticompetitive scheme to spin lawful business practices into an antitrust suit.

## LEGAL STANDARD

The critical issue on summary judgment "is whether the record evinces a genuine
dispute as to any material fact." *In re Wholesale Grocery Products Antitrust Litig.*, 752
F.3d 728, 732-33 (8th Cir. 2014) (internal quotation marks omitted). The Eighth Circuit
has not hesitated to affirm grants of summary judgment in complex antitrust cases. *See,
e.g., HDC Medical, Inc. v. Minntech Corp.*, 474 F.3d 543, 550 (8th Cir. 2007) (affirming
grant of summary judgment to defendant on plaintiff's attempted monopolization claims);
*Flegel v. Christian Hosp., Northeast-Northwest*, 4 F.3d 682, 691 (8th Cir. 1993)
(affirming grant of summary judgment on plaintiff's Sherman Act Section 1 and 2 claims
to defendant).

The Circuit Court has also made clear that given "the unusually high cost of
discovery in antitrust cases, the limited success of judicial supervision in checking
discovery abuse, and the threat that discovery expense will push cost-conscious
defendants to settle even anemic cases, the federal courts have been reasonably
aggressive in weeding out meritless antitrust claims at the pleading stage." *Insulate SB,*
797 F.3d at 543 (internal quotation marks and alterations omitted).

In enforcing a settlement agreement, the Court has ample authority to dismiss a
complaint. *See Lansing v. Wells Fargo Bank, N.A.*, 2016 WL 3390400 (D. Minn. Apr.

19

25, 2016); *Lansing v. Wells Fargo Bank, N.A.*, 2016 WL 3406085 (D. Minn. June 17,

2016) (adopting Magistrate Judge's recommendation), *aff'd*, *Lansing v. Wells Fargo*

*Bank, N.A.*, 894 F.3d 967 (8th Cir. 2018); *Laser Aiming Sys. Corp., Inc. v. Bondhus*, 2016

WL 912181, at *6 (D. Minn. Mar. 7, 2016) (dismissing four counterclaims with prejudice

on a summary judgment motion because of impact of release ending prior lawsuit).

## ARGUMENT

**I.     The 2011 Settlement Agreement Bars Insignia From Asserting Any Pre-2011 Facts and Conduct Underlying Released Matters in This Court.**

Courts construe contracts like the Settlement Agreement as a matter of law.  When

the relevant language "is unambiguous, Minnesota courts give that language its plain and

ordinary meaning."  *In re SRC Holding Corp.*, 545 F.3d 661, 666 (8th Cir. 2008); *see*

*also Qwinstar Corp. v. Anthony*, 882 F.3d 748, 754 (8th Cir. 2018) ("Where the parties

express their intent in unambiguous words, those words are to be given their plain and

ordinary meaning.").  The central issue is "the intent evidenced by the release itself."

*Marketing Assistance Plan, Inc. v. Associated Milk Producers, Inc.*, 338 F. Supp. 1019,

1022 (S.D. Tex. 1972).  The court must give effect to the parties' drafting decisions—

"freely contracting actors in the marketplace, particularly sophisticated business entities

who rely on experts to advise them, are best suited to determine what makes the most

economic sense, and the language they have mutually negotiated and agreed to is the best

evidence of what those parties intended."  *In re SRC*, 545 F.3d at 668.

Insignia has never argued that the 2011 Settlement Agreement is ambiguous; indeed, Insignia insisted that it should be construed as a matter of law when it cross-moved for judgment on the pleadings.  Wind Ex. 10 at 13-18, 27, 29.

### A. Paragraph 9 Unambiguously Prohibits Any Attempt Even to Assert or Introduce into Evidence Pre-Release Underlying Facts and Conduct.

The discovery taken by Insignia on the origins of Paragraph 9 of the Settlement Agreement confirms what the unambiguous language explicitly says: NAM paid Insignia a large sum of money to ensure that the released parties (all of the Defendants herein) would never have to contend with the facts and conduct underlying every claim that was brought or could have been brought through the date of the release, let alone the *same* facts and conduct that had been marshaled against NAM in *Insignia I*.  Wind Ex. 19 (Testimony of NAM 30(b)(6) designee), at 122:18-123:3; 124:11-21.

The parties began with the broadest possible definition of matters that were being released.  The "Released Matters" include "any and all manner of actions and causes of action, suits, debts, obligations, contracts, torts, covenants, claims," in "law or in equity, known or unknown, of any kind or character, from the beginning of time up to the date of this Agreement."  Wind Ex. 1, ¶ 9.

Paragraph 9 of the Settlement Agreement contains Insignia's covenant not to sue. That provision provides that Insignia:

> promises, covenants and agrees not to sue, *attempt to introduce as evidence, or otherwise assert any of the Released Matters and/or the underlying facts or conduct supporting the Released Matters against* the Defendant [NAM In-Store] or the Defendant Released Parties *in any court*, governmental or regulatory body or other proceedings.

21

This covenant has two parts. First, paragraph 9 reaffirms that Insignia cannot "sue" and pursue the *claims* that were the subject of *Insignia I* and other "Released Matters." The "Released Matters" include all claims of any kind that could have been brought through the date of the Release. Second, in addition, Paragraph 9 bars Insignia from ever again even "attempt[ing] to introduce into evidence, or otherwise assert[ing] any of the . . . *facts or conduct supporting the Released Matters*." In other words, pursuant to the Settlement Agreement, Insignia cannot plead (let alone otherwise exploit) in any subsequent proceeding against Defendants any alleged "fact or conduct" that Insignia could have (let alone did) offer in support of the claims released in 2011.

The parties could not have been clearer that they intended to prohibit the reassertion of not just claims, but all of the facts and conduct underlying those claims.

Paragraph 9, by its terms, covers the waterfront of litigation use of "the underlying facts or conduct" in "any" future "court" case – Insignia agreed not to even attempt to introduce as evidence "or otherwise assert" the material underlying the Released Matters. That is everything lawyers do with facts and conduct in litigation: assert them, and then, if supported with facts, attempt to introduce them into evidence. Paragraph 9 by its terms stops this process in its tracks.

Finally, Paragraph 9 makes clear that the release applies to *all* subsequent proceedings. Insignia agreed not to assert any Released Matters or underlying facts or conduct "in any court, governmental or regulatory body or other proceedings."

**B. Paragraph 9 Is Fully Enforceable.**

Insignia has suggested that enforcing the contract it entered and for which it was paid $121mm is against public policy, citing cases providing that an agreement that "absolve[s] one party from liability for future violations of the anti-trust statutes" is against public policy. *Fox v. Midwest Theatres v. Means*, 221 F.2d 173, 180 (8th Cir. 1955). This argument ignores the terms of the Settlement Agreement before the Court.

Paragraph 9 does not immunize Defendants for *future* antitrust violations. Instead, the Settlement Agreement prohibits Insignia only from asserting pre-2011 facts or conduct underlying the released claims to support a claim that Defendants committed an antitrust violation after 2011. If Insignia can plead an antitrust case based on post-release facts and conduct, the Settlement Agreement would not limit Defendants' liability.

The fact that even general releases can have an indirect impact on claims that rest on pre and post release conduct does not make them against public policy. Courts "have enforced even general releases to bar antitrust claims predicated on continuing violations of pre-release conduct." *Xerox Corp. v. Media Sciences, Inc.*, 609 F. Supp. 2d 319,326 (S.D.N.Y. 2009) (emphasis omitted).

Here, what is before the Court is not just a general release, but an explicit agreement that Insignia could not in a new case marshal the same facts and conduct that it had already packaged, sold and been paid for. The Settlement Agreement does not stop Insignia from ever bringing another antitrust claim. Instead, the Settlement Agreement bars Insignia from selling the same thing twice.

II.    __Insignia Has Violated the Covenant Not to Sue__.

    A.  __The Complaint Depends On Allegations of an Anticompetitive Scheme__
         __That Are Based Entirely On Violations of the Covenant Not To Sue.__

The cornerstone of the Complaint is visible in its opening paragraphs:  NAM violated the Sherman Act by monopolizing the in-store promotions market through "pervasive anticompetitive strategies" including "exclusionary agreements with retailers," Wind Ex. 5, at ¶¶ 1-2.  But as Insignia well knows, exclusivity, rights of first refusal and other non-price restraints in agreements between a service provider and a retailer are not prohibited by law.  They are governed by the Rule of Reason.  *See GTE Sylvania, Inc.,* 433 U.S. at 57-59; *Business Electronics Corp. v. Sharp Electronics Corp.*, 485 U.S. 717, 735-36 (1988).

This is certainly true in the Eighth Circuit.  *See Double D Spotting Serv., Inc. v. Supervalu, Inc.*, 136 F.3d at 559 (8th Cir. 1998) (vertical restrictions "not per se violations . . . because they 'promote interbrand competition by allowing the manufacturer to achieve certain efficiencies in the distribution of his products'") (quoting *GTE Sylvania*, 443 U.S. at 54); *Lomar Wholesale Grocery, Inc.,* 824 F.2d at 590.  Vertical exclusivity provisions are not barred by law, *U.S. Healthcare, Inc. v. Healthsource, Inc.,* 986 F.2d 589, 594 (1st Cir. 1993), and staggered expiration dates have been found to be pro-competitive.  *See Menasha Corp. v. News America*, 354 F.3d 661, 663 (7th Cir. 2004) ("One might think that staggered expiration dates make entry easier . . . [a rival] can sign up chains as their exclusives expire, without having to enroll

the entire retail industry at one go."); *Fleer Corp.* v. *Topps Chewing Gum, Inc.*, 658 F.2d

139, 149-50 (3d Cir. 1981).

That is why the third paragraph of the Complaint insists that NAM's contracting

practices must be viewed as part of an admitted anticompetitive scheme to injure

competition itself (not merely an individual competitor). And, Insignia alleges that

scheme has already been admitted, as NAM executives have "repeatedly acknowledged"

that they have "sought to build contractual barriers to make it unlawfully difficult for

competitors to compete." Wind Ex. 5, at ¶ 3.

Not surprisingly, in bringing an earlier Sherman Act case complaining of vertical

restraints in the relationships between NAM and retailers, Insignia attempted to connect

those contracting practices with alleged evidence of an overall anticompetitive scheme.

When Insignia decided to return to the well that had delivered a $121mm settlement, it

again asserted that the same contracting practices were part of an anticompetitive scheme

– but this time, Insignia elected to assert literally the same evidence of that scheme that it

marshaled in *Insignia I* and that its lawyers deployed (and dated) in *Dial*.

This time, however, Insignia was faced with the covenant not to even "attempt to

introduce into evidence, or otherwise assert the . . . facts or conduct" that underlay the

broadly defined released matters in the Settlement Agreement. Insignia attempted to

elide the commitments it had made in this Court through a variety of strategies, which

began (but by no means ended) with stripping the dates off evidence that it and its

lawyers had already dated in earlier filings in this Court and other federal courts. Had

Insignia believed that it could rely on this evidence consistent with the Settlement

Agreement, there would have been no reason to strip out the dates. As the record demonstrates, and as Insignia has been forced finally to admit, the "acknowledgements" of an anticompetitive scheme so essential to the Complaint, and found in ¶¶ 3, 31, 35, 42 and 43, all rested exclusively on pre-2011 facts and conduct that underlay the claims released in the Settlement Agreement. *See* pp. 8-13 *supra*. Their inclusion in the Complaint represented a breach of the Settlement Agreement that was pleaded in the Counterclaim and now been proven beyond dispute.

The Court was first told that the various pre-2011 allegations were mere "context," Wind Ex. 10, at 13, a mantra repeated under oath by Insignia's corporate designee, Wind Ex. 6, at 148:16-19. But that was never true. Even the careful euphemism of Insignia's counsel confirms the critical role played by the alleged "acknowledgments" of an anticompetitive scheme; without the "pre-2011 information," its "case [would be] harder to prove." Wind Ex. 3, at 73:2-3. A case built on vertical restraints in retail contracts leading to lost business by the plaintiff is not going to succeed, not without the critical pleading and proof that these contractual terms have been deployed as part of a scheme to injure competition. *See Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 338 (1990) ("The antitrust laws were enacted for the protection of *competition*, not *competitors*." (internal quotation marks and citation omitted)); *see also Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2 (1984). That is why Insignia has fought for a year to keep the pre-2011 facts and conduct in the case. They are not mere "context;" they serve a critical role in creating the appearance of an antitrust case out of lawful business

practices, relying on facts and conduct that Insignia had agreed not to assert again in any

court.

Discovery has now confirmed the central role of these assertions.  Insignia's

designee confirmed that the alleged anticompetitive "game plan" found in paragraphs 3,

31, 35, 42 and 43, represents the very heart of Insignia's case that NAM has been

executing an unlawful scheme since 2011, including in 2018-19.  Wind Ex. 6, at 140:17-

141:2, 142:5-143:11.  All of the claims alleging improper contracting practices are

infected by the violations of the covenant not to sue in Paragraphs 3, 31, 35, 42 and 43.

Even the few dated claims alleging improper "interference" with Insignia's

business opportunities depend for their viability on the allegations that these are all part

of an anticompetitive scheme.  Insignia dates a handful of instances where it sought to

compete with Defendants, believed they were on the verge of success with some retailer,

when Defendants "swooped in" and enforced their contractual exclusivity or other

existing rights, or presented the retailer with a better offer.   Wind Ex. 5, at ¶¶ 37, 45-47,

50, 57-58.  But competitive bidding is "often the very essence of competition."

*Weyerhaeuser Co. v. Ross-Simmons Hardwood Lumber Co.*, 549 U.S. 312, 313 (2007)

(internal quotation marks omitted).

Whether Defendants were competing on price or enforcing their exclusivity rights,

Insignia's business disappointments do not support an antitrust claim, absent pleading

and proof that they were part of an anticompetitive scheme causing injury to competition.

