UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Insignia Systems, Inc.,

               Plaintiff,

                              **MEMORANDUM OPINION
AND ORDER**

     vs.                       Civ. No. 19-1820 (MJD/BRT)

News Corporation, News
America Marketing FSI LLC and
News America Marketing In-Store
Services, LLC,

               Defendants.

---

William Christopher Carmody, Arun S. Subramanian, Mark Musico, Y. Gloria Park, Alejandra Salinas and Rachel S. Black, Susman Godfrey LLP, Hunter J. Shkolnik, Napoli Shkolnik PLLC, and Jerry W. Blackwell and S. Jamal Faleel, Blackwell Burke PA, Counsel for Plaintiff.

Todd A. Wind, Nicole M. Moen, Timothy M. O'Shea and Rachel L. Dougherty, Fredrikson & Byron, PA, William B. Michael, Kenneth A. Gallo, Jane B. O'Brien and Jeannie S. Rhee, Paul, Weiss, Rifkind, Wharton & Garrison, Gerson A. Zweifach and Kimberly Broecker, Williams & Connolly LLP, Counsel for Defendants.

---

This matter is before the Court on Defendants News America Marketing

FSI LLC, News America Marketing In-Store Services LLC and News

Corporation's (hereinafter collectively referred to as "News") Motion for

Summary Judgment on the Counterclaim [Doc. No. 193] and Plaintiff Insignia

Systems, Inc.'s ("Insignia") Motion for Partial Summary Judgment on the

Counterclaim [Doc. No. 201].

## I.     Background

News and Insignia are third-party providers of in-store promotion

products and services that are sold to consumer-packaged-goods companies

("CPGs") for placement in retail stores including grocery stores, drugstores and

dollar stores.  (Comp. ¶ 1.)  Insignia claims that News has acquired and

maintained a monopoly in this market through exclusionary agreements with

both retailers and CPGs.  (Id. ¶ 2.)   Insignia has asserted the following claims

against News: Count I, Section Two of the Sherman Act, Monopolization; Count

II, Section Two of the Sherman Act, Attempted Monopolization; Count III,

Section One of the Sherman Act, Exclusive Dealing; Count IV, Section Two of the

Sherman Act, Conspiracy to Monopolize; Count V, Tortious Interference with

Business Relationships or Expectancies with Retailers; Count VI, Tortious

Interference with Contracts with CPGs; Count VII, Violation of Minn. Stat. §

325D.52, Monopolization; Count VIII, Violation of Minn. Stat. § 325D.52,

Attempted Monopolization; and Count IX, Violation of Minn. Stat. § 325D.52, Exclusive Dealing.

### A.    Prior Litigation

In 2004, Insignia filed an antitrust suit in this District against News. (Insignia I, Case No. 04-cv-4213.)  In that action, Insignia also alleged that News had acquired and maintained dominance in the above markets through various wrongful acts, such as entering into exclusive contracts with retailers, and brought a number of antitrust claims against News under state and federal law. (Id.)

On February 9, 2011, after the first day of trial, the parties entered into a Settlement Agreement.  (Wind Decl. Ex. 1.)  The terms of the Settlement Agreement include that News would pay Insignia $121 million, the parties would enter into an exclusive ten-year sales agreement by which News agreed to provide Insignia with the exclusive right to sell price signs into News's retail network, News would not seek to enforce any right of first refusal and/or right of last refusal contained in any of its then current agreements with retailers, and the parties mutually agreed to not do or say anything which falsely disparages the other party to others.  (Id. ¶¶ 1-4.)  The Settlement Agreement also provides that

Insignia "releases, remises, acquits, and forever discharges [the other] . . . from

any and all manner of actions and causes of action, suits, debts, obligations,

contracts, torts, covenants, claims, rights of contribution and/or indemnification,

rights of subrogation, sums of money, judgments, executions, liabilities,

damages, interest, costs, expenses, attorneys' fees and legal costs, demands and

rights whatsoever, contingent or noncontingent, in law or in equity, known or

unknown, of any kind or character, from the beginning of time up to the date of

this Agreement (collectively, the "Released Matters")."  (Id. ¶ 9.)  This provision

also includes a covenant not to sue by which Insignia agreed "not to sue, attempt

to introduce as evidence, or otherwise assert any of the Released Matters and/or

the underlying facts or conduct supporting the Released Matters against the

Defendant or the Defendant Released Parties in any court, government or

regulatory body or other proceedings."  (Id.)

