## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| INSIGNIA SYSTEMS, INC., <br><br>            Plaintiff, <br><br>     v. <br><br> NEWS CORPORATION, <br> NEWS AMERICA MARKETING FSI L.L.C., and <br> NEWS AMERICA MARKETING IN-STORE SERVICES L.L.C., <br><br>          Defendants. | Case No.: 19-cv-1820 <br><br><br><br> **JURY TRIAL DEMANDED** |

## AMENDED COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

## TABLE OF CONTENTS

NATURE OF THE ACTION ...................................................................................................... 1

PARTIES ..................................................................................................................................... 3

JURISDICTION AND VENUE ................................................................................................. 4

FACTUAL ALLEGATIONS ..................................................................................................... 4

   I. OVERVIEW OF THE THIRD-PARTY ISP MARKET ......................................................... 4

      A.   The Relevant Product Market for Third-Party ISPs ....................................................... 4

      B.   The Relevant Geographic Market for Third-Party ISPs ................................................. 6

      C.   News's Market Power in the Third-Party ISP Market ..................................................... 6

   II. NEWS'S MONOPOLIZATION OF THE RELEVANT MARKET ..................................... 8

      A.   Exclusionary Contracts Denying Competitors Access to Distribution ........................... 8

      B.   Practices Enhancing Competitor Exclusion from Distribution ..................................... 11

      C.   Exclusionary Contracts Denying Competitors Substantial Access to CPGs ................ 13

      D.   Practices Suppressing Competitor Access to CPGs ...................................................... 14

INJURY TO COMPETITION .................................................................................................. 14

COUNT I .................................................................................................................................. 16

COUNT II ................................................................................................................................. 17

COUNT III ................................................................................................................................ 18

COUNT IV ................................................................................................................................ 18

COUNT V .................................................................................................................................. 20

COUNT VI ................................................................................................................................ 20

COUNT VII ............................................................................................................................... 21

COUNT VIII .............................................................................................................................. 22

COUNT IX ................................................................................................................................ 23

PRAYER FOR RELIEF ........................................................................................................... 23

JURY DEMAND ...................................................................................................................... 24

Plaintiff Insignia Systems, Inc. brings this action under Sections 1 and 2 of the Sherman Antitrust Act, and certain state laws, against Defendants News Corporation, News America Marketing FSI L.L.C., and News America Marketing In-Store Services L.L.C. (collectively, "News" or "NAM") for actual damages, treble damages, declaratory and injunctive relief, costs of suit, pre- and post-judgment interest, and other relief, and alleges as follows:

## NATURE OF THE ACTION

1.      News and Insignia are third-party providers of in-store promotion products and services ("ISPs") sold to consumer-packaged-goods companies ("CPGs") for placement in retail grocery stores, drugstores, and dollar stores.  News's pervasive anticompetitive strategies in this market have violated the antitrust laws of the United States and Minnesota.

2.      News has acquired and maintained a monopoly in this market through exclusionary agreements with retailers and CPGs and other illegal conduct as further described below and will be revealed in discovery.

3.      The unlawful purpose behind News's anticompetitive conduct could not have been more transparent.  News frankly and repeatedly acknowledged that it has sought to build contractual barriers to make it unlawfully difficult for competitors to compete.

4.      News is no stranger to antitrust scrutiny.  It has been sued at least five times by its competitors, and by a class of its CPG customers, and has paid over $930 million in settlements to date.  Why does News continue to engage in illegal conduct despite these lawsuits?  Because it is extremely lucrative.

1

5.      News's market share has grown from 84 to 97 percent.  Its annual revenue from the relevant market has grown from approximately $391 million to almost $440 million.  The number of its competitors has shrunk from 12 to 1—Insignia.  News's unlawful monopoly has not been reigned in but in fact has become even more severe.  As the exclusionary contracts with retailers and CPGs that first created News's unlawful market dominance continue, News's monopoly has actually been emboldened.

6.      News's exclusionary contracts have achieved this goal through a number of anticompetitive provisions.  News's contracts often define exclusivity in such overly broad terms as "shelf messaging" or "general advertising" that News could, in essence, preclude any competitor's product from placement with a major retailer regardless of whether that product existed at the time the retailer agreed to exclusivity and regardless of whether News offers a comparable product.