*See Double D Spotting Serv., Inc. v. Supervalu, Inc.*, 136 F.3d 554, 561 (8th Cir. 1998);

*Amerinet, Inc. v. Xerox Corp.*, 972 F.2d 1483, 1507 (8th Cir. 1992) (Under "competitor's

privilege" doctrine, "competitive conduct which is neither illegal nor independently actionable does not become actionable because it interferes with another's prospective contractual relations.") (internal quotation marks omitted).

The allegations asserting acknowledgments of an anticompetitive scheme are critical to the Complaint and this lawsuit. The Court should find that Paragraphs 3, 31, 35, 42 and 43 were filed in violation of the Settlement Agreement.

### B. The Allegations of Market Power and Anticompetitive Practices Also Violate the Covenant Not to Sue.

The record demonstrates that the allegations in Paragraphs 2, 5, 24 and 25 of market power and in Paragraphs 9 and 27-30 of market conditions are all based in least in part on facts and conduct underlying the monopolization claims released in 2011. *See* pp. 13-15 *supra*. If NAM acted illegally to acquire, maintain or extend its market position after February 2011, then of course the law would hold it accountable, but that is not what Insignia is seeking to do here.

As Insignia's CEO testified, when she joined Insignia in 2016, she knew that the business depended in part on investing in building an attractive retail network to present to CPGs, and she knew that NAM had "more stores." Wind Ex. 6, at 74:7-22 (when recruited for CEO job, was not told that NAM had a lock on retail market, only that it had "more stores" in its retail network than Insignia had); 175:10-22 (business depends on paying for access to retailers). If the size of NAM's retail network made it an attractive business partner to CPGs and an effective competitor after February 2011, that does not create an antitrust claim, and Insignia knows it. That is why Insignia is attempting to

leverage allegations that NAM *illegally* acquired market power *before* February 2011, rather than attempt to identify illegal conduct by NAM after that date.

The Settlement Agreement bars this.

The record also demonstrates that Insignia is being more than coy when it allows that its allegations of excessively broad exclusivity provisions, or rights of first refusal provisions, or staggered renewal dates, or excessively long contract terms, "might" include pre-2011 facts and conduct.  Wind Ex. 6, at 34:4-17; 38:4-6; 47:16-21; 69:5-6; 88:20-89:1.  In fact, the Complaint makes clear that Paragraphs 33-34 (on excessively broad exclusivity) allege facts and conduct underlying released claims (that is why in Paragraph 35, the 2001 remarks, "explain" the alleged practice); so does all of Paragraph 31 (as it is tied to the 2009 testimony cited at the end); so does Paragraph 41 (on staggered renewal dates), as even Insignia admitted, Wind Ex. 6, at 135:7-13. *See pp.* 15-18 *supra*.  And to the extent that the allegations in Paragraphs 7 and 36-37 are about rights of first refusal, those must be based on pre-2011 facts and conduct (as previously alleged in *Insignia I*), because Insignia apparently has no example of a post-2011 right of first refusal, or of a post-2011 automatic renewal such as alleged in Paragraph 40.  Wind Ex. 6, at 120:6-123:8; 167:12-168:14.

Quite apart from the fact that the critical allegations of an anticompetitive scheme all rest on assertions of evidence that violate the covenant not to sue of Paragraph 9 of the Settlement Agreement, the balance of the Complaint is filled with allegations that clearly rest on facts and conduct underlying the claims released in 2011.

For this second reason, the Court should grant summary judgment on Defendants' counterclaim, and find that Insignia has asserted facts and conduct underlying claims released in the Settlement Agreement.

### III.   **The Court Should Dismiss the Complaint.**

Intent is not an element of a breach of contract claim, but the undisputed facts before this Court demonstrate that Insignia's breach was not only purposeful – to sustain a case where there was none to plead – but carried out in a manner calculated to add to the burden imposed on the Court and Defendants.

Insignia and its counsel knew the dates of the undated "acknowledgments" of anticompetitive intent – having pleaded the dates in prior pleadings in *Insignia I* and *Dial* (which Insignia relied on in the course of preparing the Complaint here).  Again, had Insignia believed that including this material was consistent with the Settlement Agreement, it would not have gone to the trouble of stripping out the dates.

Any suggestion that the breach was inadvertent was eliminated when Insignia responded to the Counterclaim, which expressly alleged that Insignia had pleaded facts and conduct underlying the claims released in *Insignia I* (even citing the 1999 date of the "destroy" statement in Paragraph 3 and the 2001 date for Paragraph 35).  Wind Ex. 8, at ¶¶ 16, 18-19, 21.  Insignia denied these allegations – not just the legal characterization of the breach, but the facts as well.  Wind Ex. 9, at ¶¶ 16, 18-19, 21.  As Insignia knew then, and the record demonstrates, those denials were simply false.

The Court directed the parties to address the factual issues in expedited discovery. The requests asked Insignia to confirm that the quoted but undated acknowledgements

were from some two decades ago in some cases, and pointed to Insignia's own pleadings that marshaled the same evidence in opposing summary judgment in 2009. Insignia insisted that these questions were "vague and ambiguous," and "disproportionate" to the "needs of the case" (notwithstanding that the Court rejected Insignia's exception to the R&R and endorsed the discovery sought).

The pattern continues. When asked about the date of an undated allegation, Insignia's corporate designee would typically answer that the allegation was in "the Dial *2014* complaint," Ex. 6, at 20:6-13; 32:6-16; 99:4-7 (never failing to mention that post-2011 date), and would admit the pre-2011 source only when confronted with the fact that Insignia's counsel provided the date in *Dial*. And, like clockwork, the corporate designee would routinely qualify an answer with "discovery is ongoing." *Id.* at 22:3-8; 23:13-21; 33:16-22; 169:11-21.

Of course, the issue before the Court is whether Insignia breached the Settlement Agreement *by filing the July 2019 Complaint* asserting facts and conduct underlying claims that had been released in 2011 – "ongoing" discovery should have nothing to do with it. But Insignia's dodge is revealing. Insignia's focus has been about discovery: hiding what its Complaint relies upon for as long as possible, launching "ongoing discovery" to look for some basis to pursue an antitrust suit besides recycled material, and in any case imposing the kinds of discovery costs that the Court of Appeals has recognized often leads to settlements of bogus cases. *Insulate,* 797 F.3d at 543.

Insignia knew better than to plead an antitrust case based on the proposition that NAM (in the words of Insignia's CEO) "has more stores" in its retail network, makes

31

competitive offers, enters exclusivity agreements with retailers, and enforces its legal rights with third parties. Instead, Insignia filed a Complaint driven by inflammatory evidence of anticompetitive intent and business practices, hid the dates, and stalled as long as possible before the Settlement Agreement could be enforced.

That time has finally come.

The Court should grant summary judgment on the Counterclaim, as the undisputed facts demonstrate that Insignia has in fact breached Paragraph 9 of the Settlement Agreement. By Insignia's admission, the critical allegations of anticompetitive scheme in ¶¶ 3, 31, 35, 42 and 43 all rest exclusively on facts and conduct underlying claims released in 2011; the allegations of market power and impacts in ¶¶ 2, 5, 9, 24-25, and 27-30 also depend in substantial part on facts and conduct underlying released claims; the allegations of improper contracting practices, ¶¶ 7-8, 33-36, 38, 40-44, 46; and even the allegations that NAM acted in "bad faith" in enforcing its contractual rights and thereby caused Insignia not to acquire new business, ¶¶ 51-56, all depend on the pre-2011 "acknowledgments" of an anticompetitive scheme.

The proper remedy for a breach of contract that impacts virtually every substantive allegation of a lawsuit is dismissal of the complaint that embodied the breach, without prejudice to Insignia's ability to re-plead consistent with Rule 11. *See Lansing*, 2016 WL 3390400*; Laser Aiming System Corp.*, 2016 WL 912181; *see also Metro. Sports Facilities Comm'n v. Minnesota Twins P'ship*, 638 N.W.2d 214, 227 (Minn. Ct. App. 2002) (specific performance ordered where contract damages are not "readily

measurable"). Where, as here, the Complaint embodies the breach and its pendency will continue to impose damage, dismissal is the most appropriate remedy.

The Court should also order Insignia to reimburse Defendants for the fees they have already incurred in enforcing Paragraph 9 of the Settlement Agreement. When a plaintiff violates a covenant not to sue, an award of the costs to enforce the covenant is appropriate to offset some of the past damage caused by the breach. *See 3M Innovative Properties Co. v. Barton Nelson, Inc.*, 2004 WL 1278672 (D. Minn. June 6, 2004) (concluding that "American Rule" did not apply because "attorneys' fees and costs were the actual measure of damages"); *3M Innovative Properties, Co. v. Barton Nelson, Inc.*, 2005 WL 679073 (D. Minn. Mar. 22, 2005) (same). Insignia carried out this breach in filing the Complaint, and did everything it could to avoid enforcement of the covenant not to sue for a year. It should now pay the Defendants' costs incurred in enforcing the Settlement Agreement.

## CONCLUSION

The Court should grant Defendant's Motion for Summary Judgment on the Counterclaim, and dismiss the Complaint.

Dated: July 10, 2020

s/ Todd Wind
Todd Wind (#0196514)
Nicole M. Moen (#0329435)
Timothy M. O'Shea (#0386437)
Rachel L. Dougherty (#0399947)
**FREDRIKSON & BYRON, P.A.**
200 South Sixth Street, Suite 4000
Minneapolis, MN 55402-1425
Telephone: 612.492.7000
Facsimile: 612.492.7077
twind@fredlaw.com

33

nmoen@fredlaw.com
toshea@fredlaw.com
rdougherty@fredlaw.com

William B. Michael (admitted *pro hac vice*)
NY Bar No. 4296356
**PAUL WEISS RIFKIND WHARTON &
GARRISON**
1285 Avenue of the Americas
New York, NY 10019-6064
Tel:   212.373.3648
Fax:  212.492.0648
wmichael@paulweiss.com

Kenneth A. Gallo (admitted *pro hac vice*)
NY Bar No. 430369
Jane B. O'Brien (admitted *pro hac vice*)
NY Bar No. 4484457
Jeannie S. Rhee (admitted *pro hac vice*)
District of Columbia Bar No. 464127
**PAUL WEISS RIFKIND WHARTON &
GARRISON**
2001 K Street, NW
Washington, DC 20006-1047
Tel:   202.223.7356
Fax:  202.204.7356
kgallo@paulweiss.com
jobrien@paulweiss.com
jrhee@paulweiss.com

Gerson A. Zweifach (admitted *pro hac vice*)
District of Columbia Bar No. 349266
Kimberly Broecker (pending *pro hac vice*)
MD Bar No. 1712130260
**WILLIAMS & CONNOLLY LLP**
725 Twelfth Street, N.W.
Washington, DC 20005
Tel:   202.434.5000
Fax:  202.434.5029
gzweifach@wc.com
kbroecker@wc.com