### B.    Present Action

In response to the Complaint filed in this action, News filed an Answer

and asserted a counterclaim of breach of contract against Insignia.  (Doc. No. 19.)

News claims that Insignia has materially breached the Settlement Agreement by

asserting in its Complaint allegations that were released under the Settlement Agreement.  (<u>Id.</u> at 38.)

News previously moved for judgment on the pleadings on its counterclaim of breach of contract, which motion was referred to the Magistrate Judge.  In her Report and Recommendation, the Magistrate Judge recommended denial of the motion because to determine whether certain facts or conduct included in the Complaint were underlying facts or conduct released in the Settlement Agreement, "would take the Court well beyond the confines of the pleadings."  ([Doc. No. 110] R&R at 7-8.)  The Magistrate Judge recommended a period of expedited discovery on the contract dispute, followed by cross motions for partial summary judgment.  (<u>Id.</u> at 11.)  This Court adopted the R&R and expedited discovery followed.  ([Doc. No. 120] Order dated April 6, 2020.)

At this time, News moves for summary judgment on its counterclaim of breach of contract.  Insignia has filed a cross motion for partial summary judgment on the counterclaim.

## II.    Standard for Summary Judgment

Summary judgment is appropriate if, viewing all facts in the light most favorable to the non-moving party, there is no genuine dispute as to any material

fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ.

P. 56(a); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986).  The party seeking

summary judgment bears the burden of showing that there is no disputed issue

of material fact.  <u>Celotex</u>, 477 U.S. at 323.  "A dispute is genuine if the evidence is

such that it could cause a reasonable jury to return a verdict for either party; a

fact is material if its resolution affects the outcome of the case."  <u>Amini v. City of</u>

<u>Minneapolis</u>, 643 F.3d 1068, 1074 (8th Cir. 2011) (citing <u>Anderson v. Liberty</u>

<u>Lobby, Inc.</u>, 477 U.S. 242, 248, 252 (1986)).  The party opposing summary

judgment may not rest upon mere allegations or denials but must set forth

specific facts showing that there is a genuine issue for trial.  <u>Krenik v. County of</u>

<u>Le Sueur</u>, 47 F.3d 953, 957 (8th Cir. 1995).

## III.    Discussion

### A.    Whether the Covenant Not to Sue Is Ambiguous

"The district court has the inherent power to enforce a settlement

agreement when the terms are unambiguous."  <u>Barry v. Barry</u>, 172 F.3d 1011,

1013 (8th Cir. 1999).   As this is a diversity case, the Settlement Agreement must

be construed pursuant to Minnesota law.  <u>Id.</u>  When construing a contract under

Minnesota law, the Court is to determine and enforce the intent of the parties,

and where the intent of the parties is unambiguously expressed, "[t]he language found in a contract is to be given its plain and ordinary meaning." In re ResCap Liquidating Trust Litigation, 428 F. Supp. 3d 53, 77 (D. Minn. 2019) (quoting Turner v. Alpha Phi Sorority House, 276 N.W.2d 63, 67 (Minn. 1979)). "A contract is ambiguous if, based on the language alone, it is reasonably susceptible of more than one interpretation." Art Goebel, Inc. v. North Suburban Agencies, Inc., 567 N.W.2d 511, 515 (Minn. 1997). Whether a contract is ambiguous is a question of law and "depends, not upon the words or phrases read in isolation, but rather upon the meaning assigned to the words or phrases in accordance with the apparent purpose of the contract as a whole." Id.

News asserts that Paragraph 9 of the Settlement Agreement unambiguously prohibits any attempt to assert or introduce into evidence pre-release underlying facts and conduct that supported those claims defined as "Released Matters" when asserting a new claim in this case.

The Settlement Agreement defines in broad terms the matters that were being released, including "any and all manner of actions and causes of action, suits, debts, obligations, contracts, torts, covenants, claims" in "law or in equity, known or unknown, of any kind or character, from the beginning of time up to

7

the date of this Agreement."  (Wind Decl., Ex. 1 at ¶ 9.)  Insignia further agreed

to the following:

> Each of Plaintiff and the Plaintiff Released parties further promises,
> covenants and agrees not to sue, attempt to introduce as evidence, or
> otherwise assert any of the Released Matters and/or the underlying facts or
> conduct supporting the Released Matters against the Defendant or the
> Defendant Released Parties in any court, governmental or regulatory body
> or other proceedings.