7.      In other cases, News has employed right-of-first-refusal or delayed rollout provisions that have effectively afforded News exclusivity.  In 2019, for example, News torpedoed late-stage negotiations between Insignia and a major retailer on a distribution contract by exercising its right-of-first refusal in bad faith.  Further, News has engaged in automatic rollovers that automatically extend the contracts past the initial term unless the retailer provides sufficient notice prior to the original termination date.

8.      Moreover, among other retaliatory tactics, News has repeatedly and unjustifiably threatened breach of contract litigation against retailers and CPGs in bad faith.

9.      As a direct result of News's exclusionary contracts and other anticompetitive conduct, existing News competitors have been shut out and potential new competitors have

been effectively blocked from entry.  This is the exact type of injury antitrust laws were designed to prevent and flow from the competition-reducing aspects of News's conduct. Insignia, specifically, has been substantially foreclosed from selling ISPs to the vast majority of CPGs.  This has caused Insignia to incur lost sales and profits, higher costs, loss of good will, and a substantial decline in the value of its publicly traded stock.

## PARTIES

10.     Plaintiff Insignia Systems, Inc. is a Minnesota corporation with its principal place of business in Brooklyn Park, Minnesota.  It sells in-store marketing products and services to retailers and consumer packaged goods manufacturers.

11.     Defendant News Corporation is a Delaware corporation with its principal place of business in New York, New York.

12.     Defendant News America Marketing FSI L.L.C. is a Delaware limited liability company with its principal place of business in New York, New York.  News America Marketing FSI L.L.C. is a wholly owned subsidiary of News Corporation.

13.     Defendant News America Marketing In-Store Services L.L.C. is a Delaware limited liability company with its principal place of business in New York, New York. News America Marketing In-Store Services L.L.C. is a wholly owned subsidiary of News Corporation.

14.     News Corporation sells in-store marketing products and services to retailers and consumer packaged goods manufacturers through its marketing unit, News America Marketing.  News America Marketing FSI L.L.C. and News America Marketing In-Store

Services L.L.C. are a part of the News America Marketing unit and are responsible for managing the sales of the in-store marketing products and services for News Corporation.

## JURISDICTION AND VENUE

15.    This Court has subject matter jurisdiction under 28 U.S.C. §§ 1337 (commerce and antitrust regulation) and 1331 (federal question), as this action arises under Sections One and Two of the Sherman Act, 15 U.S.C. §§ 1, 2.  This Court has jurisdiction over the state-law claims under 28 U.S.C. § 1367 (supplemental) and § 1332 (diversity).

16.    Venue is proper within this judicial district as provided in 28 U.S.C. § 1391(b) and (c).

17.    Each Defendant has transacted a substantial amount of business in this district.  The conduct complained of occurred in part in this judicial district, the harm caused by News's anticompetitive and tortious conduct occurred in substantial part within this judicial district, and each party is found within this judicial district.

18.    News's activities have been within the flow of interstate commerce of the United States.  News's activities were intended to and have had a substantial effect on the interstate commerce of the United States.

## FACTUAL ALLEGATIONS

## I.  OVERVIEW OF THE THIRD-PARTY ISP MARKET

### A.  The Relevant Product Market for Third-Party ISPs

19.    The relevant product market is the sale of third-party ISPs.  In this market, CPGs contract with third-party providers, such as News and Insignia, to create and place

ISPs in retail grocery stores, drugstores, and dollar stores.  Third-party providers contract with retailers to gain access to their aisle space.

20.     The product market consists of all in-store products sold by third-party providers to CPGs in order to influence the purchasing behavior of customers in the United States while they are in the process of shopping and before they get to the cash register. These products include print and electronic shelf signage, shelf coupon dispensers, end-of-aisle displays, freezer clings, floor signage, and shopping cart advertising, all designed to persuade shoppers to buy the product at the moment of decision.

21.     These products have a number of distinctive features that leave them without a reasonably interchangeable substitute.   Unlike out-of-store and post-purchase promotions, these products:

      a.  Attract customer attention at the moment of purchase decision;

      b.  Offer intrusive, more visible advertising in a clutter-free environment that the shopper must view;

      c.  Differentiate the brand at the shelf;

      d.  Help the customer comparison shop; and

      e.  Do not require customer action until time of product selection; and

      f.  Reach consumers who are actively shopping and more receptive to advertising.