***Attorneys for Defendants***

EXHIBIT 23

# EXHIBIT 10

CONFIDENTIAL - ATTORNEYS' EYES ONLY UNDER PROTECTIVE ORDER

Page 1

```
 1
 2              UNITED STATES DISTRICT COURT
 3              EASTERN DISTRICT OF MICHIGAN
 4
     -------------------------------
 5   VALASSIS COMMUNICATIONS, INC., )Case No.
                                    )
 6             Plaintiff,          )2:13-cv-14654
                                    )
 7          v.                      )
                                    )
 8   NEWS CORPORATION, et al.,      )
                                    )
 9             Defendants.  )
     -------------------------------
10
             * C O N F I D E N T I A L *
11
        * A T T O R N E Y S'  E Y E S  O N L Y *
12
       * U N D E R  P R O T E C T I V E  O R D E R *
13
14              VIDEOTAPED DEPOSITION
15                      OF
16                 TOM DITTRICH
17              New York, New York
18              Friday, April 14, 2017
19
20
21
22
23
24   Reported by:
     ANNETTE ARLEQUIN, CCR, RPR, CRR, CLR
25   JOB NO. 121918
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY UNDER PROTECTIVE ORDER

Page 6

1    Dittrich - Confidential - Protective Order

2       Weiss, Rifkind, Wharton & Garrison for the

3       witness.

4          MR. LEVY:  Vincent Levy of Holwell

5       Shuster & Goldberg for the plaintiff.        09:02AM

6          MS. GIUDICE:  Lauren Giudice from

7       Holwell Shuster & Goldberg for the

8       plaintiff as well.

9          THE VIDEOGRAPHER:  Will the court

10      reporter please swear in the witness.        09:02AM

11            *         *         *

12   T H O M A S   D E T T R I C H,  called as a

13      witness, having been duly sworn by a

14      Notary Public, was examined and testified

15      as follows:                                  09:03AM

16   EXAMINATION BY

17   MR. LEVY:

18      Q.    Good morning.

19      A.    Good morning.

20      Q.    Could you please state your name for   09:03AM

21   the record.

22      A.    Thomas Dittrich.

23      Q.    I've placed in front of you

24   Exhibit 1.

25          Do you recognize the document?           09:03AM

CONFIDENTIAL - ATTORNEYS' EYES ONLY UNDER PROTECTIVE ORDER

Page 8

1    Dittrich - Confidential - Protective Order

2    questions, I'll try to let you finish your

3    answers.  If I step over an answer, please let

4    me know.

5         A.    Very good.                              09:04AM

6         Q.    If you don't understand a question,

7    feel free to ask for clarification.

8              If your lawyers object, I'm sure

9    they've told you, but you should answer the

10   question anyway unless you're told not to.        09:04AM

11             All that is clear?

12        A.    Understood, yeah.

13        Q.    Could you please let me know what

14   your current responsibilities are at News?

15        A.    I'm the senior vice president of       09:04AM

16   merchandising.

17        Q.    What does that entail?

18        A.    That entails doing a variety of

19   products and services for both package good

20   companies and retailers.                          09:04AM

21        Q.    And by package good companies, what

22   do you mean?

23        A.    Procter & Gamble, General Mills, all

24   the major companies that are involved in product

25   distribution.                                     09:05AM

CONFIDENTIAL - ATTORNEYS' EYES ONLY UNDER PROTECTIVE ORDER

Page 9

1      Dittrich - Confidential - Protective Order

2          Q.    And retailers, could you tell me what

3      you mean by that?

4          A.    Food, drug and mass retailers across

5      the country; Kroger, Walgreens, Kmart.              09:05AM

6          Q.    You said in your two answers ago that

7      merchandising entailed doing a variety of

8      products and services.

9              Could you give me examples of the

10     products and services you were referencing?        09:05AM

11             MR. WEBBER:  Objection.

12         A.    Sure.

13             We do a number of things.

14     Instant-redeemable coupons or the coupons that

15     are stickers you put on products, putting up        09:05AM

16     displays, filling displays, putting advertising

17     materials on displays, doing audit work, whether

18     products are in the stores or not.  So a variety

19     of things in retail stores.

20         Q.    Approximately how long have you been      09:05AM

21     working for NAM or its predecessors?

22         A.    I've been working there for 30 years

23     in June.

24         Q.    Were you always in merchandising?

25         A.    No.  I've had a variety of jobs.          09:06AM

CONFIDENTIAL - ATTORNEYS' EYES ONLY UNDER PROTECTIVE ORDER

Page 10

1    Dittrich - Confidential - Protective Order

2       Q.    Approximately when did you move over

3    to merchandising?

4       A.    I think it was the spring of 2010.

5       Q.    Okay.  I think there would be some          09:06AM

6    documents that can clarify, but we'll get to

7    those.

8            What were you doing before you

9    switched into merchandising?

10       A.    I was in trade marketing or what we        09:06AM

11    know as shopper marketing.

12       Q.    And what did that entail?

13       A.    I negotiated the retail deals for a

14    section of the country for News America.  And I

15    also called on the package good community that     09:06AM

16    marketed to those retailers.

17       Q.    Which section of the country were you

18    responsible for around the time that you

19    switched over to merchandising?

20            MR. WEBBER:  Objection.                     09:06AM

21    BY MR. LEVY:

22       Q.    Go ahead.

23       A.    Which sections was I responsible for

24    before I was in merchandising?

25       Q.    Right before you moved into              09:07AM

CONFIDENTIAL - ATTORNEYS' EYES ONLY UNDER PROTECTIVE ORDER

Page 11

1     Dittrich - Confidential - Protective Order

2   merchandising.

3       A.    The central part of the country.

4       Q.    Was that -- were you responsible --

5   when did you -- strike that.                              09:07AM

6            When did you get responsibility for

7   that section of the country?

8            MR. WEBBER:  Objection.

9       A.    I have to think in terms of how old

10  my kids were, is the best way to determine it.      09:07AM

11  It was I think around 2008 or '9, in there.

12      Q.    And before that, did you have

13  responsibility for negotiating agreements with

14  retailers?

15           MR. WEBBER:  Objection.                     09:07AM

16      A.    Before that job, no.

17      Q.    Okay.  What were you responsible for

18  before that job?

19           MR. WEBBER:  Objection.

20      A.    Before I was in shopper marketing, I      09:07AM

21  was a regional in core sales.

22      Q.    And when did you switch over

23  approximately from core sales to shopper

24  marketing?

25      A.    It was 2008 or '9.  I'm not quite         09:08AM

CONFIDENTIAL - ATTORNEYS' EYES ONLY UNDER PROTECTIVE ORDER

Page 12

1    Dittrich - Confidential - Protective Order

2   sure.

3        Q.    How long had you been in core sales

4   when you switched over, approximately?

5        A.    I had been in core sales since          09:08AM

6   probably since 1997 or '96.

7        Q.    I'm going to show you a document

8   we'll mark as Exhibit 2.  It was marked I think

9   at your prior deposition.

10            (Plaintiff's Dittrich Exhibit 2, NAM      09:08AM

11       document entitled "News America Marketing

12       and Energizer - Schick Partnership Proposal

13       Fiscal 2005/2007," Bates stamped

14       NAM-VAL2-002070000 through 0026, marked for

15       identification, as of this date.)             09:08AM

16   BY MR. LEVY:

17       Q.    You can look at -- as with all these

18   documents, you should feel free to look at any

19   section you wish.  I just have a couple of

20   questions, and I'll direct you to the relevant   09:08AM

21   parts.

22            The document on its face says it's

23   from 2003.

24            Do you see that on the first page?

25       A.    Yes.                                    09:09AM

CONFIDENTIAL - ATTORNEYS' EYES ONLY UNDER PROTECTIVE ORDER

Page 68

1      Dittrich - Confidential - Protective Order

2    reference to a meeting?

3         A.    Yeah.

4         Q.    Okay.  Nancy Perkins writes an email

5    to Dominic Hansa and to yourself, cc'd Patrick          10:33AM

6    Kroc and Marty Garofalo, saying, "Hi, guys,

7    Marty wants to make sure we acknowledge that

8    we're aware we need to stagger our SUPERVALU

9    independent deals and that we're adjusting the

10   terms accordingly."                                     10:34AM

11             Do you see that?

12        A.    Yes.

13        Q.    Do you have any recollection of this?

14        A.    Not particular.

15        Q.    Do you have a general recollection of    10:34AM

16   it?

17             MR. WEBBER:  Objection.

18        A.    It was one of thousands of emails,

19   yeah.  No, nothing specific.

20        Q.    Do you have any recollection of         10:34AM

21   discussing staggering deals?

22             MR. WEBBER:  Objection.

23        A.    No, not specifics.

24        Q.    Any general recollection?

25             MR. WEBBER:  Objection.                  10:34AM

CONFIDENTIAL - ATTORNEYS' EYES ONLY UNDER PROTECTIVE ORDER

Page 69

1    Dittrich - Confidential - Protective Order

2       A.    No.  Our deals were naturally

3    staggered.

4       Q.    Well, here it says, "We're adjusting

5    the terms accordingly."                    10:34AM

6          Do you see that?

7       A.    Yes.

8       Q.    Would you characterize it as

9    naturally staggered?

10      A.    No.                               10:34AM

11          MR. WEBBER:  I'm sorry, can I just

12      get an objection there.

13          Go ahead.  Sorry.

14      A.    The deals we engaged with were

15   dictated by our clients, their fiscal years and   10:35AM

16   their terms.  So you'd negotiate deals and they

17   would start and conclude when retailers wanted

18   to run their programs.  So all of those were

19   different timing, different terms.  Staggering

20   was, to me, something that just happened       10:35AM

21   naturally.

22      Q.    Marty is Marty Garofalo?

23      A.    Yes.

24          Garofalo.

25      Q.    I'm sorry.                        10:35AM

CONFIDENTIAL - ATTORNEYS' EYES ONLY UNDER PROTECTIVE ORDER

Page 70

1      Dittrich - Confidential - Protective Order

2          A.    Well, he's my boss.  I felt I had to

3      add that.

4          Q.    We'll let him know.

5          A.    Thank you.                          10:35AM

6          Q.    Do you have an understanding of why

7      Marty wanted to make sure that you acknowledged

8      the need to stagger the independent deals?

9              MR. WEBBER:  Objection.

10         A.    No, not specifically.               10:35AM

11         Q.    Generally?

12         A.    Generally in the job you had in

13     retail, one was doing the deals with the

14     retailers and then secondarily going and selling

15     to all the constituencies around them.        10:35AM

16             Doing the deals was the most time

17     consuming, least favorable part of my job.  So

18     staggering just meant that you didn't -- you

19     could focus on the entire job.  You were never

20     having to do everything at once.              10:36AM

21         Q.    But this was something that Marty

22     wanted, not something that the SUPERVALU

23     independents wanted, right?

24             MR. WEBBER:  Objection.

25         A.    Yeah.  It was never a topic with the  10:36AM

CONFIDENTIAL - ATTORNEYS' EYES ONLY UNDER PROTECTIVE ORDER

Page 71

Dittrich - Confidential - Protective Order

1      independents.  The independents would run when

2      they wanted their independence.  So there was...

3          Q.    Do you know why this was urgent?  The

4      subject line is "Urgent."                          10:36AM

5              MR. WEBBER:  Objection.

6          A.    No.

7          Q.    Okay.  In a prior answer you said

8      that the job in retail, one was doing deals with

9      the retailers and then secondarily going and        10:36AM

10     selling to all the constituents around them.  I

11     don't mean to characterize your testimony.  I

12     just want to know who the constituents are that

13     you referenced in your prior answer.

14         A.    Oh.  Every packaged good company has       10:37AM

15     marketers both at their headquarters and then

16     around retailers.  So in the trade job, you

17     would focus on the retail deals and then selling

18     products to the packaged good community around

19     those retailers.                                     10:37AM

20         Q.    Okay.  So the constituents were

21     employees at NAM or people outside of NAM?

22         A.    In the context of what --

23         Q.    Your prior answer.

24         A.    My prior answer, the constituencies        10:37AM

EXHIBIT 24

# EXHIBIT 9

**Submitted with Redactions Approved by Dkt. 267**

Page 1

1

2                    ** ATTORNEYS' EYES ONLY **

3    UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF MICHIGAN
4    - - - - - - - - - - - - - - - - - - - -x
     VALASSIS COMMUNICATIONS, INC.,
5
                      Plaintiff,                    Case No.
6                                                  2:13-cv-14654
             vs.
7
     NEWS CORPORATION, et al.,
8
                      Defendants.
9    - - - - - - - - - - - - - - - - - - - -x

10

11        VIDEOTAPED DEPOSITION OF JUNE CAMPBELL

12

13                    New York, New York

14                   Friday, June 2, 2017

15

16

17

18

19

20

21

22

23

24   Reported by: JEFFREY BENZ, CRR, RMR

25   Job No: 124509

Page 8