(Id.)

News asserts this covenant has two parts.  First, it reaffirms that Insignia

cannot sue and pursue the claims that were the subject of Insignia I and other

"Released Matters."  Second, the provision bars Insignia in any post-settlement

litigation or proceeding from "attempt[ing] to introduce into evidence, or

otherwise assert[ing] any of the . . . underlying facts or conduct supporting the

Released Matters . . ."  (Id.)   Insignia is therefore barred from proving its current

claims on facts or conduct that supported the Released Matters.

Insignia offers a different interpretation of the covenant not to sue.  It

argues the covenant only prevents it from asserting facts or conduct "supporting

the Released Matters."  By using the present participle of "supporting"- a breach

of the covenant would involve only those facts or conduct that "presently"

support the Released Matter.  Insignia argues that News's interpretation would

8

effectively re-write this provision to preclude Insignia from asserting any facts or conduct that "concerned" or "related to" the Released Matters, even though the provision was written to address only those facts and conduct "supporting" and "underlying" Release Matters.

Further, Insignia argues that News's interpretation renders superfluous the provision's use of "underlying" and "supporting."  To avoid rendering either term superfluous, any breach would require the assertion of facts both "underlying" **and** "supporting" the Released Matters.  As applied here, the inclusion of pre-2011 facts and conduct might be said to underlie Released Matters, but the inclusion of such facts and conduct in the current Complaint seeking to remedy post-settlement antitrust violations do not also support the Released Matters.

The Court rejects Insignia's interpretation that by using the participle "supporting" the parties meant the covenant not to sue applied exclusively to the claims that had already been extinguished.  Instead, the Court finds the language is clear that the phrase –  "any of the . . . underlying facts or conduct supporting the Released Matters" – serves to identify the facts and conduct that could not be recycled in a future case, not to limit the covenant's application to a case that was

already over.  The covenant not to sue is forward-looking, which was made clear

by the language that it applied in "any court."  The Court finds Insignia's

interpretation is not reasonable because it would render the covenant not to sue

meaningless.

### B.  Whether the Covenant Not to Sue Is Enforceable

Insignia argues that as a matter of law, News has no actionable breach of

contract claim to assert.  It argues that courts have rejected breach of contract

counterclaims similar to the claim News has asserted in this case.  See Bukuras v.

Mueller Group, LLC, 592 F.3d 255, 267 (1st Cir. 2010) (rejecting defendant's

attempt to bring an independent claim for breach of release provision in

severance agreement in order to recoup the costs of defending itself in litigation,

because waivers and releases are usually affirmative defenses on which the

employer bears the burden); see also, Karnes v. Quality Pork Processors, 532

N.W.2d 560, 563 (Minn. 1995) ("A release is an affirmative defense to a cause of

action, and the validity of a release is a matter for the trial court.").

Insignia further argues that covenants not to sue primarily serve as a

shield, rather than a sword, and that "sufficient effect is given the usual covenant

not to sue if, in addition to its service as a defense, it is read as imposing liability

only for suits brought in obvious breach or otherwise in bad faith." Artvale, Inc. v. Rugby Fabrics Corp., 363 F.2d 1002, 1008 (2d Cir. 1966); see also Growblox Scis., Inc. v. GCM Admin. Servs., LLC, 14-cv-2280, 2016 WL 1718388, at *5-7 (S.D.N.Y. Apr. 29, 2016).

The Court finds that the cases Insignia relies on concern counterclaims founded on releases rather than covenants not to sue. See Bukuras, 592 F.3d at 266; Karnes, 532 N.W.2d at 562-63; Kunza v. St. Mary's Regional Health Ctr., 747 N.W.2d 586, 591 (Minn. Ct. App. 2008). As explained in Kunza, "a release and a covenant not to sue are differing types of instruments with different legal consequences." 747 N.W.2d at 591.

> A release has been defined as a relinquishment, concession, or giving up of a right, claim, or privilege, by the person in whom it exists, to the person against whom it might have been enforced. A release may, dependent upon its terms, have the effect of extinguishing a right of action, and if so, it may be pleaded as a defense to any suit on the action. However, it is a well-established rule that a covenant not to sue does not constitute a satisfaction but merely an agreement not to enforce an existing cause of action against the party to the agreement . . .