22.     The product market does not include "trade promotion" arrangements where individual CPGs have contracts with individual retailers to promote their products.  In part, this segment of in-store advertising is distinct from the relevant third-party ISP product

market because such one-to-one relationships do not allow the CPGs to make pervasive and simultaneous national or regional promotional launches.  By contrast, a contract with a third-party provider like News can allow a single CPG to place advertisements across as many as 55,000 stores and multiple retail chains.

### B.   The Relevant Geographic Market for Third-Party ISPs

23.     The relevant geographic market is the United States and regional submarkets. CPGs purchase ISPs from News and Insignia for placement within retailers located in the United States.  News and Insignia contract with retailers for access to the retailers' stores located within the United States.

### C.   News's Market Power in the Third-Party ISP Market

24.     News has unlawfully acquired and maintained market power in the relevant market.  This market power is evidenced by direct or circumstantial evidence.

25.     As alleged herein News has demonstrated that, by virtue of its exclusionary contracts and related anticompetitive conduct, it has the power to exclude its competitors from substantial competitive opportunities.

26.     News also has an overwhelming share of the market and has erected barriers to competitive entry and expansion in order to protect its monopoly.  In 2009, News earned $391,792,000 of in-store annual revenues in the United States, which amounted to 84 percent of the market.  Its 12 competitors shared the remaining 16 percent of the market. In the intervening decade, despite the numerous lawsuits and settlements, News's market power has only increased and all but eliminated its competitors.  In 2019, it is projected that News will earn $439,760,000 of in-store annual revenues in the United States, which

will amount to 97 percent of the market.  Its only remaining competitor, Insignia, will have an approximate 3 percent share of the market.  Thus, today News is the only significant player in the relevant market.   This is an unheard of level of consolidation.

27.    News's monopoly is protected by multiple high and expensive barriers to entry and expansion.   To enter the market, a competitor must be able to offer retail distribution networks comparable to News's 55,000-store retail network in order to be an attractive alternative.   CPGs buy third-party ISPs as a sales tool that will put their promotions in front of millions of consumers nationwide.  CPGs are reluctant to contract with a third-party provider unless it can offer a national reach and has established contracts with retailers.  Thus, without a critical mass of retailers in its distribution network, a third-party provider cannot effectively compete with News or maintain any significant market share.

28.    As described below, News's contracts with retailers lock competitors out of a large share of the distribution they need to compete with News.  As of 2019, News controls 100 percent of the all commodity volume ("ACV") in drugstores and dollar stores. On information and belief, News's share of the ACV in grocery stores is at least 83 percent. ACV represents the total annual sales volume of retailers and quantifies the volume of products sold through retailers.  News's retail network contains a vast majority of the major grocery stores (Albertson's, Kroger, Safeway, Publix, Winn-Dixie), in addition to the totality of drugstores (CVS, Walgreen's, Rite Aid) and dollar stores (Dollar General, Family Dollar).

29.     Moreover, any potential competitor must make investments in developing ISP offerings and entering into retail distribution contracts well before it can generate any revenue.

## II.  NEWS'S MONOPOLIZATION OF THE RELEVANT MARKET

### A.  Exclusionary Contracts Denying Competitors Access to Distribution

30.     News's monopolization of the relevant market begins with its stranglehold on the retailer distribution network.  As CPGs, the purchasers in the relevant market, readily acknowledge, "to obtain the necessary nationwide coverage, CPGs have to deal with one middleman, News, the only vendor with pervasive national access to retail chains by virtue of its exclusive contracts."

31.     Internally, News has frankly acknowledged that it has sought to build contractual barriers to make it difficult for competitors to compete.  News developed this exclusive, national network of retail chains in order to control a large percentage of ISPs and to forestall competition.

32.     Throughout the statutory damage period, News has continued its practice of entering into exclusionary contracts with retailers.  These contracts have ensured that direct distribution in many of the nation's largest retailers remains out of reach for News's competitors.  News's retailer contracts have achieved this anticompetitive effect during the statutory period for at least four reasons.