```
 1            Campbell - Attorneys' Eyes Only
 2              THE VIDEOGRAPHER:  The time is        09:12
 3      9:13 a.m.  We're off the record.             09:12
 4          (Discussion off the record.)             09:13
 5              THE VIDEOGRAPHER:  The time is        09:13
 6      9:14 a.m.  We are on the record.             09:13
 7      Q.    Okay.  Ms. Campbell, have you gone by   09:13
 8  a different name previously?                      09:13
 9      A.    Yes.  Campbell is my married name.      09:13
10      Q.    And what was your prior name?           09:13
11      A.    Grieco.                                 09:13
12      Q.    Who is your employer?                   09:13
13      A.    News America Marketing.                 09:13
14      Q.    To back up, when did you change your    09:13
15  name?                                             09:13
16      A.    I was married in 2008.                  09:13
17      Q.    So you said News America Marketing is   09:13
18  your employer?                                    09:13
19      A.    That's my employer.                     09:14
20      Q.    For how long have you worked at News    09:14
21  America Marketing?                                09:14
22      A.    18 years, coming up to 19 in           09:14
23  September.                                        09:14
24      Q.    Congratulations.  What is your current  09:14
25  position?                                         09:14
```

Page 9

1          Campbell - Attorneys' Eyes Only

2      A.   Vice president of finance.              09:14

3      Q.   For how long have you held that        09:14

4  position?                                        09:14

5      A.   Probably nine years, if I had to       09:14

6  guess.  Around nine years.                       09:14

7      Q.   So you started in approximately -- you 09:14

8  were -- you were awarded that position in        09:14

9  approximately 2008?                              09:14

10     A.   2008.  I'm trying to -- it was right    09:14

11 around when I got married.  So it was right      09:14

12 around that time, yes.                           09:14

13     Q.   And what was your position before       09:14

14 that?                                            09:14

15     A.   Director of finance.                    09:14

16     Q.   And how did your responsibilities       09:14

17 change?                                          09:14

18     A.   I -- I don't recall specifically.  I    09:14

19 think they didn't change materially.  It was     09:14

20 more of a title adjustment.                      09:14

21     Q.   From 2009 to the present, who have you  09:14

22 reported to?  And if it's been different people, 09:14

23 could you let me know at what periods you         09:14

24 reported to different people?                     09:14

25     A.   Sure.  2009, I believe I reported       09:15

Page 10

1              Campbell - Attorneys' Eyes Only

2     to -- sorry, trying to remember.                    09:15

3              But I believe I reported to Joe            09:15

4     Ruchalski because I do recall that he was the       09:15

5     one that promoted me or recommended my              09:15

6     promotion.  So Joe Ruchalski.                       09:15

7        Q.    What is Joe Ruchalski's position?          09:15

8        A.    He at the time was vice president of       09:15

9     finance.                                            09:15

10       Q.    And so you assumed his role?               09:15

11       A.    No, not necessarily.                       09:15

12             No, I didn't.  I continued to report       09:15

13    to him.                                             09:15

14       Q.    Is he still employed at News America?      09:15

15       A.    He is not.                                 09:15

16       Q.    When did he depart?                        09:15

17       A.    Seven years ago, eight years ago, a        09:15

18    while ago.                                          09:15

19       Q.    And then after him, who did you report     09:15

20    to?                                                 09:15

21       A.    I think for a short time I was             09:15

22    reporting to Wayne Campanelli.  And then after      09:15

23    Wayne, I think it was directly to John Linguiti.    09:15

24    For a period it was -- I reported to John           09:16

25    Linguiti, and then after that Chris Blanco.  And    09:16

Page 11

1              Campbell - Attorneys' Eyes Only

2    today I report to Ajay Singh.                        09:16

3              Hoping that I didn't forget anybody.       09:16

4    In there.  Excuse me.  It's been a long time.        09:16

5        Q.    No problem.  Did your responsibilities     09:16

6    change when you -- when the reporting structure      09:16

7    changed?                                             09:16

8        A.    My responsibilities did change over        09:16

9    the course of my 18 years at News America            09:16

10   certainly, but the reporting responsibilities        09:16

11   not necessarily are correlated to the                09:16

12   responsibility changes.                              09:16

13       Q.    And so what are your job                    09:16

14   responsibilities as vice president of finance        09:16

15   planning and analysis?                               09:16

16       A.    Sure, yes, FP&A.  So I'm in charge of      09:16

17   budgeting, forecasting, month-end actuals,           09:16

18   financial analysis, new product profitability        09:16

19   analysis, for example, a number of various           09:16

20   financial analysis.                                  09:17

21              And I support -- having said that, I      09:17

22   support the in-store business for U.S. and           09:17

23   Canada, merchandising for U.S. and Canada, our       09:17

24   smart source direct business for U.S. and            09:17

25   Canada, our digital business for U.S. and            09:17

Page 12

1              Campbell - Attorneys' Eyes Only

2    Canada, and our -- our newly acquired business,      09:17

3    Checkout 51, which is about almost two years old      09:17

4    now.                                                  09:17

5         Q.    You said Checkout 51?                      09:17

6         A.    Checkout 51, yes.                          09:17

7         Q.    When you say you support the in-store      09:17

8    business, what does that mean?                        09:17

9         A.    What does that mean?  I'm responsible      09:17

10   for the budgeting and forecasting, as well as         09:17

11   the month-end actuals related to that business,       09:17

12   any ad hoc financial analysis that may come           09:17

13   about, new product introductions.                     09:18

14        Q.    When you say you're responsible for        09:18

15   budgeting, what does that entail?                      09:18

16        A.    That entails -- the process -- are you     09:18

17   asking what the process is?                            09:18

18              It's an annual process for our fiscal      09:18

19   year, so we meet with all of the business             09:18

20   leaders that support the business.                     09:18

21              So my primary responsibility, because      09:18

22   it's in-store, is to work with our -- we have a       09:18

23   trade department, as well as a core sales             09:18

24   department.  We have two different sales               09:18

25   departments, so to work with them.                     09:18

 1             Campbell - Attorneys' Eyes Only

 2             I'm mainly responsible for the P&L.  I      09:18

 3    should also mention this.  Through contribution      09:18

 4    margin or operating profit, not all the way down     09:18

 5    to EBITDA, which would include overheads, for         09:18

 6    example.  I would not -- I'm not responsible for      09:18

 7    the overheads related to any of those                09:18

 8    businesses, for the most part.                       09:18

 9         Q.   So you said you're responsible for         09:19

10    P&Ls through contribution margin and what?           09:19

11         A.   Operating profit.  Operating profit,       09:19

12    yeah.  But that would exclude, for the most          09:19

13    part, overhead expenses.                             09:19

14         Q.   And what is contribution margin?           09:19

15         A.   Contribution margin -- there's a           09:19

16    variable contribution.  There's a few different      09:19

17    terminologies for contribution margin, but           09:19

18    generally it's revenue, less your direct             09:19

19    expenses.                                            09:19

20         Q.   And why is that important?                 09:19

21             MR. WEBBER:  Objection.                     09:19

22             Go ahead.  You can answer.                  09:19

23         A.   Why is that important?  It's important     09:19

24    to understand the profitability of the business,     09:19

25    yeah.                                                09:19

Page 26

1              Campbell - Attorneys' Eyes Only

2        A.    I'm responsible for creating pro         09:32
3    formas for the retailers, yeah.                    09:32
4        Q.    And what is pro forma?                   09:32
5        A.    A pro forma is an estimate of a --       09:32
6    it's generally on an annual basis, and it's a      09:32
7    picture of what we think the retailers'            09:32
8    contribution to revenue and expense would be for   09:32
9    News America Marketing.                            09:32
10            So it's a pro forma.  It's based on as    09:32
11   much -- as much of the actuals that we have at     09:32
12   that point.  So it is a pro forma, and it does     09:32
13   have some assumptions in it, but it's based on     09:32
14   our actuals, for the most part.                    09:32
15       Q.    What sort of assumptions are included    09:32
16   in the pro forma?                                  09:32
17       A.    Well, on a retailer basis, we don't      09:33
18   know -- we don't have retailer P&Ls.  We don't     09:33
19   have a system that's going to put out a retailer   09:33
20   P&L.                                               09:33
21            So when we're analyzing, and we're        09:33
22   going forward into our retail contract             09:33
23   negotiation, we really want to have a good idea    09:33
24   of what this retailer -- what this means to us,    09:33
25   how profitable they are, how much revenue          09:33

CASE 0:19-cv-01820-MJD-BRT Document 243-1 Filed 09/08/20 Page 207 of 268
Case 1:17-cv-07378-PKC Document 274-15 Filed 09/28/20 Page 100 of 15

Page 27

1              Campbell - Attorneys' Eyes Only

2      they're bringing to the organization.              09:33

3              Our P&Ls, our month-end, our              09:33

4      reforecasts and all of the information that I      09:33

5      provided to you already that we look at is        09:33

6      generally based on product lines.                 09:33

7              So when we sell, we sell to a CPG         09:33

8      company, and we'll sell them a shelf talk, and    09:33

9      they'll take pick a whole stream of retailers     09:33

10     that they want to go into.  And that's generally  09:33

11     how we look at the business.  Our systems         09:33

12     support that.  We don't have systems that         09:33

13     support a retailer P&L.                           09:33

14             So I say assumption.  We do our very      09:33

15     best to put together the best review of what      09:34

16     that retailer would be.                           09:34

17             And so we start with actual volume        09:34

18     that we know has been placed in those stores.     09:34

19     And from there we make assumptions for revenue    09:34

20     and costs.  We attribute revenue and costs to     09:34

21     that volume.                                      09:34

22         Q.   What information do you use to           09:34

23     determine the revenue?                            09:34

24         A.   What information?                         09:34

25             MR. WEBBER:  Objection.                   09:34

Page 178

```
 1              Campbell - Attorneys' Eyes Only
 2         record, is NAM-VAL14-009422657.              13:58
 3         Q.   Take a look at this document, and let   13:58
 4    me know when you've had a chance to review it.    13:58
 5              (Witness reviewing document.)           13:58
 6         A.   Okay.                                   13:59
 7         Q.   All right.  And for the record, this    13:59
 8    is a March 28, 2011, e-mail from June Campbell    13:59
 9    to Marty Garofalo, copying Wayne Campanelli,      13:59
10    Subject:  K-Mart.                                 13:59
11              Is this an e-mail that you sent in the  13:59
12    ordinary course of your business at NAM?          13:59
13         A.   Yes.                                    13:59
14         Q.   And there's an attachment called        13:59
15    book1.xlsx.                                       13:59
16              Do you see that?                        13:59
17         A.   Uh-huh.                                 13:59
18         Q.   If we look at that, it's another        13:59
19    K-Mart pro forma.  Looks like it was updated      13:59
20    March 28, 2011.                                   13:59
21         A.   Yes.                                    13:59
22         Q.   And the March 28, 2011, proposal says,  13:59
23    ██████████████████████████████                    13:59
24              Do you see that?                        13:59
25         A.   Yes, I do.                              13:59
```

Page 179

1          Campbell - Attorneys' Eyes Only

2      Q.   Do you recall getting asked to run a      13:59

3  pro forma for a higher guarantee?                   13:59

4      A.   I don't recall.                            13:59

5      Q.   If you'll just briefly walk me through     14:00

6  the -- the pro forma you had done -- actually,      14:00

7  if you go down to the -- to Row 20 where it         14:00

8  says, "Expiration date of proposal, 1/3/2010,"      14:00

9  is that just not updated from the prior?            14:00

10     A.   These are all very manual, I think,        14:00

11 and you will probably the notice of the date of     14:00

12 the next meeting hasn't changed.  It's still        14:00

13 November.  There's a lot of -- yeah, this is a      14:00

14 very manual document.  It's not a live document,    14:00

15 unfortunately.  It requires a lot of manual         14:00

16 input.                                              14:00

17     Q.   Okay.  There's an additional column in     14:00

18 this version compared to the last one where it's    14:00

19 Column C here.                                      14:00

20     A.   Yes.                                       14:00

21     Q.   With the -- the new proposal to            14:00

22 increase the per-store guarantee to ███ per         14:00

23 store with one -- PL carts of 1 per cycle.          14:00

24          Do you see that?                           14:00

25     A.   Uh-huh.                                    14:01

Page 180

1              Campbell - Attorneys' Eyes Only
2         Q.   So it's a per-store guarantee of ▇▇▇      14:01
3    and one private-label cart every cycle?  That's     14:01
4    13 private-label carts for the year.                14:01
5              MR. WEBBER:  Objection.                    14:01
6         A.   That would mean 13 -- 13 for the year,    14:01
7    one per store per cycle is what that would mean.    14:01
8         Q.   And where is the private label           14:01
9    accounted for in the pro forma?                     14:01
10        A.   Well, this is a summary, so you're not    14:01
11   going to see it.  It's in the contribution          14:01
12   margin.                                              14:01
13        Q.   Where in the contribution margin?        14:01
14        A.   You're not going to see it.  It's just   14:01
15   sitting -- it's a cost.  It's between the           14:01
16   revenue and the contribution margin or cost.  So   14:01
17   it's embedded in there.                             14:01
18        Q.   So it would be reflected in another      14:01
19   document that is --                                 14:01
20        A.   That's pulled into here.                 14:01
21        Q.   Got it.                                   14:01
22             And then the check at the bottom?        14:01
23        A.   Yeah.                                     14:02
24        Q.   Can you just explain what analysis       14:02
25   you're doing there?                                 14:02

Page 181

1            Campbell - Attorneys' Eyes Only

2       A.   No, it's not.  It's not an analysis.    14:02

3    It's just not updated.  It's not utilized.      14:02

4       Q.   What do you mean by "It's not           14:02

5    utilized"?                                      14:02

6       A.   The checks are meant to make sure that  14:02

7    the data is calculating and footing accurately, 14:02

8    but it needs to be manually updated.  These     14:02

9    formulas need to be changed, and the formula    14:02

10   wasn't changed.                                 14:02

11      Q.   Okay.                                    14:02

12      A.   That's what that means to me.           14:02

13      Q.   Okay.  And then here in Row 95 it       14:02

14   says, "Financial highlights."                   14:02

15            And the below in 96 there's the        14:02

16   revenue, and here it's listed as ███████?       14:02

17      A.   Yes.                                     14:02

18      Q.   And where would the revenue figure      14:02

19   come from?                                      14:02

20      A.   So those are the actual placements.     14:02

21   So this is feeding off of the latest estimate   14:02

22   column.                                         14:02

23            So there were no -- there was no       14:02

24   change in assumptions on revenue.  It would have 14:03

25   been the actual placements at our revenue rate. 14:03

1          Campbell - Attorneys' Eyes Only

2     Q.   And do ...                              14:03

3          And why were there no changes in the   14:03

4    assumptions here?                             14:03

5     A.   We typically don't change the          14:03

6    assumptions.  We start with the latest estimate,  14:03

7    which is our kind of kick-off point, if you   14:03

8    will, for the P&L.  And then we layer on the  14:03

9    changes that the FIR is proposing or the      14:03

10   salesperson is proposing.  But we wouldn't go 14:03

11   back and change the assumptions, the initial  14:03

12   latest estimate.  The business was the        14:03

13   essentially the same.                         14:04

14   Q.   Thank you.                               14:04

15        You can put that one aside.              14:04

16        MR. WEBBER:  Lauren, could we take a     14:04

17   very quick break?                             14:04

18        MS. GIUDICE:  Definitely.                14:04

19        MR. WEBBER:  Thank you.                  14:04

20        MS. GIUDICE:  Go off the record.         14:04

21        THE VIDEOGRAPHER:  The time is           14:04

22   2:04 p.m.  We're off the record.              14:04

23        (Recess from 2:04 to 2:16.)              14:04

24        THE VIDEOGRAPHER:  The time is           14:15

25   2:16 p.m.  We are on the record.              14:15

EXHIBIT 25

# EXHIBIT 15

**Submitted with Redactions Approved by Dkt. 267**

CONFIDENTIAL - ATTORNEYS' EYES ONLY
UNDER PROTECTIVE ORDER

Page 1

1                    C. Mixson

2              UNITED STATES DISTRICT COURT

3              EASTERN DISTRICT OF MICHIGAN

   --------------------------------------------------------x

4    VALASSIS COMMUNICATIONS, INC.,

5              Plaintiff,          Case No.

                                   2:13-cv-14654

6         vs.

7    NEWS CORPORATION, et al.,

8              Defendants.

   --------------------------------------------------------x

9

10

11           CONFIDENTIAL - ATTORNEYS' EYES ONLY

12              UNDER PROTECTIVE ORDER

13

14

15           CONFIDENTIAL VIDEOTAPED DEPOSITION OF

16                 CHRISTOPHER MIXSON

17                New York, New York

18                  May 10, 2017

19

20

21

22

23   Reported by:

24   THOMAS A. FERNICOLA, RPR

25   JOB NO. 124065

CONFIDENTIAL - ATTORNEYS' EYES ONLY
UNDER PROTECTIVE ORDER

Page 5