Id. A covenant not to sue is an affirmative undertaking, that is capable of breach just as with any contract, therefore News's counterclaim is an actionable claim for breach of the Settlement Agreement. See e.g., Lansing v. Wells Fargo Bank, N.A., 894 F.3d 967, 972 (8th Cir. 2018) (affirming district court's grant of

judgment on the pleadings based on enforceable settlement agreement that contained a covenant not to sue); <u>Pinnacle Pizza Co., Inc. v. Little Caesar Enterprises, Inc.</u>, 598 F.3d 970, 981-82 (8th Cir. 2010) (affirming the district court's grant of summary judgment on a counterclaim that asserted breach of a mutually agreed upon covenant not to sue in a franchise agreement).

Insignia further argues that if the Settlement Agreement is enforced, it will not be able to make basic foundational points, and the jury would then operate behind a veil of ignorance. The Court finds, however, that the covenant not to sue does not bar general background information, it only bars Insignia from asserting underlying facts or conduct that supported the Released Matters to prove its current claims.

Insignia further argues that News had previously attempted to exclude pre-settlement agreement conduct in other litigation and was unsuccessful. The Court finds, however, that cases cited for this argument, <u>Insignia I</u> and <u>Valassis II</u>, are distinguishable.

The 2002 Settlement Agreement at issue in <u>Insignia I</u> only involved a release from claims; it did not include a covenant not to sue.  (Civil No. 04-4213 [Doc. No. 833] (Order dated February 4, 2011 at 2).)[1]

The 2010 Settlement Agreement at issue in the <u>Valassis II</u> did include a covenant not to sue which barred "Claims or allegations made, or which could have been made, by Plaintiff in the Litigation."  ([Doc. No. 223] Moen Decl., Ex. 12 at ¶ 6.)  By its terms, that covenant did not include language that barred the assertion of facts and conduct underlying the released claims in future proceedings, as does the covenant at issue here.

Insignia also cites to two decisions in the <u>Valassis II</u> litigation to argue any pre-settlement facts and conduct are admissible as background information.  (Ex. 11 (2019 Order Denying News's Motion for Summary Judgment at 4 n.2); Ex. 13 (2019 Valassis Hearing Tr. at 41).)  Contrary to Insignia's arguments, however, the court made clear there was room for pre-settlement evidence as background

---

[1] Insignia further argues that in <u>Insignia I</u>, Judge Tunheim denied News's attempt to exclude all pre-2002 settlement conduct at trial.  While Judge Tunheim did deny News's motion to exclude, he nonetheless held "to prevent abuse of this ruling, the Court may require the parties, when introducing evidence that came into existence prior to the date of the Release, to demonstrate how it is not related to the claims asserted in the prior litigation, but is related to the instant litigation."  (<u>Id.</u> at 4.)

information only, not that the current claims could be based on pre-settlement

conduct.  (Id.)

Finally, the Court finds that public policy is not served by judicial override

of the unambiguous language in the Settlement Agreement that ended seven

years of litigation in Insignia I.  Instead, public policy favors settlement and

compromise of litigation.  United States v. Pfizer Inc., 560 F.2d 319, 322-23 (8th

Cir. 1977); Keller v. Wolf, 58 N.W.2d 891, 894 (Minn. 1953).

## C.    Allegations at Issue

News argues that the allegations in the Insignia I complaint are similar to

those in the Complaint filed in this action.  In addition to the same claims of

monopolization and vertical restraints such as exclusivity, Insignia relied on the

same testimony it had marshaled in the prior case, with one difference: except for

the allegations dated 2018-19, the allegations in the Complaint are not dated at

all.  News argues that one familiar with the prior action would recognize that the

Complaint here is rooted in facts and conduct that predated and were underlying

the claims released in the Settlement Agreement.  For example, in paragraph 3 of

the Complaint, Insignia alleges "News frankly and repeatedly acknowledged

that it has sought to build contractual barriers to make it unlawfully difficult for

competitors to compete," and asserts various undated quotes and testimony to demonstrate these "frank" and "repeated acknowledgements."  News asserts that this same "evidence" was quoted in the Complaint filed in <u>Dial Corp. v. News Corp.</u>, Case No. 1:13-cv-6802 (S.D.N.Y.).  The same counsel that represents Insignia in this case represented the <u>Dial</u> plaintiffs, and significantly, dates were not deleted in the <u>Dial</u> case because the <u>Dial</u> plaintiff was not bound by the 2011 Settlement Agreement.