33.     First, News's retailer contracts grant News exclusivity in terms that easily encompass the entire relevant market and more.  One retailer contract, for example, granted News exclusivity to "shelf messaging."  Another retailer contract granted News exclusivity

to "general advertising."  News's retailer contracts often take their exclusivity language a step further and prohibit retailers from using signage that is "substantially similar to any NAM Program" or "includes any mention or description of product features or benefits or any advertising claims."

34.     As a result of this overly broad language, News could, in essence, preclude any competitor's product from placement with a major retailer regardless of whether that product existed at the time the retailer agreed to exclusivity and regardless of whether News offers a comparable product.

35.     Second, even if News's retailer contracts do not expressly include exclusivity provisions, right-of-first-refusal provisions have effectively afforded News exclusivity.  By way of example, Insignia has led the industry in developing innovative digitally-integrated signage and coupon promotion signage.  These ISPs have been innovative because they encourage shoppers to interact with physical in-store signage through their smartphones and other related devices.

36.     In 2019, Insignia was in late-stage negotiations with a major retailer on a distribution contract for this signage. However, News swooped in to torpedo the deal. How?  News exercised existing right-of-first-refusal rights in bad faith to pressure the retailer to cancel the deal, even though News did not have products and processes comparable to what Insignia was offering at the time of negotiations.

37.     News's right-of-first-refusal provisions have the purpose and effect of eliminating bargaining, discouraging innovation, and allowing News, a monopolist in the

relevant market, to profit from the ingenuity of its potential competitors without expending the necessary research and development costs.

38.     News's delayed rollout provisions have a similar effect.  News recently signed a contract with a major grocery chain that substantially limits the type and rollout of products that another third-party provider can display in that grocery chain.  Specifically, News's anticompetitive provision only permits the grocery chain to contract for signs with other third-party providers that comply with specific size requirements and contain a "call to action" on the sign.  The anticompetitive provision goes on to state that any signs that meet such a limiting requirement can only be rolled out on the delayed timeframe of 250 stores in the first quarter and 500 stores in the second quarter, never allowing a new provider to reach full scale until a full year after initiation.  On information and belief, News added this provision into the contract in bad faith after it became aware of the fact that the grocery chain was in late-stage discussions with Insignia to enter into a direct distribution contract.  This cap has not only precluded a competitor from offering a national product with this retailer in 2019, but it has also made the economics of any product rollout with this retailer difficult to sustain because of the limited return in the first year of service.

39.     Third, the duration of News's exclusivity rights under any of these provisions is effectively long-term.  News's retailer contracts regularly employ automatic rollovers that automatically extend the contracts past the initial term unless the retailer provides sufficient notice prior to the original termination date.  As a result, contracts with initial two- or three-year terms are extended by News for multiple years (without intervening competitive bidding under a request for proposal process).

40.     Fourth, News has intentionally staggered the expiration dates of its retailer contracts so that, in any given year, opportunities for competitors to expand and underbid News's monopoly distribution are limited.

41.     This practice has also strengthened the barriers to entry because it ensures that it will take a competitor many years to build up a network comparable to that of News and be able to compete on prices for a comparable range of services.

**B.   Practices Enhancing Competitor Exclusion from Distribution**

42.     News's anticompetitive control of distribution extends beyond the terms of its exclusionary contract with retailers.  News has also repeatedly and unjustifiably threatened breach of contract litigation against retailers who explore direct relationships with News's competitors.  In 2018, for example, News threatened breach of contract litigation against a major grocery chain soon after News realized that the grocery chain was engaged in late-stage negotiations with Insignia.

43.     News has also repeatedly and unjustifiably threatened retaliatory conduct against retailers who explore direct relationships with News's competitors.  By way of example, in January 2019, a major drugstore circulated a request for ISP proposals that it stated could be a "multi-vendor solution"—in other words, the retailer expressly contemplated partnering with multiple ISP providers.  In response to the drugstore's request, Insignia submitted a proposal and was selected a finalist.  News was made aware of Insignia's selection and soon after, Insignia's proposal was rejected by the drugstore despite the fact that Insignia had received positive feedback on its most recent proposal presentation.

44.     When pressed for an explanation, a drugstore representative revealed that News had unjustifiably threatened the drugstore in bad faith with an unjustifiable withdrawal of News's contractual obligations if it moved forward with Insignia. The representative added that, while he did not understand the contractual basis for the threat, the drugstore nevertheless rejected Insignia's proposal because it could not risk damaging its relationship with News.