```
 1                    C. Mixson

 2     CHRISTOPHER MIXSON,

 3     called as a witness, having been duly sworn by a

 4     Notary Public, was examined and testified as follows:

 5     BY THE REPORTER:                                        09:01:55

 6          Q     Please state your full name and             09:01:55

 7       address for the record.                              09:01:55

 8          A     My name is Christopher Mixson.  I           09:02:08

 9       live at ███████████████████████                      09:02:10

10       ██████   ██████                                      09:02:13

11     BY MR. LEVY:                                           09:02:14

12          Q     Good morning.                               09:02:18

13          A     Good morning.                               09:02:18

14          Q     You've been deposed before; correct?        09:02:21

15          A     I have.                                     09:02:22

16              (Plaintiff's Exhibit 1, Transcript            09:44:59

17       with beginning Bates NAM-VAL2-007646254,             09:44:59

18       was marked for identification.)                      09:44:59

19              (Plaintiff's Exhibit 2, Transcript            09:44:59

20       of Christopher Mixson dated August 28,               09:44:59

21       2008, was marked for identification.)                09:44:59

22              (Plaintiff's Exhibit 3, Transcript            09:44:59

23       of Christopher Mixson dated November 5,              09:44:59

24       2008, was marked for identification.)                09:44:59

25          Q     And I've put in front of you three
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY
UNDER PROTECTIVE ORDER

Page 9

1           C. Mixson

2      Q     You're not employed by NAM today; is          09:05:12

3  that right?                                             09:05:14

4      A     I'm not employed by News America             09:05:15

5  Marketing, no.                                          09:05:16

6      Q     You left News America Marketing in           09:05:18

7  2013; is that right?                                    09:05:20

8      A     Yes.                                          09:05:21

9      Q     Do you currently have any contracts          09:05:22

10  with News America concerning your cooperation           09:05:24

11  in any litigation?                                      09:05:28

12      A     Yes.                                          09:05:30

13      Q     What are the terms of any such               09:05:32

14  contracts?                                              09:05:35

15          MR. MICHAEL:  Objection to form.               09:05:37

16          THE WITNESS:  Answer the question?             09:05:40

17          MR. MICHAEL:  To the extent you                09:05:42

18      know.                                               09:05:42

19      A     I resigned from News America in              09:05:45

20  2013, and the company put together a                    09:05:48

21  separation agreement, and it was set up as a            09:05:52

22  consultant agreement that included providing            09:05:56

23  consulting services on-demand, really, and a            09:06:00

24  willingness to represent the company in any             09:06:05

25  legal action that may be taken.

CASE 0:19-cv-01820-MJD-BRT   Document 243-1   Filed 09/08/20   Page 218 of 268
Case 1:17-cv-08373-JPC   Document 12-21   Filed 09/22/19   Page 3 of 13

Page 10

CONFIDENTIAL - ATTORNEYS' EYES ONLY
UNDER PROTECTIVE ORDER

1          C. Mixson

2          It included a noncompete with                    09:06:11

3     specific, you know, specific companies that --        09:06:16

4     frankly, it was kind of a broad range of              09:06:20

5     companies, but kind of the typical thing.             09:06:26

6          Q     How long does that arrangement go          09:06:29

7     for?                                                   09:06:31

8          A     I'm not sure of the specific date          09:06:32

9     that it ends, but it's coming up pretty               09:06:34

10    quickly.  It terminates in June.                      09:06:38

11         Q     Of this year?                              09:06:39

12         A     Yes.                                        09:06:40

13         Q     Are you receiving any form of              09:06:40

14    compensation under that agreement?                    09:06:43

15         A     Yes.  I have a compensation that           09:06:45

16    comes in to me on a monthly basis as part of          09:06:49

17    that long-term consulting agreement.                  09:06:51

18         Q     Is that every month whether you do         09:06:55

19    work or not?                                           09:06:57

20         A     Yes.                                        09:06:58

21         Q     Other than participating in the            09:07:00

22    deposition today and in the deposition in             09:07:00

23    Dial, have you done any sort of consulting or         09:07:04

24    any other work for News America Marketing             09:07:07

25    since you left in 2013?

CONFIDENTIAL - ATTORNEYS' EYES ONLY
UNDER PROTECTIVE ORDER

Page 11

| | | |
|---|---|---|
| 1 | C. Mixson | |
| 2 | MR. MICHAEL:  Objection to form. | 09:07:12 |
| 3 | A    No. | 09:07:13 |
| 4 | MR. MICHAEL:  Just give me a minute | 09:07:14 |
| 5 | to object after the question. | 09:07:16 |
| 6 | THE WITNESS:  Okay. | 09:07:18 |
| 7 | Q    How much are you receiving each | 09:07:19 |
| 8 | month from News America Marketing under this | 09:07:21 |
| 9 | agreement? | 09:07:24 |
| 10 | A    I honestly don't know the exact | 09:07:25 |
| 11 | number.  You know, it's somewhere -- they | 09:07:27 |
| 12 | basically took my compensation and halved it | 09:07:34 |
| 13 | as a separation agreement.  So it was probably | 09:07:36 |
| 14 | somewhere in, you know, the $40,000 range on a | 09:07:39 |
| 15 | monthly basis. | 09:07:42 |
| 16 | Q    Has it gone up or down in any way | 09:07:43 |
| 17 | since you left NAM in your monthly payment? | 09:07:46 |
| 18 | A    No. | 09:07:49 |
| 19 | Q    Do you receive any form of | 09:07:53 |
| 20 | contingency agreement with NAM whereby you | 09:07:55 |
| 21 | would receive more money if certain events | 09:07:56 |
| 22 | came to pass? | 09:07:59 |
| 23 | MR. MICHAEL:  Objection to form. | 09:08:00 |
| 24 | A    I don't believe so. | 09:08:01 |
| 25 | Q    Do you have any information that | |

CONFIDENTIAL - ATTORNEYS' EYES ONLY
UNDER PROTECTIVE ORDER

Page 12

```
 1              C. Mixson
 2   your current agreement with NAM would be          09:08:05
 3   renewed after it expires this June?               09:08:08
 4      A    No.                                        09:08:10
 5      Q    What were the circumstances of your       09:08:16
 6   separation?  Did you retire?  Were you asked       09:08:19
 7   to leave?  What caused you to leave News           09:08:21
 8   America Marketing in 2013?                         09:08:24
 9      A    I was looking for a change.  I have        09:08:27
10   the financial wherewithal to do that, very        09:08:31
11   good relationships with the people that I         09:08:35
12   worked for just totally voluntary.  I wanted      09:08:38
13   to go skiing.                                      09:08:43
14      Q    I'm very envious.                          09:08:44
15           Let me ask you this:  You were            09:08:51
16   president of NAM in 2013 when you left; is        09:08:53
17   that right?                                        09:08:56
18      A    Yes.                                       09:08:56
19      Q    And you had been president of NAM         09:08:57
20   since 2003?                                        09:09:00
21      A    Yes, those dates sound about right.       09:09:02
22      Q    During that time frame 2003 to 2013      09:09:05
23   or while you were president, did your             09:09:08
24   responsibilities as president change in any       09:09:10
25   way?
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY
UNDER PROTECTIVE ORDER

Page 13

C. Mixson

1

2    A    That's a hard question to answer          09:09:19

3    because the dynamics of the business changed   09:09:23

4    over that period of time.  But essentially,     09:09:25

5    no, I think the separation of responsibilities  09:09:27

6    at the company remained pretty consistent       09:09:32

7    throughout that time.                           09:09:34

8    Q    What responsibilities did you have         09:09:35

9    as opposed to, say, the CEO of NAM?             09:09:37

10   A    My responsibilities were primarily         09:09:41

11   to manage the -- well, manage the advertiser    09:09:43

12   side of the business.                           09:09:51

13   Q    By advertisers, you mean CPGs?             09:09:55

14   A    Yes.                                        09:10:00

15   Q    What did managing the CPG side of          09:10:01

16   the business entail for you?  Let me try that   09:10:06

17   again.  What were your responsibilities with    09:10:08

18   respect to managing the CPG side of the         09:10:11

19   business?                                        09:10:14

20   A    Well, the head of sales reported          09:10:15

21   directly to me.  We had divisional managers     09:10:18

22   that reported up to the head of sales, and so   09:10:25

23   on, as you can imagine, through a               09:10:27

24   typically-structured sales organization, and I  09:10:31

25   was at the top of that group of people and,

CONFIDENTIAL - ATTORNEYS' EYES ONLY
UNDER PROTECTIVE ORDER

Page 14

1           C. Mixson

2    you know, I managed that.                          09:10:38

3        Q    The head of sales when you left, was      09:10:40

4    that West Naze?                                     09:10:43

5        A    Yes.                                       09:10:45

6        Q    Were you on the executive committee       09:10:46

7    of NAM?                                             09:10:48

8        A    Yes, I was.                                09:10:49

9        Q    Who else was on that body when you        09:10:49

10   left, if you can remember?                          09:10:52

11       A    Oh, my recall may be a little             09:10:57

12   insufficient here, but it was, generally            09:11:00

13   speaking, the primary department heads at News      09:11:02

14   America including West Naze; West Naze's top         09:11:08

15   lieutenants, who were the division managers.         09:11:13

16           There were three of them:  The head         09:11:16

17   of marketing, Jesse Aversano; the head of IT,        09:11:20

18   a gentleman named Bill Christie; the head of         09:11:27

19   the retail side of the business named Marty          09:11:31

20   Garofalo; the head of human resources, Ms.           09:11:35

21   Rita Meyer; the head of finance who was John         09:11:37

22   Linguiti.  I think that covers most of them.         09:11:47

23       Q    Mr. Carlucci was not on the                09:11:54

24   executive committee at the time; is that            09:11:56

25   right?

CONFIDENTIAL - ATTORNEYS' EYES ONLY
UNDER PROTECTIVE ORDER

Page 87

|  | | C. Mixson | |
|---|---|---|---|
| 1 | | | |
| 2 | | Well, you can ask the questions, but | 10:55:15 |
| 3 | | the reality is that, you know, clients operate | 10:55:16 |
| 4 | | on their own calendar. | 10:55:22 |
| 5 | | Generally, there are sometimes that | 10:55:24 |
| 6 | | you can get them to move forward, but that | 10:55:26 |
| 7 | | determination isn't really a News America | 10:55:30 |
| 8 | | determination.  It can be a News America want. | 10:55:31 |
| 9 | | It doesn't necessarily translate into a News | 10:55:35 |
| 10 | | America get. | 10:55:39 |
| 11 | Q | Right.  The CPG may or may not | 10:55:39 |
| 12 | | agree, but if you had it your way, you would | 10:55:41 |
| 13 | | have your ROFRs relating to FSIs with CPGs | 10:55:43 |
| 14 | | expire at different times; correct? | 10:55:49 |
| 15 | A | Yes.  If you had it your way, and | 10:55:51 |
| 16 | | you're a college student, you're not going to | 10:55:53 |
| 17 | | have all your final exams on the same day. | 10:55:55 |
| 18 | Q | Right.  That's all I'm asking. | 10:55:58 |
| 19 | A | It's the same thing, yes. | 10:55:59 |
| 20 | Q | That's all I'm asking. | 10:56:01 |
| 21 | | In the same way while you were | 10:56:02 |
| 22 | | president of NAM, if you had it your way, | 10:56:05 |
| 23 | | NAM's agreements with its retailers would also | 10:56:10 |
| 24 | | be staggered; correct? | 10:56:13 |
| 25 | | MR. MICHAEL:  Objection to form. | |

CONFIDENTIAL - ATTORNEYS' EYES ONLY
UNDER PROTECTIVE ORDER

Page 88

1                    C. Mixson

2    A     Yes, that stands to reason.  Yes.          10:56:15

3    Q     And as to those contracts as well,         10:56:18

4    if you had it your way, they would be longer     10:56:23

5    rather than shorter; correct?                    10:56:26

6          MR. MICHAEL:  Objection to form.           10:56:29

7    Lack of foundation.  Vague.                      10:56:29

8    A     Yes, I think so.  You know, I didn't       10:56:36

9    run the retail side of the business, and I'm     10:56:38

10   sure there's lots of nuances there that would    10:56:40

11   escape me.                                       10:56:43

12         But generally speaking on both sides       10:56:45

13   of the business in many cases, frankly, what     10:56:48

14   we found happening was that -- you know, and     10:56:51

15   again, not being the retail expert, but this     10:56:57

16   would be in my opinion -- that what happened     10:57:00

17   during, you know, my 30-plus years in business   10:57:03

18   was rampant consolidation of retailers.          10:57:07

19         You know, when I was a kid, Kroger         10:57:13

20   was 30 different independent retailers, and      10:57:15

21   now they're, I believe, the biggest what we      10:57:17

22   would call high/low retailer in the country.     10:57:21

23   Every time a retailer acquires more stores,      10:57:24

24   the value of the retailer goes up.               10:57:30

25         So as the value of the retailer goes

CONFIDENTIAL - ATTORNEYS' EYES ONLY
UNDER PROTECTIVE ORDER

Page 91

1              C. Mixson

2    characterize your testimony.  That's true with          10:59:49

3    respect to retail agreements on the in-store            10:59:52

4    business.  Yes?                                          10:59:55

5              MR. MICHAEL:  Objection to form.               10:59:55

6         A     Again, I didn't run the retail side          10:59:56

7    of the business, but I tried to express, I              10:59:59

8    don't see -- it's just a basic business                 11:00:02

9    reality, I think that that would apply to               11:00:06

10   both.                                                    11:00:09

11             You know, my retail involvement,              11:00:11

12   while I participated in some retail meetings            11:00:12

13   because it was nice to have the title of                11:00:15

14   president there, I didn't really get into the           11:00:17

15   nitty gritty of negotiations; and most of my           11:00:19

16   updates on retail would come from an executive         11:00:22

17   committee roundtable where department heads            11:00:26

18   would give me a heads-up.                               11:00:30

19        Q     But you had an understanding from            11:00:31

20   being president of the company and attending           11:00:32

21   executive committee meetings about the basic           11:00:37

22   strategy of the company; correct?                       11:00:40

23        A     Yes.                                          11:00:41

24        Q     And you were asked about this in            11:00:42

25   your Dial deposition.  It's true, isn't it,

CONFIDENTIAL - ATTORNEYS' EYES ONLY
UNDER PROTECTIVE ORDER

Page 92

1            C. Mixson

2    that through your time as president, one of                11:00:49

3    NAM's strategy on the in-store side of the                 11:00:51

4    business was to enter into long-term exclusive             11:00:54

5    and staggered contracts with retailers.                    11:00:58

6    That's true; right?                                        11:00:58

7         A    Yes.                                             11:00:59

8         Q    One of the reasons for that strategy            11:01:00

9    was to provide disincentive to competitors to             11:01:01

10   enter the in-store fray; correct?                         11:01:05

11            MR. MICHAEL:  Objection to form.                 11:01:08

12        A    Well, yes.  I don't know that -- I              11:01:09

13   think the way you're wording it, disincentive,            11:01:12

14   if Valassis has secured an agreement with a               11:01:16

15   company for multiple years which they have,               11:01:22

16   certainly News America is disincentivized from            11:01:24

17   being able to secure that same agreement                  11:01:28

18   because it's already been awarded.                        11:01:31

19            The same is true on the other side              11:01:32

20   of the street.  If we've entered into a                   11:01:34

21   long-term agreement with a retailer, then the             11:01:39

22   competitors that want that same business that             11:01:42

23   we have would logically be deincentivized for             11:01:45

24   that agreement term because that business has             11:01:50

25   already been dedicated.

EXHIBIT 26

# EXHIBIT 16

Page 1

1

2                UNITED STATES DISTRICT COURT

3                EASTERN DISTRICT OF MICHIGAN

4

5    VALASSIS COMMUNICATIONS, INC., )
                                     )
6              Plaintiff,          ) 2:13-cv-14654
                                     )
7         vs.                      )
                                     )
8    NEWS CORPORATION, et al.,      )
                                     )
9              Defendants.         )
     -------------------------------)

10

11

12

13

14      * CONFIDENTIAL - ATTORNEYS' EYES ONLY *

15

16        VIDEOTAPED DEPOSITION OF WEST NAZE

17              New York, New York

18            Friday, May 26, 2017

19

20

21

22

23   Reported by:

24   KRISTIN KOCH, RPR, RMR, CRR

25   JOB NO. 124508