Following the completion of expedited discovery, News asserts it is clear that the allegations of an anticompetitive scheme asserted in this case rests on facts and conduct underlying the Released Matters.

### 1.      Acknowledgements by News Executives

The Complaint pleads five acknowledgements by executives that its contracting practices were part of an anticompetitive scheme.

In paragraph 3, Insignia alleges that the unlawful scheme behind the contracting practices is visible in the undated assertion that "a former News America Marketing, Inc. chairman . . . vowed to 'destroy' News's competitors." Insignia now admits it relied on that statement in 2009 to support its claims in the prior action.  (Wind Decl., Ex. 15 (Insignia's Amended Responses to Requests

15

for Admission at 2-3).)  In addition, Insignia's current lead counsel's firm

represented the plaintiffs in <u>Dial</u> and relied on the <u>Dial</u> Complaint in drafting the

Complaint at issue here.  (<u>Id.</u> Ex. 15 (Plaintiff's First Amended Objections and

Responses to Defendants' First Set of Requests for Admission at 2-4), Ex. 17

(Plaintiff's Responses and Objections to Defendants' First Set of Interrogatories at

6-7, 12, 17-22, 24, 26-29, 31, 33-34).)  Insignia's lawyers now concede that in <u>Dial</u>

they quoted the same alleged statement of anticompetitive purpose asserted in

paragraph 3 and attributed the statement to a trade article published in 2004,

which reported the statement was made in 1999.  (<u>Id.</u> Ex. 6 (Glancy Dep. at 32-

33); Ex. 15 (Plaintiff's First Amended Objections and Responses to Defendants'

First Set of Requests for Admission at 2).)

     In support of the claim that News developed an exclusive, national

network of retail chains in order to control a large percentage of the ISP's and to

forestall competition, Insignia cites to a statement by a former News account

manager that "100 percent of his retail accounts in the southeast United States

had exclusivity clauses."  (Comp. ¶ 31.)  As Insignia now admits, that account

manager's testimony was cited on Insignia's trial exhibit list in the prior action.

(<u>Id.</u> Ex. 15 (Plaintiff's First Amended Objections and Responses to Defendants'

First Set of Requests for Admission at 3).)  Insignia has also admitted that its

counsel cited the source and 2009 date of the testimony in the <u>Dial</u> action.  (<u>Id.</u>

Ex. 15 (Plaintiff's First Amended Objections and Responses to Defendants' First

Set of Requests for Admission at 3); Ex. 16 (Amended Complaint in <u>The Dial</u>

<u>Corporation v. News Corporation, et al.,</u> No. 1:1-cv-6802-WHP (E.D. Mich. April

8, 2014 at ¶ 76).)  Insignia's corporate designee concedes that Insignia has no

source for paragraph 31 other than the testimony from 2009, which was

marshaled by Insignia in support of its claims in the prior action.  (<u>Id.</u> Ex. 6

(Glancy Dep. at 89-90).)

      To demonstrate that the broad language in News's exclusivity provisions

is part of an anticompetitive scheme, Insignia attributes another undated

statement to a former News COO:  "the aggressive tactic" of broad exclusivity

language should be deployed and "if there was any one who was a bed-wetting

liberal [and] concerned about doing the right thing, they should exit the

company."  (Comp. ¶ 35.)  Insignia now admits that same testimony was cited in

Insignia's brief opposing summary judgment in the prior action.  (<u>Id.</u> Ex. 18

(Insignia Memo. In Opp. To Summary Judgment at 33-34 (attributing "bed-

wetting" statement to Mr. Carlucci from the spring of 2001)).)  Further, in the

<u>Dial</u> action, Insignia's counsel was specific about the sourcing of the statement.

(<u>Id.</u> Ex. 16 (<u>Dial</u> Comp. at ¶¶ 82-83).)  Finally, Insignia's corporate designee

testified to no basis for this statement other than the one made in 2001.  (<u>Id.</u> Ex. 6

(Glancy Dep. at 105-06).)

Paragraphs 42 and 43 refer to statements attributed to News executive

Martin Garofalo, allegedly acknowledging the anticompetitive purpose and

effect of staggering contract dates.  The paragraphs do not contain dates, but the

dates of these statements were included in its brief in opposition to summary

judgment in the prior action.  (<u>Id.</u> Ex. 18 at 12-13 (citing to Garofalo speaking

notes from July 2002).)  Insignia's corporate designee conceded that Insignia had

no source for these statements other than those referred to in the prior action.