45.     On information and belief, News's unlawful threat was in direct conflict with the drugstore's understanding of its distribution contract with News. News's unlawful threat was also in direct conflict with the retailer's initial proposal, which made clear that the retailer was ready and able to work with multiple third-party providers offering different products.

46.     During the statutory period, News has demonstrated that when a competitor tries to compete for a particular retailer distribution contract, News will not only take unlawful action to preclude the competitor's contract with that particular retailer, it will also take unlawful retaliatory action to interfere with its competitors' potential contracts with other retailers.

47.     In 2018, for example, Insignia was in late stage negotiations with one major grocery chain to negotiate a contract that would expand its existing direct relationship, including the placement of Insignia's freshADS and innovative digitally-integrated signage and processes. As noted above, News did not offer the same range of products and processes at the time of the negotiations and was therefore not attempting to compete fairly. However, when News got word of the fact that Insignia was also in the final stages of

negotiations with a second major grocery chain for a similar direct relationship contract, News swiftly retaliated and tortiously interfered in Insignia's negotiations with both grocery chains. As a result of News's bad faith interference, both grocery chains abruptly halted negotiations with Insignia and entered into exclusionary contracts with News.

## C. Exclusionary Contracts Denying Competitors Substantial Access to CPGs

48.     Another aspect of News's monopolization in the relevant market is the significant amount of control it exerts over its competitors' access to the market's consumers, CPGs. Throughout the statutory damage period, News has entered into exclusionary contracts with CPGs that contain many of the same anticompetitive provisions seen in News's retailer distribution contracts.

49.     News's exclusionary CPG contracts are routinely extended for multiple years past the initial two- to three-year term through automatic rollover provisions. By way of example, one of News's largest CPG clients had a News contract effectively extending 10 years.

50.     On information and belief, during the statutory period, these contracts have also continued to contain the overly broad exclusionary language and rights-of-first refusal or requirements that have effectively shut out competitor's access to the market's consumers for years.

51.     The durability of these exclusionary contracts prevents and discourages competitors from providing vigorous price and quality competition for News in the relevant in-store market both prior to and during the statutory damage period.

52.     Thus, News has suppressed competition with exclusionary contracts at both ends of the distribution chain.  News's competitors are contractually blocked from serving many purchasers and, when they do secure accounts, their distribution is crippled.  This latter impairment in turn feeds back to further disadvantage News's competitors' ability to sell to CPGs because News's distribution network cannot be matched.

**D.  Practices Suppressing Competitor Access to CPGs**

53.     Finally, News has suppressed competitors' access to market consumers through anticompetitive conduct that interferes with Insignia's existing contracts with CPGs.  As with retailers, News has repeatedly and unjustifiably threatened breach of contract litigation against CPGs in bad faith.

54.     In 2018, for example, numerous CPGs were told by News that they were required to work with News and precluded from purchasing Insignia ISPs even though News knew that those CPGs also had existing contracts to purchase ISPs from Insignia.

55.     As another example, in 2019, News blocked another CPG from using an Insignia product because it alleged the product was "not approved" under News's contract with the CPG.  On information and belief, this alleged approval authority was in direct conflict with the terms of the CPG's contracts with News and Insignia.

## INJURY TO COMPETITION

56.     News's exclusionary contracts and other anticompetitive conduct has caused significant harm to competition in the third party in-store advertising and promotion market.  In 2019, News has foreclosed 97% of the relevant market and has no legitimate procompetitive justification for doing so.  Existing News competitors have been shut out

and potential new competitors have been effectively blocked from entry. The number of News competitors has gone from 12 to 1. This is the exact type of injury antitrust laws were designed to prevent and flow from the competition-reducing aspects of News's conduct.

57.    CPGs have been precluded from dealing with News's competitors, including Insignia, as a cost-effective alternative to News. Retailers have been forced to forego dealing with Insignia. Prices to CPGs for ISPs have increased and the output of ISPs to CPGs has decreased. News has increased prices to CPGs by passing on the costs of exorbitant cash payments News makes to retailers to maintain its monopolistic control of the retailer distribution channels. The quality of ISPs has been reduced and information about pricing has been restricted as a result of News's behavior. Introduction and adoption of innovative signage products and processes by competitors has been repeatedly stifled by News behavior.