```
 1     W. Naze - Confidential - Attorneys' Eyes Only

 2   W E S T   N A Z E,

 3        called as a witness, having been duly sworn

 4        by a Notary Public, was examined and

 5        testified as follows:

 6   EXAMINATION BY

 7   MR. LEVY:                                            09:07

 8        Q.    Good morning.                             09:07

 9        A.    Good morning.                             09:07

10        Q.    Could you, please, state your name       09:07

11   for the record.                                     09:07

12        A.    My name is West Naze.                     09:07

13        Q.    Okay.  Are you currently employed by     09:07

14   NAM?                                                09:07

15        A.    I am not.                                09:07

16        Q.    Okay.  When did you cease being          09:07

17   employed by NAM?                                    09:07

18        A.    December 2013.                            09:07

19        Q.    Okay.  Do you have any -- do you         09:07

20   currently have any agreement with NAM related      09:07

21   to your separation or otherwise?                   09:07

22        A.    I do.                                    09:07

23        Q.    Okay.  And what are the terms of        09:07

24   that agreement, to your knowledge and              09:07

25   understanding?                                     09:07
```

Page 7

W. Naze - Confidential - Attorneys' Eyes Only

1

2    A.   I am in the last year of a    09:07

3  consultancy agreement.    09:07

4    Q.   Okay.  Are you paid under that    09:07

5  consultancy agreement?    09:07

6    A.   I am.    09:07

7    Q.   And how much do you receive?    09:07

8    A.   I don't know the honest answer    09:07

9  without looking.    09:07

10    Q.   Okay.  Can you give me a ballpark?    09:07

11    A.   Annually, $320,000 gross.    09:07

12    Q.   Okay.  And has that been consistent    09:07

13  throughout the life of the agreement?    09:07

14    A.   Yes, it has been.    09:07

15    Q.   Okay.  Do you have any obligations    09:07

16  to NAM under the terms of the agreement as you    09:07

17  understand it?    09:08

18    MR. BRACHMAN:  Object to form.    09:08

19  Vague.    09:08

20    You can answer to the extent you    09:08

21  understand.    09:08

22    A.   Yes, I do.    09:08

23    Q.   And what is your understanding of    09:08

24  those obligations?    09:08

25    A.   Simply to participate in litigation.    09:08

1    W. Naze - Confidential - Attorneys' Eyes Only

2        Q.    Anything else?                              09:08

3        A.    No.                                         09:08

4        Q.    Okay.  And by "participate," do you         09:08

5    have an obligation to cooperate in litigation?        09:08

6        A.    Yes.                                         09:08

7        Q.    Okay.  And in return for the money          09:08

8    that you receive under the consultancy                09:08

9    agreement, do you perform any other -- any form       09:08

10   of consulting services for NAM?                       09:08

11       A.    Currently I am not.                         09:08

12       Q.    Okay.  Have you under -- during the         09:08

13   term of the agreement?                                09:08

14       A.    I have not.                                 09:08

15       Q.    Okay.  And you said the agreement           09:08

16   was in its last year.  Do you know the                09:08

17   expiration date?                                      09:08

18       A.    December 31st of 2017.                      09:08

19       Q.    Okay.  Could you tell me what your          09:08

20   title and responsibilities were at NAM as of         09:09

21   the time that you left NAM?                           09:09

22       A.    I was executive vice president of          09:09

23   North American sales.                                09:09

24       Q.    Okay.  When did you -- when did you         09:09

25   get that title?                                       09:09

Page 9

W. Naze - Confidential - Attorneys' Eyes Only

2    A.    Roughly September of 2006.    09:09

3    Q.    Okay.  Did your responsibilities    09:09

4    change during the time frame of September 2006    09:09

5    until the time you left NAM?    09:09

6    MR. BRACHMAN:  Object to form.    09:09

7    A.    Generally they did not.    09:09

8    Q.    Okay.  And what were your    09:09

9    responsibilities as EVP of sales for North    09:09

10    America?    09:09

11    A.    Basically in charge of the sales    09:09

12    organization that covered the United States as    09:09

13    well as Canada and responsible for FSI and    09:09

14    in-store business.    09:09

15    Q.    Did you have responsibility for any    09:09

16    other businesses at NAM other than FSI and    09:09

17    in-store?    09:09

18    A.    Direct responsibility, I did not.    09:09

19    Q.    Okay.  And you have been deposed    09:10

20    before, Mr. Naze; is that right?    09:10

21    A.    Several times.    09:10

22    Q.    Several times.  And I have put in    09:10

23    front of you Exhibits 1, 2 and 3, which I may    09:10

24    refer to from time to time.    09:10

25    A.    Okay.    09:10

Page 96

1    W. Naze - Confidential - Attorneys' Eyes Only

2    a slightly different question, which is you          10:50

3    would not press them to buy things that you          10:50

4    understood they didn't want, but my question         10:50

5    was if a CPG told you it didn't want something       10:50

6    and you didn't try to convince them otherwise,       10:50

7    did they have an understanding that if they had      10:50

8    bought more, they would get a discount based on      10:50

9    volume?                                              10:50

10           MR. BRACHMAN:  Object to form.               10:50

11    Compound.  Calls for speculation.  Vague.           10:50

12       A.    Again, I think as a sales -- wearing       10:50

13    my sales hat, I think whether it's in this          10:50

14    particular example, a client would understand       10:50

15    that if they brought -- a client would ask us       10:50

16    "if I gave you more volume, is there an             10:50

17    opportunity to get a better price." So less         10:50

18    dictated by News America, more dictated by the      10:50

19    client.                                             10:50

20       Q.    Well, whoever dictated it, it was a        10:50

21    conversation that happened as a general matter;     10:50

22    right?                                              10:51

23           MR. BRACHMAN:  Object to form.               10:51

24       A.    Could it?  It could, sure.                 10:51

25       Q.    Okay.  In the period, say, 2000            10:51

Page 97

1    W. Naze - Confidential - Attorneys' Eyes Only

2    until the time you left NAM, did you believe        10:51

3    that NAM's retail network was better than the       10:51

4    network of any competitor?                          10:51

5            MR. BRACHMAN:  Object to form.              10:51

6        A.    I thought News America had a great        10:51

7    network.                                            10:51

8        Q.    And you thought it was better than        10:51

9    any competitor's; right?                            10:51

10       A.    I don't know that I said that, but        10:51

11   I...                                                10:51

12       Q.    Well, it had more stores, right,          10:51

13   than any other network?                             10:51

14           MR. BRACHMAN:  Objection.                   10:51

15       A.    More stores than what?                    10:51

16       Q.    Than any competing network.               10:51

17           MR. BRACHMAN:  Object to form.              10:51

18   Compound.  Time frame.                              10:51

19           MR. LEVY:  I gave both.  What's the         10:51

20   basis for the objection?                            10:51

21           MR. BRACHMAN:  You are asking him           10:52

22   2000 through when he left NAM?                       10:52

23           THE WITNESS:  Thirteen years.               10:52

24           MR. BRACHMAN:  There is a number of         10:52

25   years in there.  The number of retailers in         10:52

Page 98

W. Naze - Confidential - Attorneys' Eyes Only

1

2      the network could have fluctuated in any      10:52

3      given year.                                    10:52

4          MR. LEVY:  Right, and I asked              10:52

5      whether throughout that period NAM had more   10:52

6      stores than its competitors.  That's a fair   10:52

7      question.                                      10:52

8          MR. BRACHMAN:  So you are asking him       10:52

9      in every year if he knows?                     10:52

10         MR. LEVY:  Okay, that's fine.              10:52

11     Q.    Let's look at your deposition            10:52

12   transcript in the Insignia case, Exhibit 1.  We  10:52

13   will do it this way.  Page 86 along the margin.  10:52

14         Before we look at it, sitting here         10:52

15   today, do you think that NAM had a better        10:52

16   network than its competitors in that time        10:52

17   frame?                                           10:52

18         MR. BRACHMAN:  Same objection.             10:52

19     A.    I think News America has a great         10:52

20   network.                                         10:52

21     Q.    Okay.  Did it have better stores?        10:52

22         MR. BRACHMAN:  Same objection.             10:53

23     A.    Better than what?                        10:53

24     Q.    Better than the competition.            10:53

25         MR. BRACHMAN:  Same objections.           10:53

Page 99

W. Naze - Confidential - Attorneys' Eyes Only

1

2      A.    It's a matter of opinion to the          10:53

3   packaged goods guy.                               10:53

4      Q.    What was your opinion as to what the     10:53

5   packaged good guys thought?                       10:53

6           MR. BRACHMAN:  Calls for                  10:53

7      speculation.  Object to form.                  10:53

8      A.    I think News America had a great         10:53

9   network.                                          10:53

10     Q.    Okay.  Let's look at page 86, which      10:53

11  is on along the margin which has 7648010, and     10:53

12  this Exhibit 1, and if I could direct you to --   10:53

13          MR. BRACHMAN:  West, I think it's         10:53

14     the small numbers.                             10:53

15          THE WITNESS:  Small number 86?  Not       10:53

16     page 86?  Sorry about that.  Okay.             10:53

17     Q.    Are you with me?                          10:54

18     A.    Yes.                                      10:54

19     Q.    Okay.  And you see it says on 86,        10:54

20  line 10:                                           10:54

21          "Question:  What about your retail        10:54

22     network, do you think it is better than        10:54

23     your competitors?"                             10:54

24          And you say:                               10:54

25          "Answer:  I do."                          10:54

Page 100

1    W. Naze - Confidential - Attorneys' Eyes Only

2                And then the question is:                    10:54

3                "Question:  How so?                          10:54

4                "Answer:  More stores.                       10:54

5                "Question:  Anything else?                   10:54

6                "Answer:  No.                                10:54

7                "Question:  Is it just the number of         10:54

8    stores that you feel are important to CPGs?              10:54

9                "Answer:  Not necessarily.                   10:54

10               "Question:  What else is important           10:54

11   to CPGs about a promotional vendor's retail              10:54

12   network?                                                 10:54

13               "Answer:  Quality of stores.                 10:54

14               "Question:  What do you mean by              10:54

15   that?                                                    10:54

16               "Answer:  Much better to have                10:54

17   Safeway, Kroger, Ahold, Albertson's, than                10:54

18   it is, you know, small guys."                            10:54

19               And then it goes on.  Do you see all         10:54

20   that?                                                    10:54

21       A.    I do.                                          10:54

22       Q.    Okay.  And that was true at the time           10:54

23   when you said it?                                        10:54

24       A.    I did.                                         10:54

25       Q.    Okay.  And you stand by that today?            10:54

Page 101

W. Naze - Confidential - Attorneys' Eyes Only

1

2    A.    I do.                                          10:54

3    Q.    And it's still true during the time          10:54

4    frame 2008 until the time you left; right?         10:54

5    A.    Correct.                                       10:54

6    Q.    So during the time 2008 until the            10:54

7    time you left, NAM had a better network with        10:55

8    higher-quality stores and more stores; right?      10:55

9    A.    That's what my testimony reads.               10:55

10   Q.    I am just trying to understand               10:55

11   whether that testimony would be true for the        10:55

12   period between the time you testified in 2008       10:55

13   and the time you left NAM.                          10:55

14   A.    Again, my opinion is yes.                     10:55

15   Q.    Okay.  Okay.  And then there is a            10:55

16   question, it says:                                  10:55

17       "Question:  -- you said it's much             10:55

18       better to have Safeway, Kroger, Ahold and      10:55

19       Albertson's."                                   10:55

20       Do you see that on line 9, page 87            10:55

21   on the side?                                        10:55

22   A.    Correct.                                       10:55

23   Q.    And then:                                     10:55

24       "Answer:  Those are the people doing          10:55

25       all the volume."                                10:55

Page 102

1    W. Naze - Confidential - Attorneys' Eyes Only

2         "Question:  So that would be a              10:55

3    combination of how many stores they have        10:55

4    and their -- how well-known they are and        10:55

5    other things, presumably?"                      10:55

6         And then:                                   10:55

7         "Answer:  Yeah.  Popularity is the          10:55

8    word I was going to say."                        10:55

9         And then:                                   10:55

10        "Question:  Thank you.  Is there            10:55

11   anything else that CPGs look for in a            10:55

12   retail network?                                  10:55

13        "Answer:  That would be -- to the           10:55

14   best of my knowledge, I think what I told        10:55

15   you is probably what they look for."             10:55

16        And you gave that testimony; right?        10:56

17   A.    Correct.                                    10:56

18   Q.    And that was all true at the time?         10:56

19   A.    True.                                       10:56

20   Q.    Okay.  And did what you said about         10:56

21   the network as of 2008 remain true between 2008  10:56

22   and the time you left NAM, 2014?                 10:56

23   A.    Quality network, yes.                       10:56

24   Q.    Okay.  Now, when you sold in-store         10:56

25   promotional products to CPGs, you touted the     10:56

EXHIBIT 27

# EXHIBIT 18

**Submitted with Redactions Approved by Dkt. 267**

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 1