(<u>Id.</u> Ex. 6 (Glancy Dep. at 125-26, 131, and 144).)

**2.    Market Power and Exclusionary Contracting Practices**

**a.    Unlawful Acquisition of Market Power: Paragraphs 2, 5, 24-25.**

In the Complaint, Insignia alleges that News acquired and maintained a

monopoly for over a decade.  The reference to "over a decade" necessarily

includes pre-2011 conduct and Insignia similarly alleged in <u>Insignia I</u> that News's

exclusionary contracts with retailers and CPGs created News's unlawful market

dominance.  (Id. Ex. 7 (Insignia I Complaint at ¶ 2).)  Insignia's corporate

designee confirmed that the allegations contained in paragraph 5 of the

Complaint assert conduct that preceded the 2011 Settlement Agreement.  (Id. Ex.

6 (Glancy Dep. at 34, 37-38).)

Paragraphs 24 and 25 allege that News has unlawfully acquired and

maintained market power in the relevant market by virtue of exclusionary

contracts and related uncompetitive conduct.  In Insignia I, Insignia claimed that

News had already acquired its monopoly position through exclusionary

contracts.  (Id. Ex. 7 (Insignia I, at ¶¶ 20-22, 56, 116).)  Insignia's corporate

designee confirmed that Insignia's position is that News unlawfully acquired

market power before 2011.  (Id. Ex. 6 (Glancy Dep. at 64).)

News asserts that while Insignia is free to plead claims that News

unlawfully acquired or maintained a monopoly after 2011, that is not what

Insignia has done.

**b.      Impact on Market Conditions: Paragraphs 9, 27-30.**

News asserts it is undisputed that in-store marketers must negotiate with

retailers and pay for the real estate for the ability to provide in-store services to

CPGs, that potential competitors must make investments in developing ISP

offerings and entering into retail distribution contracts before it can generate

revenue and that News has built the largest retail network.  Insignia does not

allege that News's payments to build its retail network are illegal, or that it is

illegal if Insignia is outbid.  Insignia nevertheless alleges that News's network of

retailers locks competitors out of a large share of the distribution they need to

compete.  News asserts this allegation is not new, as Insignia raised it in 2005.

(Wind Decl., Ex. 7 (Insignia I  at ¶ 53).)   Insignia's claim that News has a

stranglehold on the retailer distribution network is not new either, as the same

allegation was made in 2005.  (Id. at ¶ 20.)   While Insignia may plead and prove

unlawful acts based on facts and conduct after February 9, 2011 – the date of the

Settlement Agreement – Insignia has not done so with respect to these

allegations.

> **c.      Broad Exclusivity Provisions: Paragraphs 6, 33-35.**

Insignia further alleges in paragraphs 6, 33 and 34 that News's

exclusionary contracts contain a number of anti-competitive provisions.  The

allegations involving exclusionary contracts are "explained" in paragraph 35,

which includes reference to an undated quote from News's COO.  Insignia's

corporate designee confirmed this refers to a statement made in 2001.  (Id. Ex. 6
(Glancy Dep. at 99-101).)

### d.    Staggered Renewal Dates for Retail Contracts: Paragraphs 41-44.

Insignia alleges that News staggered expiration terms of its retail contracts
in order to erect barriers to entry for rivals.  (Comp. ¶ 41.)  This allegation and
the facts upon which it was based were asserted in Insignia I in opposition to
News's motion for summary judgment.  (Wind Decl., Ex. 18 (Mem. of Law in
Opp. To S.J. at 12-13, 47).)  The allegations in paragraphs 41 and 44 are based on
statements made in 2002.  (See Comp ¶¶ 42-43; Wind Decl., Ex. 6 (Glancy Dep. at
135).)

### e.    Right of First Refusal Provisions: Paragraphs 7, 36 and 38.

Insignia further alleges that News's right of first refusal provisions have
effectively afforded News exclusivity and have eliminated bargaining.  (Comp. at
¶¶ 7, 36 and 38.)  News argues that these allegations appear to be rooted in pre-
2011 conduct.  In 2005, Insignia alleged that News insisted on the contractual
right of first refusal, and the Settlement Agreement expressly forbade the parties
from enforcing rights of first refusal and provided a remedial scheme in the

event of such a breach.  (Wind Decl., Ex. 1 (Settlement Agreement at ¶¶ 3 and 7).)