58.    News's illegal activity has also harmed consumers who purchase goods at grocery stores, drugstores, and dollar stores by reducing price and quality competition in ISPs, restricting in-store advertising innovation and the types of information available to consumers, and causing CPGs to pay higher prices which are passed on to consumers. The ongoing illegal acts of News, unless enjoined, will continue to harm competition by raising prices, restricting output and lowering quality. Those effects are not offset by any procompetitive justifications.

59.    News's anticompetitive and predatory conduct has caused substantial harm and damage to Insignia's ISP business. Insignia has lost at least 4 percent of market share.

Insignia's economies of scale have been severely constrained.  As a third-party provider, Insignia is required to pay a retailer a flat fee for access to distribution.  Those flat fee payments have become less economical when Insignia has been limited in the type and timing of signage that it can place with retailers due to News's exclusionary contracts and other anticompetitive conduct.  Insignia's business has also been severely impacted as a result of News's bad faith and unjustifiable claims with CPGs and retailers.  Thus, as a result of all of News's unlawful conduct, Insignia has been severely damaged through lost sales and profits, higher costs, loss of good will, and a substantial decline in the value of its publicly traded stock.

## COUNT I

### Monopolization
### (Section Two of the Sherman Act)

60.     All foregoing paragraphs are incorporated herein by reference.

61.     News has monopolized the relevant market for the sale of third-party ISPs in the United States in violation of Section Two of the Sherman Act, 15 U.S.C. § 2.

62.     News has monopoly power in the relevant market.  News has willfully acquired or maintained monopoly power in this relevant market through exclusionary, predatory, and other unjustified business conduct, as opposed to a superior product, business acumen, or historic accident.  This monopoly power is protected by high barriers to competitive entry and expansion.

63.     News' exclusionary conduct has no legitimate procompetitive justification. News's use of exclusionary contracting and its other conduct enhancing competitive exclusion, taken as a whole, have unlawfully excluded or suppressed competition.

64.     News has injured competition and its suppression of competition has allowed it to unlawfully obstruct Insignia's ability to access retail distribution chains and offer competing services to CPGs, thereby diminishing Insignia's profits and value as an enterprise throughout the damage period in an amount to be determined at trial.

## COUNT II

### Attempted Monopolization
### (Section Two of the Sherman Act)

65.     All foregoing paragraphs are incorporated herein by reference.

66.     News has entered into exclusionary contracts and engaged in other exclusionary conduct with the specific intent of creating a monopoly in the relevant market for the sale of third-party ISPs in the United States.

67.     News's exclusionary conduct had no legitimate procompetitive justification. News's conduct gave it a dangerous probability of acquiring monopoly power.

68.     News has injured competition and its suppression of competition has allowed it to unlawfully obstruct Insignia's ability to access retail distribution chains and offer competing services to CPGs, thereby diminishing Insignia's profits and value as an enterprise throughout the damage period in an amount to be determined at trial.

## COUNT III

**Exclusive Dealing**
**(Sections One of the Sherman Act)**

69.   All foregoing paragraphs are incorporated herein by reference.

70.   With its exclusionary contracts with retail chains and CPGs, News has unlawfully restrained trade, in violation of Sections One of the Sherman Act, 15 U.S.C. § 1, in the relevant market for the sale of third-party ISPs.

71.   News has market power in the relevant market.   This market power is protected by high barriers to competitive entry and expansion.

72.   These exclusive contracts have no procompetitive justifications that could not be achieved through less restrictive alternatives.   Even if there were procompetitive benefits, the anticompetitive effects of these exclusive contracts would far outweigh any procompetitive benefits.   News's exclusive contracts have foreclosed at least 90% of the relevant market under Section One of the Sherman Act.

73.   News's exclusive contracts during the statutory damage period have injured and excluded competition.   As a consequence, News has unlawfully obstructed Insignia's ability to access retail distribution chains and offer competing services to CPGs, thereby significantly diminishing Insignia's profits and value as an enterprise throughout the damage period in an amount to be determined at trial.