```
 1          CONFIDENTIAL - MARK SCHULMAN
 2          UNITED STATES DISTRICT COURT
 3          EASTERN DISTRICT OF MICHIGAN
 4     VALASSIS COMMUNICATIONS, INC.,   )
                                        )
 5               Plaintiff,            )
                                        )
 6          vs.                        ) Case No.
                                        ) 2:13-cv-14654
 7     NEWS CORPORATION, et al.,       )
                                        )
 8               Defendants.           )
       ------------------------------)
 9
10          * * *ATTORNEYS EYES ONLY* * *
11     CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER
12        VIDEOTAPED DEPOSITION OF MARK SCHULMAN
13             New York, New York
14             Thursday, June 22, 2017
15
16
17
18
19
20
21
22
23     Reported by:
24     KATHY S. KLEPFER, RMR, RPR, CRR, CLR
25     JOB NO. 125477
```

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 5

1          CONFIDENTIAL - MARK SCHULMAN

2   MARK SCHULMAN, called as a

3        witness, having been duly sworn by a Notary

4        Public, was examined and testified as

5        follows:                                  08:55

6   EXAMINATION BY

7   MR. HEIDLAGE:

8        Q.    Good morning, Mr. Schulman.

9        A.    Good morning.

10        Q.    Could you please state your full name  08:56

11   and address for the record.

12        A.    Mark Schulman, █████████████████

13   █████████████████

14        Q.    And are you currently employed by News

15   America Marketing?                             08:56

16        A.    I am.

17        Q.    And if I refer to it as "News

18   America," "News" or "NAM," will you understand

19   I'm referring to News America Marketing?

20        A.    Yes, I will.                        08:56

21        Q.    How many times have you been deposed

22   before?

23        A.    This will be my third time.

24        Q.    In what matters were you previously

25   deposed?                                       08:56

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 7

1    CONFIDENTIAL - MARK SCHULMAN

2    Q.    If you don't fully understand a

3  question, please let me know.  I will assume you

4  understand my question unless you tell me

5  otherwise.                                    08:57

6         Do you understand?

7    A.    I understand.

8    Q.    If at any time you want a break,

9  please let me know.  I do ask, however, that

10  before taking a break, you answer any pending   08:57

11  question.

12         Do you understand?

13    A.    I understand.

14    Q.    Thank you.

15         Could you please walk me through your  08:57

16  employment at News America Marketing, what

17  positions you had and at what times?

18    A.    Sure.  I've been working at News

19  America Marketing since 1999, and my role when I

20  started was Director of Pricing and Contracts.    08:58

21  In approximately 2003 or 2004, I was promoted to

22  the position of Vice President, Pricing and

23  Contracts, and that's my current position today.

24         And if I can backtrack a little bit, I

25  also worked at News America when it was acquired 08:58

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 8

1           CONFIDENTIAL - MARK SCHULMAN

2   in 1988, worked at the FSI Division for

3   approximately two years to 1990, and then I held

4   various other roles at News Corp., at New York

5   Magazine, and TV Guide Magazine, and there were    08:58

6   times where both of those entities were sold.

7       Q.      Okay.  What were your responsibilities

8   as VP, Pricing and Contracts from 2003 to the

9   present?

10      A.      Review -- review pricing for our          08:59

11  product lines, working with Sales reviewing

12  contracts, and also helping manage our sales

13  goals process, our bonus payment process, our

14  management sales reporting process.

15      Q.      What did reviewing pricing entail?        08:59

16          MS. O'BRIEN:   Objection.

17      A.      I mean, that's a -- that's a very

18  wide, open question, but it's -- it's, to try to

19  summarize, I would receive requests from our

20  sales teams or sales managers and work with them   09:00

21  in reviewing them and either approving the

22  pricing or modify the pricing or not approving

23  the pricing, but it would always be in

24  communication with Sales and giving the

25  Finance -- Finance input.                          09:00

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Page 86

CONFIDENTIAL - MARK SCHULMAN

1
2   money anywhere.  They could spend it on TV.
3   They could spend it on print.  They could spend
4   it digital.  They could spend it with Catalina.
5   They could spend it with Insignia.  They could      10:47
6   spend it directly with the retailer.
7            So we -- we would want to -- we would
8   want to win the business because the client has
9   a number of different ways they can -- they can
10  spend their money.                                   10:47
11      Q.   Okay.  Did you ever compare it -- did
12  you ever compare the price that you were
13  offering to any other company's prices?
14      A.   I don't -- I wouldn't know what other
15  companies are charging, so no.                       10:47
16      Q.   I mean, did you ever attempt to
17  determine what the -- what other companies were
18  charging?
19      A.   I never did no.  No.
20      Q.   Did you ever receive any market          10:47
21  analysis as to what other companies might be
22  charging?
23      A.   I don't believe I ever did, no.
24      Q.   Okay.  Did you have an understanding
25  as to the -- for the in-store products, were        10:48

Page 87

1          CONFIDENTIAL - MARK SCHULMAN
2    there any other products that you considered to
3    be directly competitive that your price needed
4    to be competitive with?
5          A.    Any type of marketing, any type of     10:48
6    promotion was -- was a competitor to -- to
7    in-store.
8          Q.    Okay.  Did you do any financial
9    analysis to analyze whether or not the -- how
10   your prices compared to any other types of       10:48
11   products?
12         A.    No, I did not.
13         Q.    Okay.  Do you know of anyone who did
14   at News America?
15         A.    I'm not aware of that.               10:48
16         Q.    Okay.  So was there any analysis that
17   you did to determine whether or not your prices
18   were competitive with other products' prices?
19         A.    Did I?  No, I never did.
20         Q.    Okay.  So when you -- do you know of   10:48
21   anyone else who did?
22         A.    Not that I'm -- not that I'm aware --
23   not that I'm aware of.
24         Q.    Okay.  So I think when you -- when you
25   talked about the -- I want to get a sense of      10:49

Page 88

1              CONFIDENTIAL - MARK SCHULMAN

2    where you -- when you were considering whether

3    or not to approve a price, what types of

4    information you would look at.

5              One of the pieces of information you    10:49

6    said was discussions with Sales; is that

7    correct?

8         A.    Correct.

9         Q.    Okay.  Another piece of information

10   was the schedule of the various clients and what 10:49

11   categories they had made purchases in; is that

12   correct?

13        A.    That's also correct.

14        Q.    Okay.  What other documents or sources

15   of information would you look to in considering   10:49

16   whether or not to approve a price?

17        A.    I think that would be it.  I have

18   my -- my revenue comparison report that shows

19   the revenue by client by category, and then I --

20   I would speak with Sales.                         10:50

21        Q.    Okay.  In determining what price to

22   approve, did you -- in the course of --

23   withdrawn.

24              In the course of the pricing

25   discussions and approval process, did you ever    10:50

Page 89

1     CONFIDENTIAL - MARK SCHULMAN
2    consider what price that Valassis was charging?
3        A.    No, I didn't know what Valassis was
4    charging.
5        Q.    Okay.  Earlier we saw the published    10:50
6    rate card that you used to -- from Valassis, do
7    you recall that?
8        A.    I do.
9        Q.    Okay.  And you didn't use that to
10   determine --                                     10:50
11       A.    No, I never did.
12       Q.    Did you ever seek to try to find a
13   similar type of rate card or estimate a similar
14   type of rate card for Valassis?
15       A.    No, I did not.                          10:51
16       Q.    Okay.  Did you ever consider whether
17   or not the client was purchasing other products
18   such as FSI from News America?
19       A.    When they were purchasing in-store?
20       Q.    Yes.                                    10:51
21       A.    Yes, we did.
22       Q.    Okay.  And how would that be a factor
23   in the price?
24       A.    Well, when we're negotiating and
25   working on our FSI, MSA or FSI ROFR agreements,  10:51

EXHIBIT 28

# EXHIBIT 19

**Submitted with Redactions Approved by Dkt. 267**

Page 1

1

2              UNITED STATES DISTRICT COURT

3              EASTERN DISTRICT OF MICHIGAN

4

5    -------------------------------

     VALASSIS COMMUNICATIONS, INC., )Case No.

6                                    )

                  Plaintiff,        )2:13-cv-14654

7                                    )

              v.                     )

8                                    )

     NEWS CORPORATION, et al.,       )

9                                    )

                  Defendants.  )

10   -------------------------------

11

12

13

14

15

16              VIDEOTAPED DEPOSITION

17                     OF

18              LISA TOPHAM

19            New York, New York

20         Wednesday, April 12, 2017

21

22

23   Reported by:

24   ANNETTE ARLEQUIN, CCR, RPR, CRR, CLR

25   JOB NO. 121917

1          L. Topham

2          MS. MOJICA:  Bianca Mojica on behalf

3      of behalf of defendant News Corporation.

4          THE VIDEOGRAPHER:  Will the court

5      reporter please swear in the witness.

6          *          *          *

7  L I S A   T O P H A M,   called as a witness,

8          having been duly sworn by a Notary

9          Public, was examined and testified as

10          follows:

11  EXAMINATION BY

12  MS. GIUDICE:

13      Q.    Would you please state your name for

14  the record?

15      A.    Lisa Topham.

16      Q.    Good morning, Ms. Topham.  We met

17  earlier off the record.  My name is Lauren

18  Giudice.  I'm from the law firm of Holwell

19  Shuster & Goldberg and we represent plaintiff

20  Valassis Communications.

21          You realize you're under oath today?

22      A.    Yes.

23      Q.    All right.  Is there any reason that

24  you wouldn't be able to testify honestly or

25  truthfully?

CASE 0:19-cv-01820-MJD-BRT Document 243-1 Filed 09/08/20 Page 255 of 268
Case 1:19-cv-01803-VSB-RC Document 243-1 Filed 09/22/20 Page 255 of 268

Page 7

1                        L. Topham

2              MS. GIUDICE:  All right.  I would

3        like to introduce what has been designated

4        as Topham Exhibit 1.

5              (Plaintiff's Exhibit Topham 1,

6        LinkedIn profile of Lisa Topham, marked for

7        identification, as of this date.)

8   BY MS. GIUDICE:

9        Q.    Is this your LinkedIn profile?

10       A.    Yes.

11       Q.    If you look down toward the bottom of

12  the page, it includes education.

13             Does this accurately reflect your

14  educational background?

15       A.    Yes.

16       Q.    And then above that looks like your

17  work experience.

18             Does that accurately reflect your

19  professional work experience?

20       A.    It does.

21       Q.    So you joined News America Marketing

22  in September of 2005?

23       A.    Yes.

24       Q.    If I refer to NAM or News America,

25  will you understand that to be your employer

Page 8

L. Topham

2  News --

3      A.    Yes.

4      Q.    Okay.  Great.

5            So what were your general job

6  responsibilities when you were a financial

7  analyst for News America from 2005 to about

8  2010?

9      A.    So in 2005 to 2010 I was just

10  honestly a lower level than I am today.  I had

11  similar responsibilities except for managing a

12  direct report.

13            So I worked on retail contract

14  proposals, I handled the field expenses,

15  contract negotiations and similar items like

16  that.

17            Currently today I am handling all

18  those similar roles except I have a direct

19  report.

20      Q.    And who is your direct report?

21      A.    Stephanie Stiles.

22      Q.    And who do you report to?

23      A.    June Campbell.

24      Q.    What is June Campbell's position?

25      A.    She's a VP of finance.

Page 103

1                          L. Topham

2    proposal, we wouldn't necessarily bring it

3    forward.  It all depends on the instance.

4         Q.    Definitely.

5                You had some questions on this

6    proposal.

7         A.    I did, but that's me doing my own due

8    diligence so that I can prepare for that Monday