Insignia's corporate designee conceded that it never availed itself of the right to

seek relief for any breach in the years after the Settlement Agreement was

entered into.  (Wind Decl., Ex. 6 (Glancy Dep. at 182).)  When asked for post-2011

examples of such breaches, the designee could cite to only what was

characterized as something similar to a right of first refusal.  (Id. at 118-120.)  The

designee further testified that she has never seen a right of first refusal in one of

News's contracts post-2011 and no one at Insignia informed her that News had

enforced a right of first refusal.  (Id. at 167-68.)

> **f.     Long Term Contracts with Automatic Rollovers:
> Paragraph 40.**

Insignia alleges that News employs automatic rollovers to make contracts

effectively long term.  (Comp. ¶ 40.)  This allegation was made in 2005, and there

is no mention of such conduct continuing after 2011, other than speculation.  (See

Wind Decl., Ex. 6 (Glancy Dep. at 122 (conceding that she had no information a

particular contract was extended through an automatic rollover or whether the

retailer simply chose to negotiate a series of extensions).)

### D.      Whether Allegations Breach Settlement Agreement

The primary claim against News in this action is that News violated the

antitrust laws by monopolizing the in-store promotions market through

pervasive anticompetitive strategies including exclusionary agreements as well

as other illegal conduct.  (Comp. ¶ at 1 and 2.)  Vertical restraints such as

exclusivity, right of first refusal and other non-price restraints between a service

provider and a retailer are not prohibited by law; they are governed by the Rule

of Reason.  See Continental T.V., Inc. v. GTE Sylvania, Inc., 433 U.S. 36, 57-59

(1977); Business Electronics Corp. v. Sharp Electronics Corp., 485 U.S. 717, 735-36

(1988); see also Double D Spotting Serv., Inc v. Supervalu, Inc., 136 F.3d 554, 559

(8th Cir. 1998) ("Vertical nonprice restrictions are governed by the rule of reason

and are not per se violations, because they 'promote interbrand competition by

allowing the manufacturer to achieve certain efficiencies in the distribution of his

products.'")

News argues that because the vertical restraints used by News are not per

se illegal, Insignia must allege that News's contracting practices be viewed as

part of an admitted anticompetitive scheme to injure competition itself and that

News has already admitted the scheme as alleged in paragraph 3 of the

Complaint.

The Court finds that News has demonstrated that Insignia had asserted the

same contracting practices at issue in <u>Insignia I</u> and alleges in this case some of

the same evidence that it marshaled in <u>Insignia I</u> and that its lawyers deployed,

and dated, in the <u>Dial</u> case.  In this case, however, Insignia has opted to exclude

from those allegations the relevant dates.  As the record demonstrates and

Insignia has admitted, the "acknowledgements" of an anticompetitive scheme

found in paragraphs 3, 31, 35, 42 and 43 of the Complaint all rest exclusively on

pre-2011 facts and conduct.  As a result, the inclusion of such allegations

represent a breach of the Settlement Agreement.

Also, as Insignia admits, the pre-2011 allegations are crucial to proving the

current claims.  (Wind Decl., Ex. 3 (Tr. Jan. 14, 2020 Hr'g on cross motions for

judgment on the pleadings at 73).)  A case built on vertical restraints in retail

contracts leading to lost business is not going to succeed without the critical

pleading and proof that these contractual terms have been deployed as part of a

scheme to injure competition.  <u>See</u> <u>Atlantic Richfield Co. v. USA Petroleum Co.</u>,

495 U.S. 328, 338 (1990) ("The antitrust laws were enacted for 'the protection of

competition, not competitors.'"). News has demonstrated that the pre-2011 facts and conduct are not mere context; they serve a critical role in creating the appearance of an antitrust case arising out of lawful business practices.

Based on the record, files and proceedings herein, the submissions of the parties, and its review of the allegations set forth in the Complaint, the Court finds that News has demonstrated that Insignia has breached Paragraph 9 of the Settlement Agreement by alleging facts and conduct underlying and supporting the Released Matters as part of their claims of anticompetitive conduct for post-2011 claims.

Insignia argues that News has not demonstrated that it has suffered any harm as a result of the breach. The Court disagrees. News has sufficiently demonstrated that its litigation costs have increased as a result of the breach, and that the scope of this lawsuit will change significantly once the covenant not to sue is enforced.