## COUNT IV

**Conspiracy to Monopolize**
**(Sections Two of the Sherman Act)**

74.   All foregoing paragraphs are incorporated herein by reference.

75.     With its exclusionary contracts with retail chains and CPGs, News has conspired to monopolize, in violation of Section Two of the Sherman Act, 15 U.S.C. § 2, in the relevant market for the sale of third-party ISPs.

76.     News has conspired with retailers and/or CPGs with the specific intent of creating a monopoly in the relevant market for the sale of third-party ISPs in the United States. News has acted in furtherance of that conspiracy by entering into exclusionary contracts.

77.     News has market power in the relevant market.  This market power is protected by high barriers to competitive entry and expansion.

78.     These exclusive contracts have no procompetitive justifications that could not be achieved through less restrictive alternatives.  Even if there were procompetitive benefits, the anticompetitive effects of these exclusive contracts would far outweigh any procompetitive benefits.  News's exclusive contracts have denied News's competitors substantial competitive opportunities under Section Two of the Sherman Act.

79.     News's exclusive contracts during the statutory damage period have injured and excluded competition.  As a consequence, News has unlawfully obstructed Insignia's ability to access retail distribution chains and offer competing services to CPGs, thereby significantly diminishing Insignia's profits and value as an enterprise throughout the damage period in an amount to be determined at trial.

## COUNT V

**Tortious Interference
with Business Relationships or Expectancies with Retailers (Common Law)**

80.     All foregoing paragraphs are incorporated herein by reference.

81.     Insignia has business relationships with hundreds of retailers to whom Insignia paid or would have paid for access to the retailers' aisle space.

82.     Insignia also has reasonable business expectancies with dozens of retailers from whom Insignia proposes to purchase access to the retailers' aisle space.

83.     News is, and at all pertinent times was, aware of the relationships and/or expectancies between Insignia and these retailers.

84.     News has intentionally and unlawfully interfered with the relationships between Insignia and the retailers by the acts described above.

85.     News' actions have caused the retailers to terminate or alter their business relationships or expected relationships with Insignia.

86.     Retailers who have used and would otherwise continue to sell access to their aisle space to Insignia have been unlawfully coerced by News to sell aisle space to News.

87.     The termination of these business relationships and expectancies has caused significant financial harm to Insignia.

## COUNT VI

**Tortious Interference
with Contracts with CPGs (Common Law)**

88.     All foregoing paragraphs are incorporated herein by reference.

89.     Insignia, as described above, had contracts with dozens of CPGs to whom Insignia sells ISPs.

90.     News is, and at all pertinent times was, aware of the contracts between Insignia and these CPGs.

91.     News has intentionally and unlawfully interfered with the contracts between Insignia and the CPGs by the acts described above.

92.     News's actions were intended to, and did, interfere with Insignia's contracts with CPGs, causing their causing their disruption, termination, or other similar act.

93.     CPGs who have used and would otherwise continue to use Insignia as their ISP provider have been unlawfully coerced by News to disrupt, terminate, or otherwise not perform under their contracts with Insignia and to use News as their ISP provider.

94.     Insignia has suffered significant financial harm as a direct and proximate result of News' wrongful conduct.

## <u>COUNT VII</u>

**Monopolization**
**(Section 325D.52 of the Minnesota Antitrust Act)**

95.     All foregoing paragraphs are incorporated herein by reference.

96.     News has monopolized the relevant market for the sale of third-party ISPs in the United States in violation of Section 325D.52 of the Minnesota Antitrust Act, Minn. Stat. § 325D.52.

97.     News has monopoly power in the relevant market.  News has willfully acquired or maintained monopoly power in this relevant market through exclusionary,

predatory, and other unjustified business conduct, as opposed to a superior product, business acumen, or historic accident.  This monopoly power is protected by high barriers to competitive entry and expansion.

98.    News's exclusionary contracting and its other conduct enhancing competitive exclusion, including without limitation its agreements with CPGs and retailers, taken as a whole, have unlawfully excluded or suppressed competition.

99.    News has injured competition and its suppression of competition has allowed it to unlawfully diminish Insignia's profits and value as an enterprise throughout the damage period in an amount to be determined at trial.