9    meeting.

10        Q.    And based off of this email, is there

11   any reason to think that you did not convey this

12   information?

13        A.    No, there's no reason to think I

14   didn't.  I just don't know if it happened or

15   not.

16        Q.    Okay.  You can set that one aside.

17               (Witness complies.)

18               MS. GIUDICE:  Mark this Exhibit 10.

19               (Plaintiff's Exhibit Topham 10, Email

20        dated 7/25/11 from Topham to Blanco with

21        attachment, Bates stamped CPG_VALASSIS_0013835

22        through 0013837, marked for identification, as

23        of this date.)

24   BY MS. GIUDICE:

25        Q.    Ms. Topham, I'm handing you what

Page 104

1                        L. Topham

2    we've marked as Exhibit 10.  This is a

3    July 25th, 2011 email from you to Chris Blanco.

4              Who is Chris Blanco?

5        A.    He was our former CEO.

6              No, sorry, CFO.  Sorry, CFO.

7        Q.    And he's no longer the CFO?

8        A.    He is no longer with the company.

9        Q.    Do you know when he left the company?

10       A.    I do not.

11       Q.    But was he the CFO in 2011?

12       A.    He -- I don't know if he was CFO at

13   that point or if he was our controller at that

14   point.  I'm not sure of his role at that point.

15       Q.    Did he work in finance?

16       A.    He worked in finance, yes.

17       Q.    He always work in finance as long

18   as --

19       A.    Yes.

20       Q.    -- you've known him?

21             MS. O'BRIEN:  Again, let her finish.

22   BY MS. GIUDICE:

23       Q.    All right.  So the subject line here

24   is Kmart and it looks like there's an attachment

25   called "Book 2" and it's in Excel.  I'm opening

Page 105

1                         L. Topham

2   to that.

3               And so what is this document?

4        A.    So this is a Kmart overview.

5        Q.    And so what is an overview?

6        A.    It shows the current, our latest

7   estimate for the retailer as well as a proposal.

8        Q.    So it would be written when there was

9   a proposal?

10              MS. O'BRIEN:  Objection.

11       A.    It's our standard format that's used,

12  yes.  So we'll look at our current P&L and then

13  what we're trying to do going forward.

14       Q.    And so it's used -- if you could just

15  explain a little bit more.  When is it used?

16       A.    During a proposal.  Like when I get

17  an FIR.

18       Q.    Okay.  This one' dated July 21st,

19  2011.

20       A.    Yes.

21       Q.    Is this something that you would

22  prepare in response to receiving an FIR?

23       A.    Yes.

24       Q.    Do you remember making this document?

25              MS. O'BRIEN:  Objection.

Page 106

1                          L. Topham

2          A.      I don't remember.

3          Q.      If you look at, it starts with column

4   B and it looks like row 9 or row 7 says

5   "Overview" and row 9 says, ████    guarantee for

6   1,300 store and █████ signing bonus for 3-year

7   contract."

8          A.      Yes, that's what it says.

9          Q.      What is ████ guarantee?

10         A.      ██████ guarantee.

11         Q.      And what is that?

12                 MS. O'BRIEN:  Objection.

13         A.      It looks like it's the proposal from

14  this document.

15         Q.      But what does that mean, a ████████

16  guarantee?

17         A.      What we would pay the retailer.

18         Q.      And then there's ██████ signing

19  bonus.

20                 What is that?

21         A.      Again, that's what we would pay the

22  retailer.

23         Q.      And ██████ is ██████?

24         A.      ██████, yes, sorry.

25         Q.      No worries.

Page 107

1          L. Topham

2          If we look at, okay, it looks like

3    Column C, row 21, it says, "▓▓▓▓..." which you

4    said was ▓▓▓▓▓▓▓▓

5          A.    Yes.

6          Q.    "...for 1,300 store and ▓▓▓▓▓▓▓▓

7    signing bonus for 3 years" and then in

8    parentheses it says, "FY 12, bud rev rate 11 act

9    costs."

10          What is FY 12 bud rev rate?

11          A.    That would be our fiscal year '12

12    budgeted revenue rates.

13          Q.    And so what are budgeted revenue

14    rates?

15          A.    Those would be the rates by product

16    that we're budgeting.

17          Q.    So is that an actual cost or a future

18    cost?  What do you mean by budgeting?

19          A.    It would be our budget.  It would be

20    what we're projecting for this year.

21          Q.    So it's a projection?

22          A.    Yes.

23          Q.    And what is '11 act costs?

24          A.    That would mean actual costs.

25          Q.    So in this you're saying it's the

Page 108

1                    L. Topham

2    fiscal year 2012 projections and the 2011 actual

3    costs?

4         A.    Yes.  That's what that states.

5         Q.    And if you scroll down to rows 95 --

6    well, row 95 says "Financial Highlights"?

7         A.    Yes.

8         Q.    And then in row 98 it says.

9    "Contribution Margin Percentage"?

10        A.    Yes.

11        Q.    And it says ▉ percent.

12        A.    Yes.

13        Q.    Is that a high contribution margin?

14              MS. O'BRIEN:  Objection.

15        A.    No, it's not high.

16        Q.    Is it a low one?

17        A.    It's on the lower side, but it's

18   profitable.

19        Q.    And if we go -- how do you know it's

20   profitable?

21        A.    ▉percent, that's positive.

22        Q.    And if we go to column number, or

23   excuse me, letter G, row 21, it says, Latest

24   Estimate (FY 10 rates)."

25              What does that mean?

1          L. Topham

2     A.    So that would be our latest estimate

3  based on the past 13 cycles.

4          And then it says "FY 10 rates," so I

5  don't remember what we did here, but I would say

6  it's based on FY 10 rates based on the heading

7  there.

8     Q.    So it's information from the prior or

9  current contract.

10    A.    Yes.

11    Q.    Using the fiscal year 2010 rates.

12    A.    Yes.

13    Q.    So it's not the proposal, it's --

14    A.    That would be our latest estimate.

15    Q.    Of the then existing contract, right?

16    A.    Our current, yes.

17    Q.    Okay.  And if you go down to, still

18  in column G, and if you can look at row 51,

19  there's ████

20    A.    Yes.

21    Q.    What is that?

22          MS. O'BRIEN:  Sorry?

23          MS. GIUDICE:  Column G, row 51.

24          MS. O'BRIEN:  Got it.  Thank you.

25    A.    That would be the volume in the

EXHIBIT 29

| | |
|---|---|
| **From:** | Gloria Park |
| **To:** | Dagnew, Lina; Milligan, Heather C; Mark Musico; Arun Subramanian; Alejandra Salinas |
| **Cc:** | S. Jamal Faleel; Jerry Blackwell; Bill Carmody; Rodney Polanco; Michael, William; Gallo, Kenneth A; O"Brien, Jane B; Tannenbaum, Brette; Dedrickson, Kirsten; Moen, Nicole; Wind, Todd; GZweifach@wc.com |
| **Subject:** | Re: Insignia v. News Corp. et al - Custodians |
| **Date:** | Friday, February 28, 2020 7:45:57 PM |

Lina,

We are supplementing our list of proposed custodians with an additional name: Karin Westrell.

Best,
Gloria

Gloria Park | Susman Godfrey
o. (212) 729-2029
c. (917) 340-3695

> On Feb 28, 2020, at 2:14 PM, Gloria Park <GPark@susmangodfrey.com> wrote:
>
>
> Lina,
>
> Below is Insignia's revised list of News custodians that we propose adding to the ten News custodians to which the parties have already agreed.  We reserve our rights to amend or supplement this list.  We look forward to having a product meet and confer this afternoon.

| |
|---|
| Alan Verdun |
| Allison Ditto |
| Cecili Swift |
| Chris Dungan |
| Darin Lee |
| Gavin O'Day |
| Henri Lellouche |
| Jeffrey Boniello |
| Jeremy Turner |
| Jesse Aversano |
| Joe Bevilacqua |
| Joedy-Ann Buchanan |
| Jon Rubin |
| Laura Grasing |
| Lauren Holland |
| Matthew Pawlik |
| Michelle James |

| Patrick Kroc |
| Ryan DeVoe |
| Scott Shankin |
| Sharon King |
| Terry Powell |

Best,
Gloria


**Gloria Park | Susman Godfrey**
o. 212.729.2029 | c. 917.340.3695
1301 Avenue of the Americas, 32nd Fl. | New York, NY 10019
gpark@susmangodfrey.com

This e-mail may contain privileged and confidential information.  If you received this message in error,
please notify the sender and delete it immediately.

---

**From:** Dagnew, Lina <ldagnew@paulweiss.com>
**Sent:** Thursday, February 27, 2020 8:58 PM
**To:** Gloria Park <GPark@susmangodfrey.com>; Milligan, Heather C
<hmilligan@paulweiss.com>; Mark Musico <MMusico@susmangodfrey.com>; Arun
Subramanian <asubramanian@SusmanGodfrey.com>; Alejandra Salinas
<ASalinas@susmangodfrey.com>
**Cc:** Dan Gustafson <DGustafson@gustafsongluek.com>; Joshua Rissman
<jrissman@gustafsongluek.com>; mlooby@gustafsongluek.com; S. Jamal Faleel
<jfaleel@blackwellburke.com>; Jerry Blackwell <blackwell@blackwellburke.com>; Bill
Carmody <bcarmody@SusmanGodfrey.com>; Rodney Polanco
<RPolanco@susmangodfrey.com>; Michael, William <wmichael@paulweiss.com>;
Gallo, Kenneth A <kgallo@paulweiss.com>; O'Brien, Jane B <jobrien@paulweiss.com>;
Tannenbaum, Brette <btannenbaum@paulweiss.com>; Dedrickson, Kirsten
<kdedrickson@paulweiss.com>; Moen, Nicole <NMoen@fredlaw.com>; Wind, Todd
<twind@fredlaw.com>; GZweifach@wc.com
**Subject:** RE: Insignia v. News Corp. et al - Production Transmittal


Thanks, Gloria.  We will send a dial in for 4 p.m.

**Lina Dagnew** | Associate
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
2001 K Street, NW | Washington, DC 20006-1047
+1 202 223 7455 (Direct Phone) | +1 202 330 5027 (Direct Fax)
ldagnew@paulweiss.com | www.paulweiss.com
*Pronouns: She/Her/Hers*

---

**From:** Gloria Park <GPark@susmangodfrey.com>
**Sent:** Thursday, February 27, 2020 4:09 PM

**To:** Milligan, Heather C <hmilligan@paulweiss.com>; Mark Musico
<MMusico@susmangodfrey.com>; Arun Subramanian
<asubramanian@SusmanGodfrey.com>; Alejandra Salinas
<ASalinas@susmangodfrey.com>
**Cc:** Dan Gustafson <DGustafson@gustafsongluek.com>; Joshua Rissman
<jrissman@gustafsongluek.com>; mlooby@gustafsongluek.com; S. Jamal Faleel
<jfaleel@blackwellburke.com>; Jerry Blackwell <blackwell@blackwellburke.com>; Bill
Carmody <bcarmody@SusmanGodfrey.com>; Rodney Polanco
<RPolanco@susmangodfrey.com>; Michael, William <wmichael@paulweiss.com>;
Gallo, Kenneth A <kgallo@paulweiss.com>; O'Brien, Jane B <jobrien@paulweiss.com>;
Tannenbaum, Brette <btannenbaum@paulweiss.com>; Dagnew, Lina
<ldagnew@paulweiss.com>; Dedrickson, Kirsten <kdedrickson@paulweiss.com>;
Moen, Nicole <NMoen@fredlaw.com>; Wind, Todd <twind@fredlaw.com>;
GZweifach@wc.com
**Subject:** RE: Insignia v. News Corp. et al - Production Transmittal

Heather,

We are available to meet and confer between 3-5pm ET tomorrow.  Please let us know
if that timeframe works on your end.

Thanks,
Gloria

**Gloria Park | Susman Godfrey**
o. 212.729.2029 |  c. 917.340.3695
1301 Avenue of the Americas, 32nd Fl. | New York, NY 10019
gpark@susmangodfrey.com

This e-mail may contain privileged and confidential information.  If you received this message in error,
please notify the sender and delete it immediately.

---

**From:** Milligan, Heather C <hmilligan@paulweiss.com>
**Sent:** Wednesday, February 26, 2020 3:02 PM
**To:** Gloria Park <GPark@susmangodfrey.com>; Mark Musico
<MMusico@susmangodfrey.com>; Arun Subramanian
<asubramanian@SusmanGodfrey.com>; Alejandra Salinas
<ASalinas@susmangodfrey.com>
**Cc:** Dan Gustafson <DGustafson@gustafsongluek.com>; Joshua Rissman
<jrissman@gustafsongluek.com>; mlooby@gustafsongluek.com; S. Jamal Faleel
<jfaleel@blackwellburke.com>; Jerry Blackwell <blackwell@blackwellburke.com>; Bill
Carmody <bcarmody@SusmanGodfrey.com>; Rodney Polanco
<RPolanco@susmangodfrey.com>; Michael, William <wmichael@paulweiss.com>;
Gallo, Kenneth A <kgallo@paulweiss.com>; O'Brien, Jane B <jobrien@paulweiss.com>;
Tannenbaum, Brette <btannenbaum@paulweiss.com>; Dagnew, Lina

<ldagnew@paulweiss.com>; Dedrickson, Kirsten <kdedrickson@paulweiss.com>;
Moen, Nicole <NMoen@fredlaw.com>; Wind, Todd <twind@fredlaw.com>;
GZweifach@wc.com
**Subject:** Insignia v. News Corp. et al - Production Transmittal

Counsel:

As per our email correspondence dated February 21, 2020, attached please find a
letter regarding Defendants' February 26, 2020 document production. A link to the
encrypted media production will follow. The password for the production media will
be transmitted to you via separate e-mail.

We are available to meet and confer regarding custodians and search terms on Friday,
February 28.

Regards,

Heather


**Heather C Milligan** | Associate
**Paul, Weiss, Rifkind, Wharton & Garrison LLP**
2001 K Street, NW | Washington, DC 20006-1047
+1 202 223 7465 (Direct Phone) | +1 202 379 4960 (Direct Fax)
hmilligan@paulweiss.com | www.paulweiss.com
*Pronouns: She/Her/Hers*


This message is intended only for the use of the Addressee and may contain information that is privileged and confidential. If you are not the intended recipient, you are hereby notified that any dissemination of this communication is strictly prohibited. If you have received this communication in error, please erase all copies of the message and its attachments and notify us immediately.