### E.     Whether Dismissal of Complaint Is Appropriate.

News asks that if the Court grants its motion for summary judgment on its counterclaim, the proper remedy is dismissal of the complaint that embodied the breach without prejudice to Insignia's ability to re-plead consistent with Rule 11.

The Court finds the appropriate remedy in this case is to strike those allegations that are clearly based on pre-2011 settlement conduct.  In some instances, however, the record is not yet clear that all of the allegations identified by News in its current motion are based solely or substantially on pre-2011 settlement facts and conduct underlying the Released Matters.  Whether or not Insignia is able to prove, for example, that News employed overly broad exclusivity language in their contracts as part of an anticompetitive scheme based on post-2011 facts and conduct is best addressed at summary judgment once discovery is closed.  Accordingly, the Court will order Insignia to file an Amended Complaint within seven days from the date of this Order, striking those allegations identified below.

News also asks that the Court order Insignia to reimburse News for the fees they have already incurred in enforcing paragraph 9 of the Settlement Agreement.  See 3M Innovative Props. Co. v. Barton Nelson, Inc., Civ. No. 02-3591, 2004 WL 1278672 (D. Minn. June 6, 2004) (finding attorneys' fees and costs were the measure of damages for breach of covenant not to sue, but that fact issues remained as to whether parties intended for attorneys' fees to be a recoverable measure of damages).

Pursuant to the American Rule "absent statute or enforceable contract, litigants pay their own attorneys' fees." <u>Alyeska Pipeline Serv. Co. v. Wilderness Society</u>, 421 U.S. 240, 257 (1975).  Minnesota law similarly provides that attorneys' fees and costs are not recoverable in litigation unless there is a specific contract permitting them or a statute authorizing such recovery.  <u>Ly v. Nystrom</u>, 615 N.W.2d 302, 314 (Minn. 2000) (citations omitted).  Here, the Settlement Agreement does not explicitly provide for such damages in the event of a breach.

Minnesota does recognize exceptions to the American Rule, such as the third-party litigation exception.  <u>Kallok v. Medtronic, Inc.</u>, 573 N.W.2d 356, 363 (Minn. 1998).  Other courts have taken different approaches to the issue of whether attorneys' fees are recoverable as damages in cases involving a breach of a covenant not to sue.  <u>See</u> <u>Pinnacle Pizza Co., Inc. v. Little Caesar Enters.</u>, 04-4170, 2008 WL 11505713 at *4 (D. S.D. Dec. 3, 2008).  In one line of cases, courts have found attorneys' fees are recoverable for an action filed in a breach of a covenant not to sue.  <u>Id.</u> (citing <u>Anchor Motor Freight, Inc. v. Int'l Brotherhood of Teamsters Local Union No. 377</u>, 700 F.2d 1067, 1072 (6th Cir. 1983)).  Another line of cases recognizes an exception to the American Rule if the breach is obvious or made in bad faith, <u>id.</u> (citing <u>Artvale</u>, 363 F.2d 1002, 1008), while other courts

27

have declined to award attorneys' fees as damages for a breach of covenant not

to sue, <u>id.</u> (citing cases).

Regardless, the Court finds that News's request for attorneys' fees and

costs is premature.  As in the <u>3M Innovative Props. Co.</u> case, News's claim for

attorneys' fees and costs is the alleged measure of damages for Insignia's breach

of the covenant not to sue, yet there are fact questions as to whether the parties

contemplated the recovery of such damages when they entered into the

Settlement Agreement and whether Insignia breached the covenant not to sue in

bad faith.

**IT IS HEREBY ORDERED**:

1.  Defendants Motion for Summary Judgment on the Counterclaim [Doc.

    No. 193] is **GRANTED in part and DENIED in part** as set forth in this

    Memorandum Opinion and Order.  Within seven (7) days from the date

    of this Order, Plaintiff shall file an Amended Complaint with the

    following allegations stricken:

    a.  Paragraph 2, "For over a decade";

    b.  Paragraph 3, the last sentence;

      c.  Paragraph 5, "In the intervening decade since the antitrust

          litigation began";

      d.  Paragraph 31, the last sentence;

      e.  Paragraphs 35, 42, 43, in their entirety; and

      f.  Paragraph 40, the last sentence.

2.  Plaintiff's Motion for Partial Summary Judgment [Doc. No. 201] is

**DENIED.**

Date:  December 7, 2020                   s/ Michael J. Davis
                                                  Michael J. Davis
                                                    United States District Court