100.    News's exclusionary conduct has no legitimate procompetitive justification.

## COUNT VIII

### Attempted Monopolization
### (Section 325D.52 of the Minnesota Antitrust Act)

101.    All foregoing paragraphs are incorporated herein by reference.

102.    News has entered into exclusionary contracts and engaged in other exclusionary conduct with the specific intent of creating a monopoly in the relevant market for the sale of third-party ISPs in the United States.

103.    News's conduct gave it a dangerous probability of acquiring monopoly power.

104.    News has injured competition and its suppression of competition has allowed it to unlawfully obstruct Insignia's ability to access retail distribution chains and offer

competing services to CPGs, thereby diminishing Insignia's profits and value as an enterprise throughout the damage period in an amount to be determined at trial.

## COUNT IX

### Exclusive Dealing
### (Sections 325D.51 and 325D.53 of the Minnesota Antitrust Act)

105.    All foregoing paragraphs are incorporated herein by reference.

106.    With its exclusionary contracts with retail chains and CPGs, News has unreasonably and unlawfully restrained trade in the State of Minnesota, in violation of Section 325D.53 of the Minnesota Antitrust Act, Minn. Stat. § 325D.53.

107.    News's exclusive contracts implemented prior to and during the statutory damage period have substantially injured competition and excluded competition in the State of Minnesota. As a consequence, News has unlawfully obstructed Insignia's ability to access retail distribution chains and offer competing services to CPGs, thereby significantly diminishing Insignia's profits and value as an enterprise throughout the damage period in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that:

A.    This Court declare that News's conduct constitutes:

    (1)    Violations of Sections One and Two of the Sherman Act, 15 U.S.C. §§ 1 and 2; and

      (2)      Violations of Sections 325D.51, 325D.52, and 325D.53 of the Minnesota Antitrust Act, Minn. Stat. §§ 325D.51, 325D.52 and 325D.53;

B.      This Court permanently enjoin Defendants and their agents and employees from continuing their unlawful actions set forth herein;

C.      Plaintiff recovers treble actual damages;

D.      Plaintiff recovers its reasonable attorneys' fees and costs as allowed by law;

E.      Plaintiff recovers pre-judgment and post-judgment interest at the highest rate allowed by law; and

F.      Plaintiff be granted such other and further relief as the Court deems just and equitable.

## JURY DEMAND

Plaintiff requests a trial by jury in this matter.

Dated: December 14, 2020      Respectfully submitted,

*/s/ S. Jamal Faleel*
BLACKWELL BURKE P.A.
Jerry W. Blackwell
Minnesota State Bar No. 186867
blackwell@blackwellburke.com
S. Jamal Faleel
Minnesota State Bar No. 320626
jfaleel@blackwellburke.com
431 South Seventh Street, Suite 2500
Minneapolis, MN 55415
Telephone: (212) 343-3200
Fax: (212) 343-3205

SUSMAN GODFREY LLP
William Christopher Carmody (*pro hac vice*)

24

New York State Bar No. 4539276
bcarmody@susmangodfrey.com
Arun Subramanian (*pro hac vice*)
New York State Bar No. 4611869
asubramanian@susmangodfrey.com
Mark Musico (*pro hac vice*)
New York State Bar No. 5238001
mmusico@susmangodfrey.com
Y. Gloria Park (*pro hac vice*)
New York State Bar No. 5477047
gpark@susmangodfrey.com
1301 Avenue of the Americas, 32nd Floor
New York, New York 10019
Telephone: (212) 336-3330
Fax: (212) 336-8340

Alejandra C. Salinas (*pro hac vice*)
Texas State Bar No. 24102452
asalinas@susmangodfrey.com
1000 Louisiana Street, Suite 5100
Houston, Texas 77002
Telephone: (713) 651-9366
Fax: (713) 654-6666

Rachel S. Black (*pro hac vice*)
Washington State Bar No. 32204
rblack@susmangodfrey.com
1201 Third Avenue, Suite 3800
Seattle, WA 98101
Telephone: (206) 516-3880
Fax: (206) 516-3883

NAPOLI SHKOLNIK PLLC
Hunter Shkolnik (*pro hac vice*)
New York State Bar No. 2031458
hunter@napolilaw.com
360 Lexington Avenue, 11th Floor
New York, New York 10017
Telephone: (212) 397-1000

*Attorneys for Insignia Systems, Inc*